UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

WILMINGTON TRUST, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE FOR MFRA TRUST 2015-1,

Plaintiffs

CIVIL ACTION

Docket No: 2:21-cv-00278-SDN

-versus-

VOLUME I

MELANIE B. HOWE AND HENRY W. HOWE IV,

Defendant

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on for BENCH TRIAL held before **THE HONORABLE STACEY D. NEUMANN,** United States District Court Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine, on the 16th day of December, 2025, at 8:47 a.m. as follows:

Appearances:

For the Plaintiffs: Reneau J. Longoria, Esquire

For the Defendant: John Z. Steed, Esquire

Michelle R. Feliccitti, RPR
Official Court Reporter

(Prepared from manual stenography and computer-aided transcription.)

## INDEX OF PROCEEDINGS

Testimony: (See below) Page:

## INDEX OF WITNESSES


| WITNESS: | Page: |
|---|---|
| Michael Paterno | |
| DIRECT EXAMINATION BY MS. LONGORIA | 21 |
| CROSS-EXAMINATION BY MR. STEED | 130 |
| CONTINUED RECROSS-EXAMINATION BY MR. STEED | 145 |
| Adam Diaz | |
| DIRECT EXAMINATION BY MS. LONGORIA: | 111 |
| CROSS-EXAMINATION BY MR. STEED | 115 |
| CONTINUED CROSS-EXAMINATION BY MR. STEED | 142 |
| REDIRECT EXAMINATION BY MS. LONGORIA | 143 |
| RECROSS-EXAMINATION BY MR. STEED | 144 |


## INDEX OF EXHIBITS


| Plaintiffs Exhibit No. | Description | Admitted |
|---|---|---|

| Defendants Exhibit No. | Description | Admitted |
|---|---|---|

| Joint Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | Warranty Deed conveying subject property to Henry Howe and Melanie Howe dated April 20, 2007 | 19 |
| 2 | Note to Challenge Financial Investors, Corp. By Melanie B. Howe and Henry W. Howe, IV, dated April 20, 2007, with endorsements | 19 |
| 3 | Mortgage to Mortgage Electronic Registration Systems, Inc. As nominee for Challenge Financial Investors Corp. By Melanie B. Howe and Henry W. Howe, IV, dated April 20, 2007 | 19 |
| 4 | Loan Modification Agreement dated July 20, 2010, between Melanie B. | 19 |

| | | |
|---|---|---|
| | Howe and Henry W. Howe, IV, and Mortgage Electronic Registration Systems, Inc.(MERS) | |
| 5 | Nationstar Welcome Letter to Henry W. Howe and Melanie B. Howe dated November 11, 2010 | 19 |
| 6 | Loan Modification Agreement dated July 21, 2011, between Melanie Howe and Henry Howe and Nationstar Mortgage LLC | 19 |
| 7 | Compliance Agreement by Henry W. Howe and Melanie B. Howe, executed July 30, 2011 | 19 |
| 8 | Assignment of Mortgage by MERS to Nationstar Mortgage LLC, dated March 1, 2013 | 19 |
| 9 | Loan Modification Agreement dated August 12, 2014, between Henry Howe and Melanie Howe and Nationstar Mortgage LLC | 19 |
| 12 | Assignment of Mortgage by Nationstar Mortgage LLC to MTGLQ Investors, L.P., dated January 17, 2017 | 19 |
| 13 | Inadvertent Second Assignment of Mortgage by Nationstar Mortgage, LLC to MTGLQ Investors, L.P. dated January 19, 2017 | 19 |
| 14 | Notice of Assignment, Sale, or Transfer of Ownership of Mortgage Loan to MTGLQ Investors, L.P. dated January 20, 2017 | 19 |
| 15 | Welcome Letter from Selene Finance to Henry Howe, IV, and Melanie Howe, dated March 1, 2017 and Modification Offer from Selene Finance dated June 29, 2017 | 19 |
| 16 | Loan Modification Offer by Selene Finance to Henry Howe, IV, and Melanie Howe, dated June 29, 2017 | 19 |
| 17 | Declaration of Fannie Mae | 19 |
| 18 | Letter by Selene Finance to Henry Howe, IV, and Melanie Howe, about the servicing of their loan transferring from Selene Finance to Fay Servicing, LLC dated August 15, 2017 | 19 |
| 19 | Welcome Letter from Fay Servicing, LLC to Henry W. Howe, IV, and Melanie B. Howe, dated September 11, 2017 | 19 |

| | | |
|---|---|---|
| 20 | Assignment of Mortgage by MTGLQ Investors, L.P., to Wilmington Trust, National Association, Not in Its Individual Capacity, but Solely as Trustee for MFRA Trust 2015-1, dated September 12, 2017 | 19 |
| 21 | Rescission of Inadvertent Second Assignment of Mortgage to MTGLQ Investors, L.P., dated December 5, 2017 | 19 |
| 22 | The 2024 Florida Statutes (including 2025 Special Session C), Title XXXVI, Chapter 607, Section 607.1432 Receivership or custodianship Florida Action Complaint | 19 |
| 23 | Florida Complaint for Declaratory Relief and Appointing Receiver for Challenge Financial Investors Corporation, by Wilmington Trust, National Association, not in Its Individual Capacity, but Solely as Trustee for MFRA Trust 2015-1, dated August 26, 2022 | 19 |
| 24 | Florida Court Docket Report in Wilmington Trust, N.A. v. Challenge Financial Investors Corp. | 19 |
| 25 | Quitclaim Deed by Henry W. Howe, IV, to Melanie B. Howe, dated February 3, 2022 | 19 |
| 27 | Motion to Appoint Receiver in Florida Action by Wilmington Trust, National Association, not in Its Individual Capacity, but Solely as Trustee for MFRA Trust 2015-1, dated January 18, 2023 | 19 |
| 28 | Florida Court Order Granting Motion to Appoint Receiver, dated February 3, 2023 | 19 |
| 29 | Quitclaim Assignment of Mortgage by Paul Wersant as Receiver for Challenge Financial Investors Corp. To Wilmington Trust, National Association, Not in Its Individual Capacity, but Solely as Trustee for MFRA Trust 2015-1, dated February 21, 2023 | 19 |
| 30 | Affidavit of Commencement of Foreclosure, by Matthew Kelly, dated October 22, 2024 | 19 |
| 32 | Transcript of May 24, 2023 | 19 |

| | | |
|---|---|---|
| | Deposition of Melanie B. Howe | |
| 33 | Transcript of May 31, 2023 Deposition of Michael Paterno (Rule 30(B)(6) Fay Servicing via Michael Paterno) | 19 |
| 34 | Transcript of May 31, 2023 Deposition of Michael Paterno (Rule 30(B)(6) Wilmington Trust via Michael Paterno) | 19 |
| 36 | Transcript of August 6, 2025 Deposition of Melanie B. Howe | 19 |
| 37 | Transcript of August 6, 2025 Deposition of Michael Paterno | 19 |
| 39 | Property Inspection Reports dated January 2011 to November 2025 | 19 |
| 40 | Trial Subpoenas to Plaintiff and Fay Servicing from Defendant | 19 |
| 41 | The 2017 Docket in MTGLQ v. Challenge Financial | 19 |
| 42 | March 11, 2020, Motion to Amend Judgment Pursuant to M.R.Civ.P. 59(e) | 19 |
| 43 | April 7, 2021, Order Denying Motion to Amend Judgment Pursuant to M.R.Civ. P. 59(e) | 19 |
| 45 | Mortgage Statements from September 2014 to July 2025 [Disc. 366-562] | 19 |
| 46 | CFPB-Fay Servicing, LLC Consent Order Dated August 21, 2024 | 19 |
| 50 | Loan Application dated March 259, 2007 [Disc. 10-18] | 19 |
| 51 | Customer identification and signature affidavits dated April 20, 2007 [Disc 44- 49] | 19 |
| 52 | Title Policy [Disc 82-92] | 19 |
| 53 | Occupancy and Financial Status Affidavit dated April 20, 2007 [Disc 187-188] | 19 |
| 54 | Military Affidavit as to Defendants | 19 |
| 55 | Trial Subpoenas to Defendants from Plaintiff | 19 |
| 56 | Transcript of December 4, 2025 Deposition of Henry Howe | 19 |
| 10 | Flow Servicing Agreement Dated November 17, 2014, Between Fay Servicing, LLC And Mfresidential Assets I, LLC | 51 |
| 11 | Certificate of Trust of MFRA TRUST 2015-1, dated May 19, 2023 | 53 |
| 38 | Judgment Figures/Payment History | 106 |

| | | |
|---|---|---|
| 35 | Notice of Mortgagor's Right to Cure to Henry W. Howe, IV, and Melanie B. Howe, in pursuant to 14 M.R.S. Â§ 6111, dated August 5, 2024, with proof of mailing | 152 |

**SIDEBAR CONFERENCES**

Pages: None

**CHAMBERS CONFERENCES**

Pages: None

(Open court.)

THE COURT: Good morning, everyone.

MS. LONGORIA: Good morning.

MR. STEED: Good morning.

THE COURT: The day has come. We're finally here.

We are here in the matter of MFRA versus Howe. Docket No. 21-cv-278. We are here for a bench trial.

Counsel, could you please enter your appearances.

MS. LONGORIA: Yes. Good morning, Your Honor. Reneau Longoria for Wilmington Trust National Association, not in its individual capacity, but solely as trustee for the MFRA Trust 2015-1, as well as for Fay Servicing.

THE COURT: Good morning.

MR. STEED: Good morning, Your Honor. John Steed for Melanie Howe.

THE COURT: Good morning.

MR. STEED: Good morning.

THE COURT: And, counsel, could you please introduce who is at counsel table with you.

MS. LONGORIA: Yes, Your Honor. This is my client. Mike Paterno is employed by Fay Servicing and here as a witness for both Fay and the Trust.

THE COURT: Good morning.

MR. STEED: Good morning, Your Honor. Melanie Howe.

THE COURT: Good morning, Ms. Howe.

MS. HOWE: Good morning.

THE COURT: And if everybody could try to pull those microphones close and speak -- speak right in that, that would be helpful.

So I understand we have some preliminary matters to discuss. And you're both on your feet now, so I'm not sure who wants to go first. Attorney Steed.

MR. STEED: Sure, Your Honor. I think the first issue may be -- is with order of operations or which hat Fay is wearing. And so I -- I don't know if the Court has thought about that already and has ideas. If not, I have a suggestion. And I think we disagree on how that should be handled.

THE COURT: I was hoping you all would come in here with a proposal for how to have it handled. So I'm glad to hear your proposal, and I'll hear from Attorney Longoria.

MR. STEED: Your Honor, my -- conceptually, at least for the sake of the record, I'd like it more or less split into two proceedings. Fay would put on -- or Fay and Trust -- the Trust would put on its foreclose, and we'd defend it. And, sort of, witness presentation would be limited to issues raised in the foreclosure. And part of that, at least for Ms. Howe, is very practical. She has claim about her emotional distress. It doesn't -- it would be much harder for her and I think harder to even get a clear picture if her affirmative case came out on cross before I had her on direct on how this has

affected her as far as the violation. So I think, regardless of what we do, that's a practical issue I would hope could be addressed.

And then on the -- on both the foreclosure, some of the defenses depend on what Fay did and/or what the Trust did, at least as far as whether each is a debt collector under the Maine Unfair Debt Collections Practices Act. They could both be a debt collector, and that could have implications through the statute of limitations, at least under our theory. So that's an important distinction at least for some of our defenses, which hat Mr. Paterno is wearing.

And then -- but as a practical matter, when a foreclosure usually happens, the witness comes up, they're from the servicer, but it doesn't matter who they're speaking for because they're just presenting evidence. So I think he's -- as a servicer rep, he's appearing for Fay. And I would want to cross him as Fay and then call him for MFRA just in the foreclosure and then, you know, start over and put on our affirmative case. And, again, we subpoenaed a witness from Fay and subpoenaed a witness from MFRA. My understanding is that they have designated the same person to speak on different topics.

THE COURT: So how many witnesses would be called twice?

MR. STEED: It would -- well, one or four, I guess,

depending -- or five. You know, because I think the -- the plaintiffs' position is that it's their witness. He's -- you introduced him as our witness. We're going to call him. He's going to testify. And they can do what they want. So then he's just categorized as whatever. But on cross, I need some clarity which hat he's wearing at different times. And it seems complicated for a record a year from now when you're answering this question, who were you speaking on behalf of, when it might be just easier to say, I'm wearing this hat now. It's clear on the record. We ask questions. Now I'm wearing this hat, and it's clear on the record. And then, you know, at the end of the first one, we can certainly say, now you're being called to testify as blah, blah, blah. Anything you said before that isn't true, and then it gets integrated in other questions. It can just be added. But at least the record is clear.

So that -- that would be my proposal.

THE COURT: Okay. I'll hear from you, Attorney Longoria.

MS. LONGORIA: Thank you, Your Honor. I wanted to just speak to my -- plaintiffs' position myself. So I would like to proceed chronologically. Because this is a bench trial as opposed to a jury trial, I think Your Honor can -- can sort it out. And certainly the record is something that will be preserved, and we can cite from various sections.

So my intent was to initially call Mr. Paterno. He does represent Fay, as well as the Trust. I would proceed through his testimony chronologically. Then Mr. Steed would have the opportunity to cross-examine him. He can certainly make it clear. He can ask the questions twice. He's deposed him with either hat, so he can certainly ask the questions twice in that manner, if he wants.

After Mr. Paterno testifies, it was my intent to call Adam Diaz briefly. We've agreed to most of those exhibits. So I anticipate his testimony being very brief. And then I would call Ms. Howe.

Ms. Howe -- and one of the points of clarification is we have the foreclosure. We have a multicount complaint, and we have counterclaims that we're defending against. I'd like to get the testimony in as -- as logical and as chronological order as possible. There are things that happened in life that overlap, so to speak, and I think that's relevant. And so when I get to Mrs. Howe, I too would proceed chronologically with her testimony in the loan documents, et cetera. To the extent that in his case he wants to recall her, that's fine, and then can I cross-examine her after he does that. But I'd like the opportunity -- and I have subpoenaed her in my case -- to go straight through.

Also, I have subpoenaed Henry Howe. Whether he'll appear or not -- he's not here now, but whether he'll appear or not, I

don't know. He's on my list. If he doesn't appear by the end, I'll make certain -- you know, I'll make a request to the Court.

And then, finally, as a housekeeping matter -- and it may help you actually decide the answer to that question -- so we have agreed on a whole series of Exhibits. And one of the -- even more than we have filed. So one of the first things I wanted to do was move that all into evidence. But I wanted to make the representation to the Court that in addition -- while we may not agree on that, we're trying very hard to agree on as much of the court record as possible. So when you let me know how you want to proceed, I'll proceed with putting these documents into the record.

I've also -- we have also spoken in advance to the clerk in an effort to keep your record very clean. I have certain copies that are my original certified copies, and I will tender those to the court. But, basically, counsel and I have agreed on a number of documents such that we won't need to have an additional certified copy of everything.

So the two binders that will go to the witness stand, at the end of the trial we will pull out anything that doesn't come in and tender these to the Court so that you'll have that complete record.

THE COURT: Okay. Thank you. And I appreciate you both working together for -- for that stipulated record. That

is going to be very helpful.

So it is a bench trial. I am going to, I think, proceed in -- chronologically. Makes sense. I understand it. There may be pieces of time where that doesn't make sense, but I think keeping that record chronologically will be -- will be helpful. And like I said, a bench trial, you can anticipate that I'm going to ask for -- from you both proposed findings of fact. So I think to -- we'll, together, be able to make it clear. Ms. Howe, I think, can be different. I mean, I will let Attorney Longoria call her, and then I'll let you, you know, recall her for those other things, to keep that a little bit cleaner and -- just because there's a bit of a different circumstance. So -- so we'll do that.

I know that there's also -- is it -- who is on Zoom?

MS. LONGORIA: Oh, my paralegal is on Zoom. And that's just purely for cost.

THE COURT: Okay. Is there a witness that's going to be testifying?

MS. LONGORIA: Oh, Adam.

THE COURT: That's Adam Diaz

MS. LONGORIA: Adam will be testifying via Zoom at the end of the day. And as soon as we get close to him, Kelly will get him on Zoom.

THE COURT: Okay. And you, Attorney Steed, have called Adam Diaz. I understand you both called Mr. Paterno and

Ms. Howe, but they're both here and will be here all day. You also listed Mr. Diaz as one of your witnesses as well? Is that true?

MR. STEED: Yes, Your Honor. But I didn't subpoena him, so I'll just cross-examine him.

THE COURT: Okay. I just wanted to see -- I didn't want to be calling people back and forth on the Zoom. So that's okay.

MR. STEED: One other thing. Eva Wood is -- my assistant worked with her on Zoom yesterday, and her internet connection is such that Zoom is very difficult. And so I wondered if it's possible to do a phone call, or phone call into the Zoom and not have the video? Her testimony is not critical, but....

MS. LONGORIA: I would object to that because she's refused to speak to me. She refused to be deposed. So I have the right to cross-examine her, and I can't do that on the phone. I have no idea what she's looking at, et cetera.

THE COURT: Are you -- is it anticipated that she would be testifying today or tomorrow?

MR. STEED: Tomorrow, Your Honor.

THE COURT: Tomorrow. Okay. Well, I'm unlikely to let her appear just by phone because I do want to make sure that I can see her and she can be cross-examined. So maybe try to help her find a better location in the meantime.

MR. STEED: Thank you.

MS. LONGORIA: The library she could.

THE COURT: Okay. Anything else before we get started?

MS. LONGORIA: So I'll turn to the Exhibits. One other thing. I understand, as I walked in, counsel filed a motion. I don't have a copy of it, and I would ask Your Honor to give me until tonight to find a copy of it and to respond to it. It's a motion for judicial notice of a bunch of cases. But I can't see it, and so I would ask not to consider it yet.

THE COURT: Is that relevant to your matters today, or is that something that can be discussed tomorrow?

MR. STEED: It -- it may become -- it was actually not supposed to be filed until it became relevant. So that was just a mistake in recordkeeping on my part. But it may become relevant. It deals with possible debt collection activities. And there's been a witness subpoenaed to testify about those matters. So it shouldn't be necessary -- I don't think it's controversial that both organizations file a lot of foreclosures. But if it's contested or if the witness isn't prepared, it's just evidence that's there.

THE COURT: Okay. If you can get Attorney Longoria a copy of it, that will help.

MS. LONGORIA: So one thing that I realized in what counsel said, that probably is an issue to discuss at the

outset, is whether or not a -- the plaintiff, the owner of the debt, under the Fustolo decision and the other cases that we cited in our trial brief, can be a debt collector. Counsel is arguing that it depends on how they act. I would argue that under Fustolo and the cases that I cite, the owner -- it doesn't depend on whether the loan was bought in default, it doesn't depend on how they act. It's the servicer. And if a servicer buys a loan before it's in default or the servicer -- there are other contingencies. We understand that Fay is a debt collector. That's not an issue. But the law, I would argue, is clear that the plaintiff is not a debt collector. And that's an issue of law for Your Honor to decide, not an issue of fact that has relevant testimony to it.

So I just wanted to speak to that because he spoke as if we all agree that that's an issue. And according to the trial briefs, we don't agree on that. Your Honor will just have to decide.

THE COURT: Okay. I'm not totally sure if you are asking something of me or just sort of making your record. To the extent you're asking me to not allow fact testimony that may be relevant to that....

MS. LONGORIA: I'll object when that time comes. It's something he said in his preliminary remarks, and I didn't want to leave it unsaid.

So moving on to what we agree on. So with regard to the

joint exhibit list, I would move into evidence Exhibit 1.

THE COURT: One moment while I pull it up. Sorry.

MS. LONGORIA: Yes, Your Honor.

THE COURT: Make sure I'm on the same page here. Okay.

MS. LONGORIA: Okay. Exhibit 2 we agree, so I move that into evidence. But when it comes time for that, I also have the original note, and I will show it to Your Honor for examination. But I move it into evidence because it's a document we agree upon the admission of.

And I move into evidence Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7; Exhibit 8; Exhibit 9; Exhibit 12; Exhibit 13; Exhibit 14; Exhibit 15; Exhibit 16; Exhibit 17.

THE COURT: On my copy -- I just want to make sure the record is clear -- I have that as not being a joint exhibit.

MS. LONGORIA: Exactly. And we spoke this morning, and we agree. And I'll make that clear as we go through. If there's a change in what you have, I will make it clear when I'm speaking.

MR. STEED: I have a couple things to clarify. I don't know if you want me to do them exhibit by exhibit or as -- at the end. I can do either.

THE COURT: Let's do it at the end, but thank you.

MS. LONGORIA: Exhibit 18, Exhibit 19, Exhibit 20, Exhibit 21, 22, 23, 24, 25. We do not agree on 26, but I have

the certified copies of those public records. So I will wait to talk about that until I get to that during the examination. Exhibit 27, 28, 29, 30, 32, 33, 34, 36.

Okay. The transcripts of the depositions, those are a change. So I wanted to make sure. 36 and 37. So on your spreadsheet, 32, 33 and 34, and 36 and 37 shows that they were contested, and those are no longer contested.

THE COURT: As well as mine shows 17 and 29 as being contested. And those are also no longer contested, right?

MS. LONGORIA: That's correct. Oh, I misspoke. No. 29 is the quitclaim assignment. That is contested. I apologize, Your Honor. I have a certified copy of that, and it's proposed for the admission; but he does contest 29.

And so 39 -- I move for the admission of 39, 40, 41, 42, 43, 45, 50, 51, 52, 53, 54, 55, and 56.

THE COURT: And, again, to be clear, 56 was contested but now is joint.

MS. LONGORIA: Correct. And now it's admitted.

And I would present to the clerk the agreed-upon original certified copies, although duplicative. Should I bring those to Michelle?

THE COURT: Sure.

MS. LONGORIA: And that's all I have. Thank you.

THE COURT: All right. Thank you. Attorney Steed.

MR. STEED: Yes. Should I stand for all talking?

THE COURT: Yes.

MR. STEED: Okay. So I think -- so with Exhibit 6 and 9 and 4, those are all loan modification agreements, Your Honor. And I think the stipulation was that the Howes signed those, but -- so there's no objection to the admissibility that they signed that, but I think, you know, there are some issues with what -- whether they say anything useful for this case.

THE COURT: You argue their weight?

MR. STEED: Yes.

THE COURT: Is that it?

MR. STEED: I mean, that's generally it. If -- if there are some things that are -- no objection to the admissibility, but there are some that -- and the documents say what they say. And that's even true of the default notice. The issue is whether the -- like, there's hearsay within them that's admissible, with a lot of it. So I don't think....

THE COURT: Okay. But you're going to argue that at the time --

MR. STEED: Yes.

THE COURT: -- they are discussed?

Okay. So I am going to admit those Exhibits as just discussed.

Anything further before we begin?

MS. LONGORIA: I'm ready to proceed. We would call Michael Paterno to the stand.

THE WITNESS: May I approach with these?

THE COURT: Yes, you can. And before you get sworn in, I just actually want to -- you can have a seat for a minute, Mr. Paterno.

I -- I know that you said, Attorney Longoria, that your paralegal is on the Zoom.

MS. LONGORIA: Yes.

THE COURT: Is that -- is that necessary for you? Was that your plan, that she'd be on the Zoom?

MS. LONGORIA: It's very helpful to me, Your Honor.

THE COURT: Okay.

MS. LONGORIA: She's not recording it. But rather than have her drive here, she's not great at driving in the snow. And I had asked yesterday if that was possible.

THE COURT: Okay. Okay. Then, yes, we'll keep it open.

MS. LONGORIA: Thank you.

THE COURT: Go ahead.

THE CLERK: Please raise your right hand. Do you solemnly swear that the testimony you shall give in the cause now in hearing shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, I do.

THE CLERK: Please be seated. And if you could please state your name and spell your first and last name for the

record.

THE WITNESS: Michael, M-I-C-H-A-E-L. Paterno, P-A-T-E-R-N-O.

DIRECT EXAMINATION

BY MS. LONGORIA:

Q. Mr. Paterno, how are you employed?

A. I'm employed with Fay Servicing, LLC.

Q. What is Fay Servicing, LLC?

A. We are a mortgage servicer.

Q. And what is the relationship between Fay Servicing, LLC, and the named plaintiff in this case, the Wilmington Trust entity?

A. We are the loan servicer for the Trust.

Q. And what does that mean? What does a loan servicer for a trust do?

A. We accept payments from the borrower. We also make payments to -- for escrow items like taxes and insurance. We do loan modifications if the loan is in default or past due. We also bring loans through foreclosure, if that's the unfortunate outcome. And we're pretty much a soup-to-nuts loan servicer.

Q. Okay. And what are your duties and responsibilities with Fay?

A. I am a senior litigation representative. And I review all of the business records of Fay Servicing that we have in-house,

also our main system of record, and prepare for any court-related matter, whether it be a trial, like today, a deposition, or even mediation.
Q. Okay. And with regard to this case, have you had the opportunity to review the business records, not just as they appear before you in exhibits but in your back office system?
A. Yes, I have.
Q. And in addition to this court appearance, how many times have you appeared for depositions in this case?
A. In this case, I believe two.
Q. Okay. And on two occasions you appeared for depositions, but did you appear within those depositions for both Fay and for the Trust?
A. Yes.
Q. Okay. And when I refer to the Trust, Wilmington National Association is the trustee for the MFRA 2015 trust. But if I refer to it, as the Trust, it's the named entity in this action?
A. Correct.
Q. Okay. So in addition to appearing on the deposition -- for the deposition and for preparing for attending this trial, have you, throughout the time, been engaged with the -- this loan as far as bringing the complaint and helping prepare the various documents that have been necessary throughout?
A. Yes.

Q. Okay. So I'd like to turn your attention back to the beginning. You have documents in front of you. I will also proceed and bring those documents up electronically. And the first document I would call your attention to is Exhibit 1. It is a warranty deed. And I will bring that up.

So this document has already been admitted. But, essentially, what is this document?

A. This is a warranty deed from a Christopher Cote, Heather Cote, formerly known as Heather King, granting to Henry Howe and Melanie Howe.

Q. Okay.

A. For the address of the property.

Q. And the next document I would call your attention to has been admitted as Exhibit 2. It's the original note. And that begins at page 6.

So in addition to having the note before you in the binder as a copy, did you compare the original of that document for its accuracy?

A. Yes.

MS. LONGORIA: Your Honor, I would approach and provide you with the original note for examination.

THE COURT: Thank you. Attorney Longoria, this original is the same as on the screen?

MS. LONGORIA: Yes, Your Honor. That was just his testimony.

THE COURT: Okay.

MS. LONGORIA: May I have it back? Sorry.

BY MS. LONGORIA:

Q. All right. And to back up, when somebody purchases a property, they sit down at the closing table, and they sign a lot of documents. What happens to those documents? In other words, are some documents sort of special and they go to live in a collateral file, and other documents get scanned? What happens at the closing with regard to the closing package, or the closing documents?

A. The original documents are returned to the lender for keeping. All the collateral documents. You have note, mortgage. There are documents sent for recording. And then there are documents that are scanned and imaged. The tile company will obviously keep -- or the closing company will keep copies for their own records. Also, those records are given to the borrowers for their records as well.

Q. And calling your attention to page 9. What is this?

A. Page 9 of Exhibit 2 is a Bailee letter. A Bailee letter is an industry letter that's used when the original collateral for a loan is being sent from one entity to another.

Q. Okay. And the rest of the documents in the collateral file we'll talk about at different times.

But the collateral file, the sorts of things that one keeps in a collateral file, include what?

A. A collateral file will have the original note. Usually a copy of -- a recorded copy of the mortgage. There will be original assignments. There could be loan modifications in the loan file, if there were loan modifications done during the life of the loan. There would be a title policy. Usually that would be about it.

Q. And this collateral file, the page 9 you testified shows that it was confirmed to be received in my office on May 23rd of 2018. Is there some special place that collateral files get kept before they get sent out to law firms for cases?

A. So collateral files for 95, even 99 percent of what a servicer will do is held with a custodian. There is a registered custodian that is part of holding that collateral on behalf of the owner. We have access to that -- to the custodian. We will make a request that we need the original documents. We'll make a request, through a system that we have, that communicates with the custodian. It's called LPS. They mail us the collateral file, and then we review the collateral file and then prepare the letter that you see here, the Bailee letter, and then send it on to the attorney.

Q. Okay. And before the collateral file was with Fay on behalf of the Trust, where would it have come from?

MR. STEED: I'm going to object there just on foundation, Your Honor.

THE COURT: Sustained.

A. The collateral file would have been with the custodian.
BY MS. LONGORIA:
Q. So it was sustained. So I need to reask a better question.
So the collateral file is now with -- who is the collateral file now with?
A. It's right there in your hand.
Q. Okay. So before it was in my hand, it was sent to me by Fay, as demonstrated in Exhibit 9?
A. Correct.
Q. Where was it before it was with Fay?
MR. STEED: Right. That's where my objection is. I just don't see that anywhere in the record, and I don't know how he could testify about it if it's not in the record, unless he had it in his hands.
THE COURT: Well, I think -- you can ask him, and he can testify. You can cross-examine him how he knows that.
MS. LONGORIA: Sure.
BY MS. LONGORIA:
Q. Do you know, from your review of the business records, where the collateral file was before it was with Fay?
A. Yes. It was with the custodian.
Q. Okay. And before -- before it was with the custodian, who was it with?
THE COURT: Looks like there's another objection.

MR. STEED: Yes, Your Honor. Just -- I mean, I don't need to go into it every time, but if I could just, sort of, state it so that where all these documents were and what the relationships were in the past are things that I think would be reflected in documents that aren't in the record. I don't think it's appropriate to let him testify about things that aren't in the record when they would be reflected by documents. And if it gets into the record and I cross-examine him, the record is not always clear where the source of that information was if he's allowed to testify about things that it would seem he knows based on documents that aren't here.

THE COURT: Well, I'm going to overrule the objection. He testified he -- he reviewed -- knows that from looking at business records. Again, you're free to cross-examine him to -- for whatever purpose you want.

MR. STEED: Okay.

BY MS. LONGORIA:

Q. And I can be a little bit more clear on my questions.

So when folks sit down at the table and there are the original documents that you testified about that need to be kept, after closing those documents go to who?

A. They would go -- in this case they went to the original lender. The original lender documents, I don't know if -- who their custodian was at the time.

Q. Right.

A. They may have their own in-house custodian.
Q. Right.
A. And they may keep record -- those records in their own custodial care, or they actually have an outsourced custodian that they use. The custodian that was used at the time when Fay made the request is Wells Fargo. Wells Fargo custodial offices are in Minnesota.
Q. Okay. So do you have any doubt that the documents that are the file of -- the collateral file that are in the record, that you testified to that Fay has now, came from the original owner?
A. Correct.
Q. No. Do you have any doubt about that?
A. No, no.
MR. STEED: I'm just going to object on foundation. I don't know what they're talking about when they say what's in the collateral file. I don't know what's in there.
MS. LONGORIA: His testimony laid out what's in the collateral file.
THE COURT: He testified what's in the collateral file. You're --
MR. STEED: Okay.
THE COURT: You're going to be able to cross-examine him on all of this.
BY MS. LONGORIA:

Q. And for clarity, as I go through these documents, I'll ask you whether or not they are in the collateral file as well.
A. Okay.
Q. So let me next direct your attention to Exhibit 3, page 11. This has been admitted as a certified copy of the mortgage.
And while the document speaks for itself, when was this mortgage given in relation to the purchase of this property?
A. This was April 20th of 2007.
Q. And is that the same day that the deed was also dated?
A. I'm sorry?
Q. Was that Exhibit 1, it -- the mortgage is dated the same day as the deed?
A. That is correct.
Q. So in other words, this is a purchase money mortgage, not a refinance?
A. Correct.
Q. Now with regard to that original mortgage, the original mortgage was given to whom in order to obtain this property for the Howes?
A. To -- it was given by Melanie Howe and Henry Howe to Challenge Financial.
Q. Okay. And that document reflects -- as well as the note in Exhibit 2, reflect the original terms of the note?
A. Yes.

Q. Okay. And there is an original principal balance, interest rate and whatnot that are reflected in the -- in the document itself. I don't want you to read the -- all of those details into the record. But just for the big picture, this loan started off with a principal balance of how much?
A. $208,000.
Q. And what was the original interest rate?
A. I believe it was 4. -- I'm sorry 7.25 percent.
Q. Okay. And the maturity date?
A. Maturity date is May 1st of 2037.
Q. And what does that mean? What's a maturity date on a note?
A. A maturity date would be when the loan is -- should be complete, fully paid. If it's not fully paid, there may be a small balance that would be due at that point in time.
Q. Okay. So because it's not 2037, up until that point there are payments that are due every month?
A. Yes.
Q. Okay. And are there late charges set forth in these documents?
A. I'm sorry?
Q. Is there a late charge percentage that is set forth in these documents?
A. Yes.
Q. What is that percentage?

A. The late charge is usually 5 percent of the payment. But I'm just looking for it specifically. Yeah, the amount of the late charge would be 5 percent of the overdue payment of principal and interest.

THE COURT: What page is that on?

THE WITNESS: That is on page 7, under 6a.

THE COURT: Thank you.

BY MS. LONGORIA:

Q. And there's just a couple of other provisions that I wanted to point out in the mortgage itself. Can you look at paragraph 7 of the mortgage, which appears on page -- all right -- it appears on page 17. And the document speaks for itself. I don't want you to read it to the Court; but I want you to talk about the obligation to maintain the property and the lender's inspection of that property. Can you talk about that, in general, as a servicer and as a duty -- as a duty of your servicing?

A. Sure. So it's expected that, you know, they're going to maintain the property. They're going to make sure that the roof is always, you know, dried in and that the property is at least painted or well cared for on the outside. That they maintain the lawn. That they maintain the grounds and stuff like that. If a property happens to go into foreclosure, we will send out property inspectors every couple -- you know, couple of weeks or so just to, again, see if the property is

occupied, see if it's at least being maintained.

Sometimes houses go into foreclosure they can become vacant, and the grass gets overgrown and then we got to deal with, you know, city violations and county violations and that kind of stuff. So we -- we obviously want to stay away from that kind of thing.

Q. Okay. Let's talk more specifically about that. If a city or town finds code violations and they take actions to fix those things, is that lien before you or behind you, in general?

A. I'm sorry?

Q. So if for some reason a city finds that a property is not being maintained and that there are code violations and they need to go out and deal with it as part of -- of their city or town, the cost of doing that, if the city or town takes action on the property, is that a superior lien to your mortgage?

A. Yeah. They can place a lien. Sure.

Q. So you look to avoid having that happen?

A. Absolutely.

Q. And is that tied to an acceleration notice, or is that part of the duty that comes with a mortgage from the outset of servicing?

MR. STEED: Objection, Your Honor.

THE COURT: Based on what?

MR. STEED: Well, I think she's asking him to

interpret legal requirements, not facts. She's asking about the superiority of a lien under Maine law.

THE COURT: Overruled. He can testify based on his experience.

BY MS. LONGORIA:

Q. That was actually the last question. This question has to do with what -- do you recall the question?

A. I -- I think so.

Q. Okay. Go ahead and answer it.

A. So -- well, maybe I don't.

Q. Fair enough. So as a servicer, your duties under paragraph 7, do those begin when you send an acceleration notice?

A. They usually begin with the loan is in default. If they get into 120 days past due, they -- and we may not send a demand letter at that point, but they will start when the loan is in default.

Q. Okay. And this loan, for the purpose of clarity -- we haven't got to that point yet -- but what is this loan due for? What day?

A. October 1st of 2014.

Q. Okay. So at the point that Fay began servicing this loan, it was in default?

A. Yes.

Q. All right. So your duty to protect and inspect the

property under paragraph 7, that was already in place when the loan boarded with Fay?

A. Correct.

Q. Okay. I also want to call your attention to paragraph 12b, which is on the next page. No. It was on page 20. And, again, the section speaks for itself; but it talks about the lender's right if the borrower doesn't meet their obligations. So in this case, with the last payment being made in 2014, did you all keep paying taxes every year or every half year, if they are due every half year, in this case?

A. Yes.

MR. STEED: I just objection on that on the basis of when they're saying "you," I'm not clear if it's the Trust or the servicer that made the payment.

THE COURT: Okay. Sustained. Can you clarify that?

MS. LONGORIA: I will.

BY MS. LONGORIA:

Q. What are the duties and responsibilities of a servicer on behalf of the Trust once the Trust buys the loan?

MR. STEED: Your Honor, again, I just want to object. So there's an Exhibit that is almost entirely redacted that's the agreement between Fay and the servicer. And they chose to redact it. And I think what he's testifying are things that might be in the redacted portions of that document. So at least on that, where it's really clear they made a choice not

to include parts of the document that are there, I just ask to not let him testify about a legal relationship that's defined in a 100-page document that they have and won't share.

THE COURT: If the concern is that the document is redacted and he's testifying to information that's redacted, isn't that what you want, the information?

MR. STEED: But I want all of the information. I mean, so they say, here's a 100-page document. We're going to bring this guy on. He's going to testify about what we won't share, without being able to confirm if it's true or look at any other things. I mean, at a minimum, there's a definitions section in that agreement. We don't know what any of the definitions are, so....

THE COURT: So I'll let her ask it. I understand your argument. You can cross on it, and you can talk to me about the weight I should give that testimony.

MR. STEED: All right. Thank you, Your Honor.

THE COURT: Thank you.

MS. LONGORIA: And I'll speak to that further when I get to that exhibit.

BY MS. LONGORIA:

Q. In the beginning you testified that Fay was a servicer for the Trust. What I'm asking for is you to expand on that a bit and tell me what the duties and responsibilities are for Fay servicing on behalf of this Trust in this case?

A. Similar to what we discussed in the prior paragraph about property inspections and not having city violations and things billed in and cost. And obviously that will be transferred to the loan and then that obviously weighs on the investors, their investment.

The same as with taxes and insurance, if we don't maintain those things, then things can go to tax sale, then obviously that costs more money. It's just going to get -- to be into a worse situation. Insurance has to be maintained, obviously, with the investment of a $200,000 loan. If there were damage from a storm or something and there's no insurance, then, you know -- so as a servicer, we are required to maintain that stuff on behalf of the investor.

Q. And you write those checks?

A. Yes.

Q. You being Fay?

A. Us being Fay, yes.

Q. Sorry.

So finally in that document, I direct your attention to paragraph 14. Again, it speaks for itself, but there seems to be a description of various things that a -- or that a lender -- and lenders is the general term that's used in the mortgage -- may charge a borrower for various services. So, in general, you've spoken of taxes and insurance. What other checks does Fay write on behalf of the Trust in connection with

this mortgage loan?
A. Mortgage insurance was on this loan and then, again, the property inspections and taxes and insurance.
Q. And what about cost and attorney fees?
A. We have attorney's fees and things like that as we're going through foreclosure. Title fees. Attorney's fees.
Q. And even aside from foreclosure, because this case is combined with a suit on the note, in enforcement of that note were there costs and attorney fees incurred?
A. Yes.
Q. And I would next turn your attention to Exhibit 4, which begins at page 28. And what is this?
A. Exhibit 4, beginning on page 28, is a loan modification.
Q. And at some point after taking this loan in 2007, did the borrowers fall behind?
A. Yes.
Q. Okay. And actually, even before their loan was modified, was there a trial modification?
A. That I am not sure of.
Q. Okay. Those documents appear later. I'll take them one at a time. I am sorry.
So with regard to this document which is before you, it is at page 28, the loan was behind when the borrowers sought to modify it?
A. That is correct.

Q. And does this document reflect how far the loan was behind as of 8/1 of 2010?
A. It does not specify a specific date that it was behind. But it does give you the amount that the unpaid principal at that time -- which started out at 208,000 in 2007 -- the unpaid principal was now 224,186.62.
Q. And does it indicate how much of that is capitalized in paragraph 1?
A. Capitalized amount is 20,929.78.
Q. So talk to me about what that means. When someone falls behind, what is the capitalized amount in a loan modification that catches them up?
A. So the actual principal balance went from 208,000. They made payments where the principal became 203,256.84. But because they were -- stopped paying, or there weren't payments received after that, then interest begins to build up, escrow begins to build up, and then that's what becomes the capitalized amount.
Q. Okay. So when a person enters into a loan modification, is their loan current?
A. No.
Q. Okay.
A. After the modification, everything is brought current.
Q. Thank you.
A. Up until that point, no, it's not.

Q. Okay. So after they executed this modification document, was their loan brought current?
A. Right. Everything is brought current.
Q. So -- and on page 30, we see that both there is a notarization clause that actually appears before the signatures that were on 7/24/2010?
A. Correct.
Q. And it was witnessed by Jimmy Wood and Ada Wood?
A. Yes.
Q. And it was also signed by MERS and prepared by CitiMortgage?
A. That is correct.
Q. From your business records, do you know whether or not CitiMortgage was servicing the loan at that time?
A. Yes. That is correct.
Q. So the loan originally -- the original lender was Challenge. At what point is that loan first sold?
A. The sale of the loan was a couple of months after the origination to Fannie Mae.
Q. I'm going to direct your attention to Exhibit 17 -- it's been admitted -- page 154 so that you can --
MS. LONGORIA: Your Honor, if I may stop for a second. The video seems to have gone dark. I don't know if you're using it. But if you're not, that's okay. But the screens are dark, and so I'm no longer projecting.

THE COURT: Yes, that's true.

MS. LONGORIA: I can keep going because he's kind of using the notebook.

THE CLERK: Are you able to see it now?

MS. LONGORIA: Pardon?

THE CLERK: Are you able to see it now?

MS. LONGORIA: No. It's plugged in.

I don't want to slow us down if you're not using it. I'm guessing our Zoom is gone, but that's fine. I can --

THE COURT: I'm not using it. Although, it is -- okay. It is up on my screen there.

MS. LONGORIA: We'll keep going. I don't want to waste any time then. That's just fine.

THE COURT: Michelle, can you get us IT. I mean, you don't know who's going to come into this trial, and we want to make sure the Exhibits are publically available.

MS. LONGORIA: Thank you, Your Honor. I will.

BY MS. LONGORIA:

Q. So I will go to page 154. And what is this? So it's 154 and 155.

A. This is an affidavit from Fannie Mae.

Q. And does it reflect the period that Fannie Mae owned this loan?

A. Yes. They actually acquired it from CitiMortgage on June 28th of 2007, and they owned it until December 22nd, 2016.

Q. Okay. Okay. Directing your attention back to the loan modification. In 2010, the servicer was CitiMortgage, owner was Fannie Mae, and this loan was modified to bring the Howes current?

MR. STEED: Objection. Foundation. I don't need to --

THE COURT: Okay. Sustained. I mean, overruled. You'll talk about it again, I'm sure.

BY MS. LONGORIA:

Q. I'm going to now direct your attention to Exhibit 5, which begins at page 32. And what is this?

A. This is a hello letter from Nationstar saying they are now the servicer of the loan effective 11/1 of 2010.

Q. Okay. So the servicer changes from Citi to Nationstar, but the owner of the loan stays the same?

A. Correct.

Q. Okay. So this hello letter lets the Howes know that Nationstar is now where they should send their payment?

A. Correct.

Q. I next direct your attention to -- one second -- Exhibit 6, which begins at page 35. Sorry, 33, 34, 35. Okay. Exhibit 6 is another loan modification. Can you talk to us about this loan modification? First off, it speaks for itself, but it's still between Henry and Melanie. And this document reflects it's also -- the other party, at that point, was

Nationstar?
A. Correct.
Q. All right. And the terms of this modification -- so -- and I should -- going back to that first modification. Did the interest rate change on Exhibit 4, or was the loan just brought current?
A. It looks like they had -- in paragraph 2 of Exhibit 4, there was a step rate. So they started out with the first five years of the new modification at 2 percent. Then the next year the loan would go into 3 percent. After -- that would be in the sixth year. Then it looks like in the seventh year it went to 4 percent. And it probably ended -- it looks like it wound up to be 4.375 --
Q. Okay.
A. -- for the remainder of that time frame.
Q. So in 2007, when they took out the loan to buy the home, the interest rate was 7.25. In 2010, when they modified the loan, the interest rate dropped to 2 percent?
A. Correct. With a final rate at 4.375.
Q. Okay.
A. And the maturity date was moved to August 1st of 2040.
Q. So what does that do to the affordability of the payment? What is the amount of the principal and interest payment when this first modification starts out?
A. It brings it down, down to a much lower level.

Q. Okay. I'll direct your attention to page 28. That first initial principal and interest payment, it looks like in line three, is 828.64. Am I reading that correctly?
A. Correct. At 2 percent, the principal and interest payment for the first five years would have been 828.64.
Q. Okay. So now we go -- they fell behind again and were given another opportunity to bring that loan current beginning at page 35?
A. Correct. On July 21st of 2011.
Q. And can you talk about those essential elements of this modification too? Was the loan capitalized again in order to bring it current?
A. The loan was capitalized again, consisting of a total at $223,204.66.
Q. And what was -- what was the interest rate for that initial period?
A. The initial first five years also was at 2 percent. After the first five years, the sixth year went to 3 percent. And then in the seventh year, it went to 4 percent. And from thereafter, into the eighth year until maturity, it went to 4-1/2 percent.
Q. Okay. So just keeping track of that first payment. It looks from this as if the principal and interest drops again to 764.98?
A. Correct.

Q. Okay. So the original P and I, according to that note, was $1,418.93. Then it drops to the $800 number that you spoke of in your testimony. Now it's dropping again to 764.98?

A. Correct.

Q. Okay. How are they able to bring that payment down? Did something happen to that -- that maturity date?

A. Yes. So it moved again from -- the previous mod was in 2040. This is now 2044.

Q. Okay. So if the borrower were never to modify again and they were to bring -- reinstate their loan, they would now have until 2044 to pay that loan in full?

A. Correct.

Q. Okay. And directing your attention to page 41, the compliance agreement. What is that?

A. This is just an agreement just specifying when they're signing off on the modification that if there's any issues in the paperwork or anything that may be incorrect or something that needs revision, that the borrowers would cooperate with the lender to make it correct.

Q. Okay. And in signing this loan modification with Nationstar, in addition to talking about the new terms that they promise to pay, are there other provisions in here that talk about the borrowers' ongoing promises or commitments to the note and mortgage? Specifically directing your attention to paragraph 4.

A. Yes. So it -- again, in paragraph 4 it will state -- it will show -- you know, in this case it speaks for itself. But it does tell them that they're going to -- you know, you still abide by the original covenants and agreements within the other security agreements.
Q. Okay. And in paragraph 7, that's where it reflects the capitalization on page 38?
A. I'm sorry, what was your question again.
Q. Is the capitalization for this loan modification reflected on page 38, paragraph 7?
A. Yes. When the 223 is -- the 223,204.66 is also referenced in paragraph 1.
Q. And the next document I wanted to direct your attention to is page 42. Now, this is already in evidence. And I understand that all of the recorded assignments, whether you're relying on them or not for purposes of standing, are on the record. Is this one of the assignments that gets recorded?
A. Yes.
Q. Okay.
A. Correct. Yes.
Q. And then I want to turn your attention to Exhibit 9, which begins at page 43. Did the borrowers fall behind on their 2011 loan modification?
A. Yes.
Q. And did they seek to modify their loan again?

A. Yes, they did.
Q. And still with Nationstar. What did Nationstar do to bring the loan current for the borrowers in this instance in 2014?
A. So the -- page 44 of the modification, they go ahead and capitalize the balance again. So they have a -- now in August of 2014, there is a $237,329.72 unpaid amount. The next paragraph there is a principal balance that they are deferring. So it would be a noninterest bearing principal at 23,199.73. And the interest amount that remain -- I'm sorry, the principal amount that remains that they would be amortizing and charging interest on would be the 214,129.99.
Q. Can you explain a little further, what does it mean to have a deferred principal balance? What -- what is that?
A. So the deferred -- usually a servicer will defer possibly some -- make some deferment in order to make a payment a little bit lower.
Q. Okay.
A. So that the borrower can, you know, maintain that payment amount for the life of the loan. That deferred principal, in some cases, may actually be reduced if a -- if a borrower pays for a certain number of years. The deferment might be reduced over time, and then eventually would go away if all the payments are met. So a deferment is just something -- it's a little bit of a way to make a payment lower. Rather than

capitalizing and amortizing the full balance of 237, you can use that to help -- would lower the payment.

Q. So if, say, in December of 2014 they sold the property, they would still be responsible for that money and -- and the pay -- in a payoff statement?

A. Correct.

Q. Okay. But from this point in 2014 until now, you all aren't charging any interest on that money?

A. There is no charge of interest on the 23,199.73.

Q. Okay. And what happened to the interest rate? Is it still a variable interest rate, or did that change in paragraph two as well?

A. In this modification, it was a straight fixed interest rate at 4.625. The principal and interest amount was 979.92, and the new maturity date now, August 1st of 2054.

Q. Okay. So -- and what -- so the initial -- so 979.92. Good.

And did they make any payments right away under this loan modification?

A. There was one payment made, I believe, a couple months after the actual implementation.

Q. Okay. All right. So next I'm going to turn your attention to Exhibit 10. Now this is the document that Attorney Steed began speaking about. So let me first ask you, what is this?

A. This is a flow servicing agreement between Fay Servicing and MFR Residential Assets.
Q. And I understand that this document is redacted. Is this how this document is retained in your business records as Fay Servicing?
A. Yes.
Q. And did you produce this document in this form in discovery?
A. Yes.
Q. So Fay Servicing does not have a copy of this document that is not redacted?
A. Correct.
Q. So the Trust would have a copy of this document that is not redacted, presumably? I don't -- or do you know?
A. I believe they do, yes.
Q. Okay. So the document, as it exists in your business records and the document that is marked for identification purposes as Exhibit 10, this truly and accurately reflects both the document that was produced?
A. Yes.
Q. And the document as it exists in your business records?
A. Correct.
Q. And it reflects the signatures of the parties to the document?
A. Correct.

MS. LONGORIA: Now, I will move for its admission.

MR. STEED: I object, Your Honor. I think there's a rule of completeness in the federal rules of evidence that says we have a right to demand the entire document.

I also just -- as far as plausibility, this an agreement between Fay Servicing and the Trust, and of course they have a copy of it. I would just -- I understand that maybe in the records they brought to trial this is how it is, but Fay Servicing -- it says right on the first page, Fay Servicing, LLC, as servicer. They did not sign this redacted document. I mean, they didn't sign it like this.

THE COURT: And what is the purpose of your putting in this almost entirely blacked-out document into -- what's the purpose for its --

MS. LONGORIA: It's -- it is simply to reflect the ongoing flow servicing relationship between the Trust and Fay. Sometimes we'll introduce the pooling and servicing agreement to show that loans have come over in a particular pool, et cetera. This document is relevant because it reflects that there is a relationship between Fay and the LLC, and then there's a joint agreement that comes at the end that adds the Trust to it. It simply reflects the business relationship that those entities have. This witness has testified to that, and he is aware of that business relationship independent of the document.

But I would argue that the document speaks for itself. I think that these two entities have a right to keep their -- the terms of their business relationship private. I would say that the pleading filed today -- I haven't seen it yet, but counsel is looking to have the Court take judicial notice of this case, that case, and the next case. And so if the Court were to order me to produce this document unredacted, I would request it from the Trust. I don't have it in my records yet, but I could request it; and then I would ask the Court to accept it under seal.

The reason why I didn't do that in advance is I don't think that there are essential provisions in here to either my case or his case. This was disclosed in discovery. We have been transparent about the fact that it's redacted. And I don't think that -- it speaks for itself. And as Your Honor pointed out, it goes to weight, not -- not to admissibility because of the way it exists within their documents.

THE COURT: Attorney Steed, what is -- I guess, what's -- what's your -- your response? I understand you don't want it in. I mean, I'm inclined to let it in because I guess it does show a signed contract for the relationship. As Attorney Longoria says, it speaks for itself by saying completely nothing because it's a black document.

MR. STEED: Sure.

THE COURT: But it does show -- it does show a signed

agreement.

MR. STEED: Understood, Your Honor. I just, I guess, when we get to our case, the sufficiency of the proof is going to be the theme. And so this is part of it.

THE COURT: Okay. So I'll let it in, like I said, at this point for that purpose.

BY MS. LONGORIA:

Q. So in the back of this document there's a joinder agreement, and I'm going to direct your attention to that. So this document is signed by MF Residential Assets 1, LLC, as the initial owner and Fay Servicing. Does -- can you explain the joinder agreement and the additional parties that are added to this contract?

A. The joinder is MFRA Trust 2015-1 for the benefit of Fay Servicing. Then have you MFRA Residential Assets, LLC, the owner.

THE COURT: Pardon me, can you tell me what page you're on?

THE WITNESS: I'm on page 136. I'm sorry.

MR. STEED: Lot of black to scroll through.

THE COURT: Okay. I'm at 136. Sorry. Go ahead.

A. So MFRA Trust 2015-1 and Fay Servicing, LLC.

BY MS. LONGORIA:

Q. And that is the named plaintiff in this action?

A. The MFRA Trust 2015-1, yes.

Q. So while the original contract is dated November 17, 2014, the joinder agreement adds the Trust as a party to that contract?
A. Correct.
Q. Okay. So the next document I'd like to -- and that's signed by the Trust?
A. Yes.
Q. As well as by Fay?
A. Yes.
Q. And there is another owner joined in this, as well as a property manager, et cetera. And all of those folks are then bound by this flow servicing agreement?
A. Yes.
Q. Okay. So the next document to direct your attention to is Exhibit 11. It begins on page 140. This is a certified copy of the Trust certificate. And, again, it speaks for itself. But does this reflect the date that the Delaware Statutory Trust, MFRA Trust 2015-1, by and through Wilmington Trust National Association, not in its individual capacity, but as Trustee, was formed?
A. On July 1st of 2015.
Q. Okay.
A. That is on page 140.
MS. LONGORIA: And I would move for the admission of Exhibit 11.

MR. STEED: No objection.

THE COURT: Exhibit 11 admitted.

BY MS. LONGORIA:

Q. Okay. So I direct your attention to Exhibit 12, which begins at page 144. Again, this assignment is not one that you are relying on, but is this an assignment of record from Nationstar to MTGLQ?

A. Correct.

Q. Next there's another two documents, 13 and 14. These are, again, assignments not being relied upon for your standing, but they are assignments of record?

A. That is correct.

Q. Okay. So the next document I would direct your attention to is Exhibit 14. That begins on page 147. And what is Exhibit 14, dated January 20, 2017?

THE COURT: I'm sorry, Attorney Longoria. I just want to make sure I'm correct. I think previously you talked about Exhibits 13 and 14 and said those are assignments not relied on.

MS. LONGORIA: I misspoke. Yes, Your Honor.

Yeah. 13 is an assignment, for the record to be corrected, and 14 is not. And that's the document I would direct your attention to, beginning at page 147.

THE COURT: Thank you. I just want to make sure I'm on the same page.

BY MS. LONGORIA:
Q. So directing your attention to this document. Does this reflect the new owner of the loan?
A. Yes.
MR. STEED: Objection. Foundation. It's -- I think they said the owner was Fannie Mae.
MS. LONGORIA: The owner was Fannie Mae until this.
MR. STEED: Okay.
BY MS. LONGORIA:
Q. So this document speaks for itself. But in paragraph --
THE COURT: Just so the record is clear, overruled. Go ahead.
MS. LONGORIA: I'm sorry, Your Honor.
BY MS. LONGORIA:
Q. So this document, it speaks for itself; but directing your attention to paragraph 2, does it say when it was sold from Fannie Mae?
A. The date of the sale of the transfer in No. 2 is December 22nd of 2016.
Q. And the transferee is the MTGLQ Investors, L.P.?
A. Correct.
Q. Okay. And then the next document I would direct your attention to is document no. 15. That begins at page 149. Who is the servicer for MTGLQ?
A. It gets transferred to Selene Finance.

Q. And Exhibit 15 is -- appears to be and is admitted by agreement. This is a letter dated 3/1 of 2017 from Selene to the Howes. Do you sometimes refer to this as a hello letter?
A. That is correct.
Q. Okay. So are you notifying the Howes -- or was your predecessor in interest notifying the Howes that the servicing of their mortgage loan would change from Nationstar to Selene?
A. That is correct.
Q. Okay. And the next document I would direct your attention to is Exhibit 16. That begins at page 152. What is this?
A. This is a letter that went to the house explaining to them that they can get a -- again, the loan was in default by this time. The payment was due for October 1st of 2014. This letter is dated June 29th of 2017, and it's offering them a discounted principal balance to $175,000 and offering them a change in payments. And it's just offering them a way out of the default that they're in.
Q. Okay. And did they accept a modification offer?
A. No.
Q. Okay. And 17 we've already discussed, and it's admitted, reflecting the ownership period for Fannie Mae.
I'd next direct your attention to Exhibit 18, which begins at page 156. What is Exhibit 18?
A. Exhibit 18 is the what we call good-bye letter. So it's a good-bye letter from Selene explaining that the loan is being

transferred to Fay Servicing, and Fay Servicing will be their new servicer.

Q. And the next letter, 19, what is this?

A. This is the Fay hello package. This -- obviously with the transfer now we're saying hello, we are your new servicer. This gives them a whole -- information about Fay Servicing. They can do payments by mail. You know, they can do it the old-fashioned way. They can use automatic ACH. So that's what all of this information gives them, all of that paperwork.

Q. And within this document, specifically on page 164, are they made aware of their current interest-bearing principal?

A. Yes. They have the current principal balance with late charges and their current monthly payment due, which was the payment as of 10/1/2014.

Q. So I notice in this letter there's a -- so September 11, 2017. So there's $588 in late charges.

A. Correct.

Q. So even though this mortgage loan allows late charges to be charged for as long as the loan is -- or speaks to when a loan is in default, only $588 is here. Is that -- does Fay charge more late charges as the loan goes on, or is that the number for late charges that you seek throughout?

A. No. That has been the same number throughout -- even through now.

Q. Okay. And above that it talks about what -- the loan, the

payment due date, 10/1 of '14; is that accurate?
A. Correct.
Q. And on 10/1 of '14, was -- what was the current monthly payment amount?
A. 1530.13.
Q. Okay. So this loan doesn't give all of the details? It doesn't have the deferred principal, the interest, the advances, et cetera, it just has the current interest-bearing principal amount?
A. That is correct.
Q. Okay. So the next document that I would call your attention to is Exhibit 20. Begins at page 173. Is this another document within the MERS chain of assignments?
A. That is correct.
Q. And while not effective for the purposes of foreclosure, it -- it is reflective of the fact that the MTLG -- GLQ Investors, L.P., assigned their interest in this to the plaintiff, correct? It's that -- that is the name -- named plaintiff, Wilmington Trust National Association?
A. That is correct.
Q. All right. And then the next document, there's a recision of a prior assignment at 21. And, again, are you relying on this recision for your standing?
A. No.
Q. But it's on record?

A. Yes.
Q. Okay. And then we're going to skip 22 because that is a statement of the law in Florida. But I want to speak generally about the Florida action and Fay's involvement in directing that. So the actual Exhibits I will speak to with regard to attorney -- through Attorney Diaz as a subsequent witness.
But in light of the Greenleaf issue that you had in this case, was Challenge Financial Investors Corp., a live, active corporation when the Greenleaf decision came down?
A. They were not.
Q. Okay. So after 2019 and Beal Bank came down and we could not do a dec case in Maine to establish standing -- and there are pleadings with regard to that in this case -- but was the decision made to go to Florida to obtain a receiver to wind up the corporation and get an assignment of that quitclaim assignment?
A. Yes.
Q. And were you involved in that decision?
A. I was not.
Q. Okay. And when the decision -- or when the quitclaim assignment was obtained and recorded, is that when you got involved in this case?
A. Yes.
Q. Okay. So I'm going to direct your attention to Exhibit -- well, first, I'll direct your attention to Exhibit 25. It's at

page 242.

So in the midst of all of this, there appears a quitclaim deed from one borrower to the other. From Henry to Melanie. It's dated February 3rd of 2022.

A. That is correct.

Q. Was permission requested to transfer the interest in the property to Melanie?

A. Permission from whom?

Q. Did Henry ask to give his interest away? Did he ask the bank to transfer his interest in the property?

A. Not that I know of, no.

Q. Can anyone just transfer their interest in the property under the note and mortgage without the consent of the lender or the current holder?

A. They could, yeah. They'd still be liable because they signed the original documents; but they could transfer.

Q. So they signed the original note. So Henry is still responsible for paying that original note?

A. Sure.

Q. Okay. So the next group of documents are the York County Probate case documents for guardianship.

MS. LONGORIA: And, Your Honor, I'm going to pause and lay the foundation for these simply under 902(2), and 902(4). These are certified copies of public records. The first pages are the document -- or the docket. The case begins in 2016,

and the docket entries continue until 2020. It includes a jurisdictional affidavit and it includes an affidavit of various parties. It includes a divorce judgment, which we just went over the quitclaim deed, and the divorce between Melanie and Henry. And it supplements our record with regard to the divorce agreement, the fact of the divorce, when the divorce occurred. It also sets forth the various information with regard to the children and who was living where, et cetera. It is relevant because it -- the documents -- these public records occur alongside the period in which the counterclaim alleges damages, and they are relevant to that.

And based on the fact that they are certified copies of public records and that the borrower is putting the period from 2014 -- or is attempting to put the period from 2014 until 2020 in as an issue in this case -- whether we agree that that's permissible under the order on the motion for summary judgement or not -- they are attempting to build a case that goes beyond the December 6, 2020, to December 6, 2021, period. And for that reason, I would offer Exhibit 26 into evidence.

MR. STEED: I mean, Your Honor, I think this is one of the things that I was talking about, sort of, on the order. I think if we get into that, it might be useful to -- in response to Ms. Howe's discussion of her emotional distress. But I don't think just by itself -- I mean, this is -- largely relates to a really kind of tragic and unrelated, sort of,

disruption in Ms. Howe's family where her daughter moved out when she was 16, and they've been estranged since then. And I think there's some argument that maybe that was the real reason she was having emotional issues during that era; but we haven't even raised it as an issue yet. So I think it should at least stay out for now. And then she can -- certainly may be useful as impeachment evidence if she testifies and says other than what the documents say. But right now they're probate -- I mean, they're hard -- sealed, hard-to-get-at probate records. In Maine probate, I think guardianships generally have to be a party to get them. And this would make them very public, and it's very private. So we object to it now.

THE COURT: Go ahead.

MS. LONGORIA: May I speak to the sealed part? There are -- within this document, there are sealed documents. This is public record. Anyone can go into the probate court and obtain a certified copy of these records. That's why they're admissible under 902 and 904. There are not copies of sealed records in this submission.

MR. STEED: I'm saying relevance. And then there's a reason not to admit them because of the sensitive nature of them. I mean, they're -- I don't doubt that they're real records. The issue is, and just as a practical matter, I'm pretty -- 98 percent sure if I went onto Maineprobate.net right now and tried to pull guardianship records of a minor, I

couldn't get them unless I could establish to the court that I had a real good reason. The general public can't just pull these. And -- and now they would subject to something the general public could easily --

THE COURT: Well, for now with respect to the relevance issues, I'm not going to let them in now. I agree. They very well may become relevant once we know what the counterclaims are. So -- but, you know, preserved your ability to try again at a later time when they may be relevant.

MS. LONGORIA: Thank you. I will. Just to correct the record, however, I walked into the public agency. I obtained these. I wrote the check. I walked out. These are public records. And I would -- just to preserve my objection, I would argue that they are relevant even within my main case because they establish a chronology of events, and that was the reason why I was offering them in the context of the foreclosure case.

When he says that we haven't even raised that issue, by filing an answer and alleging damages, he has raised that issue, and that was the purpose for attempting to introduce this now. I'll move on. I just wanted to preserve that.

BY MS. LONGORIA:

Q. Okay. And we won't discuss 27. However with regard to -- or 28. But I will direct your attention to Exhibit 29. And that begins at page 334.

So, first, this is a multipage document. It's captioned: Quitclaim assignment of mortgage. And it includes a copy of the order granting the plaintiff's motion to appoint a receiver as part of the recorded document. It ends at page 338.

MS. LONGORIA: So as an initial matter, Your Honor, I have also submitted this document with the original certified records that I have presented to the Court, and I would move for its admission as a certified copy of a public record.

THE COURT: This is Exhibit 29, at page 334?

MS. LONGORIA: Yes, Your Honor. Pages 334 through 338.

THE COURT: Any objection?

MR. STEED: Yeah, Your Honor. I object to the admission. It's not relevant because the receiver wasn't authorized to act in Maine, and there is no evidence that they are --

THE COURT: Sorry, I can't hear you.

MR. STEED: There is no evidence the receiver was authorized to act in Maine. I think it would just incorporate the arguments made in the receiver -- the Florida receivership briefing. Do I need to articulate that more or --

THE COURT: No. I understand there is an issue. I'm going to admit them. If for some reason they don't become relevant or there's an issue, it's a bench trial, I can always disregard it.

MR. STEED: If I'm being overzealous, I'm trying to make a -- I'm not trying to be unpleasant. I'm just trying to do a good job.

BY MS. LONGORIA:

Q. So following this quitclaim assignment, were you then able to initiate a foreclosure case?

A. Yes.

Q. Now prior to obtaining the quitclaim assignment, however, you had initiated a multicount complaint based upon the note contract, as well as the agreement of the parties, and the advances that were made for taxes, insurance, and, as set forth fully in the complaint, to enrich the borrowers and to protect the property from either demise or tax sale, those -- that action continued, correct?

A. Correct.

Q. But after obtaining a quitclaim assignment, the docket -- the docket reflects that an additional complaint was filed, and there was actually a motion to join the action. That action with the note case back then, that was denied, so the foreclosure case moved on and the note case moved on?

A. Correct.

Q. Okay. So with regard to Exhibit 30, as an element of the foreclosure, the recording of an affidavit of commencement of foreclosure as set forth at 339 through 350, does -- this is -- it's been admitted as a certified copy of that affidavit. But

attached to the affidavit is a copy of the original complaint in the foreclosure action, but without its exhibits?
A. Correct.
Q. Okay. And in this original complaint, the principal balance is set forth, as well as the interest, the late charges, and the escrow advances. I am directing your attention to page 347.
A. That is correct.
Q. So as you initiated this action, notwithstanding the fact that you had incurred attorney fees in connection with that note case, your complaint for foreclosure elected not to include those attorney fees?
A. Correct.
Q. Okay. And the single count complaint is pled to be an in rem -- remedy against the property to extinguish any interest that Melanie Howe, at this point, has in the property?
A. Yes.
Q. So next I would direct your attention to Exhibit 35. That begins on page 453.
THE COURT: 453?
MS. LONGORIA: Yes.
BY MS. LONGORIA:
Q. Now, this Notice of Right to Cure is dated August 5th of 2024. So I'm going to step back a minute. And after your quitclaim assignment was recorded back in 2023, did there come

a time when you all sent a -- or my office sent, but you directed, a right to cure be sent to the borrower?

A. That is correct.

Q. Okay. So the prior Notice of Right to Cure, I'm going to -- this is not yet an exhibit. So it's not electronic. It was turned over in discovery. 56. So I'm going to mark it as Exhibit 57. I'll show it to counsel so he --

MS. LONGORIA: It's just the original 2023 Notice of Right to Cure.

And may I approach?

THE COURT: You may.

BY MS. LONGORIA:

Q. So in doing this initial Notice of Right to Cure, was there a statement as to how far -- how many payments behind the borrower was?

A. You talking about Exhibit 57?

Q. Yes. Let me first lay some foundation for that. What is the date of that document?

A. The date of the letter is April 14th of 2023.

Q. Okay. And does that appear to actually be the original Notice of Right to Cure that was sent?

A. Yes, it is.

Q. And is it true and accurate with regard --

MS. LONGORIA: Well, it's the original. So I move for the admission of the original.

THE COURT: Any objection?

MR. STEED: Well, I'm not sure what it's for, and it also wasn't ever provided to me until now, as far as I know.

MS. LONGORIA: It was in the discovery. I can get you the page.

MR. STEED: I still don't understand what's it being admitted for even.

MS. LONGORIA: I'll ask him some questions.

MR. STEED: Wouldn't we just ask the questions before admitting it?

THE COURT: I'm going to allow it.

MR. STEED: Okay. Is there -- is there a copy up that I can see so I know what we're talking about at the same time?

MS. LONGORIA: It's in the discovery. So I don't have another copy of it. I'm just going to ask him a couple brief questions. If you want me to stop and I'll bring it back, I will.

MR. STEED: No, that's fine.

BY MS. LONGORIA:

Q. So my question on this is very simple. The amount to reinstate in this loan, did it describe that there were -- was a number for payments that are due at the point in April of 2023 when this was sent?

A. Yes. Total payment amount is $146,324.89.

THE COURT: Attorney Longoria, can you publish the

document?

MS. LONGORIA: Oh, I can, Your Honor.

THE COURT: So they can see it at the same time.

MS. LONGORIA: I forgot about that aspect of technology. Thank you so much. Thank you.

BY MS. LONGORIA:

Q. All right. So it's already there. This is where I'm supposed to wear the bifocals. Just one second.

Okay. So directing your attention to page 2 of this document. There is a statement that the total payments -- total payment amount due is this 146 number, and then there are late charges below that?

A. Yes.

Q. And a total to cure?

A. $146,912.89.

Q. And a breakout of the amount of that that is interest?

A. The interest amount on that is 84,945.89.

Q. So if the borrower would have come current with that number, would Fay have accepted the amount tendered and brought the loan current?

A. Yes.

Q. But during this time in 2023, was there some case law that came down that led us to send an additional demand with more of a breakdown?

A. That is correct.

Q. Okay. And is that demand reflected in Exhibit 35?
A. Yes.
Q. Okay. So turning your attention to Exhibit 35. Instead of just saying the payments that were due, you've got a list of payments that are due?
A. That is correct.
Q. Okay. So let's back up because we haven't actually talked about your boarding of a loan yet. And that actually belonged back in 2017, so I apologize.
So please go back to 2017 when you began servicing this loan. And please explain to the Court, when you board a loan, what do you do? You being Fay. What does Fay do when it boards a loan?
A. So Fay, in boarding a loan, the loan boarding process usually begins about 45 days prior to the actual boarding of -- the final board of the loans. Our investors are buying pools of loans. So these loans are coming over in, you know, large pools. Sometimes they're 40 to 50 loans, and they can go all the way up to 2, 3,000, 5,000 loans. But the initial meetings happen about 45 days prior to the -- to the -- to the board final. Those initial meetings, the prior servicer and Fay Servicing, are discussing the hello and good-bye letters. They get prepared, reviewed, when they get mailed. All that is done at the meetings. The meetings are also involving how the information is going to come over. It comes obviously to Fay

in a sealed, secured file. They may send it by e-mail. They could sent it, you know, through the mail as long as it comes in a secured file that, you know, would have only secure entry that somebody can get into.

Once they get that secured file, we -- at that time in 2017, we were using a system called ELI, which was Electronic Loan Interface. The Electronic Loan Interface was the system that would take in the information from the prior servicer and run it through a series of scenarios. So ELI is looking for anomalies or things that maybe don't make sense. For the lack of a better way to explain it, if there was a loan that's statused in foreclosure, a loan that's in foreclosure would have to have certain aspects of that transfer in order to say, yes, this is a status foreclosure loan.

Some of those things would be a default date that would have to be in the past. It would have to have a demand letter date. It would have to have a referral date to an attorney. And then the referral -- after the referral of the attorney, there would be a first part of action.

And then there's other, you know, filings and things like that. So those kinds of things would have to be dated in this -- in these data fields. If that information is not there for a foreclosed loan, ELI says, well, wait a minute, you have an issue here. You have a loan status at foreclosure, but yet, you know, you don't have a default date, or you don't have a

demand letter date. So how could you have this status if this is missing.

So that's what the information -- the system does. It looks at principal balances and makes sure that the principal balance that's getting transferred is correct. Escrow balances, all of the information that comes through is all done through this ELI system.

After we review that at the preliminary stage, our special loans team has also developed their own type of ELI system where it takes now the information from the prior servicer and the information from ELI, and they do a secondary data review on that information to make sure that what ELI has come up with is correct. Then we await the final board. For the final board is -- goes through the same exact process.

We get all of the final information securely sent to Fay. It goes into ELI. We go through that same exact process that we did with the preliminary information. But now we have information that's going to be going into MSP. MSP is our main system of record. And then our special loans team now does a secondary audit on the ELI information, the prior servicer information, and the information that's going to be put into -- into MSP to make sure that that information is correct.

At that final board stage, we also do doc to data review on about 34 different data points. The data that we're looking out of the docs that we're looking at to complete that data

would be the original, not the -- the copies of the note. Mortgage. Could be a loan modification. Could be an appraisal from, you know, the origination. We gather information to make sure that the information that's going into MSP, we make sure that we're just checking on that data.

The other one that we do is for loans that are -- adjustable rate loans. We do a special adjustable rate look on those loans as well. This loan, at the time it transferred, had a fixed rate. But if the loans that had, like, the step rates -- the mods that were previous to the last ones were step rate mods -- all that would be put in MSP to make sure it's done correctly. If it's a straight adjustable rate mortgage, we make sure we have to do -- make sure that we have to have the proper interest rate marker to -- in order to do the adjustments.

So some loans are done by live bore. Some loans are done by the fed rates. Some loans are done by 30-year bonds or whatever. We have to make sure that the information that's in the note for that particular interest rate marker is correct in MSP so that we're doing the right, you know, interest rate for that note.

But once all that is done, then the information becomes our system of record. MSP -- we move going forward. MSP, at that point, also does an amortization on all of the loans to make sure that wherever the loan may have stopped in time, that

the principal balance that we have going forward would be the principal balance that was transferred and that there wasn't anything out of the ordinary.

One other final thing that -- so we get all of that information in there. Then we go live with MSP. All of the documents that come from the prior servicer, and there may be all kinds of -- you know, we have statements that come from them. Their monthly statements. We'll get -- if they've had demand letters, we'll get all kinds of their correspondence that they've had with the -- with the borrower. Any loan modification letters or any kind of letters that they may have sent to the borrower, those usually come in through the boarding process, and then they get put into a document system that we call AIQ. AIQ is our digital document system, and MSP is our main system of record that houses all of the loan information.

And everything that we do on a daily basis for a loan is done in MSP. And we also have another system called LPS. LPS is our communication system with our attorneys, and also the communication system we use with the custodians that I explained earlier - - - - - - - - --

Q. Okay. And to define MSP, the acronym stands for?

A. -- well, some people think it stands for mortgage service platform; but other people say it doesn't have any acronym, so....

Q. Very well.
A. I'm on the side of I really don't care.
Q. Okay. That's what it's called.
A. It's a good system.
Q. And have you had the opportunity, in preparing for your testimony, to review not just the documents before you, but to review MSP and review the boarding?
A. I'm sorry, can you repeat that?
Q. Have you had the opportunity, in preparing for trial, not just to review the documents before you but to review your MSP system?
A. Yes.
Q. And many of the documents that we've introduced already today would normally require the foundational testimony that you're giving now with regard to your boarding process. So I just want to ask you a few more questions so that our record is complete on that.
You are making and creating records from the point you begin servicing as part of your business practice, but are you also relying on records that you've -- you've obtained from the prior servicers in the context of servicing the loan?
A. Yes.
Q. But your boarding process that you've just testified to, if you find something that you don't agree with, you do what? In other words, what controls from the point you service on?

A. So if there's an anomaly or something that ELI may show, then we will go back to the prior servicer at that time and ask for correction. Or it may be something that one of our internal departments can review and possibly do a correction and not having to go back to the prior servicer.

There may be things in the boarding that we don't see or that are not as visible or that they don't maybe show as a possibility of an error until, you know, we might -- we could service a loan for a year, maybe two, and maybe the borrower says, hey, I should have this payment amount or maybe there was a loaned modification and you didn't get the loan modification or whatever, you know, and sometimes those types of things happen. But -- and we would obviously -- at that point we can go ahead and correct them, at that point, in just getting all of the information. But anything that happens at the boarding process or at the time of boarding, we would be able to address it at that point.

Q. Okay. So -- and that process was done in this case?

A. Yes.

Q. Okay. So in preparing the second demand letter with all of its detail, there are a number of statements that are included in the record at Exhibit 45. And these appear to be loan statements that go back to 8/19 of 2014.

A. That is correct.

Q. Okay. And in preparation for trial, did you have the

opportunity to review the statements against the information in the Notice of Right to Cure?
A. I have.
Q. And with regard to principal and interest, do the statements from -- well, the first statement you have is 8/19 of 2014. So from that point forward, do the statements align with principal and interest?
A. In regard to the first statement that -- which is pages 978 to 980, that principal and interest is slightly lower because it's still based on the previous modification. They had not implemented the new modification at this point in time.
Q. Okay. And let me go back to the records to refresh and make sure we're speaking of the correct dates.
So the loan modification was signed on -- the last loan modification in 2007 -- or 2014 was signed November -- no, August 26th of 2014?
A. Correct.
Q. Okay. When was the first payment under that to be made?
A. So it was due for September.
Q. Mm-hmm.
A. Even though the timing -- the signing of it the payment would have still been due for September of that year, 2014.
Q. Okay. And so at the point on August 19th of 2014, this first statement reflects prior to the modification?
A. Right. So this interest and principal on this statement

is based on the 2011 modification because they had not implemented the new modification at this point.
Q. Okay. So directing your attention to page 981. Does this -- beginning with the statement dated 9/19 of 2014, does this reflect the new principal and interest amount?
A. So this particular statement was prepared on 9/19, after they had the signed mod in-house. And this does then reflect the proper interest and principal and interest payment.
Q. Okay.
A. Of 979.92.
Q. And from -- and one other question. So you provided this big stack of statements that is Exhibit 45. Are there two missing statements in there at some point during that chronology?
A. I believe there were two missing statements in, I want to say, maybe around February or March of 2017.
Q. Okay. And -- but this is what you -- this is what came over?
A. Yes.
Q. Okay.
A. All of the statements that we received are here.
Q. Okay. So --
A. Or prepared ourselves.
Q. And these statements accurately reflect the principal and interest amount with the new fixed rate of 979.92?

A. Yes.
Q. Okay. And talking about escrow. So you've talked about taxes and insurance, and at one point you testified with regard to mortgage insurance. Are all three of those things considered escrow?
A. Yes.
Q. Can you describe mortgage insurance, how long it lasts on a loan and why it changes?
A. For the most -- most of the mortgage insurances we see, they are -- initially they start out as a ten-year contract, so to speak. It kind of frontloads in the first ten years. So your payments into the first ten years are significantly higher. In this case, the amount was $325 per month, and then after the ten-year contract --
MR. STEED: Your Honor, object on foundation on that one. I mean, this --
THE COURT: To the whole question or just that portion of it?
MR. STEED: Just the portion that the mortgage interest -- well, actually, I withdraw that, Your Honor. But if I'm standing up, I could really use a comfort break, if it's possible.
THE COURT: Yes. We're just about to talk about time for a break.
MS. LONGORIA: This is a fine place.

THE COURT: This is a good time for a break?

MS. LONGORIA: I'm with you.

THE COURT: Just so I know, how much longer do you think you have with this witness? That's okay if you don't know.

MS. LONGORIA: About -- no. I can -- I can -- I would say less than an hour.

THE COURT: All right. So why don't we take a 15-minute break. We'll be back here at 11:05.

(Break taken. Time noted: 10:49 a.m.)

(Proceeding resumed. Time noted: 11:13 a.m.)

THE COURT: All right. We are back on the record, and you can proceed.

MS. LONGORIA: Your Honor, as an initial housekeeping matter, I neglected to move for the admission of Exhibit 35. I now do so.

THE COURT: Okay. Let me just -- my computer is slowly restarting again so I can make sure I'm looking at the correct Exhibit. Any objection?

MR. STEED: Yes. Yes, Your Honor. I mean, I believe it's authentically what was mailed and as far as it having been sent. It was sent with -- on Ms. Howe's behalf to my office by agreement. However, as -- I would ask the Court to hold off on admitting it until after cross-examination. In particular, this record appears not to be a record of Fay Servicing but

some other business. And certainly businesses can integrate other businesses' records based on, I think, certain facts that I assume they can produce; but then the question is, is it reliable. And I think if it's not reliable -- you know, if the -- if the opponent of the evidence is able to show that it is not reliable, then it shouldn't be admitted under U.S. Bank versus Jones. It's sort of the First Circuit's adoption of integrated business records rule. I think under Jones -- under -- the general idea is that if a business relies upon and verifies another businesses' records, it can be admitted as a business record.

Here -- I mean, there's one concern because I -- my -- by offer of proof, I think, based on other trials that what the plaintiffs' witness will say is that it provided the information, you know, in this spreadsheet to counsel. Counsel edited the letter and then sent it back.

And so, you know, the only -- you know, it was -- and that the information is compiled from more than one electronic source that isn't here. And this isn't obviously what -- I mean, this might be -- so there's human manipulation possibly of this data. It comes from MSP, gets put into this.

THE COURT: I'm going to cut you off for a minute. What's your objection?

MR. STEED: Oh, that it shouldn't be -- it's -- it's not properly admitted as a business record.

THE COURT: It's not a business record.

MR. STEED: And -- well, it's -- I mean, it's not a business record, and it contains hearsay within hearsay once we hear more about it. And so we don't want to stop and cross-examine him how. But I think there -- one, is it properly integrated as a business record. Will we be able to produce evidence that says, this particular record isn't reliable based on the other evidence in the record. And so I think it would be premature to admit it now and then just -- you know, subject to cross and give it weight when there is a threshold crush to admissibility that would need to be based on evidence that can't come out until later.

THE COURT: Okay. Ms. Longoria.

MS. LONGORIA: May I speak? U.S. v Jones is the key case. That was my demand. It was admitted. It was created by the law firm and verified by the servicer and retained within the servicer's business records, just like this one was. The Jones decision turned on attorney fees that were included in the demand letter that were prior to sending of that demand. And that was why in Jones the note case judgment went through, but the foreclosure case judgment did not go through.

But as to the business records, that's the hallmark decision that says, if you integrate the business records and you rely on them in servicing, they're sufficiently trustworthy as business records to be allowed. And both the loan history

and the demand letter in Jones were admitted. Counsel's objection goes to weight. He'll have the opportunity to cross-examine. But -- and I'm happy it lay further foundation with this witness about the preparation of this letter. But it is not only a business record of my law firm, it is a business record as an agent for Fay Servicing, it is a business record of Fay Servicing.

THE COURT: Okay. So I know Jones, but I do want to review it in light of this letter. So I want to reserve ruling. You can ask about it, but I'll reserve ruling on the ultimate admissibility.

MS. LONGORIA: Very good.

BY MS. LONGORIA:

Q. So Mr. Paterno, when we left off, you were talking about mortgage insurance generally. And my next question I would like to direct your attention to mortgage insurance with regards to this loan.

So in order to talk about that, first, the -- you testified that the note and mortgage were signed in April -- April 20th of 2027 [sic]. When was the first payment due on this loan?

A. It was April of 2007.

Q. Sorry.

A. April 20th, 2007.

Q. Yes.

A. I believe the first payment was due on June 1st of 2007.
Q. Okay. And that first payment would have included mortgage insurance?
A. Correct.
Q. And where is the amount of mortgage insurance --
MR. STEED: Object just on that last question that it would have included. I just don't -- I haven't seen that anywhere in the record, in the 2007 pay history or anything about 2007. And this is an important question, actually, where did the authority come from to charge this, if it's in the mortgage, but a document or two or three that's not here.
THE COURT: Okay. So I'm going to sustain the objection. You know, you're welcome to ask additional questions to try to get the information.
BY MS. LONGORIA:
Q. Where is the mortgage insurance provided for in the loan documents? Or -- or if it is, or is it provided elsewhere when a loan is originated?
A. In paragraph 10 of the mortgage, which is on page 18, it does discuss that if the lender requires mortgage insurance, it would be applied. Mortgage insurance is not spelled out specifically as the terms here, but it would have been included in the borrower's good faith estimate when the loan was originated.
MR. STEED: Again, I'm going to object to that.

THE COURT: Hold on one minute. I just -- so you're talking about paragraph 10, if the lender required mortgage insurance as the condition making the loan, I will pay the premiums for the mortgage insurance. But is there anything in the documents that talks about the number or that it's included in the escrow?

THE WITNESS: No. Like I said, would have been in part of the good faith estimate at the origination, which is not here.

THE COURT: Which is not here?

THE WITNESS: Right.

MR. STEED: Your Honor, and that's -- I would just object to that, that it would be in some other document. Doesn't help us with whether it was actually authorized.

THE COURT: Okay. So I don't know if there's still -- I understand your objection to his answer. But I think it's clear for me now what that's -- what that is or isn't based on. So I'm going to overrule your objection. The answer is what it is. And you can argue about why that's significant or not.

BY MS. LONGORIA:

Q. So back to mortgage insurance for the ten-year period. So the first payment of this loan was in June of 20 --

A. 2007.

Q. 2007. So from June of 2007 forward for a ten-year period, as reflected in the breakout in your demand letter -- let me go

to 454 -- is one aspect of the escrow mortgage insurance?
A. Yes.
Q. And this 325.87, that is the number for mortgage insurance for the on -- until April 1st of 2017?
A. That is correct.
Q. Now on March 1st there appear to be two 325.87 amounts in the March payment, and then after that it drops to 3467 for the balance of the loan. Can you explain why mortgage insurance drops after 10 years, even if the loan is in default?
A. So the initial -- again, as I was saying earlier that the mortgage insurance is frontloaded for the first ten years. So the payment is significantly higher for the first ten years, and then it drops after that to the percentage that you have there.
Q. Okay.
A. Some of them are all different. I don't know the exact percentage of this particular one, but it -- they are a percentage of the principal and interest that are due, and then it changes again after the tenth year.
Q. So from June of 20 -- 2007 through the change date of March 1st of 2017 with the double payment, that fulfills the ten-year obligation at the higher payment, and then the loan payments begin to drop down for 3467?
A. Correct.
Q. Okay. Now taxes and insurance. Taxes being real estate

taxes?
A. That is correct.
Q. And insurance being insurance on the property?
A. Yes.
Q. Okay. So during the course of this Notice of Right to Cure, the loan is always in default, correct?
A. Correct.
Q. All right. So there -- for lack of a better word, escrow is a bucket, generally? A place where a borrower's payments pay -- are paid into, and then they are distributed from the escrow account?
A. Yes.
Q. So in this case, beginning in 2014 when the loan goes into default, there's nothing being paid into the escrow bucket, for lack of a better word, from 2014, October, until today?
A. Correct.
Q. But Fay continues to pay real estate taxes and property taxes?
A. Correct.
Q. Now throughout the servicing from 2014 all the way to now, there are various statements sent out with estimated escrow payments that attach to that original principal and interest payment, correct?
A. Correct.
Q. So your principal and interest payments tie out with

Exhibit 45, no matter who the servicers are, correct?
A. Correct.
THE COURT: Attorney Longoria, I don't know what you mean by tie out.
MS. LONGORIA: Oh, thank you.
BY MS. LONGORIA:
Q. They are the same in the statements as they are in this letter?
A. For principal and interest, correct.
Q. For principal an interest?
A. Yes.
MR. STEED: And Your Honor, I think I would just object to -- it's helpful to move things forward up until now, but this gets into something sensitive. So I object to the leading questions here.
MS. LONGORIA: Okay.
THE COURT: Okay. Sustained. Try not to lead if we don't have to; but it's okay to lead a little bit so we can finish the trial.
MS. LONGORIA: Thank you.
BY MS. LONGORIA:
Q. So the numbers for taxes and insurance, for the numbers for escrow, in this letter where did those come from? Or -- okay.
A. Initially they come from the prior servicer, and then

every year an escrow analysis will be done. So Fay would do an escrow analysis, and that -- those numbers -- escrow is always a forward-looking process. So when we do an analysis at the beginning of the year, we are analyzing for what moneys we will need to collect in order to pay taxes and insurance for the coming year. So there's always -- taxes obviously increase, so we're always looking for -- you know, our tax vendor will, you know, get an idea as to what the upcoming tax rate changes may be, and we'll bill those into escrow. And escrow we're allowed to get I think it's 6 or 7 percent more, just as a cushion, as a servicer for any unforeseen things with --

MR. STEED: Objection. Foundation.

A. -- escrow. So that will be --

THE COURT: To that part of the testimony?

MR. STEED: Yes, Your Honor.

THE COURT: About the 6 or 7 percent cushion?

MR. STEED: Yes, Your Honor.

THE COURT: Okay. So I'll sustain that. You can answer this portion of the question, and then you can ask him a foundational question on that piece.

BY MS. LONGORIA:

Q. So without specifying the percentage of interest, you can continue.

A. All right. I'm sorry. Go ahead and repeat that.

Q. He has objected to the portion of your question with

regard to the percentage of interest -- or the percentage that your escrow can vary?

A. Okay.

THE COURT: Tell me how you know the escrow can vary.

THE WITNESS: It's just common in the industry. So it's been some time -- I've been doing this for 30 years. So I know it's just been common in the industry that escrow is -- while we collect the amounts that we need, there always has to be some cushion, and that's usually like 6 percent.

THE COURT: Do you know what that comes from, that norm?

THE WITNESS: It's just a standard norm. And I do believe it's actually a -- sort of a part of a federal guideline that we can -- that we have that's built into that.

THE COURT: So -- and you say escrow. Just generally? So you'd add up the taxes, the mortgage insurance, and the insurance, and then you can get 6 or 7 percent added on that, or only a piece of the tax is at 6 or 7 percent added?

THE WITNESS: It would only -- well, because we know that mortgage insurance is the fixed number, that doesn't change. So it would only be on the taxes and insurance because those numbers are the ones that can change throughout the year.

So we have a tax vendor. We also have an insurance vendor. So they will get -- presumably you have -- and this goes into probably a little bit more than necessary. So every

tax entity -- you know, every year you get your tax bill as a homeowner. They may be 2 percent or 1-1/2 percent, whatever they billed in, and the increase always happens. So our tax vendors take an average every year and say, okay, this county is going to do -- probably going to do 2 percent. So when we look at that mortgage in that county, we're going to go and -- and add a 2 percent to the escrow just so that we are, you know, hopefully covering that coming year's tax amount. The 6 percent is just a general cushion that we're allowed to have built into escrow. So that 6 percent added will be based on the -- what the tax amount is and what the insurance is. Not the -- not the -- what do you call it, the other insurance. Not the mortgage insurance. Just on property and insurance and on taxes.

THE COURT: Okay.

THE WITNESS: Okay?

THE COURT: I'm sure you're going to have more questions or argue that. That's fine. Go ahead. Thank you.

BY MS. LONGORIA:

Q. But with regard to this loan, nothing has ever been paid for escrow since the October 1st, 2014, statement, has it?

A. There have no -- been no payments received from the borrower, and so escrow has not been funded by the borrower. Escrow has been funded by the prior servicer and Fay Servicing.

Q. Thank you.

So in create -- so you testified with regard to the 2023 letter not having all of this breakdown. When you worked with -- well, how -- how did you work with our offices to create this Notice of Right to Cure?
A. So I review MSP's records, and that's how we -- we have payment screens in the MSP that will spell out what the payments were during the timeframes.
Q. Okay. So you didn't go back and rely on statements that were sent by Nationstar or Selene, et cetera?
A. Not for the letter, no.
Q. Okay. So while you did, in preparation for trial and you made -- you testified that the principal and interest numbers in the statements and in the Notice of Right to Cure are the same, the taxes and insurance -- the escrow payments for all three of those categories, those come from MSP, not from the statements?
A. Correct.
Q. Okay. And in -- in addition to the payments that were due from October of 2023, there are two items that are in the Notice of Right to Cure. One that appeared on 457. One is for $1,356, and the label is property inspections. And what is that?
A. So property inspections I think we discussed a little earlier. When a loan goes into default, a servicer will send somebody to -- out to the property to review the property, make

sure it's being somewhat maintained. If it's still occupied, they'll see if it's still occupied as well.

Q. Okay. And the next accrued late charges, that's where I see this same 588. So Fay was only asking for $588, the same amount that was owed in late charges when you boarded that loan?

A. Yes.

Q. And the total amount to reinstate the loan at the time of this demand letter was 165,537.78. If that would have been paid within the 35 days of receipt of the letter, would this loan have been brought current?

MR. STEED: Objection. Foundation.

THE COURT: Overruled. You can answer.

A. Yes.

BY MS. LONGORIA:

Q. Okay. And pursuant to U.S. Bank versus Jones, did you exclude the attorney fees that were incurred prior to the sending of this letter?

A. Yes.

Q. Okay. Following this letter, did the borrower reinstate their loan?

A. They did not.

Q. Okay. Next document I would call your attention to is the payment history, which begins Exhibit 38. It begins on page 559.

So the first -- actually, this is not in evidence. So we're going to have some questions about what this is and how -- how you created it.

So first off, what is this?

A. So the first page, which is page 559, is a page that we call the total amount due. Or it's a page that we use for judgment figures.

Q. Okay. And following page 39 of Exhibit 38, there are Bates stamp pages. The first of which -- or the first group of which is called the account history. What is that?

A. So the first grouping from page 560 to 566 is the first portion of Fay Servicing's pay history. And I say the first portion because we archive -- our MSP system gets archived every five -- after five years. So anything before that is -- is a different -- we have it -- part of the rest of the agreement -- part of the rest of the Exhibit, but we'll get to that.

Q. Yep. So starting on page 567, what is this?

A. Page 567 is the pay history for --

Q. This will be 567 through 568.

A. This appears to be a corporate -- some -- and this is not -- this is just a small breakdown of some of the corporate advances.

Q. And the date that the advances were made is reflected in the left-hand column that we can read on --

A. These are between, it looks like, January 7th of 2020 -- well, actually, there's two different pages. So the first page, which is 567, goes from 1/31/2020 up to December 10th of 2020.
Q. So it's in reverse chronological order. In other words, you're reading it from the bottom up is how this report reads?
A. Correct.
Q. Okay.
A. And then 568 is from 1/7 of 2020 through 11/19 of 2020.
Q. And then 569, this -- this --
THE COURT: Before you move on, I'm sorry.
MS. LONGORIA: Yes, Your Honor.
THE COURT. What -- pages 567 and 568, what we were talking about, what -- what is that document from? How did that document get generated?
THE WITNESS: So on 567, this is strictly corporate advances. So in the corporate advances would include attorney's fees or any title costs or property inspections.
THE COURT: This is an internal database that you created or someone created from your office?
THE WITNESS: This is created through MSP.
THE COURT: Through MSP.
BY MS. LONGORIA:
Q. And this is over five years. So is this one of the archived documents that you were talking about?

A. Yeah. This is -- this is one piece of the archive. So this is only for corporate advances.
Q. Right.
A. The archive part that I was talking about is a full payment history, which would encompass everything, taxes and insurance, payments, anything, that's a slightly different history than that.
Q. And so -- and directing your attention to 569. Is that where the first of those archived Fay Servicing loan histories appears?
A. Right. So this -- starting on 569 through 5 -- it looks like 577, that is the archive pay history from 2017 through 2019 for Fay Servicing.
Q. Okay. And just to help read these, because this is another way of looking at the data, how are these -- how -- how is this -- at the top it says 12/31 of '19. So for the 12/31, is this all of 2019, this first few pages?
A. Page 569 to 571, those three pages encompass all of 2019. And on the top right-hand corner is the 12/31/2019 date.
Q. Okay. And the prior report was in reverse chronological order. But this one actually started with January at the top and finishes with 12/26 at the bottom?
A. Right. So your transactions here start from the beginning of the year on page 569, and then they end on the end of the year on page 571.

Q. Okay. And then starting with page 572, on the top right-hand corner it says 12/31/18. Is this the similar report for the loan history for the year of 2018?

A. Right. So these are 2018. And, again, it starts on page 572 with the transactions earlier in the year. And as it goes through to page 574, it ends with the transactions at the end of the year.

Q. Okay. And then directing your attention to 576. 12/30/2017 is in the top right-hand corner. What is this?

A. Right. Same thing here. This is only two pages for 2017. 12/30/17 is at the very top right-hand corner. And then on page 576, you have the beginning year transactions and then to the end.

Q. Okay.

A. And the -- with 2017, we -- this is when we began servicing. So this actually starts in September of 2017 as opposed to the other ones that started at the beginning of the year. So this one only picks up from when we took servicing.

Q. Okay. And then I would direct your attention to the document that begins in -- on page 578. The top of this says, 2/21 of '17. What is this?

A. This is the pay history for Nationstar.

Q. And is the pay history for Nationstar something that Fay relied upon and incorporated in its business records in the servicing of this loan?

A. Yes. That is correct.

Q. And the boarding process that you testified to earlier --

MR. STEED: Your Honor, I'm just going to object on foundation to that.

THE COURT: To the previous question?

MR. STEED: Yeah. Verified and relied upon, but I don't know what that means. That just seems like recitations of legal elements in a case about integrated business records without going into the facts of what they did.

THE COURT: Well, okay. I'll sustain -- I'll overrule the objection. He can -- you can ask follow-up questions, if you want. My assumption is that it has to do with the ELI system that he was testifying to.

MS. LONGORIA: Exactly. I was just laying foundation questions one at a time.

BY MS. LONGORIA:

Q. So this is the record of a prior servicer?

A. That is correct.

Q. And you previously testified that when you boarded this loan into the Fay Servicing system, that you went through a process for verifying the accuracy of your prior servicer's loans?

A. Correct.

Q. Is -- is that the process that you're relying on for incorporating these documents into your business records?

A. Yes.
Q. Okay. This particular document is dated 2/21 of 2017. Does it set forth the history of advances because there were no payments in 2017 made by the prior servicer?
A. That is correct.
Q. And this document appears to run through page 580 -- let's see. Is it 581? 9?
A. 604.
Q. 604. So the Nationstar detailed transaction history runs through page 604.
A. Correct.
Q. Okay. And that takes us back, according to the document, to 11/5 of 2010?
A. Correct.
Q. Okay. So these records were made regularly and regularly made in the ordinary course of servicing this loan?
MR. STEED: Objection. Foundation. Just clarity. There are so many different records from so many different servicers. And some of them he obviously knows about, and some of them he kind of obviously doesn't. So I think --
THE COURT: Which record are you talking about?
MS. LONGORIA: I'm talking about this entire exhibit. And I'm attempting to lay the foundation questions for the admission of the exhibit. And there's a series of questions, under the rules of evidence, that I'm going to ask him one at a

time so that by the end of the series of questions, I will have hopefully laid the foundation for the admission of this as a business record.

THE COURT: Understood. And we're talking about Exhibit 38, correct?

MS. LONGORIA: Yes. The entirety of 38.

THE COURT: All right. Go ahead. Overruled.

BY MS. LONGORIA:

Q. So with regard to your entire Exhibit 38, was this document made regularly and regularly made within the ordinary course of servicing this mortgage loan by Fay and its prior servicers?

A. Yes.

MR. STEED: Objection. Foundation. He doesn't know anything about the prior servicer's business practices.

THE COURT: Attorney Longoria is laying the foundation. When she's done asking her foundational questions, if you still have an objection you can object. Go ahead.

BY MS. LONGORIA:

Q. And were these records made and kept by individuals who had a duty to make and keep such records?

A. Yes.

MR. STEED: Objection. Foundation.

BY MS. LONGORIA:

Q. Were they made at or around the time the events

transpired?

A. Yes.

Q. To be more specific --

MR. STEED: Objection.

BY MS. LONGORIA:

Q. -- for example --

THE COURT: Hold on a second. This is not particularly helpful to me. I understand, Attorney Steed, you're objecting because you, as I understand -- maybe I'll make sure we're all on the same page. You're saying Fay Servicing can't -- can't testify about the prior I think it was loan servicing documents. Is that -- is that your objection?

MR. STEED: Yes. And I'm sorry if I don't need to keep making those objections to preserve it.

THE COURT: You have to stand when you're talking to the Court.

MR. STEED: What?

THE COURT: Can you please stand when you're talking to the Court.

MR. STEED: I'm sorry.

THE COURT: What I'm trying to get at is I understand that's what your objection is. I'm going to let her ask all the foundational questions she wants to ask to try to lay the foundation, then she is going to move to admit it. Then we can talk about whether a witness from Fay Servicing can testify or

can admit those documents.

So go ahead. Your objections to all of her questions are preserved, and at the end we'll talk about it. Go ahead.

BY MS. LONGORIA:

Q. So you previously testified that the records were made regularly and regularly made in the ordinary course of servicing by individuals whose duty it was to make and keep such records. Were those records made and kept contemporaneously with the transactions that they purport to depict?

A. Yes.

Q. By individuals who had a duty to make and keep those records?

A. Yes.

Q. And are they relied upon by Fay in the servicing of this mortgage loan?

A. Yes.

Q. And in order to verify the records prior to relying upon them, you testified previously as to the boarding process. What -- does -- is that the process for bringing a loan on and making sure that the information in Exhibit 38 is something that can, in fact, be relied upon?

A. Yes.

Q. And have you, in your preparation for trial, reviewed Exhibit 38 to determine if this Exhibit accurately reflects not

only the servicing records of Fay Servicing but the servicing records of the prior servicer?

A. Yes.

MS. LONGORIA: I move for the admission of Exhibit 38.

THE COURT: Now is your moment, Attorney Steed.

MR. STEED: Yes, Your Honor. I object to it in its entirety, but for different reasons.

As to the Fay records, I think it's clear that they rely on prior servicer's records.

And just as an example, if we look at Exhibit I think 4, it's a loan modification agreement, that is the first time Fays's -- the first page of Exhibit 38 says the principal balance is $237,175. My understanding -- I'll do this more on cross, but we get there through a series of loan modifications. First loan modification is Exhibit 4. It's signed by the Howes and MERS.

And there is just no indication in the record that MERS had authority to modify the loan. They weren't -- they're not even identified as a servicer, they're just someone. And there's -- there's no record indicating MERS's role here. There is no document saying they had authority. I think these -- a lot of these loan modifications -- I mean, similar issue with all of the loan modifications. Nationstar signed a loan modification agreement, but there's agreement that Nationstar had authority to modify the loan. There's no indication --

like, and then the same thing with the 2014 loan modification. There's some suggestion that the -- Nationstar was the servicer at that point. But just like with the Fay Servicing flow agreement, but even more so because there's no record here, there's no indication that there's authority.

And the loan modification agreements do two things. They modify the mortgage, and I think some of them get recorded. Now power of attorney can't just be signed and blank. Normally under Maine law if you even want to have a third party sign a mortgage assignment, they need to demonstrate that they have -- you know, a signed power of attorney has to be included with the mortgage assignment. And I can -- I can write -- I can give you a brief tomorrow, if you want, but that's -- the general notion is that there's no evidence of any authority even to modify the principal numbers.

So that -- this is saying our records say that this is the number. But it's clear that these come from other business servicer's records, and there's no clear indication that the authority was there. They just assumed they had the authority. It's not here. It's not anywhere. It's nothing that's been brought into discovery. So that's one issue, principal balance.

Then the prior servicer's records, I think, have the same Jones issue that the Exhibit 35, I believe, would have. There are sort of -- you know, there are questions. I -- we need to

be able to ask questions about their reliability because that's an initial question. You know, it's -- they're admissible if integrated and verified and relied upon. But how did they verify them are questions, I think, that are still open. And then are they even self-consistent. I just, as offer of proof, I'll say there are -- I'm going to be able to talk about dozens of places where the numbers within the record contradict themselves. And so that -- it's going to be, well, this says this and this says this, which is correct. How do we know if any of these records are accurate?

And so I think it's premature to admit any of these because even Fay's records assume, in large part, that the prior servicer's records were correct. And so far the only testimony is we use a computer program. We used to use a computer system called ELI. Now we use a different system, and that computer system catches mistakes.

THE COURT: I mean, isn't -- the business record exception, it doesn't -- it doesn't require, I don't think, by the rule, itself, what you're asking for. It says, are these records that, you know, this business normally relies on in the course of its business. I'm paraphrasing the record.

MR. STEED: The last -- sorry.

THE COURT: I understand. You just have to let me finish. Unless it's not -- it's not reliable. You can challenge, I think, the numbers. I mean, I understand that's

your whole argument, is these numbers aren't -- aren't reliable. But I don't think it means the record is not admitted. I mean, to me, I think it's certainly clear that, you know, Fay Servicing, in this case and then in general servicing organizations, rely on these types of numbers with their computer systems going forward for servicing mortgages. So I understand what you're trying to -- your arguments and they go to weight and reliability, but I don't think they go to admissibility under the business rule.

So is there -- so you're saying that they're wholly unreliable and so none of this is admitted under the business rule?

MR. STEED: I think the prior servicer's records, that they will prove to be questionable and then the current servicer's -- I mean, this is what their records say. I don't object to that. But whether they're accurate is a separate question. And if they're -- seem unaccurate [sic] at the inception, then I think the business record rule says they're not admissible, not that it's weight. And that is -- I mean, the question is -- is then, you know, what standard is it reviewed on later. Because if it wasn't admitted for good reason, that's a very different question than what does this evidence say.

THE COURT: Well, I'm going to overrule your objection. I don't think they necessarily seem inaccurate at

their exception. I think he testified that they are records relied upon in the normal course of business. So I'm going to admit Exhibit 38.

Go ahead, Attorney Longoria.

MS. LONGORIA: Thank you, Your Honor. And just for the record, so the two cases that are relevant to that that I would have spoke to would be both Jones and Schoen.

BY MS. LONGORIA:

Q. So you have -- Exhibit 38 has been admitted, and I'm going to return to the beginning of 38.

You initially testified that that was a summary. Let me get to it. 559. So go to page 559. So this first page of Fay's record, this reflects what?

A. So you have -- this is showing that it's -- was prepared on December 2nd at the very top line there where the quote summary is. The redacted information there is the loan number. But at the top area, it shows the borrower's name, the address of the property. It shows the principal balance, the additional principal balance that was the deferred balance on the modification in 2014 that we talked about. It shows what the total payment is. Then when you go down below the actual quote summary section, it starts with today's date, 12/16, is where all this information is through. It shows you the per diem --

Q. May I interrupt for a second? Where all this information

is through, so that's today's date. So do you mean that these are the figures that are good through today?

A. As of today, correct.

Q. Please proceed. I'm sorry.

A. The -- it shows you what the per diem amount is based on the principal and the interest at 4.625 percent. And, again, that's a per diem based only on the principal balance of 213,975.36. That is not inclusive of the principal balance for the additional $23,000, which is deferred.

Q. Okay.

A. So the total principal shows both principal amount, the 213 and the 23. So that is there at the 237. But the interest, again, is only on the 213 balance. Then the total interest is 111,815.03. Again, all of that based on the $213,000 principal. There is the pro rata MIP, which is the mortgage insurance, of 3467. There is an escrow advance amount. The escrow advance amount, again, is taxes and insurance that have been advanced by Fay, and in this case also the mortgage insurance. That total is 55,725.92.

Go a little further down, there is a late charge accumulated, which we've seen in $588. And then the final amount, which is that recoverable corporate advance amount on here does include, as we've talked, both the attorney's fees, title fees, and any other property inspections. However, that number, as we've talked about in the demand, is not -- the

attorney's fees portion and the title fees and stuff like that are not being sought after.

Q. And so your proposed judgment, you're not going to be including either the attorney fees as reflected here or any of the other litigation costs on the note case?

A. Correct.

Q. Okay. So during your testimony, you talked about various advances for taxes, insurance, et cetera. As Fay has advanced the loan, the spreadsheet that you see here, does that reflect the amounts that you have paid for taxes and insurance as you've paid them?

A. Yes.

Q. Okay.

THE COURT: I'm not understanding your question, Attorney Longoria. Reflect the amounts you've paid as you've paid them? As opposed to what?

MS. LONGORIA: As the advances were made.

BY MS. LONGORIA:

Q. So if I go to the very first one, there's a miscellaneous corporate advance. First one is $1.20, and then there's an attorney fee, corporate advance of the 6,018.75. So this document includes everything that has been advanced on the loan?

A. Correct.

Q. As you go chronologically through the checks that have

been written?

A. That is correct.

Q. Okay. In talking about the boarding process, I don't remember you testifying -- and if you have, please correct me -- as to the various data points that are verified as a loan comes over.

A. So there are about 450 different data points that ELI would look at. Or at the time of ELI, it was a little bit less. I think it was only about 3 -- 380 or 350, somewhere in there. Our new system is over 450 that it looks like. And what -- the data point is so you have a massive spreadsheet. Every loan will have information all the way through the -- the data. Some of the information, no, you won't have. So a loan may not be -- ever get to bankruptcy. So there are bankruptcy fields in these data fields. And they would be empty, of course, because there would be no bankruptcy information. So a lot of the loans that we do process through don't have all 450 data fields of information. So ELI is reviewing up to that much, but a lot of it is -- is pretty much empty for a lot of the loans.

MS. LONGORIA: Okay. I have nothing further for this witness.

THE COURT: Any cross-examination, Attorney Steed?

MR. STEED: Were we going to do Mr. Diaz?

THE COURT: Oh, that's correct. And he is on the

Zoom.

MS. LONGORIA: Just one second. We went out to verify that he was available.

THE CLERK: He's in the waiting room.

THE WITNESS: Your Honor, you want me to stay here?

THE COURT: You can step down and pop back up. But you can leave your stuff up there.

MS. LONGORIA: Okay. So for this, I will -- you'll turn me off, and we'll just have Zoom?

THE CLERK: Yes.

MS. LONGORIA: Okay.

THE COURT: You want to take a recess to get -- we're just going to take a quick recess so the clerk can get the Zoom settled, and we'll come right back.

(Break taken. Time noted: 12:04 p.m.)

(Proceeding resumed. Time noted: 12:09 p.m.)

THE COURT: All right. Hello again. We're back on record. I understand we have a witness on Zoom, and the clerk will swear you in now.

THE CLERK: Please raise your right hand. Do you solemnly swear that the testimony you shall give in the cause now in hearing shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE CLERK: And if you could please state your name

and spell your first and last name for the record.

THE WITNESS: My name is Adam Diaz. First name is Adam, A-D-A-M; last name is Diaz, D-I-A-Z.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MS. LONGORIA:

Q. And Mr. Diaz, how are you employed?

A. I am a partner at alaw firm in Florida called Diaz Anselmo & Associates.

Q. And did there come a time when you were retained by Fay Servicing, LLC, in connection with the case that you're testifying in now?

A. Yes. I was retained regarding the note and mortgage in this case and the originating lender, who was a defunct Florida corporation.

Q. And directing your attention to that action, I'll direct your attention to Exhibits 22 through 25. Each of these Exhibits have already been admitted into evidence, so I will proceed directly to the testimony -- your testimony on them.

Exhibit 22 is the 2024 Florida statutes with regard to receiverships. Are you familiar with the Florida laws with regard to the appointment of receivers?

A. Yes.

Q. And based -- so you initially testified with regard to Challenge Mortgage Company being a defunct Florida corporation.

How do you know that Challenge is a defunct Florida corporation?

A. So to do business in Florida, you have to be registered. And it's with the Secretary of State website called Sunbiz.org that we check the companies to see if they are active or inactive. And when we checked this entity, they were an inactive corporation in Florida.

Q. And based upon the fact that the corporation was inactive in Florida, Document 23 is captioned, Complaint for declaratory relief and appointing a receiver for Challenge Financial Investors. Was that filed by you?

A. Yes. I prepared this complaint. And we attempted to serve Challenge Financial Investors Corporation. They are defunct, so there was no one to serve. And we went through the process with the court to appoint a receiver for the company.

Q. And so Exhibit 24, what does that document reflect? The first few pages appear to be docket entries. Were those -- is this the docket from the Florida case after you filed the complaint?

A. 24 is the docket for this case.

Q. And the next document I would direct --

THE COURT: Attorney Longoria, I'm sorry to interrupt. Can you tell me the page number these exhibits are, because I'm doing this electronically.

MS. LONGORIA: Yes. Page 177 was Exhibit 22.

THE COURT: I found that one.

MS. LONGORIA: What's that?

THE COURT: I said I found that one.

MS. LONGORIA: Page 178 is the complaint.

THE COURT: Mm-hmm. And Exhibit 24?

MS. LONGORIA: Is page 233.

THE COURT: 230?

MS. LONGORIA: 233.

THE COURT: Thank you.

MS. LONGORIA: And for the record, we have submitted the trial Exhibit with the corresponding page numbers to the court. So we can make sure you have a copy of that after our next witness.

THE COURT: I have that. It's just if it's possible for you to say it, that way I can just scroll up and down.

MS. LONGORIA: Absolutely.

BY MS. LONGORIA:

Q. So that was page 24 -- or Exhibit 24. I would next direct your attention to Exhibit 27.

Your complaint was to wrap up the corporation and to appoint a receiver. But does Exhibit 27 reflect the fact that you filed a separate motion requesting that the court actually appoint to that receiver to take action?

A. Correct. We did file a motion to appoint a receiver, to have someone who was going to be authorized by court to execute

documents on behalf of the defunct defendant.
Q. And Exhibit 28, that begins at page 331. Is this the order from the court appointing the receiver to execute the quitclaim assignment?
A. Let me get to that one.
Q. Beginning at page 331.
A. Yes. That was an order that was entered by the court appointing the receiver to do anything necessary to enforce its lien.
Q. And then --
A. -- including --
MS. LONGORIA: I spoke over him.
A. I apologize. Including executing an assignment of mortgage. That was in paragraph 5 of the order.
BY MS. LONGORIA:
Q. And next I would direct your attention to Exhibit 29. Exhibit -- or page 334. Is this the document that the receiver executed pursuant to the court order, paragraph 5?
A. Yes. That is correct. That is the assignment. And they also attached the order granting them the authority to do it.
Q. And the action, as reflected in those docket statements, how long did you read -- leave that action open?
A. Once the order appointing the receiver was opened and the receiver was appointed, we administratively closed the action. Unless -- so there currently -- it's closed with the court.

And we can reopen it if the receiver has any additional tasks that are needed.

Q. So, for example, if there were another loan that needed a quitclaim assignment from Challenge, you would be able to reopen that and request the same task be completed by that receiver?

A. We would have to motion the court for authority for that particular document potentially, but yes.

MS. LONGORIA: Okay. I have nothing further for this witness.

THE COURT: Attorney Steed.

CROSS-EXAMINATION

BY MR. STEED:

Q. Hello, Mr. Diaz. Can you hear me?

A. I can hear you. I can't see you, but I --

Q. I think I -- I think I can probably move.

THE COURT: Can you go to the lectern, Attorney Steed? Or is that going to be too complicated?

BY MR. STEED:

Q. See me now?

A. Yep. That's better.

Q. You said when you filed this complaint in Florida you were acting on behalf of Fay Servicing?

A. I was retained by the servicer. That's correct.

Q. Okay. Did you talk to anyone else to prepare?

A. I spoke to Ms. Longoria just in general about it because the case was a Maine case, Maine law. So I spoke to her in general about this.
Q. Okay. But you prepared it, the complaint?
A. The complaint? I did draft this complaint. Correct.
Q. Okay. The complaint talks about two cases in Maine law Greenleaf I and Greenleaf II. Can you just tell me your understanding of what happened in those cases?
A. I can. And I did this in 2023. So I haven't looked at those cases since I drafted this complaint, so I don't have any personal knowledge at this moment about those cases. I have to reread them.
Q. Okay. So I'm looking at, I think, page 181. This is -- and I'm looking specifically to paragraph 17 of the complaint.
A. Okay.
Q. And that says, plaintiff holds the original note, blah, blah, blah, reflecting its valid interest in the mortgage for the purpose of foreclosing on the same. Can you explain to me what the valid interest in the mortgage was at that time that -- that it -- like, well, do you understand what rights your client had before the receivership?
A. I -- I'm not sure I'm understanding your question. But the -- what we understood in this situation, the plaintiff purchased this loan was an owner and holder of the loan. And that gives them rights to seek what they were doing in this

case with these -- the receiver.
Q. Can you explain how it gives them the rights to seek that?
A. They purchased the loan. They paid consideration for a loan. And they were the holder of the loan. Under Florida law, they would have the right to enforce the loan. And I believe when I had read cases in Maine, I believe they would also be considered a proper party.
Q. Okay. Were you aware that before this Florida receivership, Fay or the investor had filed a different lawsuit in Maine against Challenge asserting its interest in the Howe mortgage?
MS. LONGORIA: Objection.
THE COURT: Based on what?
MS. LONGORIA: He's -- he's asking the witness to go years before his involvement in this case.
THE COURT: Okay. Overruled.
BY MR. STEED:
Q. Were you aware there had been a prior lawsuit in Maine by the investor against Challenge to --
A. As --
Q. Go ahead.
A. I'm sorry. As of today, as I sit here today, I don't have a recollection of that.
Q. Were you aware at the time?
A. Honestly, it was 2023. Yeah, I cannot recall if I was

aware of that when I filed this lawsuit. Or 2022. I'm sorry.
Q. Well, on page 182 now -- and I'm looking at paragraph 31 -- that says, under Maine law and pursuant to Greenleaf I and Greenleaf II, for the purposes of foreclosure, the Howe mortgage is an undistributed asset of Challenge.
Can you explain what that means?
A. I can't recall the excerpts from the case. But my understanding was in Maine to -- there was a requirement that there was a chain of assignments of mortgage to enforce the loan or to file an action, which is common in a lot of states. And there was no assignment from the Challenge mortgage to another entity, and that was what was required. And that's what we were seeking to have Challenge do, who was a defunct corporation, do the appointment of a receivership.
Q. What I am wondering is what legal basis for Challenge -- or for, you know, Fay and the current investor to say that Challenge, who had nothing to do with the loan since 2007, why does the loan, under Maine law or Florida law, go from Challenge to the plaintiff?
MS. LONGORIA: I object to the question because it's -- there are a number of press -- there are a number of phrases in there. But one of them Challenge, who had nothing to do with the loan since 2027 [sic], there's nothing in evidence to support that Challenge had nothing to do with loan since 2007. Because under Greenleaf, the title remained in Challenge until

the quitclaim assignment.

THE COURT: So it assumes facts not in evidence?

MS. LONGORIA: My objection is he's misstating the law.

THE COURT: So can you just rephrase your question? I'll sustain that objection. Can you rephrase the question?

MR. STEED: Sure.

BY MR. STEED:

Q. We'll go back in the complaint a little bit. I think we started on -- well, as an initial place, if you go to paragraph 11 on page 180.

A. Mm-hmm.

Q. Paragraph 11 says there was an assignment of the Howe mortgage from MERS to Nationstar. Do you see that?

A. I see the statement.

Q. Okay. Why aren't MERS or Nationstar potentially entitled to the Howe mortgage? They had an interest in it, it looks like, in 20 -- in 2013.

MS. LONGORIA: Objection. He once -- he, once again, misstates the law. The law of Greenleaf is that the MERS chain of -- the MERS assignment and all assignments that flow out of the MERS assignment are ineffective. And so he says -- in his question, he's presuming that those assignments are effective, and he's asking questions about it. But that's not the law.

THE COURT: I think he asked -- according to the

transcript I'm looking at -- why aren't MERS or Nationstar potentially entitled to the Howe mortgage.

MS. LONGORIA: Right.

THE COURT: So you can answer that question, if you can, Attorney Diaz.

A. The question is, why aren't they entitled to the mortgage? Is that the question?

BY MR. STEED:

Q. Yes.

A. So MERS does not assign loans. There's references to MERS. MERS is not an assigner of a note. They are essentially a keeper of mortgages. When I was retained for this, there was a break in the assignment of mortgage change from the originating lender, Challenge, who was the actual originator of this loan. So the fact that there was a MERS to Nationstar didn't make them a necessary party to this case because MERS is not an entity that has interests in loans to assign. And MERS has some literature on that that was published, actually.

Q. Okay. But that's not in the record here, right?

A. I -- you asked me a question based on the allegation. The allegation was just outlining that there was an assignment. I don't believe my complaint states that they had an interest or anything. It says assigning the interest, but what is the interest that MERS holds. And MERS is essentially an entity that holds loans to assign other entities as a keeper, not

actually as an owner.

Q. Okay. But you put in your complaint as Exhibit E an assignment, it says here, from MERS to Nationstar. And I -- what my question is, could Nationstar -- why doesn't Nationstar have an interest in the Howe -- why isn't Nationstar a party in 2022 to this action since they had an interest in the mortgage at one point?

MS. LONGORIA: And my objection is that that misstates the law. The whole point of Greenleaf was to say that MERS did not have the authority to assign mortgages, and counsel's question just states the opposite.

THE COURT: Attorney Steed, I'm not sure why you're asking this witness about these questions that seem to be legal questions based on the law in Maine. Is it a factual question you're asking him because --

MR. STEED: Well, yes, because at different points he says that he named all parties who might claim an interest in the Howe mortgage to the complaint. But the only people that were named were Challenge. And there are other people in the chain of assignments who could claim an -- in fact, that they articulate in the complaint, that had an interest in the Howe mortgage. I think --

THE COURT: Maybe just ask him those questions. I'm not -- I'm not -- the questions -- your questions are -- yeah. Ask him those questions. I -- I can, for myself, interpret

what Greenleaf means and things like that.

BY MR. STEED:

Q. Besides the fact that the plaintiff in this Florida action had the note, what was the evidence that you saw that said they were entitled to the mortgage?

A. They acquired a loan. They paid consideration and were an owner of a loan.

Q. So -- so other than the ownership of the promissory note, there's nothing else in the record to show that they're entitled to the mortgage?

A. What record are you referring to?

THE COURT: That was my question, actually. Are you referring to the Florida record or the record here before --

MR. STEED: The Florida record.

A. The record -- we made the allegations in the complaint that they are the rightful owner. I saw that they purchased the loan. And that was sufficient to name them as the plaintiff with the right to enforce the loan. We named all parties that have an interest in the property, which would be the plaintiff and Challenge, who was the originating lender. And that's how we proceeded before the court.

BY MR. STEED:

Q. Okay. So just because I'm simpleminded, I think you said because they had the note, they had the right to the mortgage; that was your theory?

A. That's not a theory. Under Florida law, that's sufficient to establish a right to enforce or that they're an owner and holder of a loan. That's sufficient.

Q. Really. But I -- just so it's -- I'm not asking you to explain Florida law here. What I'm asking for is, was there anything besides the fact that the plaintiff now held the note that was the basis for you to ask the court for the mortgage?

A. I didn't ask the court for a mortgage.

Q. For the appointment of a receiver to sign a mortgage assignment to convey the mortgage from Challenge to the plaintiff?

A. I'm not sure I understand your question, to be candid.

Q. Sure. Real simple question. Again, I think it's a yes or no question. Is there anything besides the fact that the plaintiff was the owner of the note that entitled them to the mortgage, as far as you're concerned?

A. I can't recall if I looked at anything else in 2022. But, yes, because they were the owner of the loan, they were entitled to appointment of a receiver.

Q. And do you think it matters to the court in Florida, or would matter, if there had been a prior lawsuit in Maine where the same plaintiff had asserted the argument that because it had the note it was entitled to the mortgage, and had lost that?

A. I can't predict what the court would do. I don't have any

recollection of that set of facts that you just stated.
Q. Do you think you have any obligation of candor with the tribunal in Florida to let them know of prior lawsuits on the same theory that the same plaintiff lost in a different state?
MS. LONGORIA: Objection.
A. There was no prior lawsuit in the state -- oh, I'm sorry. Go ahead with the objection.
MS. LONGORIA: The objection is that in asking the question, he's advancing his theory as opposed to asking the witness for a factual question. He's -- he's not asking this witness for information with -- that is within his -- what he did or didn't do as a factual witness, I guess is the best way to explain it.
THE COURT: I'm going to sustain the objection. You -- I will let you try to reask it. I'm happy to get in the factual questions.
MR. STEED: Sure.
THE COURT: But the legal conclusions are just not helpful with this witness.
MR. STEED: Understood.
BY MR. STEED:
Q. As part of your representation of Fay, did they provide you with documents to prepare for your case?
A. Did they provide me documents? What -- what is that? That's kind of general.

Q. Did they, or didn't they?
A. I can't -- I didn't go back to see what I have in my file from 2022. I'm sure I looked at something.
Q. And some of the documents, did you include the documents you thought were important in the complaint?
A. I included the documents we believed were legally necessary to file the complaint to obtain a receiver.
Q. Do you -- are you in your office right now?
A. I'm in an office, yeah. My office.
Q. Your office. Do you have access to your files?
A. No. I'm outside of my case management system for Zoom.
Q. Oh. But, I mean, you could go off and get on your files right now?
MS. LONGORIA: Objection, Your Honor.
A. No. I'm logged out. I can't do it with Zoom right now.
THE COURT: There's an objection. Hold on.
MS. LONGORIA: So one of the things that's very important about testifying in Zoom is that you specifically be logged out of any other information and only have the exhibits before you. I believe he's asking him to somehow access his back office system and begin to testify from it. That's not appropriate in this situation.
THE COURT: Attorney Longoria, objection is overruled. He may be going to ask him to take a break and go get his files and tell us what he has. I don't know if that's coming or not.

But I have a question. Attorney Diaz, did you know about prior Maine actions related to the same property before you filed your complaint?

THE WITNESS: I don't believe I was aware of a prior Maine case. I know there was no cases in the state of Florida asking for a receiver for Challenge. But I don't recall a Maine case regarding this loan.

THE COURT: Okay.

BY MR. STEED:

Q. And if you had seen a Maine case regarding this loan, would you have thought it was important?

A. I have no idea. I'd have to review the case to see what it was. I'm sorry, I just closed out my Exhibits. So I'm just going to reopen them up. Okay.

Q. If you -- if we took a break and you looked at your file, would you be able to recall content -- better able to recall the contents of your file? Specifically whether your file contains a complaint filed in Maine. I can give you the docket no. and information, if you'd like. I could also -- I'm sure it's in the record here. I'm sure Ms. Longoria could e-mail you a copy of it. And maybe if you looked at that, you'd see if you ever -- would it help you to refresh your recollection, if you'd ever seen it before, if you saw a copy of it now?

MS. LONGORIA: And I object to that question based on relevancy. The Florida action was brought to a point of

receiver. The Maine action was brought for --

THE COURT: Can you speak in the microphone, Attorney Longoria? I'm sorry, it's hard to --

MS. LONGORIA: I'm sorry. I must have turned myself off. The Florida action was brought to the point of receiver. The Maine action is a declaratory judgment that was asking the Maine courts to declare that because we were the holder of the note and the mortgage loan, that we were entitled to enforce it. The receivership is an action brought in Florida to specifically appoint a receiver for the defunct originator where title remained under Greenleaf until the quitclaim assignment was assigned. So the question presumes that a declaratory case or a suit on the note, or any of the other actions that were brought in Maine, have anything to do with the Florida receivership case that is brought to appoint a receiver to wrap up that court -- that failed corporation.

So I object to the question. And I object to the request that he dig through his files to figure out whether or not he had copies of a Maine case.

THE COURT: Well, first, I think -- I think that is the point of his question. I think that's his argument, is that it should. The receivership should have had that information.

But I do wonder why -- what's the relevancy of why do you want him to dig through his files? I'm not understanding the

relevancy.

MR. STEED: Sure. I mean, ultimately he's just a lawyer who is working for a client. The client provided him with information. If the client provided him with the prior -- the information about the lawsuit in Maine, that's sort of relevant to the -- to this Fay Servicing and/or the investors can -- you know, what -- you know, I think that's relevant, whether they shared it. So if he doesn't have it in his files, it certainly suggests that it wasn't shared with him. And if it wasn't shared with him, I think that's where -- get our theory that --

THE COURT: That goes to your Unclean Hands theory. You're saying they should have shared with him, if they did not, so that --

MR. STEED: Yes. That's the theory, Your Honor.

THE COURT: Okay. What's your position on that, Attorney Longoria?

MS. LONGORIA: My position is that there's nothing to do with Unclean Hands. You've got a case that has to be brought after Beal Bank. Because in Beal Bank the court said, we are no longer going to accept a declaratory action in order for a bank to establish its interest to foreclose. And that's different than most states in the nation. So after --

THE COURT: I know -- I know what Beal Bank and Greenleaf says. I'm asking about your -- his -- his argument

is, you know, he thinks it's relevant. That would be to be argued and ultimately decided whether or not the plaintiff in this case informed -- I think he thinks it's relevant to his Unclean Hands argument whether the plaintiff in this case informed Florida counsel giving the receivership that this property had been subject to litigation in Maine.

MS. LONGORIA: Right. And my argue -- my position on that is, no, it is not relevant to the receivership case. I believe there is a statement in the complaint about the necessity for having an action to appoint a receiver because of the Beal Bank situation. And --

THE COURT: He testified to that.

MS. LONGORIA: Okay. So, yes, my position. Sorry.

THE COURT: So I am going to allow -- and, again, of course, just so everyone is clear, privilege is all gone here. Plaintiff has, you know, called this attorney to testify. I am going to allow him to take a break for him to go look at his files to be able to answer that question. Ultimately whether that's relevant or not, I don't know yet. But I'll allow him to take that break to go look, and then we'll see what his answer is.

So Attorney Diaz, I'm going to let you take a break to go look at --

THE WITNESS: Is someone --

THE COURT: Go ahead. Sorry.

THE WITNESS: Is someone e-mailing me the copy of this case that they mentioned so I can see if I have it? Because I'm not sure what I'm actually looking for.

THE COURT: Well, I think what you're looking for is in your file if you have any information on your file about a prior Maine -- any prior Maine litigation.

THE WITNESS: Okay.

MR. STEED: Specifically another declaratory judgment. I can --

THE WITNESS: Is it with the same parties?

MR. STEED: It would be titled -- excuse me -- MTGLQ Investors, L.P., plaintiff, versus Challenge Financial Investors Corp. It's docketed in York County in the State of Maine Superior Court at Alfred.

THE WITNESS: Okay. I can take a look.

THE COURT: Okay. And then maybe, procedurally -- how does it work procedurally, Michelle? Is he able to let you know when he's back, and you can bring him back up on the Zoom?

Okay. So you'll let our clerk know, Attorney Diaz, when you're back. All right. Thank you. So I'll let -- Attorney Diaz, you can get off the Zoom. Thank you.

And then I'm wondering if in the meantime we can resume questioning so that we can be efficient with our time here today?

MR. STEED: Yes.

THE COURT: Does that work? Okay. Thank you, Attorney Diaz, just let Michelle, the clerk, know when you're back.

MS. LONGORIA: Your Honor, to be clear, in our record Exhibits 41, 42, and 43 is what Attorney Steed is referring to. But you're not asking me to send these documents to him because then he'll have them, you're asking him to look and see if the prior declaratory case against the prior owner is something he has in his records now?

THE COURT: Correct. Because I think he said he wasn't sure.

MS. LONGORIA: Right.

THE COURT: Understandably.

MS. LONGORIA: I just want to make sure I'm not providing him with it. He's going see if he has anything.

THE COURT: Exactly. Okay. Thank you, Attorney Diaz.

THE WITNESS: Okay. I'll be back. Thank you.

THE COURT: Okay. So --

MS. LONGORIA: So you're going to go back.

THE COURT: Yeah. You get to go back up on the stand, Mr. Paterno.

THE WITNESS: Oh, boy.

MR. STEED: Your Honor, is it -- for questioning, is it okay if I sit down and ask questions? I'm going to be looking at my --

THE COURT: That's fine. I just wanted to make sure the witness could see you. But just be sure to talk into the microphone or use your lapel mic. Thank you.

CROSS-EXAMINATION

BY MR. STEED:

Q. Mr. Paterno, I'm going to start with some questions about the verification and integration process. Okay?

A. Go ahead.

Q. So your testimony before was that Fay verifies the information from prior servicers as part of the boarding process?

A. Correct.

Q. And Fay doesn't just, like, blindly accept the prior servicer's information, does it?

A. Blindly accept? No.

Q. Fay has a process to verify the data it receives during boarding?

A. Correct.

Q. And does it have a process to reconcile inconsistencies it detects?

A. It depends on the inconsistencies. And I think I did mention that it's -- there are things that may not be visible in a boarding process. And, you know, it may take some time for that to actually come to fruition. We may find out about an issue a year down the road or a couple of months down the

road. Or it could -- you know, obviously we would be able to work to fix any issue. But there's certain things that, you know, we can't verify specific.
Q. What kind of -- you -- sounds like you're speaking from experience there are things that occasionally come up; is that accurate?
A. Yeah. I mean just payments, for instance. Somebody can say that they made all of these payments. And our, you know, records come from the prior servicers that those payments weren't made. There may be times where they say that we've made, you know, not all of the payments, but some of the payments, and then we'd have to review if they -- you know, as long as they can prove that they have cashed checks or, you know, something to show that those payments were actually made and cashed by a prior servicer, then we would have to go look at the record and compare.
Q. So you're saying sometimes it happens that you will find that the prior servicer said there weren't payments made, and then you find out later that, in fact, customers had made the payments and they just weren't in the prior servicer's records?
A. It's very, very rare, but that actually has happened.
Q. So there's payment inconsistencies that can come up from time to time. Are there other kinds of errors that get corrected sometimes even years after the fact?
A. One of the big errors that does seem to happen -- and it's

not a big error, but it's something that happens that's common -- that actually happened with this particular loan -- is when a modification is done, it is a lot of times unfortunate where not the right amount of escrows are processed through the modification, and then as time goes on, they're not collecting what they should be for -- for escrow.

Q. Are you talking --

A. That happens.

THE COURT: Attorney Steed, I'm sorry. Didn't realize you were asking to sit at your desk. I thought you were saying to stay there. I do need you to speak -- stand when you're speaking to Court and asking questions. Go ahead.

BY MR. STEED:

Q. Are you talking about the inconsistency between the mortgage payments and the statements and the pay history?

A. Yes.

Q. Okay. So you know that there are dozens of mortgage statements that have different numbers than what the default letter says is the amount due?

A. Yes, sir.

Q. And you were laying the groundwork for that in your prior testimony, but you didn't reveal it until I mentioned it; is that accurate?

A. I don't know that the questions came up beforehand, so....

Q. But you were aware that the first, like, 30 or 40 mortgage

statements say a number with the amount due that month that's different than the default notice that you sent?
A. Correct.
Q. And you're saying you verified the default notice, right?
A. I -- I did that, yes.
Q. Yeah. And then after the fact you found that all these mortgage statements have different numbers, right?
A. Well, that was -- it was done before I got involved with the letter. That was information that was already found out and -- and fixed at the time that there was an escrow shortage that was not being accounted for. So -- but by the time I got to the letter, that had already been straightened out.
Q. So you're saying that the fact that the letter has different numbers than the mortgage statements is because you corrected an escrow shortage at some point?
A. So Fay had to correct the escrow shortage, correct, which is --
Q. Can you show me where in the record that escrow -- the information about an escrow shortage comes from?
A. Well, and that's one of the other issues I think with the letter if we go -- I don't recall the --
Q. So are you saying that the letter has some information about the escrow shortage?
A. Well, it should have. And the payment totals are correct. Unfortunately, there is a missing column on the letter that we

did not realize until after the fact. And that's -- that is the escrow shortage column. So if you were to add those columns across -- I don't recall what the Exhibit No. is. If you can --
Q. Sure. I think -- how about if we -- well, what -- sorry. Are you trying to look at the default letter or the mortgage statements?
A. The default letter. 35. Exhibit 35. Beginning on page 454. I believe it's right after the first payment. So if you were to add October 1st across --
Q. Yep.
A. -- that 1530.13 is the correct payment amount. And I think that adds across.
Q. I -- I don't follow what you just said. So what's the correct payment amount?
A. 1530.13.
Q. So -- and just so when we're looking at the payment amount due, 1530.13, where did you get that information from?
A. That information came from the boarding of the loan. And that is the information that was provided by Nationstar. Which, again, if you go back to the hello letter for Fay -- and again, I'm sorry, the hello letter is Exhibit....
Q. Well, I actually -- I was just wondering -- so I was asking if you could tell me where there was documentation. You mentioned something about an escrow shortage, and I was just

wondering where the information is in the record about the escrow shortage. Could you just answer that?
A. Well, it's not -- there's not anything in the record that we have with us. It would be --
Q. Thank you.
A. -- part of MSP.
Q. Okay. And --
THE COURT: I'm sorry, I'm -- now I'm confused too. On Exhibit 35, what you were just talking about, you said adds up across. I thought you said there was something missing from an Exhibit 35 column?
THE WITNESS: So on the first -- on the first payment for October 1, 2014, which is on page 454, if you add the 979.92 the 144.84 the 78.50 and the 3.25, that totals to 1530.33.
THE COURT: Okay.
THE WITNESS: From that point forward, there is a column missing, which was the escrow shortage column. If you add the other payments across 979.92, it does not add to 1583. I think the total is 1545.
THE COURT: I see. Okay.
THE WITNESS: So it's -- I don't know how it got missed off the letter. The payment amounts are what they are supposed to be. Unfortunately, that column did not transfer over.

BY MR. STEED:
Q. So you're saying that if the missing column were here -- so starting on November 1, we're looking at 454. November 1, 2014, it says the payment due is 1583.58. But that if we add up $979.92, $186.59, $91.16 and $325.87, it doesn't add up to 1583.54, correct?
A. Correct.
Q. What does that add up to instead?
A. I think without the escrow shortage column, it adds to maybe 1547 or -- I don't remember the numbers. I don't have a calculator with me.
THE COURT: So why is the October 1 date correct because there's not another column there. You said the October 1 date the numbers do add up.
THE WITNESS: Right. So when they -- when Fay went back and had to correct for the escrow shortage, they went back to the November 1st payment and going forward to correct that.
THE COURT: I see. Okay. Okay. Thank you for explaining that to me.
BY MR. STEED:
Q. And then could you -- if we could go to --
MR. STEED: And I apologize, Your Honor. I had printer trouble. So I meant to bring a copy of Exhibit 35 so that we -- but I think you have a paper copy, right, Your Honor?

THE COURT: I have a paper copy and an electronic copy.

BY MR. STEED: So I think -- I don't know what will be easier, but what I'm going to do is go through several mortgage statements in Exhibit 45 and compare them to Exhibit 35.

BY MR. STEED:

Q. And so -- so if you -- I don't have an extra copy for you, Mike. But I -- but I wondered is Exhibit 35 in a different source than 45? Can you look at them side by side?

A. I can do that.

THE COURT: I think they're in different binders. So that helps.

MR. STEED: Great. I have a different system. So just making sure.

BY MR. STEED:

Q. So if you go to 987. That is, I believe, a mortgage statement dated 11-18-2014 with a due date of 12-1-2014. And it says the total regular monthly payment is $1,556.32, right?

A. Correct.

Q. But then the payment due for December 1st over here in Exhibit 35 for December 1, 2014, is $1,583.54, right?

A. That is correct.

Q. So the default --

THE COURT: I'm not as fast as the witness. I'm with you on page 987, and then what are you comparing that to?

MR. STEED: To 5 -- to 454.

THE COURT: Okay.

MR. STEED: I think for a lot of what I'm going to be doing for the next 20 minutes or so anyway all involves looking at 554 and then comparing it to moving numbers in Exhibit 45.

THE COURT: What date was it that we're looking at on page 454?

MR. STEED: 454 we're looking at the column or the row for December 1st, 2014.

THE COURT: Okay.

MR. STEED: And it says that the payment due in the default letter was 1583.54, but the -- but the mortgage statement says it was less.

THE COURT: Understood. I'm following you now. Thank you.

BY MR. STEED:

Q. And so -- and you're saying that discrepancy is explained because there should have been -- there's no evidence of it anywhere in the record, but there was this -- this mortgage -- I mean, this escrow?

A. There was an escrow shortage which should have been added to those payments.

THE COURT: When you say, "escrow shortage," which -- what was short? Was it taxes due? Mortgage insurance? Insurance? Or this percentage --

THE WITNESS: So --

THE COURT: -- we talked about earlier?

THE WITNESS: What -- what happened -- what happened -- I'm sorry for cutting you off, Your Honor.

What happens with -- when they did the modification, that $23,000 that they added to the mortgage, to the principal and, you know, capitalized that, they didn't capitalize all of the escrow that they had to capitalize. So that created the shortage. Which they didn't reflect or they -- I don't even think they knew that they had actually capitalized the wrong amount. So that's what -- what created the shortage when -- by the time Fay got it and we had to, you know, go back and through the records.

THE COURT: Okay.

THE WITNESS: So we corrected that for the -- with the letter. Or it was actually corrected before the letter. But Fay had already done the corrections, and then the letter would -- I think it happens maybe in about two years after. I think we'll see where the -- the letter actually starts to match the statements at some point.

THE COURT: Okay. Thank you.

BY MR. STEED:

Q. And you didn't think it was important to share that until now?

A. It just didn't come up. Reneau didn't ask about that.

Q. And so is the -- is the adjustment in this -- so this missing column, is that all one number for each month, or does it vary month to month?
A. It was -- from what I recall, it was for a considerable amount of time being the same amount, and then it got less, and then it -- there was no more after that.
THE COURT: Attorney Steed, I just want you to know that apparently Attorney Diaz is back. Do you want to finish a certain line of questioning and then go to him or go to him now?
MR. STEED: No. This is -- goes on for a while.
THE COURT: Okay. So we'll jump back and forth. You're keeping us on our toes here.
You can step down again. We're going to get the witness back on Zoom. I'll just hang out.
THE WITNESS: May I be excused to go to the restroom?
THE COURT: You may.
Attorney Diaz, you're back. Reminder you're still under oath. And I'll let Attorney Steed continue when he's ready.
MR. STEED: Sure.

CONTINUED CROSS-EXAMINATION

BY MR. STEED:
Q. Were you able to review your records during the break?
A. I did review the case records and my e-mails. Yep.
Q. Okay. And do you have any complaints filed in Maine as

part of your records?

A. I don't have a copy of a complaint in my record. I do see that I had multiple conversations with the client, so that's not to say we didn't discuss it. But I don't have any copy right now in my records.

MR. STEED: Okay. I don't think I have anything else, Your Honor.

THE COURT: Okay. Thank you.

Any redirect?

MS. LONGORIA: I just have one redirect.

THE COURT: Yep.

REDIRECT EXAMINATION

BY MS. LONGORIA:

Q. Mr. Diaz, during the -- I called you Attorney Diaz. I apologize. During the course of Attorney Steed's examination, he asked you questions with regard to your discussions with your client and the basis for filing the complaint being that they held the note. Your response to that question was that they were the owner of the mortgage loan. Can you describe for the Court what you mean by confirming that your client owned the mortgage loan?

A. Yes. So these loans transfer from investor to investor. This particular loan was with MGTLQ at one point. And MGTLQ sold a pool of loans, which included this loan, to this plaintiff, the MFRA Trust. And when they acquired the loan in

the pools, they were the owner of the loan when they acquired it and paid consideration for.

Q. Okay. So at the point that you filed this complaint on behalf of the Trust -- the MFRA entity, the Trust, you confirmed that that Trust was, in fact, the owner of the mortgage loan?

A. Correct.

Q. Okay. The underlying purpose of the action to wrap up the affairs of this Challenge corporation, talk about that as the vehicle or the way to get whatever interest remain in Challenge transferred to your client?

A. Essentially the MERS assignments from origination are ineffective to the signed loans. So since there was a gap in the assignment of mortgage chain for this particular loan, that's why we had the receiver appointed, to conduct that task on behalf of the originating lender who was defunct.

Q. Okay. And the court order authorized the appointment of the receiver to wrap up that corporation?

A. It did.

MS. LONGORIA: I have nothing further.

THE COURT: Thank you.

Recross.

CONTINUED RECROSS-EXAMINATION

BY MR. STEED:

Q. Attorney Longoria kept referring to this as the receiver

action. Was there a count two to the receiver action that was a prayer for declaratory relief?
A. I'd have to look back at it. Give me one second, and I can look at that. There was an account for declaratory relief that we did not proceed on.
Q. Do you think it's fair to say that the -- without the count for declaratory relief, the notion to appoint the receiver -- well, let me -- let me strike that.
The motion to appoint a receiver was to appoint a receiver for a specific purpose, right?
A. Correct.
Q. And that was to convey this particular mortgage to this particular person, right, or party?
A. Yep. To do the assignment of mortgage to clean the gap up assignments, correct.
Q. Sure. And that was based on the theory that your client was entitled to the mortgage, right?
A. Correct.
Q. And that the account for declaratory relief also asked the court to find that your client was entitled to the mortgage, right?
A. Right. So we filed two counts, but they were not necessarily -- the declaratory relief count is essentially an alternative count. If there was an issue with the appointment of the receiver, we couldn't do that, we would proceed under

some declaratory -- declaratory relief account. We didn't have to do that here because we were able to appoint the receiver to do the task that was needed, and then we administratively closed the action.

Q. But how could the receiver have known what they were supposed to do without there being some presumption that there was a thing that needed to be done, right?

A. I don't understand your question.

Q. Sure. Neither do I exactly. But I think -- I think I've made my point.

MR. STEED: I don't have anymore questions.

THE COURT: Any redirect?

MS. LONGORIA: No, Your Honor. Thank you.

THE COURT: Okay. Thank you.

Thank you, attorney Diaz. You're excused. Enjoy sunny Florida.

THE WITNESS: It is 73. So I'm sorry. I feel for you guys.

THE COURT: You're just being mean now.

THE WITNESS: I'm sorry. Take care everybody.

MR. PATERNO: I'll be back soon enough.

THE COURT: And we're going to close down the Zoom now.

And you can come on back up, Mr. Paterno, and we'll get started again.

MR. STEED: Are we back?

THE COURT: We are. You can proceed.

CONTINUED RECROSS-EXAMINATION

BY MR. STEED:

Q. I think we had been talking about in Exhibit 35, on page 454, the payment row due for December 1st, 2014. And you were saying that at some point Fay -- I guess, did at some point Fay decide that the -- that the -- that the numbers back in 2014 were wrong that Nationstar had been charging?

A. Correct.

Q. And what was -- is there some documented basis for that about -- well, you said it was because the principal balance had gone up, right?

A. Well, no. So when they -- when the loan was modified at 2014, it was discovered along the way because there wasn't -- and I -- I was not involved in this process. So I mean, I'm only going based on what I -- what I remember seeing.

Q. Mm-hmm.

A. So there was not enough money being collected for escrows. So that's why you have the shortage that was added. The shortage -- I -- it was maybe, like, 40 bucks. Or it wasn't really that much. I mean, I don't have a calculator to add this across, so -- but that's why you have an escrow shortage. So they had to go -- and that's what the adjustment was to adjust this.

Q. But -- but how -- when did Fay do this? Do you know?
A. I want to say it was sometime around possibly, like, in April or May of 2017.
Q. So then just going back to page 780 -- 987 in Exhibit 45. And so this is a mortgage statement from Nationstar, right?
A. I'm sorry, which number?
Q. 987.
A. Yes.
Q. This is a mortgage statement from Nationstar, right?
A. Yes.
Q. That Nationstar sent to the Howes, right?
A. Yes.
Q. And it says they owe $1,556.32, right?
A. That is correct.
Q. And you're saying they were wrong?
A. Correct.
Q. And then just -- just moving on. Actually, we're one ahead, so I want to move back one.
Just to -- now I'm on page 984. Are you there with me?
A. 984; yes.
Q. Yep. This is another mortgage statement from Nationstar, right?
A. Correct.
Q. And it says, the monthly payment due is $1,561.11, right?
A. Correct.

Q. And you're saying that number was wrong?

A. Correct. The principal and interest numbers are correct on all the statements except for the escrow because the escrow shortage was not included.

Q. What escrow shortage where?

A. The escrow shortage that was found when Fay took over the loan.

Q. But you don't have any records of that, right?

A. It would -- when you take on a loan like that -- so there's not a specific -- there's not going to be a specific thing unless, like, when Fay does an escrow analysis and they -- an escrow analysis looks back and says, there's an error there, there is nothing that is going to come to Fay in a blaring fashion that's going to say, oh, we screwed up this escrow and there's a little bit of a shortage. It went from Nationstar to Selene. Selene did the same thing. They just kept carrying the same thing.

Q. But you verified and relied upon Nationstar's records, right?

A. Right. And again --

Q. You verified and relied on Selene's records, right? They're yes or no questions.

A. And, again, there's not everything that's going to be blaring in -- in the verification process. And the verification process does not pinpoint every single little

thing that might happen in a loan.
Q. And your verification process doesn't pinpoint the fact that the mortgage statements say one thing and your notice says another, right, even when you prepared this notice?
A. That's -- unfortunately, that has happened many times.
Q. And then moving on to 989. This is a mortgage statement from Nationstar, right?
A. Correct.
Q. And it says the monthly payment due is $1,565.67, right?
A. Correct.
Q. And the notice says a higher number, doesn't it?
A. Correct. Principal and interest, again, is correct, but the escrow portion was wrong.
Q. Is the escrow reconciliation something that happens every year? Right?
A. It does, yes. It does for Fay. I mean, we do that every year.
Q. But it took Fay more than -- well, let me stop.
I sort of -- I got -- I got sidetracked by that. I actually think doing it chronologically was a good idea. So we'll get back to that. It makes sense to do some kind of summary what the changes are as opposed to going through 40 mortgage statements.
So I'm going so start --
THE COURT: I mean, I have the Exhibits, and

they're -- well, I think 35 -- 35 has only been conditionally admitted.

MR. STEED: Right. Because we have some concerns about its accuracy.

THE COURT: Correct.

MS. LONGORIA: Objection.

THE COURT: Correct.

MS. LONGORIA: Move to strike that.

THE COURT: It's stricken. We don't need that.

MR. STEED: Sorry.

THE COURT: So I can't compare the numbers if it's not going to be admitted. So if you're using the Exhibit, do you want it to be admitted? I mean, you're repeatedly using an Exhibit that --

MR. STEED: No, I understand. But I guess what I'm trying to prove is that the -- the question is-- I'm saying it shouldn't be admitted because it's not reliable, and that is a question when integrating another party's business records. And I think -- and so that -- that's the issue is that there are multiple indicia that maybe it's not a reliable record, and it's the only source of some of the information that's part of the plaintiff's case and it's got a lot of bad data points.

THE COURT: At this point I'm going to admit Exhibit 35. I think you're making your argument as to the relevancy of it. But we're going to admit it so the record is

clear.

And I'm happy to -- you can go through, if you think that's a good use of time. But now I have these two Exhibits admitted before me if there's some kind of, you know, summary you want to make for me to go back and look, I can also do that outside of court time.

MR. STEED: Yes. Moving on, Your Honor.

MS. LONGORIA: Your Honor, just for housekeeping purposes, by the same token, we agreed for all these statements to come in. So they're admitted at -- okay. So they're admitted because we agreed. Okay. I thought he was testifying from a record that wasn't. I apologize.

BY MR. STEED:

Q. Moving now to Exhibit 4, page 28. Are you there?

A. I'm sorry, which one?

Q. Exhibit 4, page 28.

A. I have that.

Q. Okay. This is a loan modification agreement?

A. Correct.

Q. And it is signed by the Howes, is that correct, on page 31?

A. That is correct.

Q. And also on page 31 it is signed by a vice president of MERS; is that accurate?

A. I see that.

Q. And beside the mortgage assignments, can you show me anything in the record that shows that -- and this document that MERS had authority to modify the loan?

MS. LONGORIA: Objection, Your Honor, to the question. Besides the mortgage assignments, it's exactly the fact of the mortgage and assignments because that's before Greenleaf. Before Greenleaf, assignments out of MERS were fine. So that question misstates the law.

THE COURT: Okay. You can argue that. He can still answer if there's anything else aside from the mortgage assignment that influences his answer. And the answer may be no. I don't know.

A. I'm sorry, ask --

THE COURT: The objection is overruled. Why don't you ask him the question again.

BY MR. STEED:

Q. Sure. Is there anything in the record besides the mortgage assignments that show that MERS had authority to modify -- well, two questions in the terms of the note.

First the note. Did MERS -- well, can you show me where in the record MERS had the authority to modify the note?

A. Not that I know of.

Q. Okay. And is there anything in the record that shows that MERS had authority to modify the mortgage?

A. No, not that I know of.

Q. And in Exhibit 4, this first loan modification that's where the principal balance -- is one of the places where the principal balance on the loan has changed, right?
A. That's the first portion of the change, yes.
Q. And then moving onto Exhibit 6, page 35.
A. I have that.
Q. Well, actually, let me just go back for one second, though, to this 2010 loan modification in Exhibit 4.
Your previous testimony is that back in 2011 Fannie Mae is actually the owner of this mortgage, right?
A. They owned it since 2007. Yes. So in '11, yes, they still would have owned it. Yes.
Q. Okay. So is there anything in the record that shows MERS had any authority to act on behalf of Fannie Mae?
A. Not to my knowledge.
Q. Is there anything in the record that shows that Fannie Mae had knowledge that this modification happened?
A. There is a -- they are using a Fannie Mae uniform -- uniformed instrument.
Q. Okay. But other than that, is there anything?
A. No, other than CitiMortgage was their servicer at that time, but....
Q. Okay. And is there anything in the record describing CitiMortgage's authority to modify the mortgage or the note?
A. Not in the record, no.

Q. Okay. And then moving on to Exhibit 6, page 35. This is a loan modification between the Howes' borrower as borrower and Nationstar as lender; is that right?
A. That is correct.
Q. And does this also change the principal balance on the loan?
A. Yes, it does.
Q. And on page 39, there's a signature on behalf of Nationstar Mortgage. Do you see that?
A. Yes.
Q. And it says somebody named Brandy Nicholas signed it as representative. Do you see that?
A. Either Brandy or Brady. I'm not sure which.
Q. And is there anything in the record showing that this person worked for Nationstar?
A. No.
Q. And is there a power of attorney somewhere showing that this person had the ability to act on behalf of Nationstar?
A. Not in the record.
Q. Okay. And then, similar question, is there anything in the record that shows that Nationstar Mortgage had the ability to act on Fannie at this point?
A. I do believe that there were a -- I don't recall what --
Q. Just here in this record someplace if there's a document.
A. Right. Which I'm -- there was a hello letter, I thought,

from Nationstar that we looked at earlier. If I can go back to that. I don't know what --
Q. Okay. That -- that -- but besides, like, the hello letter saying that Nationstar is the servicer of the loan, is there any document describing Nationstar's authority to modify the loan anywhere in the record?
A. Well, I don't know. Again, going back to the letter, sometimes the hello letters will specify who they are servicing on behalf of.
Q. Sure.
A. I don't know if that letter does say that. If it does, that would be one record that would show that.
Q. Again going to Exhibit 9. Exhibit 9 is another loan modification; is that correct?
A. That's correct.
Q. And it's signed by someone from Nationstar on page 47; is that right?
A. That's correct.
Q. And then someone from MERS on page 48; is that right?
A. It does appear that way.
Q. Okay. And between the 2010 and 2011 mortgage modifications in 2014, is there any -- was there any power of attorney or any other letter granting authority for Nationstar or MERS to act on behalf of Fannie?
A. Not to my knowledge.

Q. Okay. Moving to Exhibit 11. This is a document that says that Wilmington Trust National Associations, I guess, is the trustee for MFRA Trust 2015-1?
A. That's correct.
Q. And do you know who receives the benefit from the MFRA Trust 2015-1?
A. There are certificate holders in the Trust; but, no, we don't know who those are individually.
Q. Okay. Do you know if any of the certificate holders in the Trust are businesses or people in Maine?
A. No idea.
Q. Okay. If you don't know that, how do you know that there's diversity jurisdiction?
A. I'm sorry?
MS. LONGORIA: Objection. There is --
THE COURT: Sustained.
BY MR. STEED:
Q. I just want to move to Exhibit 18.
A. 18, did you say?
Q. Yeah. Page -- sorry. The numbers are a little hard to read here. Let me see if I can find one that's easier.
MS. LONGORIA: 156.
BY MR. STEED:
Q. 156.
A. I have that.

Q. So this document describes -- or this is Selene's good-bye letter; is that right?
A. Correct.
Q. And so that's where Selene is telling the Howes that Fay Servicing is going to take over servicing of the loan?
A. That is correct.
Q. But the Exhibit 10, the Fay Servicing, sort of, flow servicing agreement, that -- that says that Fay was -- or that at some point before 2017, Fay and the flow servicing agreement was already servicing the loan?
MS. LONGORIA: Objection. There's no testimony that the flow servicing agreement says that they're already servicing the loan. That's not in evidence.
BY MR. STEED:
Q. Okay. We can go back. So let's go back to Exhibit 10. Page 50.
THE COURT: I'm going to reserve ruling because I'm confused, so....
MR. STEED: Sure.
THE COURT: You can both get me up-to-speed, then I'll rule.
MR. STEED: Sure.
BY MR. STEED:
Q. So Exhibit 10 is a flow servicing agreement, page 50, between Fay and MF Residential Assets, LLC, right?

A. Correct.
Q. And then I don't think the precision matters too much here. But at some point in 2015, MFRA Trust 2015-1 was joined to this agreement; is that accurate? We can find it. I don't have an exact date, but I think it's a --
THE COURT: At some point in 2015? Is that what you said?
MR. STEED: Yes. I believe it's --
A. The joinder was August 26th of 2015.
BY MR. STEED:
Q. Okay. So -- so the flow servicing agreement is something different from the regular servicing agreement; is that accurate?
A. Yes.
Q. Okay. So in 20 -- after August of 2015, Fay had whatever responsibilities are described in Exhibit 10, but there were other servicers on the loan?
A. Well, flow servicing agreement means that -- and it's -- it's just that, it flows. So MFRA and Fay have a -- an agreement that we service loans for them. At any point in time, they can purchase loans and transfer those loans to Fay for servicing. Not specific to the date of the flow agreement. The flow agreement is an ongoing agreement that covers any transfer that they may -- that they may take along the way.
Q. Got it. So it sounds like pursuant to the flow servicing

agreement, Fay took over servicing of this loan at some point in 2017?
A. Correct.
THE COURT: Is there still a pending objection, or has that been cleared up? I'm not sure.
MS. LONGORIA: It has been cleared up. Yes.
THE COURT: Okay.
BY MR. STEED:
Q. I'm on Exhibit 19, and I'm looking for a particular page there. When I get there, I'll call it out. But for you folks following along at home, that's what we're looking for.
A. I have 19.
Q. Great. So 19 is Fay's hello letter, right?
A. Yes.
Q. That's a letter Fay sends out to let the borrower know they have taken over servicing of the loan?
A. That is correct.
Q. And this would have been sent out after -- well, would this have been sent out after Fay was finished verifying and on-boarding the loan?
A. They usually -- they are -- again, as my testimony was earlier, that they are prepared and reviewed by both sides when the -- when they begin the boarding process. The letter may get mailed out some time around -- at the time of the boarding or just after.

Q. And then now I'm looking to 164.
A. I have that.
Q. Okay. And so this is dated September 11th, 2017, right?
A. Correct.
Q. And that is -- what is this? Oh, I asked what is this, this page?
A. Oh, I'm sorry. I didn't hear you say that. So this particular page is the fair debt collection, the FD -- what's called the FDCPA letter.
Q. Right.
A. So this is part -- at that time it was part of the welcome package. It's now its own separate letter.
Q. Okay.
A. We changed procedures along the way. But -- so this letter was added to the welcome package dated September 11th, which was about a week after the actual transfer. And it just specifies who the investor is at that time, who we're collecting on behalf of, and it tells them what their payment due amount was for the October 1, '14, payment, which was the payment due at that time, and then it gives the principal balance and then the late charges.
Q. Okay. So this 150 -- 1530.13, when was that -- the payment due?
A. That was for the 10/1/14 payment. We talked about that with the letter. That is the first payment on the letter, and

that was the information transferred from --
Q. Right.
A. -- during the boarding process.
Q. So that was actually the payment due back in 2014, right?
A. Correct.
Q. So that's not what the current payment was due at that time, right?
A. No. It's reflective of -- it says so current monthly payment is 1530.13. And then line four says, payment due date 10/1/14. So it's referencing that contractual payment that's due.
Q. But that was not the current monthly payment amount on September 11, 2017, right?
A. Not current as you would say current to 2017, but current because of the contractual arrangement. So the 10/1/14 payment is still the payment that's due.
Q. Sorry. I just want to go to the -- to page 981. Again, I apologize, but that's Nationstar mortgage statement due 10/1/14 that says the payment due is 1556.32, right?
A. Correct.
Q. And then -- and then just so we're clear, the -- oh, for that one it's actually all the same. So great.
And then as far as -- and then so going back to 164, Exhibit 19. It says the total amount of debt is $214,563.33, right?

A. Yes.
Q. But that's not the total amount of the debt at that time, right?
A. Well, it doesn't include interest, escrow charges, and any attorney's fees or anything like that.
Q. So it's not the amount of -- total amount of debt that was due at that time; is that correct?
A. No. But I know we've talked about this in the past, that that was just a business decision on how they would present that letter. I don't know what their decision-making process was.
Q. Sure. It was a business decision to provide incorrect information, right?
MS. LONGORIA: Objection.
THE COURT: Did you make that decision?
THE WITNESS: I did not make that decision, no. That was a corporation decision.
THE COURT: Okay. So we can move on.
BY MR. STEED:
Q. Moving to Exhibit 23. If you can just confirm that Exhibit 23 is the -- could you just confirm that Exhibit 23 is a complaint for declaratory relief and appointing receiver for Challenge Financial Investors Corporation?
A. That's what it says.
Q. And that was -- that was filed on behalf of Wilmington

Trust National Association; is that right?
A. Correct.
Q. That's the Trust. And I think Mr. Diaz testified that he had been in touch with Fay Servicing about filing this; is that accurate?
A. Yes, I believe so.
Q. Okay. So -- so with this lawsuit, the caption says it's Wilmington Trust. But is it fair to say that it was Fay who hired the lawyer to file this lawsuit?
A. That's fair, yes.
Q. Okay. Is that what actually happened, that Fay hired the lawyer?
A. Yes.
Q. And did -- did Fay make the decision to hire the lawyer? Or was that Fay's decision or the Trust's decision?
A. Fay's decision.
THE COURT: Can you hold on a moment, Attorney Steed. Okay. You can go ahead.
BY MR. STEED:
Q. Was Fay acting on behalf of the Trust when it did that?
A. Yes.
Q. Okay. And was that -- was it acting on authority that it was given by the Trust to do that?
A. Yes.
Q. Turning to paragraph 17, on page 181. Speaking on behalf

of Fay, what was the valid interest in the mortgage referred to in paragraph 17?

MS. LONGORIA: Objection. That question actually calls for a legal conclusion as opposed to being a question of fact.

THE COURT: I guess I'm going to overrule the objection. You can answer to what your belief is, and you can argue.

A. You know, we're servicing a loan on behalf of the investor. The investor had purchased the loan in a pool of loans. So that's why we would go ahead and do that.

BY MR. STEED:

Q. Okay. And when the investor purchased the loan, there was already a lawsuit going in Maine about the mortgage, right?

A. I don't know that personally.

Q. Okay.

A. I don't know the dates or the timeframes and stuff.

Q. Sure. I think we maybe go over that another time.

But you're here to testify on behalf of Fay, right?

A. Yes.

Q. And you're also here to testify on behalf of the Trust, right?

A. Correct.

Q. And I think --- I think I'll come back to this, but....

MS. LONGORIA: Your Honor, I would request that the

question be withdrawn. If he's not going to show him a document to refresh his recollection one way or the other or if he's going to come back to the question, itself, I would ask that it be withdrawn.

MR. STEED: He answered.

THE COURT: Yeah, I think he answered the question. So I don't think we need to have it withdrawn at this point.

BY MR. STEED:

Q. Looking to page 183, paragraph 33. Is it true that the plaintiff, through his attorneys, had been able to contact Chris Farrow, a former officer of Challenge.

A. That's what it states.

Q. So is it true?

A. I don't know that personally.

Q. Okay. So -- so I'd like to turn to Exhibit 40, page 870, and then also page 882. If you could just confirm that at 870 the it's a subpoena served on Fay Servicing, and on 882 it's a subpoena served on the Trust.

A. Confirmed for page 870 of Exhibit 40. And confirmed on page 882 of Exhibit 40.

Q. Okay. And have you seen these subpoenas before?

A. Yes.

Q. And were you -- were you sent by Fay and the Trust to respond to these subpoenas?

A. Yes.

Q. And did you prepare to testify on these topics?
A. I don't recall reviewing all the topics.
Q. So if you look at page 875, number 12. Do you see that on behalf of Fay you were subpoenaed to testify on all the facts related to the Florida action?
A. I see that.
Q. So you're saying in -- now looking back to 183, you're saying you don't know if the Trust, through its attorneys, had contacted Chris Farrow in the past?
A. I mean, it's specific that it says that they did and he wasn't -- he wasn't willing to execute. I have no reason to believe that that was not done.
Q. But is it -- is it Fay's position that that is true?
A. Yes.
Q. And is it the Trust's position that that is true?
A. Yes.
Q. Okay. Then on behalf of Fay, why wasn't Melanie named as a party to the declaratory judgment in Florida?
MS. LONGORIA: Objection. That question calls for a legal conclusion.
THE COURT: I think I understand him. I'm going to overrule the objection. I think he's asking as a factual matter.
A. I'm sorry, repeat your question for me.
BY MR. STEED:

Q. On behalf of Fay, why wasn't Melanie Howe named as a party to the declaratory judgment in Florida?

MS. LONGORIA: Objection. That question actually misstates the caption of the Florida action. As a Florida declaratory action as opposed to the full caption, it was to appoint the receiver, and the second count was for declaratory action. So --

THE COURT: Are you just asking him about Count 2 in the Florida action, or are you asking about Counts 1 and 2?

MR. STEED: I think it matters more for Count 2.

BY MR. STEED:

Q. I'm saying why -- well, do you agree that the complaint in the Florida action is titled, complaint for declaratory relief and appointing receiver for Challenge Financial Investors Corporation?

A. So you're talking about Exhibit 23?

Q. Yeah. On page --

A. 178.

Q. 178.

A. Yes.

Q. Okay. And do you agree that that complaint asked for declaratory relief?

A. Yes.

Q. What is Fay's position on why Melanie Howe was not named as a party to that complaint?

A. Because she was not a party to the actual transfer.

Q. Did it convey title to her home, the receivership, eventually?

MS. LONGORIA: Objection. It didn't convey. He's misstating a fact.

MR. STEED: Fine. Withdrawn.

THE COURT: Withdrawn. So there we go. Go ahead.

BY MR. STEED:

Q. Did the receiver appoint title from Challenge to the Trust?

MS. LONGORIA: Objection. That question doesn't make sense. Maybe ask it --

BY MR. STEED:

Q. Did the receiver sign a deed assigning the mortgage from Challenge to the Trust?

MS. LONGORIA: Objection. Receiver didn't assign a deed, so that question misstates facts.

BY MR. STEED:

Q. Mortgage assignment?

THE COURT: Okay. Sustained.

BY MR. STEED:

Q. Are mortgage assignments conveyances of title under Maine law?

THE COURT: I don't actually know what you're asking. So I'm not -- I'm not -- I hope everybody is not trying to be

tricky. I'm not actually sure what you're trying to ask him. So I am sustaining that objection because I'm not totally sure what you're trying to ask.

MR. STEED: Sure.

BY MR. STEED:

Q. Was the end result of the Florida action that a receiver conveyed title to the Howe mortgage from the defunct Challenge Corporation to the Trust?

A. Yes.

Q. And was that title to Melanie Howe's home?

MS. LONGORIA: Objection. It's the language that he's using. Instead of using the quitclaim assignment and assigning the mortgage, he's asking the question that speaks as if there was a deed somehow that in this case was signed by this receiver, and it wasn't. It's a quitclaim assignment of a mortgage. So the question inaccurately states facts not in evidence.

THE COURT: Okay. Sustained. I'm not sure you need to do this. I think that we all know the facts. So we can keep trying, if you want.

MR. STEED: Sure.

BY MR. STEED:

Q. Looking at 184.

THE COURT: I mean, I'll just say I think your question ultimately was why wasn't Ms. Howe named as a party.

His answer was, you know, from Fay's position is she wasn't a party to the Florida action. You argued that's not true, she should have been. I understand that. So, you know, if you have fact questions that this witness can answer, that will be helpful; otherwise, it's a legal argument which, you know, we're going to take and consider and you'll have briefing on.

BY MR. STEED:

Q. Did Fay --

THE COURT: I guess something I have a question for you is -- and, again, attorney -- did you ever speak to Attorney Diaz yourself?

THE WITNESS: No. I have on other cases. I know Adam.

THE COURT: Not regarding this case.

THE WITNESS: Nothing on this case.

THE COURT: Not regarding this case.

You're Fay's representative and the Trust. Did Fay or the Trust have conversations with Attorney Diaz about any Maine litigation?

THE WITNESS: I'm sorry, the last part I didn't hear that.

THE COURT: Did Fay or the Trust have conversations with Attorney Diaz about any of the Maine litigation? Maine, the State of Maine, litigation.

THE WITNESS: I do not know if there was any

communication with -- I know not with the Trust for sure. With Fay, I do not know if anybody was communicating with Adam about that.

THE COURT: Thank you.

BY MR. STEED:

Q. Moving to Exhibit 27, page 280, paragraph 2. There's the words, immediate and irreparable harm, and I'll have some questions about that paragraph once you've read it.

A. I'm sorry, can you go -- repeat which page?

Q. Sorry. Exhibit 27, page 280.

A. Okay.

Q. What -- what facts were there when this motion was filed that immediate or irreparable harm might befall the Trust if this motion wasn't granted quickly?

A. I'm sorry, where are you reading that?

Q. In paragraph 2.

A. Okay. And, I'm sorry, your question again?

Q. Sure. When this motion was filed, was there -- what was the urgent need to have a receiver appointed quickly? Was there any?

A. I would imagine based on the fact that there was a pending case here in Maine, but I don't know of any other reason.

Q. Okay. Moving on to Exhibit 29, page 335.

A. 335.

Q. Well, let's go back to 334 first. What's Exhibit 29?

Again, it's the quitclaim assignment of mortgage from Challenge to the Trust, right?
A. Correct.
Q. And would you agree that it was signed in Florida?
A. Yes.
Q. And by the receiver appointed by the Florida court?
A. Yes.
Q. And as far as you know, was there any activity taken in Maine to -- to have a receiver appointed in the state of Maine?
A. No. The defaulted entity was an entity of Florida, not of Maine.
Q. So I want to move back to 2017 when Fay takes on servicing of this loan. And you talked earlier about there being an on-boarding process, right?
A. Yes.
Q. And in that you said Fay verifies the prior servicer's records, right?
A. Yes, sir.
Q. When you say they verify the prior servicer's records, is there a way for Fay, just as an example, to, say, look and see if a property tax payment from 2014, before Fay was the servicer, was made? Like if it shows up in the record and says on this date, say, Nationstar paid $1,000 to the town for property taxes, is there a way for Fay to look and see if that check actually went out?

A. In -- like I mentioned earlier, with even payments, no, that wouldn't be something that would be picked up because, again, you rely on the business records. These servicers are in the same business that we're in. They are under the same guidelines and same rules and regulations. We've talked about this before. So we rely on those records. And the fact that, yes, if they say that that payment was made, then we assume, yes, that that payment was made. We may find out later on that, who knows, maybe the payment wasn't made. I mean, that I've never seen before. Not with escrow. Escrow is a very regulated section of mortgage servicing. But as far as payments and stuff like I've talked about, there have been an instance or two where, you know, payments that are not reflected in payment history or whatever actually have been made.

Q. So from what you're describing, it seems like Fay assumes the prior servicer's records are correct unless it sees otherwise?

A. We only -- we assume that they're correct in regard to things that happened years before we were involved. We can't -- there is no way for us to go back and look at a specific payment. We could -- down the road I can do that. And I've done that myself. I've actually gone to tax records in certain states and things like that and have looked to see, you know, some tax records actually show who actually made the payment.

And I've had to actually do that. But as far as the on-boarding process, that is not -- that would make the on-boarding process sort of improbable to have happen if we had to go back and make all those -- those reviews at that point in time.

Q. And when you find one error -- like as far as Fay's policies and procedures, when -- you've talked about instances where errors are found in the prior servicer's records and there's a need to go back and verify. One example was someone said, I made this payment, but the records don't show it. So when errors like that are found, does Fay take any extra steps to verify or search through other records to see if there are problems or inconsistencies as a standard practice?

A. I mean, yeah, we would definitely have to look back and see what the payment history looks like, you know, if that check was cashed, where did the check go. It's -- it's possible. I mean, we've had an instance recently where somebody didn't put their -- their loan number on a check, and it wound up getting applied to a different loan. And that's a possibility of something that might happen. I mean, a servicer could do that. If -- there might be two Smiths or two whatever, and if the loan number is not on there to identify where that check goes, it may get posted to an incorrect loan by mistake.

Q. My question was slightly different, I think. It's when

Fay discovers inconsistencies or errors in prior servicer's records, does that trigger any process to further audit of other records besides the ones that seem to be inconsistent?
A. So are you talking about specific to the -- the boarding process?
Q. No. I'm --
A. Or at any point in time of our servicing?
Q. So, for instance, in this loan, it looks like there are some inconsistencies for more than two years between what -- with this -- what the default letter says was the amount due and what the mortgage statements say the amount is due; is that accurate?
A. Understood. Yes.
Q. And at some point that was discovered by someone at Fay, correct?
A. Yes.
Q. And when those kinds of errors are discovered, does it trigger any kind of audit of the whole file or other records?
A. I don't think it triggers an audit of the entire file. It would trigger an audit of the specifics to that instance where there's an issue.
Q. So when there are errors in one area, it doesn't trigger review of other areas of the file, correct?
A. It depends on the error. It -- it could possibly do that, but I don't -- I don't think in this case -- in this particular

instance it would have evaluated a further look to other areas.

Q. Sure. And are you aware of any -- of there being a specific audit policy when errors are found at Fay?

A. I'm sorry, ask that again.

Q. Are you aware, as Fay's representative, of whether there are any specific audit policies that are triggered when errors are found in either Fay's records or prior servicer's records?

A. Outside of the boarding process, I don't know specifically if there are audit procedures for errors. Like, I mean, if I find something, I have to do the research, and then I have to go to the specific departments and say, this may look incorrect, can you take a look at that. And then they'd have to go -- I don't know if they have a specific procedural thing that they have to follow as far as any audit type thing. I don't -- I don't know that specific.

Q. Is it important to Fay that the records be accurate?

A. It is very important. And it can only be as accurate as what, you know, the prior servicer is giving us obviously.

Q. Why does it -- why is it important that the records are accurate?

A. Because you want to make sure that you're servicing the mortgage not only properly for the borrower. I mean, you may want to believe that we hate borrowers and we don't like them, but that's certainly not anyone's intent in the servicing industry. And obviously we want to be servicing the mortgage

properly for the investor.
Q. So it sounds like servicing properly for the investor and also, you know, making sure that the borrowers are getting accurate information, those are two important reasons for the information to be accurate?
A. Correct.
Q. And are there any other reasons that you can think of? It's not a trick question. I'm just....
A. I can't think of one off -- right now, no.
Q. I'm going to move to Exhibit 38.
A. I'm there.
Q. Okay. So it says the total principal balance is $237,175.09, right?
A. Correct.
Q. How do we know that that's the principal balance?
A. So the principal balance on the -- if you look at the very top box, you'll see the principal balance noted there as 213,975.36. And then you have the additional principal of 23,199.73. Going back to the initial -- and I don't recall the Exhibit No., but the 2014 modification. The 2014 modification had a deferred balance of 23,199.73. So that's where that number comes from. The principal balance, I believe on that modification, was 214,000 and some change. And I think if we go deeper into the pay history, I could point that out for you. It would be in the Nationstar section. And I cannot see the

page numbers. It looks like 587.

THE WITNESS: Do you have that, Your Honor?

THE COURT: It's coming. Okay. I'm here.

A. So if you see down at the bottom of that page, you'll see where it shows you, like, principal balance was 216,000. And that's in, like, the fifth column over I think it is or the fourth column over. And then it goes up. And you'll see the next line is where they make those adjustments for what was in the 2014 modifications. So you see the 23,199.73. And you'll see the principal balance there at 237,329. And then the principal balance changed to 214. So that's where the amount gets deferred. And then the 214,129.99 becomes the new principal balance, which is the same principal balance that was in that -- in the modification.

BY MR. STEED:

Q. Okay.

A. Then there was one more payment made. So there is a payment made on -- it's on page 585. And if you look at transaction line 415, you look all the way to the left you'll see transaction numbers. 415 was done on 12/31/14. And it shows payment, and it shows payment for principal interest and escrow. And then you'll notice that the principal balance goes from the 214,129 to the 213,975.36.

Q. Got it.

A. That was the last payment that was ever made, and then

that's why the principal balance carries forward from that point on.
Q. Got it. So just to summarize, Nationstar's records relied on the loan modification of 2014. And then Fay incorporated Nationstar's records, and that's where the principal balance comes from?
A. Correct.
Q. And then -- so we were looking on page 585. So there's a payment for 1558 on line 415. If we stay on that page and go up to line 425, do you see here where it says there's a payment for $1,000?
A. I see that.
Q. Okay. That didn't make any changes to the principal balance, though, did it?
A. No. That looks like it was moved into suspense.
Q. Okay. And then moving back to Exhibit 38. The first page said that underneath -- on page 559, underneath the total principal balance it says, total interest amount. Do you see that?
A. I'm sorry, which way? We're looking back at the --
Q. 559.
A. Okay. Yes.
Q. It says, the total interest amount as of today is $111,815.03, right?
A. Yes.

Q. In the prior loan modifications there are a lot of different interest rates, right?
A. Not on the 2014 one, no. That was one -- that's a straight fixed rate modification.
Q. Got it. But throughout the history of the loan, it's had a lot of different interest rates that were accruing; is that accurate?
A. Correct.
Q. And then this amount for total interest amount incorporates the interest due before Fay ever had the loan, right?
A. Right. From the due date of the loan. From the time --
THE COURT: When you say -- sorry. When you say "this amount," you mean the amount on Exhibit 38?
MR. STEED: Yes, on Exhibit 38.
THE COURT: Sorry. Go ahead, Mr. Paterno.
BY MR. STEED:
Q. So what I'm wondering is this number, where -- like, how does this report get generated? Is it a button you press or do you --
A. So this report comes from MSP. MSP would -- again, because when we board the loan, we know it had a modification, we do a doc to data review on the modification. That interest rate at 4.625, which was the interest rate on the modification, is what is the interest rate in -- in MSP.

Q. And then -- but the balance here includes what the prior servicer said was due for interest, right?
A. Well, yes and no. Because when we get -- we don't get an amount due for interest because what -- what the prior servicer gives us is it says the loan is due for this date for 10/1/14, and then once we have the information in the system, the interest rate automatically calculates from that due date forward. So it's not like at the time of the transfer Nationstar says, oh -- Selene at this point, Selene is going to say, oh, here is your loan, here is your principal balance, and they owe this plus interest at this point. It's not necessary to have that because the calculation is going to be the same for them as it is for us.
Q. How does MSP track that -- on what -- whatever the interest rate was on a given date in the past? So at some point during the Nationstar servicing of the loan, it had a -- the loan had a different interest rate than it has now, right?
A. Right. But that interest rate has nothing to do with -- with anything once the other modification goes in. Because in the 2014 modification, the premise of getting the $23,000 as the -- that --
Q. Got it.
A. -- role, that's taking all of the past due arrearage.
Although, as I explained earlier, they didn't take what they were supposed to because they left the escrow shortage.

But that number would be all of your escrow, all of your corporate advances, all of your interest that would be owed up until that time. So all of that gets rolled into that. So the interest rates in the previous mods don't matter anymore because now you have an entirely new loan balance going forward with the interest.

Q. Got it. So you're saying back before the 2014 modification, there was money owed in escrow that should have stayed due and owing, but Nationstar forgot to keep track of it?

A. There should have been more of it in -- rolled into the loan.

Q. But how does -- how does that --

A. So they left -- they left a negative escrow on the loan, which is what happened.

Q. And then Fay in 2017 said, these 2014 Nationstar mortgage statements were wrong?

A. Right. Well, we had to make the adjustments for the -- for the thing. Yes.

And I think earlier -- and I apologize, I think I had mentioned that we made the change in 2017. I think it was in 2018, in February or March, I think, when we actually made the changes. And they would be reflected in there.

THE WITNESS: Your Honor, is there any way I can get more water?

THE COURT: Absolutely. We're just about done, just so you know, because the court has a hard stop at 2:30.

THE WITNESS: That's fine. I can last 15 minutes.

THE COURT: Thank you, Attorney Longoria. That might be the quickest way.

MS. LONGORIA: My witness is a camel.

MR. PATERNO: Thank you.

BY MR. STEED:

Q. Looking back at Exhibit 35. I'm sorry I'm all over the place, but I had something that will take a while and I think it makes more sense to do tomorrow. So I'm trying to pick up some other little things.

Looking back at Exhibit 35, page 453. Actually, we're looking at page 454 to start.

A. I have that.

Q. Okay. So the column for mortgage insurance, does that reflect actual payments that Fay says it made for mortgage -- or that were paid by servicers for mortgage insurance?

A. Yes.

Q. And those are reflected in the pay history?

A. Yes.

Q. I'm so sorry. So when I -- so let's see. 2/5/17. So looking at page 455 on the default notice.

A. 455.

Q. Yep.

A. Yes, sir.
Q. In the mortgage insurance column for -- for -- starting at the top, March, where there's a 651.74 and then April, May, June, July, and August of 3467?
A. Correct.
Q. I can't find those in the pay history. Can you show me where they are?
A. And that -- if you recall earlier, when I was a little bit mystified by that, if you take a look at pages I think it's 368 and 367.
Q. 368?
A. Unless that's a five.
Q. Five.
A. It might be 567 and 5 -- 568.
Q. I really have a hard time reading these numbers, unfortunately. 568.
A. It might say under that plaintiff 1241. But at -- 567 is in that.
Q. Oh, yeah. 1241. I see.
A. There are two spreadsheet looking documents.
Q. Yep. These are -- are from 2020 though?
A. Right. And I was confused earlier when we were going over these documents because there was a -- and, unfortunately, it's not part of the record. We did have a spreadsheet for Selene financial for their pay history. They only had the loan for,

like, eight months. And the pay history looked like this. It was a spreadsheet like this. I think we, unfortunately, pulled the wrong spreadsheet and placed it in here. So the missing data -- the data that you're looking for there is actually on that other -- on that other spreadsheet, which we don't seem to have.
Q. And were you part of it a few days ago where I let counsel know they were missing pay history back here? Were you part of getting the new pay history that was added?
A. I did provide all of that, yes.
Q. Okay. So even after I said there's some missing dates, you got some of them, but not all of them?
A. And I -- I did not see that until this morning when I was looking at it earlier.
Q. We are now looking at Exhibit 48.
A. 48.
Q. Exhibit 48, page 1391.
A. Where are we going? I'm sorry.
Q. 1391. A letter dated September 21st, 2021.
A. Okay. So it's 1319, and a letter dated September 21st, 2021. I have that.
Q. Yes. This was a letter sent by Fay Servicing to Henry Howe and Melanie Howe?
A. Yes.
Q. And does it say -- it says, we have a right to invoke

foreclosure. Do you see where it says that? It's in that first paragraph.

A. Yes, I see that.

Q. Did Fay -- did Fay have a right to invoke foreclosure on September 21st, 2021?

A. We believe so, yes.

Q. Why did you believe that?

A. Because we were servicing the mortgage on behalf of the investor, and the loan was in default.

Q. Okay. Did -- this was before the Florida action, right?

A. Correct.

Q. And this is more a fact question than what was Fay's belief. Did Fay have the right to invoke foreclosure on September 21, 2021?

MS. LONGORIA: So I don't object to the first question because it asked for his belief. But this question is a legal question on whether or not Fay had the right to initiate foreclosure on the date of the letter. And we've briefed that issue as to whether or not they did. That's a legal question. The prior question was fine, but I object to this question.

THE COURT: I -- I understood them to be the same question. He was just clarifying that you're asking him on behalf of Fay if his belief was that Fay had the right. Is that your question?

MR. STEED: Yeah, that's -- well, I mean, I think my

question was different. I think it was -- they've been subpoenaed to give their position on whether they had the right to do it or not, and he's saying, I don't know?

THE COURT: Okay. Can you ask the question again?

MR. STEED: Sure.

BY MR. STEED:

Q. Did -- did Fay have the right to bring a foreclosure against Melanie Howe on September 21st, 2021?

THE COURT: You're objecting because you're saying it's a legal conclusion.

MS. LONGORIA: I'm objecting because it's a legal conclusion.

THE COURT: I'm going to let you answer as to what your belief is, whether or not that's relevant in my analysis.

A. I think our belief at the time would be yes.

BY MR. STEED:

Q. And then on behalf of the Trust, did the Trust believe it had the right to invoke foreclosure on September 21st, 2021?

A. I would believe so.

Q. Was there any other litigation going on in Maine related to the Howe mortgage that dealt with the question of whether the Trust had the right to invoke foreclosure?

A. I do not know that.

THE COURT: Attorney Steed, it's 2:28. You have two more minutes.

MR. STEED: Can I stop now?

THE COURT: That's a good time to stop. So how far off track are we from our timing?

MR. STEED: I -- this is more or less what I'd imagined.

THE COURT: Okay. So we're on track.

MR. STEED: I think so.

THE COURT: Attorney Longoria?

MS. LONGORIA: I think so. I expected this to be the bulk of the two days. I guess the key question for me is I've got quite a bit of time to spend with Melanie as well. So I don't know how much time -- more time you anticipate with Mike, and I -- that would just help me. That's all.

THE COURT: Well, here's the time you have. Tomorrow from 8:30 to 2:30 with two approximately 15-minute breaks. I have very little flexibility. Maybe a little bit later in afternoon I can go, but not much. And then -- and then it's going to be January until we can come back and finish trial if we don't finish.

MR. STEED: And Your Honor, could we -- there's -- as far as Melanie Howe, I wasn't 100 percent clear you were saying maybe, yes, with her it would be a little different than with Fay. I think she is going to be the next witness and that the plaintiff is going to call her. And this is obviously very stressful. So what I -- I guess, do I need to prepare her to

defend our affirmative case on her damages hearing portion on cross as an initial start, or will I be able to -- or will there be -- like, what are the limits of her direct examination as it deals to the foreclosure because I think that will really change how we get ready if she's going to be answering questions like this didn't really bother you that much, did it, without first having been able to tell her story from a friendly place when her affirmative case seems separate from the foreclosure related issues.

THE COURT: Attorney Longoria?

MS. LONGORIA: Yes, Your Honor. I intend to proceed with her chronologically as well. And I don't think that he's entitled to call her so that the testimony comes in from a friendly place when I have subpoenaed her. I will be polite. I will be as measured in my questions, et cetera, as possible. But in my case, I've listed her as a witness. And it would be my intent to begin prior to 2007 and to walk chronologically through what happened. I think it's important to be able to do that in an organized fashion and not say, okay, 2014 this applies to the foreclosure defense or this applies to --

THE COURT: I understand. I agree. I'm going to let her just get called once, and she can get asked the questions she's going to get asked. Trials are difficult. We're all going to be polite. I take you at your word, Attorney Longoria, that you'll be as polite and civil as possible, as

everyone should be with every witness.

Anything else before we break for the afternoon? I think -- I don't know what's happening with your witness. I'm not going -- just in case -- it's clear, I'm not going to let her appear by phone. She can appear by Zoom. She can come in person. That can change if that's possible. I don't know where she's located, but I -- so I know you have to make arrangements for that. We can take her out of order, if that's what's needed to allow her to appear on Zoom. I will -- I will let that happen.

MS. LONGORIA: One other housekeeping detail is Henry Howe is also listed as a witness, and he's going to appear live. But he's not a party. I just -- I want to make sure he's sequestered and not in the courtroom during Melanie Howe's testimony.

THE COURT: That's your witness? You subpoenaed him?

MS. LONGORIA: No. It's his witness.

THE COURT: Oh, you've subpoenaed him. Okay. Yeah. Witnesses will be sequestered who aren't a party to the case.

Anything else? Okay. All right. Thanks. The court will be in recess. See you all tomorrow for a prompt start.

(Proceeding concluded. Time noted: 2:32 p.m.)

* * * * *

**C E R T I F I C A T I O N**

I, Michelle R. Feliccitti, Registered Professional Reporter and Official Court Reporter for the United States District Court, District of Maine, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: January 19, 2026

/s/ Michelle R. Feliccitti

Official Court Reporter