UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

WILMINGTON TRUST, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE FOR MFRA TRUST 2015-1,

Plaintiffs

CIVIL ACTION

Docket No: 2:21-cv-00278-SDN

-versus-

VOLUME II

MELANIE B. HOWE AND HENRY W. HOWE IV,

Defendant

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on for BENCH TRIAL held before **THE HONORABLE STACEY D. NEUMANN**, United States District Court Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine, on the 17th day of December, 2025, at 8:36 a.m. as follows:

Appearances:

For the Plaintiffs: Reneau J. Longoria, Esquire

For the Defendant: John Z. Steed, Esquire

Michelle R. Feliccitti, RPR
Official Court Reporter

(Prepared from manual stenography and computer-aided transcription.)

## INDEX OF PROCEEDINGS

Testimony: (See below) Page:

## INDEX OF WITNESSES


| WITNESS: | Page: |
|---|---|
| Michael Paterno | |
| CONTINUED CROSS-EXAMINATION BY MR. STEED | 194 |
| RE-DIRECT EXAMINATION BY MS. LONGORIA | 223 |
| RE-CROSS-EXAMINATION BY MR. STEED | 246 |
| Ada Wood | |
| DIRECT EXAMINATION BY MR. STEED: | 253 |
| CROSS-EXAMINATION BY MS. LONGORIA | 259 |
| Melanie Howe | |
| DIRECT EXAMINATION BY MS. LONGORIA: | 276 |
| CROSS-EXAMINATION BY MR. STEED | 306 |
| Henry Howe | |
| DIRECT EXAMINATION BY Attorney Steed: | 323 |
| CROSS-EXAMINATION BY MS. LONGORIA | 334 |
| Michael Paterno | |
| DIRECT EXAMINATION BY MR. STEED: | 340 |


## INDEX OF EXHIBITS


| Plaintiff Exhibit No. | Description | Admitted |
|---|---|---|

| Defendant Exhibit No. | Description | Admitted |
|---|---|---|

| Joint Exhibit No. | Description | Admitted |
|---|---|---|
| 59 | Complaint in prior action | 201 |
| 46 | CFPB-Fay Servicing, LLC Consent Order Dated August 21, 2024 | 224 |
| 60 | CFPB Website | 225 |
| 61 | Order terminating the CFPB Consent order | 225 |
| 49 | Misc. Loss mitigation applications and supporting documents pulled from | 228 |

| | | |
|---|---|---|
| | Disc. 1492-2247 | |
| 58 | Selene Pay History page 1 | 233 |
| 62 | HUD Statement | 235 |
| 63 | Payment Letter to Borrower | 239 |
| 64 | Private mortgage Insurance Disclosure | 239 |
| 65 | Occupancy and Financial Status Affidavit | 239 |
| 66 | Hold Harmless for Well and Septic | 239 |
| 67 | April 24, 2007 Letter from Citi mortgage | 239 |
| 68 | Good faith estimate | 239 |
| 69 | Initial escrow account disclosure statement | 239 |
| 70 | Impound Authorization | 239 |
| 71 | Maine Application Disclosure | 239 |
| 72 | Demonstrative Exhibit | 248 |
| 26 | York County Probate Case Docs for Guardianship case 2016-0369 | 283 |
| 48 | ECF 63-34 Selected Communications between Fay and Howe, from December 5, 2017 to January 25, 2023 | 325 |
| 26A | Certified York County Probate Case Docs for Guardianship case 2016-0369 | 347 |


**SIDEBAR CONFERENCES**

Pages:

**CHAMBERS CONFERENCES**

Pages:

(Open court.)

THE COURT: Good morning, everyone. We are back on the record in Wilmington Trust National Association versus Howe. Docket No. 2:21-cv-278. Attorney Longoria and Attorney Steed are both here. I see them both on their feet.

So what should we discuss before we get started?

MS. LONGORIA: Just being polite, Your Honor.

THE COURT: I appreciate that. Thank you.

MS. LONGORIA: I guess the one thing to discuss is yesterday counsel filed ECF 242. It's 318 pages. I began to look at it last night. I don't think it's simply a motion for judicial notice. I think there is more to it than that. I'd like an opportunity to go through it, read the cases. At first glance, some appear to be judicial states, nonjudicial states, all over the map. But if we could hold this until posttrial briefing, I would address this in posttrial briefing. But I just didn't want it to come into the record without any response from me; but I can't respond to it yet.

THE COURT: Okay. Sure. That sounds -- that sounds fine. We'll have a chance to address it then.

Attorney Steed.

MR. STEED: Thank you, Your Honor.

CONTINUED CROSS-EXAMINATION

BY MR. STEED:

Q. I think yesterday, Mr. Paterno --

THE COURT: Actually, before you get started with your questioning, is there going to be a witness on Zoom today?

MR. STEED: We're going to try at 11, I think. And if it works, that's great. And if it doesn't -- the Zoom connection was unstable yesterday. If it is today, we'll just call it a day.

THE COURT: It's a new day. So you never know. And --

MR. STEED: Everybody --

THE COURT: And just so everyone knows, we're going to take our first break promptly at 10:00 a.m., and then we'll go back in. Now you can begin.

MR. STEED: Thank you, Your Honor.

BY MR. STEED:

Q. Mr. Paterno, yesterday I think your lawyer said that there wasn't any doubt that Fay was a debt collector under the FDCPA. Is that -- is that something that Fay can stipulate to?

A. Yes, sir.

Q. And, also -- and is that for -- the relevant time period I think is the year before. So all of 2021 and part of 2020; would that be accurate?

A. Yes, sir.

Q. And then can Fay also stipulate that for the purposes of the Maine mortgage servicer duty of good faith, Fay is a mortgage servicer?

A. Correct.

Q. And Fay has been operating in the state of Maine since that law went into effect in 2019?

A. Yes.

Q. And Fay was a mortgage servicer since then?

A. Yes, sir.

Q. Okay. And then I think there's some dispute about whether Fay is a debt collector under the Maine FDCPA; is that accurate?

A. Yes.

Q. Okay. Does Fay conduct business in the state of Maine?

A. Yes.

Q. Does Fay regularly collect directly or indirectly debts owed or due to another?

A. I'm sorry, can you -- I didn't get that last part.

Q. Sure. Does Fay collect debts owed or due to another?

A. For another?

Q. Yes.

A. Yes.

Q. Does it do it regularly?

A. Yes.

Q. Okay. And besides that, how does Fay make money?

A. I'm -- we have servicing contracts. So with those individuals that we're servicing for those investors, there's monetary amounts that we're able to collect based on that.

Q. So Fay makes its money collecting certain amounts due under contracts when it services for -- for investors?

A. Yeah. I mean, we get paid for our service, so....

Q. Okay. And what does Fay do on behalf of investors?

A. So -- so, again, we're a mortgage servicer. We collect payments for the loan. Our main -- obviously our main service is to collect the payments. If payments fall behind or -- you know, we're to try to modify the loans and try to get those payments coming back in for collection as opposed to having a loan that's not, you know, producing.

Q. And so there are two lawsuits going on here. There's what I refer to as the note action in my mind, the 2021 complaint, right?

A. Correct.

Q. And then there's a -- the 2023 foreclosure; is that right?

A. Yes.

Q. And it was -- it was Fay that brought those lawsuits, right?

A. In 2021 and '23, yes.

MS. LONGORIA: Your Honor, if I may.

THE COURT: You may.

MS. LONGORIA: Do you have an objection? Well, just a correction. It's 2024. So I just don't want the record to continue to say --

MR. STEED: Sure. 2024.

THE COURT: Thank you. 2021 and 2024. Thanks.

(Counsel conferring)

MR. STEED: Your Honor, may I?

THE COURT: You may.

MR. STEED: I was really hoping to start off looking more put together today.

THE COURT: You're doing fine.

BY MR. STEED:

Q. And is what you're looking at a complaint for declaratory judgment filed by MTGLQ versus Challenge Investors?

A. I see that.

Q. Okay. And that was -- eventually the Trust took over this lawsuit, right?

A. Yeah. This was initially filed right previous to the Trust.

MR. STEED: Okay. I would just move for the admission of what I think the parties have agreed to call Joint Exhibit 59.

MS. LONGORIA: No objection.

THE COURT: Let me just -- that's in the binders here? Is it in the binders here?

MR. STEED: It's not in binders.

THE COURT: Can I see it?

THE CLERK: Your Honor, it's marked as Joint Exhibit, is it, 59?

MR. STEED: It should say, yeah, 59. It was Exhibit 5 in a previous pleading in this case. So it's docket -- it's doc 63-5 in 21-cv-278.

THE COURT: No objection at this -- Joint Exhibit 59 is admitted. Go ahead.

MR. STEED: Thank you, Your Honor.

BY MR. STEED:

Q. Can you -- do you have -- do you know what this lawsuit was about?

A. Just that it -- it's a declaratory judgment. I don't really know much about that.

Q. I don't have many -- I think it speaks for itself. I won't belabor it where it's a bench trial, but....

And I just -- We also have -- if we could turn to the docket in this lawsuit. It's Exhibit 41, page 894. And I just want to go over some dates so we're clear about them.

So it looks like this complaint was filed on June 30, 2017. Is that accurate?

A. Yes.

Q. And then going forward to --

THE COURT: Attorney Steed, when you say "this complaint," is --

MR. STEED: Sorry. So the docket that we're looking at has the same docket no. as Exhibit 57.

THE COURT: Exhibit 57. Okay.

BY MR. STEED:

Q. So the complaint was filed on -- in June of 2017. It looks like on -- there was an order denying it with prejudice on February 20th -- 26, 2020, and that is on page 899. Do you see that near the bottom?

A. I see that. Yes.

Q. Okay. And then there was some -- some motions to reconsider the judgment. And it was -- there was a final order on April 8th, 2021, that's on page 900?

A. I see that.

Q. And then there's no appeal filed, right?

A. Correct.

Q. So -- so the lawsuit goes from 2017 to 2021, right?

A. Yes.

Q. Okay. And then, just briefly, if we go to Exhibit 23, page 283.

A. I'm sorry, which Exhibit?

Q. 23. Binder malfunction. 23, page -- page 283.

MS. LONGORIA: No. There's no 283.

MR. STEED: Oh, sorry.

BY MR. STEED:

Q. No. Page 281. No, I apologize. Paragraph 14, page 180.

THE COURT: Page 180, is that what you said?

MR. STEED: Sorry. I'm looking at two --

THE COURT: I have Exhibit 23, starting at page 178.

MR. STEED: Yeah. I apologize.

THE COURT: Take your time to find what you need, counsel.

BY MR. STEED:

Q. Sorry. Exhibit 27, page 283.

A. I'm sorry, 27?

Q. Yeah. Exhibit 27, on page 283, paragraph 14.

First of all, Exhibit 57 is a motion to appoint receiver, right?

A. Correct.

Q. And in that -- in 14 it says, the plaintiff -- that's the Trust -- is unable to foreclose the mortgage loan under Maine law.

Do you see where it says that in Exhibit 14? I mean paragraph 14.

A. Yes.

Q. Okay. And was that -- is there anything untrue in this motion to appoint receiver?

A. I don't believe so.

Q. Okay. That was -- that was January 2023 that that was filed, if I'm not mistaken. It looks like, on page 285, it was filed on January 28, 2023.

A. On which page does it say that?

Q. 285 under the certificate of service.

A. I see January 18th, 2023.

Q. Okay. Thanks.
A. Okay.
Q. Does -- does Fay have any policies or procedures for what to do in cases where there's a question about whether there's -- it has a right to enforce a mortgage or an investor has a right to enforce a mortgage that Fay is servicing?
A. I'm sorry, can you ask that again?
Q. Sure. So are there sometimes instances where there's question as to whether a mortgage that Fay is servicing, where the investor has the right to foreclose given what it has in its file?
MS. LONGORIA: Objection as to time frame. The question, it doesn't specify a time frame --
BY MR. STEED:
Q. Ever.
MS. LONGORIA: -- for that.
THE COURT: I think you can ask that.
MS. LONGORIA: Oh, ever.
A. I'm -- I'm sorry, but I still don't understand the question.
BY MR. STEED:
Q. Sure. So -- so in this case, the pleading says the Trust doesn't have a right to foreclosure presently in 2023, right?
A. Okay.
Q. And besides this instance, is that something that's ever

happened with a loan that Fay is servicing, that there is some question about the enforceability of the instruments?

A. I have not experienced that. I've been with Fay for eight years. I've been doing trial work now for 15 years, you know, even as another servicer, and I have not seen that.

Q. So this is the only time you've ever seen there be a question about the enforceability of any instrument involving the servicing of any loan?

A. I have not -- I shouldn't say -- I have not been personally involved in a case like that, that I can --

Q. Okay.

A. -- recall.

I do think we have other Maine cases that are similar. I don't -- unfortunately what's happening in Maine, or has happened in Maine, doesn't happen anywhere else.

Q. Sure.

A. So it takes on a little bit of a different structure.

Q. Okay. Got it.

So does Fay have any policies and procedures about how to deal with MERS issues in Maine?

A. It's -- I don't think we have a specific policy. But there's -- obviously if it's a Maine case, then it's going to go to an attorney that -- like Reneau's office that would -- you know, we'd leave all the legal side to them to decipher.

Q. Okay. So are there any special communications that go out

to people with MERS issues to -- not people, I mean, borrowers?

A. Specific, not -- not that I know of at this time.

Q. How does Fay go about independently verifying it has a right to foreclose before sending documents that mention the word foreclosure?

A. All of the information that goes out, like, on statements and things like that are -- it's -- it's a standard form. I don't know that there are, at this point, markers for, like, Maine to have a separate kind of entity at that point. I don't -- I don't know.

Q. And would you acknowledge that when a document mentions the word foreclosure, it could imply that a person could lose their home?

A. I'm sorry, you went a little low there.

Q. Sure. Oh, I might not have my microphone on.

THE COURT: You'll hear me say this a lot. When it's uncomfortably loud, that's how we like it.

MR. STEED: Okay. I can do that.

THE COURT: Okay. Good. So can my children, so you're in good company.

BY MR. STEED:

Q. Does Fay acknowledge that the word foreclosure, when it sends it out in communications, could mean that a borrower could lose their home?

A. I mean, that's the end source. If that's -- yeah, if

that's the outcome, that's a possibility, sure.
Q. Does Fay acknowledge that could be stressful?
A. It could be stressful?
Q. Yeah.
A. In some ways, I think it can be. I'll leave it at that.
Q. Okay. Earlier I think your attorney talked about that Fay and the Trust had agreed to waive recoverable corporate advances that were initially asked for in the complaint; is that right?
A. Not all the recoverable advances. Just the attorney's fees portion of the recoverable advances.
Q. And why -- why is -- why is that?
A. It's just something that we had talked about with the attorney, and that they felt that that was -- would be the right course of action.
Q. So -- so as a policy, does Fay still believe it's acceptable to charge attorney's fees, based on prior litigation, in mortgage statements?

MS. LONGORIA: Objection. That's too broad of a question. If he could specify what prior types of litigation, et cetera. So that's -- that's my objection. Because in this case there's a variety.

THE COURT: Well, I'm going to overrule the objection. I'll let you ask it. If he's confused about the question, he can let you know.

MR. STEED: Sure. Is it possible to read back the question? I don't remember it now exactly.

THE COURT: Sure.

(Court reporter read back requested material.)

THE COURT: Can you say that a little louder.

(Court reporter read back requested material.)

BY MR. STEED:

Q. As a policy, does Fay -- is it Fay's position that it's okay to charge legal fees related to litigation it lost in its mortgage fees -- in its mortgage statements?

A. Again, in most, if not all, states that -- that is allowed. I mean, even -- especially like in Florida where I live, I have actual case law that allows that. So on a broad spectrum, it's -- it's not an issue. It is something that's collectible according to the mortgage. We're allowed to collect on those fees.

So when it gets into a specific state, again, I don't know that there are -- I think we continue -- we would continue to charge it. If it's something that, again, when we talk to our attorneys in that state or in that particular case, if it's an issue, that we can easily take it off or remove it.

Q. So it is Fay's position, generally speaking, that they're allowed to collect legal fees and charge for legal fees related to any debt like -- well, let me strike that.

Is it Fay's position that it's allowed to collect fees

before a court has determined that it's entitled to legal fees in litigation?

A. Say that one more time. I'm sorry.

Q. Does -- is it Fay's position that it's allowed to charge legal fees in mortgage statements before a court has said that it's entitled to legal fees?

A. Yes, because it's -- again, it's acceptable on the mortgage. It's part of the mortgage and the documents that say that the -- you know, the lender can charge those fees.

Q. And is there any limit on that? Do they need to be reasonable?

A. Yeah, they have to be reasonable. And most servicers follow a Fannie/Freddie guideline for fees and stuff like that. So, yeah.

Q. And what -- what fees, as far as Fay is concerned, can it charge and what fees can't it charge as far as legal fees?

A. That I don't know specifically. But there are -- in corporate advance, there are items that we label as nonrecoverable, and there are ones that are recoverable. And as they get billed, our team knows which ones -- or they even come specified that these fees would be recoverable, and these are nonrecoverable. And they get posted to MSP specifically that way.

So you could -- even on this loan, there could be maybe $50,000 in attorney's fees, but maybe only 25 right now are

recoverable. Just as an argument sake, so....

Q. I'm moving now over to Exhibit 45, and I'm starting at page 1143. That's October of 2019, I believe. And I'm starting there because I believe -- I could be wrong, but that that's when the Maine mortgage -- for relevance grounds, I'm starting there because that's when I believe the mortgage servicer duty of good faith law went into effect.

MS. LONGORIA: I'm sorry, what page?

MR. STEED: 1143, maybe.

A. 1143 I have as the statement date of October 10th, 2019.

BY MR. STEED:

Q. And in the section -- so this is a -- and the section that says, delinquency notice, there are four words in there that say you may risk foreclosure. Is that -- can you confirm that, and then I have a few follow-up questions.

A. Yes, I see that. You may risk foreclosure. Yes.

Q. And is -- between -- and does that appear in every mortgage statement as far as you know? Obviously the statements are here. I'm not going to go through each one. But is it likely that appears in every statement?

A. If the loan is in default for some period of time, that's certainly a possibility.

Q. Okay. And then moving on to page 1144. Well, actually, let me ask another question.

Besides that on prior litigation in Maine, are you aware

of any other lawsuits that Fay was pursuing related to the Howe mortgage?

A. Off the top of my head, as far as timing goes, that I don't know.

Q. Okay. You don't know if there are any other lawsuits or litigation happening at that time?

A. I don't think so, as we just talked about a 2021 and then a 2024 earlier. So this being 2019, I think it would only be the one that MTGLQ had -- had started.

Q. Okay. And just on 1144, there are charges for attorney's fees. It says, foreclosure attorney fee and foreclosure fees and costs?

A. On which --

Q. On 1144.

A. Yes.

Q. And then if we look at -- if we move quick over to 570, that's the pay history. I think that's Exhibit 38. At the bottom, I think.

A. 570. Okay. I see that.

Q. Okay. So -- so those -- and that's the same date. It's October 1st, 2019, right?

A. Correct.

Q. So -- so the charges that show up on that October mortgage statement were added to the recoverable corporate advances, or were they not?

A. Those do appear to be recoverable, yes.

Q. Okay. And then going back to 1144, there are -- there is a charge for mortgage insurance paid. Do you see that in the activity since your last statement section?

A. Sorry. I don't know why I turned the page. I'm sorry, 1144, mortgage insurance. Yes.

Q. And that gets added to the escrow balance, right? It shows up in this section, but that's a charge that goes into escrow?

A. Correct.

Q. And then there's also -- and that's on almost every mortgage statement; is that fair to say?

A. Yes.

Q. And then there's also another charge, property inspection fee, correct?

A. Correct.

Q. What is that for?

A. That's the piece that we had talked about as the other part of corporate advance that we're not at this point waiving.

Q. Sure. And so that is also added to that recoverable advanced balance?

A. Yes.

Q. So besides legal fees and this monthly $14.25 -- it goes up to 20, but this sort of modest monthly charge in legal fees, what else is in the recoverable corporate advance balance?

A. Just as far as with this loan, it would be just the attorney's fees and the inspections.

Q. Okay. And with the inspections, there are monthly inspection reports where someone goes and takes photographs of the house?

A. Yes.

Q. And do those people -- are those people -- can they go onto the property and --

A. It depends on what they visualize when they're there. If they see cars or whatever, they normally wouldn't go. They may have -- there may be an instance where we may give them something to post, like to give it to the borrower, that, you know, may talk about their options of, you know, what they can do. And it's a letter that tells them, you know, who to contact and things like that. There may be an instance where we do that, but that's a special connect thing that we would do to send them out there to do that.

But on normal inspections, if there are a lot of cars or things in the -- in the visual, they will normally just take pictures and leave. If they find that there -- it may look like it's vacant, then they may go on the property and try to look in the windows and see if -- if it is vacant or if -- you know, what may be going on.

Q. Okay. And Fay hires those people?

A. Yes. They -- we have a third-party service that does

that.

Q. And what's the legal basis for Fay to be able to send people onto someone's property or to --

A. Again, I think it's part of the mortgage that we're -- you know, we tell them that we can inspect the property and that that's -- it's just part of keeping -- as I explained yesterday, that makes sure that the property is being kept. This was -- which is part of the borrower's responsibility with a mortgage. So we're just ensuring that the investment is at least staying the way it is.

Q. Absolutely. Sure. And what about in cases where the investor doesn't have the mortgage?

MS. LONGORIA: Objection. The question, when the investor doesn't have the mortgage, the mortgage is of record. So what he's asking is if there isn't an assignment of the mortgage, but the mortgage is a contract that was signed, and it was recorded. So I object to the question, the specificity of when the mortgage -- the investor doesn't have the mortgage.

THE COURT: Sustained. You can rephrase.

BY MR. STEED:

Q. If the investor doesn't have the rights articulated in the mortgage, would they still be able to send people onto -- send inspectors into a person's property?

MS. LONGORIA: Objection. That's the same -- that's the same question. The document speaks for itself. And the

question, what happens when the investor doesn't have the rights that are in the contract. So I object to that question. That's -- there's --

THE COURT: I'm -- I'm going to overrule the objection.

You can answer, to the best you can.

A. Can you repeat the question for me?

BY MR. STEED:

Q. If the -- if the investor does not have the rights that are articulated in the mortgage deed, does Fay still believe it has the right to send people onto the borrower's properties in the instance where the -- where the investor doesn't have the rights articulated in the mortgage deed?

A. I don't know. I don't know. I can't answer that question.

Q. Okay. And -- and similar question, if the investor does not have the rights articulated in the mortgage deed, does Fay have any policy on whether it's allowed to charge property inspection fees?

A. Again, I'm not -- I can't answer that.

Q. Okay. And -- and then finally on this, if the investor does not have the rights articulated in the mortgage deed, does Fay have a policy on whether it can charge the borrower for mortgage insurance?

A. Same answer. I'm not -- actually don't really understand

the question, so I really -- I can't answer that.
Q. Does Fay have policies?
A. Yeah. Absolutely.
Q. Does Fay have policies about when it can and can't charge mortgage insurance?
A. No. If it's part of the loan, it's -- there's not anything that's different about that. I don't -- it comes as part of the loan.
Q. Moving forward to 1185 in Exhibit 45, I believe.
A. 1185.
Q. Are you there? So this -- this is a mortgage statement for a payment due date of 8/1/2021, sent on July 7, 2010, -- 2021; is that correct?
A. Yes.
Q. And it shows a total amount due of $119,603.69, correct?
A. That is correct.
Q. And since the last mortgage statement we looked over in the account information, there now appears to be a running tally for recoverable corporate advances of $9,144.48, correct?
A. I see that.
Q. And that -- in this statement, that's not shown -- reflected in the total amount due, right?
A. Correct. It's -- the total amount of 119,603 is just overdue payments and the late charge, and a small recoverable of $20.

Q. Sure. And then -- but over -- but at the time of sending this mortgage statement, was that $9,144.48 something that the borrower had to pay?
A. Yeah. Eventually it would have been, yes.
Q. Okay. And then just moving on to 1187. It's the next mortgage statement. And this is the next month's mortgage statement, right?
A. Correct.
Q. And the format has changed?
A. Yes.
Q. And now the recoverable corporate advances are shown in the total amount due?
A. That is correct.
Q. Fay's position was, even before that, they were part of what the borrower owed, correct?
A. Correct.
Q. And I just want to go next to 1237.
A. 1237. I have that.
Q. Okay. And so on July 18, 2023, Fay is saying that the borrower has to pay $14,246.26 in recoverable corporate advances; is that right?
A. Yes, sir.
Q. But that amount is not in the default notice in Exhibit 35, is it?
A. Correct.

Q. And then I think moving forward to 1301, that's a mortgage statement dated July 17th, 2025. And in that mortgage statement, Fay is still asking for $14,936.26?

A. That is correct.

Q. And -- and that includes the advances we were talking about back in 2019 during a prior litigation in Maine, correct?

A. It may include a small balance back from 2018. I can't actually tell how much of that may be from 20 -- 2019.

Q. Well, I mean, my question -- we started talking about some charges for legal fees and for recoverable corporate advances for foreclosure fees back in October of 2019. And those -- what I was just asking is, are those ones we talked about in 2019 part of the running balance that gets us to this -- the corporate advances we talked about from the October 2019 mortgage statement, are they or aren't they part of the -- the running recoverable corporate advances balance that we arrive at -- this $14,000 or so -- on the July 17th, 2025, mortgage statement at 1301? Well, let me ask a different question actually.

Can you show me anything in Fay's records between October 2019 and July of 2025 where recoverable corporate advance balances are removed from the ledger?

A. There is nothing that we would have other than the -- the demand letter that does that.

Q. Okay.

A. That does that.

THE COURT: I'm sorry, other than the --

THE DEFENDANT: Other than the default letter or demand letter.

THE COURT: Oh, demand letter. I didn't hear it.

THE WITNESS: We have so many terms for that stuff.

THE COURT: Well, that's what I thought. I thought, that's a new name.

THE WITNESS: Demand and default.

THE COURT: And hello and good-bye letters. Okay. Good. I'm with you.

BY MR. STEED:

Q. All right. Moving back to Exhibit 48.

A. 48.

Q. Yes.

A. Okay.

Q. Could you look through 48 and just confirm these are all communications from Fay to Melanie Howe?

A. Yes, they are.

Q. Okay. And were they all sent on or around the date indicated on the communication?

A. Yes, sir.

Q. Okay. And then we had looked previously at 1391. And that -- that communication says we have a right to invoke foreclosure, correct?

A. Yes.
Q. And then there's -- there's another letter dated August 1st, 2022, at 1383.
A. Yes, sir.
Q. And that's -- that's after Ms. Howe filed her counterclaims against Fay, correct? Or her cross-complaint against Fay?
A. I don't know the specific date, but I would trust you for this moment.
Q. Okay. And is it fair to say that Fay was aware of the allegations in the lawsuit against it?
A. Yes.
Q. Okay. And -- and why did Fay keep sending letters telling Ms. Howe it could invoke foreclosure against her?
A. Again, I think it's the same what I talked about earlier. It's just the standard practice across the board. Unfortunately, Maine has its own quirks, and we don't -- I don't know of anything that would stop that from happening for Maine at this point.
Q. I now have some questions that specifically deal with your capacity here as a representative for the Trust. You understand?
A. Yes, sir.
Q. Okay. Does the Trust regularly bring foreclosure actions?
A. Not on its own. Only through the servicer.

Q. Okay. But it regularly does that?
A. Yes.
Q. And it's regularly named as a party in foreclosures?
A. They would be named as the party, yes.
Q. More than 100 times in 2020, would you think?
MS. LONGORIA: Objection. Calls for speculation. Even in the 318-page document he doesn't have any --
THE COURT: Overruled. He can answer it, if he knows it.
A. I would -- you -- are you talking just in Maine or --
BY MR. STEED:
Q. No. Across the country.
A. Yeah. I would say yes.
Q. Okay. And the same for 2023, more than 100 foreclosures?
A. Yes.
Q. Okay. Do you know if the Trust has any assets besides mortgage investments?
A. No.
Q. You don't or --
A. They don't.
Q. Okay. And does the money it makes on those mortgage investments primarily come from services sending them money that they collected on behalf of the investor, in this case the Trust?
A. Say that again.

Q. Sure. Where does -- they make money off those investments, right?
A. Correct.
Q. Do they receive money owed on the note from mortgage servicers mostly?
A. Everything is through the mortgage servicer. So, yes, I'm -- whatever happens with the mortgage servicer with that loan gets transferred back to the investor.
Q. Okay. Does the trust also own REO properties?
A. Yeah. Eventually they would, yes.
Q. Okay. And what are REO properties?
A. REO properties are what we call real estate owned, which is after the foreclosure.
Q. Okay.
A. So if the property goes to sale and nobody outbids at the foreclosure sale, it reverts back to the bank, and they're the owner.
Q. And those properties all come from foreclosures, right?
A. It's rare, but it's possible they could buy a portfolio that might include REO. But I -- that's probably an anomaly. So it doesn't really happen that often. But it would happen mostly after the foreclosure.
Q. So the Trust money comes from mortgage servicers collecting mortgage payments, right?
A. Correct.

Q. And then the mortgage servicers pass the money onto the Trust, right?
A. Correct.
Q. And in the case of the Howe mortgage, the loan was in default when the Trust acquired the investment, correct?
A. Correct.
Q. I'm just going to move -- I'm almost done. 46. Exhibit 46.
A. 46?
Q. Yes. It's 1303.
A. I have that.
Q. Okay. Do you -- have you seen this before?
A. I have.
Q. Okay. So this is a consent order in the matter of Fay Servicing, LLC, by the United States CFPB; is that right?
A. That is correct. And just -- this has actually been rescinded by --
Q. No, I understand.
A. -- the CFPB.

THE COURT: Please don't talk over each other. I couldn't hear what he said. You said this has actually been....

THE WITNESS: It's been rescinded. The CFPB is no longer seeking this order.

BY MR. STEED:

Q. But Fay had agreed to enter into this order; is that correct?

A. At that time, yes.

MR. STEED: Okay. I got -- I got to move for the admission of 46.

MS. LONGORIA: And I'm going to object because it's an order that is no longer in effect.

THE COURT: I'll allow the order. That testimony has made it clear, so I understand.

MR. STEED: I don't have any questions on it. I've referred to it. And I assume we're going to file posttrial briefing, Your Honor, so I'll just deal with it there.

How -- how strict are we going to be with redirect? Should I make sure I've checked everything, or can I ask questions later?

THE COURT: You can take a minute to make sure you've asked all your questions. I don't know how strict I'll be. I'll decide at the moment. But feel free to take a minute.

MR. STEED: Okay. That's all I have for this witness.

THE COURT: Thank you.

MS. LONGORIA: All right. If I may, I'll begin with that last question. I have documents marked 60 and 61 for identification. I've provided copies to counsel. If I may approach the witness?

THE COURT: You may.

RE-DIRECT EXAMINATION

BY MS. LONGORIA:

Q. And these documents are not in the notebook, but what are these?

A. The first one is a notice from the CFPB specifying that they are no longer seeking action against Fay Servicing. That's in Exhibit 60. Exhibit 61 is the order terminating the consent order that is part of Exhibit 46.

MS. LONGORIA: Okay. I move for admission of both of those documents.

THE COURT: Any objection?

MR. STEED: No objection.

THE COURT: Admitted.

BY MS. LONGORIA:

Q. And next I want to direct your attention to Exhibit 49 in the notebooks. There were questions with regard to the authority of the various entities to enter into the three loan modifications yesterday during your examination. And I want to direct your attention to Exhibit 49. 49 includes Bates stamped documents from 1394 through 1505, and they're on the Exhibit list. Ms. -- and captioned as miscellaneous loss mitigation applications and supporting documents pulled from discovery, pages 1492 through 2247. So these pages are 1394 through 1505.

Are these business records of Fay made and kept in the ordinary course of your business in servicing the loan?

A. Yes.

Q. Okay. So we talked about business records yesterday when it came to statements and accounting, et cetera. In addition to that, did Fay retain the correspondence back and forth between the borrowers when she was looking to modify her loan on those various occasions?

A. Yes.

Q. And is that this correspondence?

A. Yes.

MS. LONGORIA: I move for admission of Exhibit 49.

THE COURT: Any objection?

MR. STEED: I just don't understand how it's relevant to any of the issues here. So I think there might be specific things that -- looking to be admitted, but I just don't know what they are, and I don't know if -- some of them are.

THE COURT: So objection is to relevance.

MR. STEED: Relevance. And, also, I mean, there -- some of these -- I mean, taking in a prior servicer's records and verifying them and relying upon them is different than -- I don't know. I mean, so 1426 has something to do with a pharmacy. So I think these would need to be piece by piece as opposed to -- I --

MS. LONGORIA: I'll speak to that.

THE COURT: Speak to the relevancy, and I guess further business records.

MS. LONGORIA: So this Exhibit began as a 770-page document. In an effort to cull it to the relevant documents, we have what is before you as Exhibit 49. The Bates stamp pages were provided previously in discovery. They are related to this mortgage loan. The issue of relevance was put into -- or accentuated as an issue when counsel put -- put into question each of those loan modifications. And the -- basically the voluntariness [sic] of the borrower to enter into a loan modification in 2010 and 2011 and 2014, this is the background paperwork that was exchanged in connection with those modifications. So I provided this in advance so if counsel wanted more of those 770 pages, he could have included them. But I'm asking for these pages to be included because they are relevant to the questions that have already been asked with regard to the loan modifications, themselves. And -- yeah, that's it.

THE COURT: Okay.

MR. STEED: We don't contest that the Howes voluntarily signed the loan modification agreement. That's stipulated. They've been admitted. The only questions were had -- were authority of the other side to modify the agreements. And I don't think -- it doesn't sound like these documents have anything to do with that. So this just -- it has some stuff about her brain tumors. It looks like these are not applications. They -- she entered into the agreement. I

suppose if she says she didn't -- I don't know.

THE COURT: I'm going -- I'm going to allow the Exhibits. They're potentially relevant to the issues that are going on here. It's -- we haven't had posttrial briefings yet. I'm not sure what's going to be argued. Maybe there will be an argue -- you're arguing the other side didn't have authority. Potentially there's arguments about waiver because they entered into these agreements with the other side. So I'm going to allow the agreements. They are relevant, and testimony was there to support the business records. So go ahead.

MS. LONGORIA: Thank you.

BY MS. LONGORIA:

Q. Next there was a question with regard to $1,000. I'm going to call your attention to the statement as it appears in the Exhibit for mortgage statements, which I believe is 45. I call your attention to Exhibit 45, and March 3rd of 2015.

A. We're supposed to -- we're looking at mortgage statements or mortgage -- or the pay history?

Q. The mortgage statements. So it's -- oh, yes. It's 45, not 49. Thank you for the correction. And March 3, 2015. There was a question of you about the $1,000. Oh. Actually --

A. I think you have --

Q. My notes are incorrect. Please direct your attention to Exhibit 49 or --

A. I think it's 38.

Q. 38. Thank you. It is the loan history that I'm looking at. And I wanted you to turn your attention to March 3rd of 2015, which is page 585. And I apologize for the Bates stamping over the discovery. That won't happen again.

So I would direct your attention to that page. The top of it is dated 2/21 of '17. The question was basically, what's with this $1,000? Was this, you know --

A. The $1,000 --

Q. How was it applied, et cetera.

A. So the $1,000 was money that was sent from the borrower. And the $1,000 was put into suspense on March 3rd of 2015.

THE COURT: I'm sorry, could you tell me what does it mean, put into suspense?

THE WITNESS: I'm sorry?

THE COURT: What did you say? You said the borrower -- you said the money was sent from the borrower, and the $1,000 was put into....

THE WITNESS: Suspense.

THE COURT: What does --

THE WITNESS: And it was -- suspense is a -- sort of a holding area. Money would go into suspense when money is received, but is not enough to cover a payment. So at that time, the loan was still due for the 10/14 payment. And where this was now six -- six or seven months later that they received the $1,000, so it wasn't enough to cover the amount

due, so it goes into suspense.

THE COURT: Thank you.

BY MS. LONGORIA:

Q. And turning back one page to 584. Directing your attention to June 10th of 2015. What happens?

A. So that $1,000 was removed from suspense, and a check was sent to the Howes for that $1,000. And you could see underneath the date, just to the right of that 6/10/15 entry, you'll see payee, it says, Howe, H-O-W-E, and the $1,000 was paid back to the Howes.

Q. And next I want to -- so next I have a document that is marked for identification as Exhibit 58.

MS. LONGORIA: I've given a copy to counsel, and I'll provide a copy to Your Honor and the witness, and then I will explain.

THE COURT: Thank you.

BY MS. LONGORIA:

Q. What is this?

A. Unfortunately, yesterday when we were going over Exhibit 39, we had realized that there was a missing portion of the pay history, which was the portion of Selene's pay history that they had when they had the loan. They had the loan for about eight months or so. And this is the missing portion that we didn't have yesterday.

Q. And you testified with regard to this period of the loan

history yesterday, and there was a question asked to you as to whether or not you gave this to our office. You did, didn't you?

A. I did, yes.

Q. And on or about what day?

A. I want to say it was last week at some -- some point in time. I don't remember the exact time frame.

MS. LONGORIA: And I, as an officer of the court, will make the recommend -- or make the representation that I did not include this in the trial -- proposed trial exhibits. That was my clerical error. I'm moving to admit this document on rebuttal because he was questioned about this area of the pay history. Despite producing and collating joint exhibits of over 1500 pages for all of us, I made this mistake, and this didn't make it into that document.

BY MS. LONGORIA:

Q. And so I will ask you if this document has the same indicia of reliability as the rest of the documents that are included in the pay history, the foundation that you testified to yesterday?

A. Yes.

MS. LONGORIA: So other than the fact that I left it out of the trial binder, I -- I would argue that this document is otherwise admissible, and I would move for its admission.

THE COURT: Any objection?

MR. STEED: Your Honor, it wasn't provided in discovery, so, yes.

MS. LONGORIA: That's --

MR. STEED: It was provided in discovery last night as a supplemental.

MS. LONGORIA: Absolutely. So last week -- I did provide a supplemental discovery last night that specifically outlined this. Last week when Attorney Steed said it looks like we're missing pay history, there were three pages that were provided in the supplemental disclosure to him. It should have been provided as well. It was not.

I acknowledge that it was just obtained from the servicer last week and that it didn't go over with those other pages. Had he not been questioned on it, I would understand. But since he has been questioned on this area, and since it was provided by Fay to us, and he asked if Fay had provided any more documents to us and we discovered that they had -- and I made that mistake -- I'm asking that this be admitted because it is reliable. And but for my error not including it in the trial binder and providing it to counsel at the end of last week, it were -- it is otherwise reliable.

THE COURT: I -- I understand mistakes happen. I am going to allow Exhibit 58. I think it was an inadvertent error. You provided it last night. It's a one-page document. And while it has, you know, calculations on it, I don't think

that counsel is going to be prejudiced by -- (CK) if it had gotten it last night in light of everything else that has been received. So I am going to allow it.

BY MS. LONGORIA:

Q. So you were asked a series of questions with regard to mortgage insurance. And I'm going to go through a series of documents that I will mark and present. But this entire group is part of the origination file that was turned over in discovery, and the Bates stamped pages are on the bottom of each of these pages. And you reviewed these this morning --

A. Yes.

Q. -- in preparation for rebuttal.

So I'm going to begin with -- mark these with Exhibit 62, and I'll take them one at a time. 62.

THE COURT: Thank you.

BY MS. LONGORIA:

Q. And with regard to this document, what is this?

A. This is a HUD-1 from the closing of this loan at origination.

Q. And the foundation questions with regard to the business record that you testified to yesterday, being made regularly and regularly made, retained in your files, et cetera, all of these origination documents came from your files and were produced in discovery?

A. That is correct.

MS. LONGORIA: I move for admission of Exhibit 62.

THE COURT: Any objection?

MR. STEED: Your Honor, I object. I also -- I think what it sounds like is the witness was sworn in yesterday, the court ended, and from what counsel just said, they've talked about his testimony and what rebuttal would look like while he was still sworn and under oath. So I think, if nothing else, that's problematic, and I would object to the admission of new exhibits.

MS. LONGORIA: I'm happy to make a representation with regard to that, Your Honor. With regard to rebuttal, I pulled all of these documents out of the discovery this morning. I printed them. And when he was standing in court, I asked him if he would review them so that when he got on the stand, he would be able to testify that these were all origination documents. So there was nothing inappropriate about that conversation at all.

THE COURT: So -- so your conversation was limited to showing him the documents?

MS. LONGORIA: To showing him the documents this morning after I printed them. We even drove in separate cars this morning for other reasons. So, anyways.

THE COURT: So is there any other objection to 62? Any other basis for the objection to 62?

MR. STEED: It hurts my case, Your Honor. I -- I

don't -- I believe, when I look back at it, there are documents indicating pretty clearly that PMI was supposed to be part of the loan originally. I don't think we're going to pursue that argument. So I can save us all some time from going through these. I think that if they're all Bates stamped and from the origination document and they're going to come in anyway, I don't want to waste everyone's time by fighting over it.

THE COURT: Okay. So I will admit 62.

BY MS. LONGORIA:

Q. And that was precisely the reason for this. This document reflects that PMI, from the time of HUD, is part of this loan?

A. Yes.

THE COURT: I'm sorry, I couldn't hear you. Is part of this loan?

BY MS. LONGORIA:

Q. Was part of this loan?

A. Yes.

THE COURT: Is your lapel mic on?

MS. LONGORIA: Is that better?

THE COURT: You have to just do this awkward, you know, every time. Hopefully you shouldn't have to do that.

MS. LONGORIA: Okay.

THE COURT: That's better. Thank you.

MS. LONGORIA: Thank you.

And I'm going to -- I have other documents to introduce

that came from the origination file that are relevant to the questions that came on yesterday. So just one second, and let me do all of these at once. I'm going to mark Exhibits for identification purposes as 63, 64, 65, 66, 67, 68, 69, 70, and 71. Okay. So the first one I will present is 63.

THE COURT: Thank you.

MR. STEED: And I agree. We don't have to go through all the documents.

THE COURT: I'm sorry, what is that?

MR. STEED: In theory, do we have to go through them all? I mean, I see, yes, they agreed to PMI in the closing.

MS. LONGORIA: They're not in yet.

MR. STEED: Okay.

MS. LONGORIA: All of these are addition -- I can move them all in at once. You're right. That will be faster. Give me a minute.

THE COURT: Sounds good.

MS. LONGORIA: Is it -- oh, might I do this at our 10 o'clock break?

THE COURT: Oh, that's a good idea.

MS. LONGORIA: Thank you.

THE COURT: Is that all you have for this witness would be those?

MS. LONGORIA: Oh, no. I can skip over that and come back to that.

BY MS. LONGORIA:

Q. Okay. All right. With regard to the property inspections, you were asked questions, in general, about why mortgagors and -- you were asked specifically why servicers and trusts go out to inspect property to determine condition. Do you have any situations where a property is occupied, but it's occupied by squatters? Does that ever happen?

A. Yes, it has.

Q. Have you ever seen situations where people have converted their residential property into businesses?

A. I've seen that, yes.

Q. Have you ever had situations where people have not maintained their residential properties and have been faced with code violations?

A. Definitely it's happened.

Q. And once the mortgage is signed by the borrowers with the various rights that are within that document -- well, withdrawn.

So you testified that with regard to the 14,000, you can't tell what the breakdown of that is as far as what is for inspections and which attorney fees are included in that?

MR. STEED: Object, Your Honor. I don't think that was the question and I'd probably like to not have leading on this particular issue.

THE COURT: Objection is sustained. Leading.

MS. LONGORIA: Understood.

BY MS. LONGORIA:

Q. Okay. In Exhibit 38 at the beginning, pages 560 through 564, I noticed that there's -- one, two, three, four five, six, seven, eight -- there's nine -- the ninth column over there's escrow balance. That column appears to have a running balance of what's been advanced for taxes and insurance for escrow; is that correct?

A. That is correct on page 560.

Q. Okay.

A. Yes.

Q. Now the column that includes corporate advances, that doesn't have the same function, does it?

A. Correct.

Q. Okay.

A. It doesn't have a running total, yeah.

Q. Okay.

THE COURT: We can -- we can take our 10:00 a.m. break now, if that works for everybody. We will take a 15-minute recess. I'll see you all at 10:15.

(Break taken. Time noted: 10:00 a.m.)

(Proceeding resumed. Time note: 10:32 a.m.)

THE COURT: Good morning. We are back. You can proceed when you're ready, Attorney Longoria.

MS. LONGORIA: Thank you. Your Honor, I provided

copies of Exhibits 62 [sic] through 71 to opposing counsel and added them to the list. And this is the balance of them.

THE COURT: Thank you.

MS. LONGORIA: And I move for the admission of --

MR. STEED: I don't have a copy of those, actually.

MS. LONGORIA: I handed you them.

(Counsel conferring.)

MS. LONGORIA: Your Honor, I move for the admission of 62 through 71.

THE COURT: Any additional objections other than your previous objection, Attorney Steed?

MR. STEED: No, Your Honor. If they're all provided in discovery.

THE COURT: Okay. Exhibits are admitted. Thank you.

BY MS. LONGORIA:

Q. And I understand the documents speak for themselves. So I'm just going to highlight a couple of things. And I'll put them on the overhead.

Directing your attention to Document 63. Does that document, signed by the borrower, reflect mortgage insurance as part of the required payment?

A. Yes, it does.

Q. And Exhibit 64, did the borrower acknowledge at the time of closing the private mortgage insurance disclosure requirement?

A. Yes.

Q. And at the time of closing, did the borrower sign an occupancy and financial status affidavit that is marked as Exhibit 65?

A. Yes, they did.

Q. And they acknowledged that they have a septic system?

A. Correct.

Q. Hold harmless.

And on April 24th of 2007, there was correspondence to the borrower from the original servicer, CitiMortgage, Inc.?

A. Correct.

Q. And during cross-examination, you were asked questions about the authority of CitiMortgage and MERS to enter into loan modification agreements. Do servicers -- let me start with Fay. Does Fay have the authority to enter into a loan modification agreement?

MR. STEED: I'm going to object, Your Honor.

THE COURT: What basis?

MR. STEED: Well, foundation. I think it's -- I mean, there's a -- I believe there is a power of attorney in the record for Fay. So maybe not for Fay, but as to others. I mean, it's just general statements about the authority servicers have versus, say, a specific authority at a specific time.

THE COURT: Overruled.

MR. STEED: Okay.

BY MS. LONGORIA:

Q. Okay. So starting with Fay, if the parties were to enter into a modification, does Fay have the authority to sign the loan modification on behalf of the Trust?

A. Yes.

Q. And you've worked in this industry for how many years?

A. Over 30 at this point.

Q. Okay. So before Fay, you have experience with what other servicers?

A. BSI Financial. And also Ocwen.

Q. And in the course of reviewing and preparing to testify, do you also review records from a variety of other servicers with regard to loan modifications? Yes?

A. Yes.

Q. And what is the practice, generally, when it comes to entering into loan modifications by servicers?

MR. STEED: Objection; foundation. Objection; relevance.

THE COURT: I'm sorry, I cannot hear your objection. Can you stand?

MR. STEED: I'm sorry. Objection; foundation. And objection; relevance. I think the foundation, he's not -- he hasn't been brought in to testify as an expert. He's giving background on how an industry behaves and practices and then --

THE COURT: Objection is overruled. He can testify based on his experience. Go ahead.

BY MS. LONGORIA:

Q. You can answer the question.

A. So the general practice would be that a servicer acts on behalf of an investor, and they can sign off for the investor on a modification.

Q. So on the first modification in this case, you've got Citi and MERS sign off on the modification. Is that a normal practice in the industry?

MR. STEED: Objection. Foundation.

A. Yes.

THE COURT: Objection, foundation; is that what you said?

MR. STEED: Yes.

MS. LONGORIA: It's on the record. I can pull the document out. First page of that Exhibit 4.

MR. STEED: It's about the authority.

THE COURT: Are you asking him about Exhibit 4? Is that what you're saying?

MS. LONGORIA: He asked -- I believe the objection was to foundation.

MR. STEED: On whether it's the general practice for MERS and Citi to do that.

MS. LONGORIA: Oh, okay.

THE COURT: Whether it's a general practice for MERS and Citi. Okay. So that's sustained. You may be able to create the foundation, but we don't have it yet.

BY MS. LONGORIA:

Q. I direct your attention to Exhibit 4, page 28. Does -- oh, I'm sorry.

A. I have that.

Q. Okay. Does that reflect that the loan modification contract was entered into by CitiMortgage and the Howes?

A. Yes, it does.

Q. And on the signature page of that document, page 31, does it indicate that that is prepared by CitiMortgage and executed by MERS?

A. Yes.

Q. And, similarly, Exhibit 6 and Exhibit 9, those loan modification agreements were entered into by Nationstar and MERS, as well as the borrower, according to the signature blocks on both of those admitted Exhibits?

A. That is correct.

Q. And directing your attention to Exhibit 69. In the initial escrow account disclosure, is it reflected that in addition to county property tax hazard insurance that mortgage -- mortgage insurance would be charged on the loan?

A. Yes.

Q. And the borrowers authorized the escrow collection in

Exhibit 70?

MR. STEED: I can't see that one for some reason.

A. I can't see that one. And I have it in front of me. I can check that.

BY MS. LONGORIA:

Q. I'm -- focus --

THE COURT: Isn't it on the side, a little knob?

Q. It likes that. It just wants to be held.

A. That is the impound -- authorization impound. That's also another term for escrow.

Q. Okay.

A. So yes.

Q. Very well. And next -- yesterday -- first let me direct your attention to page 1231 in the Exhibits of the mortgage statements. And I'm going to put that on the overhead. And this one is going to be fine.

And I'm going to direct your attention back to Exhibit 57. So Exhibit 57 is admitted. And this was the document that I don't have a copy, so I'm putting it on the overhead projector. It was the original that was admitted and will be returned to the witness and will be returned to the court.

So this document, No. 57, bears the date of April 14th of 2023. And it was admitted as the original Notice of Right to Cure sent on that date. On page 2 of that document, there's a total payment amount of 1,046 -- 146,324.89?

A. That is correct.

Q. And this letter is dated April 14th of 2023. Is page 1231, the statement date April 10th of 2023, would that be the corresponding statement to the total payments outstanding on Exhibit 57?

A. That is correct.

Q. And does -- this document -- where does this document show you what the total payments -- total overdue payments were at that time?

A. In the right-hand side there's a column. The first column with the gray entries, at the top it says, explanation of amount due. And in the -- in that -- in that box, the overdue payments is the top entry at $146,324.89, which matches the Exhibit 57.

Q. And the accrued -- accrued late fees in the April 14, 2023, demand were 588, as reflected in that statement?

A. That is correct.

Q. Next. Okay. Yesterday you were asked a series of questions with regard to Exhibit -- sorry -- 35. The August 4th, 2024, demand letter. And just to go back to your testimony with regard to the breakout of the various amounts from the payments that were past due at that point. So I believe your testimony was that the principal and interest through -- throughout this letter was accurate; is that true?

A. That is correct.

Q. And it aligns with the statements from the various servicers?

A. Correct. And it aligns with the modification that was in effect as of 2014.

Q. Okay. And the next three columns that are a breakout of what you testified to as advances, are the first two columns commonly referred to as escrow advances?

A. Yes.

Q. And then the mortgage insurance is its own category of advance?

A. Well, it's also included in escrow.

Q. Also included?

A. Yes.

Q. Okay. And none of those columns include the corporate advances?

A. Correct.

Q. Okay. And at one point your -- you began testifying about things adding across. Did you have a calculator in front of you at that point?

A. I did not.

MS. LONGORIA: Okay. So, Your Honor, I have a demonstrative exhibit. I chalked -- I marked it for identification as Exhibit 72. I'm going to provide copies to counsel and the witness.

BY MS. LONGORIA:

Q. So when we look at the columns in this letter, we talked about whether or not things added across throughout the statement. Do you recall that section of your testimony?

A. Yes.

Q. Okay. So I've created an Excel spreadsheet pulling this section of the demand letter out. And there's a column that is -- one, two, three, four, five -- six columns over. The caption on the column -- I'm going to hold this up so it's easier. There we go. The caption on the column is auto sum of B, C, D, and E. In other words, I have added across on the -- each of the lines to column of numbers. And the original letter has the payment date and all of the payments that appear, and the demonstrative exhibit auto sums the payments?

A. Correct.

Q. Okay. So there comes a point in time when the auto sum of the first four columns is less than the amount that is in the payment due column. And I believe that you had some testimony with regard to escrow shortage. Is -- again, what is escrow shortage?

A. So escrow shortage is when there's not being enough money collected for escrow, that you would have to add more in order to cover the cost that you would need to cover.

Q. Okay. And you didn't create this, so I'm not asking to admit it through you. But as a demonstrative exhibit, presuming that my Excel skills are there, there's a column that

has the over or short on here that reflects whether or not the payment column includes anything other than the first four columns?

A. Correct.

Q. Okay. And one last question. You testified that the Trust makes money by collecting payments, and then there was additional testimony with regard to REO property. If a property is sold at foreclosure sale or is liquidated at some point during the process, does the Trust also make money that way?

A. Yes.

MS. LONGORIA: Okay. I have nothing further.

THE COURT: Thank you. Recross?

MR. STEED: Did you want to -- is 72 in? I don't object.

MS. LONGORIA: Okay. Sure. It's a demonstrative exhibit, so I wasn't admitting it. But that's fine.

THE COURT: Okay. Well, I'll admit it. It's a bench trial. So not much of a difference, but I appreciate it.

MR. STEED: I'm still learning. I was mostly -- I was mostly talking about criminal defendants in front of juries before.

RE-CROSS-EXAMINATION

BY MR. STEED:

Q. Are you able to tell me in the records or you just know,

when Fay took over servicing, was there any balance for recoverable corporate advances that carried over, or did it start at zero as far as Fay is concerned when Fay took over?

A. Let's go to, is it, 35?

Q. I actually don't know or I'd point you to it.

A. Yeah. I'm trying to point to it. In Exhibit 38.

Q. Yep.

A. I may be able to see that for you.

If you look on -- I'm sorry, Bates 5 -- it looks like 576, which is the Fay pay history for -- for 2017.

Q. Mm-hmm.

A. And if you look at the very top, transaction is 9/7, that's when the transfer happens. And you can see that -- that 213,3 -- 975.36, which is the principal coming in. At the very top of that -- I'm sorry. Just above that, sort of in the header of those pages, if you look just above where it says, due date and process date, it says, recoverable corporate advance balance 3,120.33.

Q. Okay.

A. And then the nonrecoverable it looks like is next to that.

THE COURT: Mr. Paterno, counsel is following but I --

MR. STEED: I'm actually not. I was trying to catch up.

THE COURT: I lost you.

MR. STEED: So we're on 576.

THE COURT: I'm on page 570 -- I do have that. At page 576.

MR. STEED: Same question, so....

THE COURT: Maybe you can start again, Mr. Paterno.

THE WITNESS: Sure. So this is the transaction time period when Fay took control of the asset.

MR. STEED: Got it.

THE WITNESS: So you'll see the transaction coming into Fay on 9/7 is the top transaction. And -- right in the middle of the page. And you see the 213,975.36, that's the principal balance being boarded onto MSP. And at the -- above that, though --

THE COURT: I'm sorry, you're saying 9/17. I'm not seeing that date. I see 12/30/17 at the top right of the page.

THE WITNESS: I'm sorry. 9/7 is the date. Not -- I meant 9 --

THE COURT: Maybe you said --

THE WITNESS: 9/7, not 17.

THE COURT: Where is that date?

THE WITNESS: So that's in the middle. If you look in the middle of that page -- do you want me to go put it up on the board? Would that be all right?

THE COURT: There we go.

THE WITNESS: That's it.

THE COURT: I see the middle. 9/5/17, is that what

we're talking about?

THE WITNESS: Right. So now you have --

MR. STEED: I've circled the recoverable.

THE WITNESS: Here you have the 9/7 date. Here you have the principal coming in for -- which was transferred to us. Then counsel has already circled those numbers. And you have the 3,120.33 is the corporate advance balance that was transferred in.

THE COURT: Thank you.

BY MR. STEED:

Q. And so at the beginning Fay treated -- there was a $3,120.33 recoverable corporate advance when it began servicing the loan?

A. Yes, sir.

Q. And do you know what it did to recover, if those fees were recoverable or not?

A. I don't know as part of that process if they come recoverable. Like I said, as you can see, the other section there next to that is nonrecoverable.

Q. Okay. And so when Fay took on the loan -- and so as far as Fay knows, prior servicers' policies would have also been -- the recoverable corporate advances were these property preservation fees, the monthly inspections, and then recoverable legal fees?

A. Yes.

Q. Okay. And are those monthly inspection fees ever any more than 20, $25?

A. They used to be 14.50. They've gone up. They're actually like $30 now.

Q. Okay. And then moving to 1163. That's in the mortgage statements, Exhibit 45, I think. Actually 1161. So we're just going to look -- at 1161, we see a mortgage statement dated 7/11/2020. And there's no recoverable corporate advance balance on that mortgage statement. And then if we move to the next one, there is one for 7,400 -- 544.71. Do you see that?

A. Yes.

Q. That's when the mortgage statements started showing a recoverable corporate advance balance at Fay?

A. Yeah. They changed a little bit of the format on this one before they went to that full change later on.

Q. Okay. And so I wasn't sure when you were talking to your lawyer on redirect, it sounded -- do you know what -- were you saying you can't tell from the record what this $7,544.71 is for?

A. Well, we certainly could if you wanted me to go back and look at each prior statement. I don't know if we have all that time, but you can --

Q. Sure. But it's either legal fees or property preserve -- inspection fees?

A. It would only be legal fees or property pres., yes.

Q. From before that date?

A. Right. And it would be reflected in all these previous statements.

Q. Okay. And then just -- and then from the time period of this October 10, 2020, mortgage statement at 1163 through the end of the mortgage statements we have, there's a mortgage statement at 1301 and it has a payment due -- due date of August 1, 2025, and the statement date is July 17th, 2025. And that shows a recoverable corporate advance balance of 1,000 -- 14,936.26, right?

A. Correct.

Q. And so does that 14,000 and change being demanded in this July, 2025, statement include the $7,544.71 demanded in this August 10, 2020, mortgage statement at 1163?

A. Yes. It would be a running total.

MR. STEED: Okay. I don't have anything else.

MS. LONGORIA: And I don't either.

THE COURT: I know you'll be sad to step down, Mr. Paterno, but you can go and sit. You can step down at counsel table.

So it is just about 11. Do you want to try the Zoom now?

MR. STEED: Sure. Let's --

THE WITNESS: Are all these going to stay here?

THE COURT: I think they are all going to go. Maybe Attorney Longoria can --

MS. LONGORIA: Actually, those can stay.

THE WITNESS: What about these new ones that we've added?

MS. LONGORIA: They should stay as well. They're going to become part of the record.

THE COURT: Sure. All right. So we'll take just a few minutes to get the Zoom running and up. Five minutes. You can run to the restroom, if you need to, and we'll be back.

(Break taken. Time noted: 10:58 a.m.)

(Proceeding resumed. Time noted: 11:03 a.m.)

THE COURT: All right. It looks like we have the Zoom working. We are back on the record.

You may proceed, Attorney Steed.

THE CLERK: Your Honor, may I swear her in?

THE COURT: Oh, yes. Thank you.

THE CLERK: Please raise your right hand. Do you solemnly swear that the testimony you shall give in the cause now in hearing shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE CLERK: And please state your name, and spell your first and last name for the record.

THE WITNESS: Ada Wood. A-D-A, W-O-O-D.

THE CLERK: Thank you.

THE COURT: Now you can proceed.

DIRECT EXAMINATION

BY MR. STEED:

Q. Hi, Ada. Are you Melanie Howe's mother?

A. Yes.

Q. How often -- where do you live? Sorry. Where do you live?

A. (Unintelligible) Hill, Illinois.

Q. Can you say that again?

A. Bunker Hill, Illinois.

Q. Thank you. How -- how often do you talk to your daughter?

A. Daily.

Q. And do you have more than one daughter?

A. No.

Q. Okay. Are you aware of any issues with -- where Melanie Howe, or your daughter, might be -- might be facing a foreclosure?

A. Yes.

Q. How long have you been aware of that?

A. I would -- I'm not sure exactly how many years it's been, but it has been a number of years. I think at least since 2019.

Q. Okay. And have you ever become aware of how that -- well, has it -- have you ever noticed it had any effect on her, one way or the other?

MS. LONGORIA: Objection, Your Honor. So the witness

is allowed to testify under 7.1, an opinion testimony of a lay witness if it's rationally based on the witness's perception. I object to a question being asked of -- that's so general, how did it affect, when she's not in daily contact with her physically to observe. She's only speaking with her on the phone. So I don't think that he's sufficiently laid foundation testimony for this testimony to come in from a lay witness under 7.1.

THE COURT: I'm going to sustain the objection. But I'd like to hear more about how Ms. Wood interacts with her daughter. See if you can get there.

MR. STEED: Sure.

BY MR. STEED:

Q. You said you talk on [sic] your daughter on the phone every day. How long do you talk to her on a given day?

A. Sometimes -- most days it is an hour.

Q. And can you -- does her tone of voice ever change?

A. Yes.

Q. And based on your daily conversations with your daughter for an hour, most days have you ever noticed any impact that -- well, does she ever talk to you about her potential foreclosure?

MS. LONGORIA: Objection. So now he's asking for hearsay conversations. Oh, I withdraw.

THE COURT: You maybe ask her again.

MR. STEED: Sure.

BY MR. STEED:

Q. Does it ever come up in conversation, this issue where she -- with the foreclosure?

A. Yes.

Q. And have you ever observed that it has any impact on her mood or --

MS. LONGORIA: Objection. He's asking if the foreclosure impacts her mood. There's no foundation for the underlying basis of her mood changing from one day, hour, conversation to the other. There's no tie-in to the foreclosure.

THE COURT: I'm going to overrule the objection. There's nothing in the rule that requires it be in-face conduct. I think she clearly established she's in regular, consistent, long-time contact with her daughter.

Go ahead. You can ask.

MR. STEED: Sure.

BY MR. STEED:

Q. Have you ever noticed any impact that issues with the foreclosure from 2019 on have had on your daughter?

A. Yes.

Q. Can you -- can you -- has it been a positive impact or negative impact from your observations?

MS. LONGORIA: Objection. She can testify under 7.1

of her observations. But saying positive, negative, making judgment about that, that's for the purview of the Court.

THE COURT: Sustained. You can ask her about her observations.

MR. STEED: Sure.

BY MR. STEED:

Q. What are your observations about what impact, if any, the foreclosure has had on your daughter, or the foreclosure issues have had on your daughter?

A. Since we are so far away, I have seen her one time since that. And that was in --

Q. I'm going to just stop you.

A. This past --

Q. Sure. Well, go ahead and say what you're going to say.

A. I have observed. So I can say I have observed her being more I would call anxious at times. And when she was here, she was concerned about it. Not -- and occasionally when she was here, tearful about it.

Q. And can you say more about that? The time when she was tearful about it.

MS. LONGORIA: Objection as to time frame. She --

THE COURT: Overruled.

MS. LONGORIA: She --

THE COURT: Overruled. She said she's been tearful about the foreclosure.

So you can ask. Go ahead.

MR. STEED: Sure.

BY MR. STEED:

Q. When was that? Can you just describe more what happened when she was tearful about the foreclosure? Can you just say more, please?

A. It was when I saw her last, which was April of 2025. She was just -- I -- I -- how can I describe it. Not fearful. But just, like, there was anxiety because it has gone on for so long, and that it should have been not even brought to this.

MS. LONGORIA: Objection. Move to strike that answer. The witness is offering an opinion as to whether it -- the foreclosure both took too long and that it shouldn't have been brought in the first place.

THE COURT: I'm going to overrule it. I'm able to understand what I'm allowed to consider and not consider.

BY MR. STEED:

Q. And were there other times when Melanie was tearful when talking about the foreclosure?

A. Yes. On the phone when persons unknown had been coming to the house taking pictures.

Q. Go ahead.

A. It frightened her. And it frightened her and the children.

Q. What time of day does she call you, generally?

A. She calls me in the morning. Probably around 7:30 my time. And in the past -- it's been in the past year and a half that early because she takes her son to work. So they talk to me on the way to work. And then she calls me in the afternoon, about 4:30 my time, when they go -- when she goes and picks him up from work. And it's about 45 -- 40 minutes each way.

Q. Are there any other things you've observed? You talked about -- and I think the time period we're interested in is about a year before COVID through the end of COVID. And does that time frame make sense to you in your mind right now?

A. Yeah.

Q. So --

A. Yes. Excuse me. Yes.

Q. So during that time period, how often, on average, would issues about the foreclosure come up in conversation?

A. About once every four to seven days.

Q. And would they be a big part of the conversation, or a passing mention? Can you talk about the time -- the amount of time it seemed to use up in your conversations?

A. I would say some days -- not all days, not all conversations -- some days might be 15 minutes of it, the conversation. Other days it might just be a little over passing, like four to five minutes.

Q. And did you -- when the conversations turned toward the foreclosure, did it have any -- did you notice any difference

in her mood or anxiety or other effect related to discussions of foreclosure?

A. Yes. Some days she was I would call sharper more --

THE COURT: Ms. Wood -- Ms. Wood, if you can repeat. We couldn't hear. You said some days she was, and that's where I lost you. So just repeat again. Thank you so much.

THE WITNESS: Sure.

A. When you talk, sometimes you get firmer, sharper. I guess grouchier. I don't know how else to explain it. More frustrated in your voice.

MR. STEED: Okay. I think that's all I have. I don't have any other questions.

THE COURT: Thank you, Ms. Wood. You're going to be cross-examined now by Ms. Longoria.

MS. LONGORIA: And could she see me here?

THE COURT: Can you see Ms. Longoria?

THE WITNESS: You're standing up in a red-looking top or jacket.

MS. LONGORIA: Yes, ma'am. That's me. Thank you. I just wanted to make sure you could see me on video. Thank you so much.

CROSS-EXAMINATION

BY MS. LONGORIA:

Q. Ms. Wood, you testified that you now live in Illinois. Did you previously live in Maine?

A. Yes.
Q. What years were you living in Maine?
A. 2004 to 2011.
Q. And in 2004 when Coli was an infant -- or Coli, I apologize, Melanie's oldest daughter, she moved back to Maine, did she live with you at that time?
MR. STEED: Your Honor.
A. Yes.
THE COURT: One minute, Ms. Wood.
MR. STEED: Just objecting on relevance. This is about an infant daughter in 2004. I'm not sure what it has --
THE COURT: Overruled. It's a cross-examination. I'm going to let her ask foundational questions. I'm sure it's going to become relevant.
MR. STEED: All right.
BY MS. LONGORIA:
Q. And Melanie lived with you until she and Henry were married?
A. Yes.
Q. And when they began shopping for a house in 2007, did you help the couple with that?
A. No.
Q. Okay. Were you aware that they did purchase a house, though?
A. Yes.

Q. Okay. And in 2010, the -- there's a loan modification admitted in evidence. You can't see all of the evidence, but I'm just going to ask you something generally about what has been admitted as Exhibit 4, page 28 through 31.

Do you recall being there in 2010 when they modified their loan the first time?

A. I mean, we may have -- we were living with them at that time. But I did not realize that it was modified at that time.

Q. All right. I have Exhibit 4 in my hand. The last page of this document appears to reflect your signature and a Jimmy L. Wood. Is Jimmy your -- was Jimmy your husband in 2010?

A. Yes.

Q. Okay. And can you see this?

A. You're -- I cannot see that. I'm sorry.

Q. I'm only asking you for the part to identify where those signatures indicating you were -- witnessed the signature of those documents, are those your signature and Jimmy's signature? Do you recognize those signatures?

A. Ma'am, I'm trying to tell you, I cannot see it at all. I can see a piece of paper that you're holding, but I cannot see any farther. My camera cannot zoom in any farther. I cannot see it. I'm sorry.

THE COURT: Attorney Longoria, hold on a minute. I'm going to see if there is anything we can do.

THE CLERK: There nothing we can do. Remember how we

said yesterday they have to have a copy with them because the system does not allow them to see the evidence via Zoom.

MS. LONGORIA: Okay. I -- it's not my witness. I didn't know what questions would be asked of her, so I couldn't prepare it that way.

THE COURT: Is there -- is there a camera that's closer that we can, sort of, do it the old-fashioned way and put that exhibit up a little closer?

THE CLERK: This won't work. Again, they can't see the --

THE COURT: Where is the camera?

MR. STEED: We can stipulate she was there and witnessed. I don't think that's a disputed fact. We also stipulated that the Howes signed it.

THE COURT: Okay.

MS. LONGORIA: Okay.

BY MS. LONGORIA:

Q. So your attorney -- or Ms. Howe's attorney has stipulated that you signed and witnessed a loan modification agreement in 2010. Does that refresh your recollection that you were aware in July of 2010 that the loan had gone into default and that the bank, CitiMortgage and MERS in particular, brought that loan current for your daughter? Do you remember that happening in 2010?

A. No. I -- I'm sorry, I do not recall that. There was a

lot going on at that time. That time of year, I do not remember.

THE COURT: She's given you her answer. She doesn't recall.

MS. LONGORIA: Very well.

BY MS. LONGORIA:

Q. So you testified there was a lot going on at that time. Prior testimony in admitted exhibits talks about Melanie's addiction to opioids. Were you aware in 2010 --

MR. STEED: Objection.

MS. LONGORIA: It's in her deposition. She acknowledged it. This is a cross-examination.

MR. STEED: It's a cross-examination. You're saying she was addicted to opioids and there is nothing --

THE COURT: What's the basis -- what's the basis for your objection?

MR. STEED: I mean, I think it's assuming facts not in evidence. But, I mean, she's -- and it's a leading question. So there's that.

THE COURT: This is cross-examination. She's allowed to lead. This is cross, I am going to allow her to get into it.

But please don't stray too afar, Attorney Longoria. I assume this is going to become directly relevant.

MS. LONGORIA: It is.

THE COURT: Okay.

BY MS. LONGORIA:

Q. And the Exhibit that has been admitted is the Exhibit 32 that reflects that testimony. So were you aware in 2010 of Melanie's addiction issues?

MR. STEED: Your Honor, just object. It's an improper question if she was aware that -- it's --

THE COURT: What's the basis for your objection, Attorney Steed?

MR. STEED: It is assuming that there was an addiction issue. I don't think there was. I don't know what it has to do with anything. So relevance.

THE COURT: So assuming facts not in evidence?

MR. STEED: Yes.

THE COURT: So -- and you said that's -- where is the -- where is the evidence that that -- what is the record evidence of that fact, Attorney Longoria?

MS. LONGORIA: Melanie Howe's direct testimony in Exhibit 32 of her deposition.

MR. STEED: She was prescribed opioids, Your Honor, by her doctor; but I don't think there was some addiction problem.

THE COURT: Okay. So I'm going to sustain the objection based on your characterization, I guess. I just don't have it directly in front of me, that word addiction. You can ask a few more questions about it, but I do want to

make sure this is relevant.

MS. LONGORIA: I can point to the exhibit where she talks -- talks about overcoming the addiction to opioids with the use of marijuana. And that was where I'm headed in my questioning.

BY MS. LONGORIA:

Q. So you testified, ma'am, that there were a number of things going on at the time. Were you aware of any usage of opioids by your daughter during that time?

A. No, I cannot really say. I know she did take, like, Tylenol with codeines for headaches. But you're talking about fentanyl. And at that time, I didn't have -- I didn't know that she was putting -- or recall that she was putting patches on.

Q. What did you say with regard to patches?

A. I didn't recall that she was putting patches on. You said fentanyl patches. I didn't recall.

Q. I -- I didn't say fentanyl patches. I asked if you were aware that she was using opioids?

THE COURT: Attorney Longoria, it's helpful --

A. You said fentanyl before --

THE COURT: It's helpful in Zoom if you speak right into the microphone.

MS. LONGORIA: Okay. Yes, Your Honor.

BY MS. LONGORIA:

Q. Actually, Melanie's deposition does speak of fentanyl patches. I had not spoken of fentanyl patches yet; but I direct your attention to page 380 where Melanie describes being on fentanyl patches, 100 milligrams. And it was changed every three or four days; 60 milligrams, extended-relief morphine.

So you were not aware of that, ma'am?

A. No.

Q. Okay. And you had moved already to Illinois by the time she began managing her pain using cannibis, medical marijuana?

A. Yes.

Q. And are you --

A. Yes.

Q. Are you aware of her consistent use of medical marijuana?

A. Yes.

Q. Okay. So if your daughter previously testified, I quit the fentanyl and the morphine, I went cold turkey to cannibis because Merideth Norris said I could do it, were you aware of that in her life struggles?

A. When she said -- when you say that, yes, about the stopping the fentanyl that I didn't realize she was on. Yes.

Q. Okay. And she testified that she was called a drug addict by a lot of people, but not by yourself.

A. Correct.

Q. And she was still on the pain medication when she took her kids out of school?

A. No.

Q. Okay. So turning your attention to the domestic situation within the house. So you were aware of the proceedings -- the emergency proceedings that were brought to remove Coli from the home?

A. Yes.

Q. Okay.

A. After the fact.

Q. After the fact being what year did you become aware of that?

A. 2019.

Q. So in your conversations with Ms. Howe from 2019 on, were there also stressful conversations about the removal of Coli -- I'll call her Coli, she has a very long name -- Ruthann Jewell is -- was her original name. You were -- those were some of the conversations that you had from the 2019 period on?

A. Yeah, I guess you would say. But a lot has -- what has this got -- can I ask, what has this got to do with your -- what has this got to do about a mortgage?

THE COURT: Ms. Wood, I know it's frustrating, but, unfortunately, the questions just can go one way in this courtroom proceeding. So you can just answer Ms. Longoria's question if you have anything further to add.

THE WITNESS: (Unintelligible.)

THE COURT: I can't --

THE WITNESS: I'm just asking a question.

THE COURT: Okay.

BY MS. LONGORIA:

Q. And were you aware that the underlying basis for the removal had to do with conditions in the home?

MR. STEED: Your Honor, I just -- I object, again, on the facts not in evidence. I don't know if there was a removal from the home. I don't -- I don't know that did happen. But I don't quite understand characterizing it like that makes sense from my understanding. I believe there was a guardianship that was filed and that the daughter moved out when she was 16. I don't think it would properly be referred to as a removal.

THE COURT: Is it in the record somewhere?

MS. LONGORIA: Absolutely. So Exhibit 26, which I tried to admit yesterday, I would be happy to admit that now. It's a certified copy of the public records from the York County Probate Court. And I would argue that those come in under 902 and 904. They reflect the subject matter that I'm questioning this witness about. And it provides additional information about the time period. Counsel was allowed to ask the witness with regard to this time period about the stressful conversations concerning the foreclosure.

There is a good-faith basis in the certified records, which I would propose to admit as Exhibit 26, that goes into what was happening in the home at that time. And counsel's

statement he made in his objection is directly contrary to this pleading. And we can expound upon it, but --

THE COURT: I'm still going to reserve ruling on 26, but I will let you ask the questions on a good-faith basis.

BY MS. LONGORIA:

Q. Let me back up a little bit. So you were in Maine until 2011?

THE COURT: One second, Attorney Longoria. Attorney Steed, you brought Ms. Wood to testify to damages based on, you know, emotional damages. Ms. Longoria is allowed to cross-examine her about that. So --

MR. STEED: Understood.

THE COURT: I just want everyone to be clear we're on the same page.

MR. STEED: And so my objection is narrower than that. It's not about talking about other things that were going on in the home. It's about using cross-examination to bring in -- like, to mischaracterize something that's more nuanced than that and gets a lay witness to agree to, you know, a theory that isn't -- hasn't been fully explained to that person. It's not that there was a lot of stress if there was -- the daughter was moved or there was things going on to characterize it as a removal when that might not be what it was. That's -- that's the issue.

MS. LONGORIA: Upon information and belief, the police

officer came to the home and removed her.

THE COURT: I'm going to overrule the objection. I'm going to let you ask it. The witness can answer about -- about what she knows. And if she doesn't think it was a removal, she can let us know that too.

MS. LONGORIA: Very well.

BY MS. LONGORIA:

Q. Ma'am, do you need the question read back? Ma'am, do you need the question restated?

A. Yes, please.

Q. Okay.

MR. STEED: Your Honor, can my client be excused? I think this is upsetting, and it doesn't really bear much on what she says. And I can -- I can talk to her later. I think the goal is to get her upset before she testifies, and I'd like it if she can be excused as her mother testifies. Counsel actually asked if she could be excused while Henry testified. So I think it would be appropriate, and they can have a more frank conversation. I can waive her appearance, and I don't think she has to be here.

THE COURT: I don't think she has to be here. If she wants to step out during this testimony, that's okay.

MS. LONGORIA: And I have no objection to that. My objection is to the characterization that I am somehow using this testimony for anything other than getting credible

evidence before the Court.

THE COURT: I understand.

Ma'am, thank you so much for your patience.

(Court Reporter read back requested material.)

BY MS. LONGORIA:

Q. So in your conversations from 2019 on, did you also speak about Coli's removal from the home?

A. We spoke about her being out of the home, but not re -- it wasn't, in my opinion, a removal.

Q. Okay. So did you --

A. She left on her own.

Q. Did you know Rebecca Drake?

A. No.

Q. And after you moved to Illinois in 2011, did you ever come back to Maine to visit between 2000 --

A. Yes.

Q. 2011 and 2019?

A. Yes.

Q. Okay. And did you ever observe domestic violence incidents between Henry and Melanie?

A. No.

Q. Okay. Were you ever in the home to observe the conditions within the home?

A. Yes. I lived there.

Q. And you lived there until 2011?

A. I lived there from 2007 to 2011.

Q. And are you aware of your daughter's arrest from the 2011 period to date? Did she speak to you about her arrest?

A. She was -- yes. But that was not in -- are you talking -- what do you mean by 2011 to the present? Do you mean that she was arrested in 2011?

Q. My -- my --

A. She was not.

Q. No. My question to you is, did she ever speak to you about the various times that she's been arrested from 2011 to present? And then I'll ask more specific questions depending on whether or not you were aware of those arrests.

A. Yes.

Q. Okay. What were you aware of with regard to the first arrest?

A. I thought there was only one.

Q. Okay. With regard to the arrest that you are aware of, what were you aware of with regard to that incident?

A. I wasn't there. I was home, here. She said she was arrested for her and -- her and Hank having an altercation.

Q. Okay. So other than the time of the arrest, you're not aware of any other domestic violence issues between the two of them?

A. No arrestable ones.

Q. Okay.

A. No hitting, no punching or anything else like that. Just yelling at one another.

Q. So from September of 2019 until September of 2020, how much -- or did you speak of the proceedings that are reflected in the York County probate docket?

A. No, because I don't know what the docket says.

Q. Okay.

A. I don't know. I do not have a copy of any of that.

Q. You were aware that --

MR. STEED: Your Honor --

BY MS. LONGORIA:

Q. -- Melanie and Henry were divorced. Do you recall when that happened?

MR. STEED: Your Honor, I've had a thought that might moot a lot of these issues. And if I could have five minutes to talk to my client, it might be that we just stipulate to nominal and statutory damages under the FDCPA and the Maine Mortgage Servicer duty to good faith, in which case emotional damages wouldn't be an issue. I don't think they're going to be a huge factor in the overall result regardless.

THE COURT: Are you interested in having that conversation, Attorney Longoria?

MS. LONGORIA: I'm interested in having that conversation, but it's more than that that it impacts, so -- but I would be happy to have a conversation. Yes, Your Honor.

THE COURT: Okay. Why don't we do that. We'll take a brief recess.

Ms. Wood, you're just going to hang tight. We're going to take a recess, and we may or may not need you again. We're not sure. So just hang tight in Illinois, and the court will be in recess.

(Break taken. Time noted: 11:45 p.m.)

(Proceeding resumed. Time noted: 12:00 p.m.)

THE COURT: Good -- is it still morning? No. It's noon exactly.

Good afternoon. We are back on the record. Ms. Howe is back in the courtroom, and Ms. Wood is still on Zoom.

Are we continuing cross-examination or something else happened?

MS. LONGORIA: We are, Your Honor.

THE COURT: Okay. And Ms. Wood, I can now see more of you. So I'm glad to see you.

BY MS. LONGORIA:

Q. And I'll resume talking about the divorce between Henry and Melanie. Do you know when they got divorced?

A. I'm not sure. I think it was 2018. Or between 2017 and 2019. I am not sure --

Q. Okay.

A. -- of the date.

Q. And are you aware of any interactions between them

following the divorce?
A. I -- interactions like talking or what?
Q. Any negative interactions.
A. Are you saying --
Q. Any negative interactions.
A. You mean like speaking to one another?
Q. If -- anything you're aware of, ma'am, after they were divorced.
A. Talking to one another every -- occasionally about the kids. That's all I could tell you.
Q. And you have no knowledge -- or do you know if she's ever hit any of the kids?
A. No, I do not. And she has -- no, I do know she has never hit any one of them, any of the children. She has never even spanked them.

MS. LONGORIA: I have nothing further.

THE COURT: Thank you. Redirect?

MR. STEED: No, nothing else, Your Honor.

THE COURT: Okay. Thank you, Ms. Wood. You are going to be excused. Good job getting your Zoom to work. I know from experience even here in court how hard that can be. So have a good afternoon.

THE WITNESS: Okay. Thank you.

THE COURT: All right. So I think we are back to the plaintiff for its next witness.

MS. LONGORIA: Yes, Your Honor. So the next witness I would call would be Melanie Howe.

THE COURT: Ms. Howe. Come on up here. And Michelle is going to swear you in before you sit down, and you can pull yourself right up when you're done. And there's water and cups up there if you need anything.

THE CLERK: Please raise your right hand. Do you solemnly swear that the testimony you shall give in the cause now in hearing shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE CLERK: Please be seated and pull yourself as close to the microphone as possible. If you could please state your name and spell your first and last name for the record.

THE WITNESS: Melanie, M-E-L-A-N-I-E, Howe, H-O-W-E.

THE COURT: And Ms. Howe, I can already tell you and I suffer from the same affliction. We speak quickly. So try to do your best to speak slowly.

THE WITNESS: Okay.

THE COURT: I'll work on it too.

DIRECT EXAMINATION

BY MS. LONGORIA:

Q. Good afternoon, Ms. Howe. I'm going to ask you a series of questions based upon some of the documents that are already in evidence and based upon our prior conversations.

But just at the outset, am I correct you were born October 30th, 1981?

A. Yes, ma'am.

Q. And you presently reside at 334 Deerwander Road?

A. Yes, ma'am.

Q. And presently with you there are your sons Henry and Hayden?

A. Yes, ma'am. And my friend who is disabled, Stefanie Stover.

Q. Tell me a little bit more about Stefanie Stover. When did Stefanie move in?

A. 2019.

Q. And how does she contribute to the household?

A. She's just, I guess, a roommate. She's my friend.

Q. And what is her disability?

A. She has a mental disability.

Q. And do her disability checks help pay the household expenses?

A. They pay for herself.

Q. And what do you mean by they pay for herself?

A. Her clothing. Her food.

Q. But they don't -- she doesn't contribute to the household in any other way?

A. No, ma'am.

Q. You grew up in Dorchester, Illinois?

A. Yes, ma'am.
Q. Graduated high school in 2020?
A. Yes -- no. I graduated high school in the year 2000.
Q. I'm sorry, 2000. Can't even read my own writing.
And after that you attended nursing school at Anderson University in Anderson, Indiana?
A. Yes, ma'am.
Q. Did you graduate from that program?
A. No, I did not.
Q. What happened?
A. I just did not continue on.
Q. Okay. There wasn't any reason why you left school?
A. One, I couldn't afford it.
Q. Okay. In October of 20 -- 2003, you had your first daughter?
A. Yes, ma'am.
Q. And we have referred to Coli during your mom's testimony by her first name. But for the record, if I'm referring to -- and you tell me if I mispronounce it --
A. You are.
Q. Col -- Col --
A. Coliberianna.
Q. Coliberianna?
A. Coliberianna.
Q. Coliberianna -- thank you very much -- Ruthann Jewell?

A. Yes. That's not her last name, but yes.
Q. Not now, but at -- when she was born?
A. Yes, ma'am.
Q. Okay. So shortly after Coli was born, you left Indiana where you were living with Jeff?
A. Yes, ma'am.
Q. Okay. And you -- you were living with Jeff before Coli was born?
A. Her name is Coli.
Q. Coli. Sorry. Coli was born?
A. Yes.
Q. And did you let Mr. Jewell know that you were taking his daughter to --
A. Yes, I did.
Q. And you had his permission to leave the state and go to Maine with his daughter?
A. He didn't stop me.
Q. And you consistently -- you spoke with him after leaving Maine?
A. Yes.
Q. And at some point in 2004, you let him know that you were going to be married to Henry Howe?
A. No.
Q. Pardon?
A. I didn't know Henry Howe in 2004.

Q. Okay. So the statement in late 2004, I was unable to reach Ms. Howe for a period of time; after which, she contacted me and announced her plan to marry.

Was that to someone other than Henry?

A. No.

Q. Pardon?

A. No, ma'am.

Q. No, ma'am, what? You didn't contact --

A. May I ask -- well, I'm not allowed to ask questions, but --

THE COURT: If you don't understand the question, you can tell her that.

A. I don't understand the question or who it's from.

MR. STEED: Your Honor, objection. I know it's cross-examination, but the statement blah, blah, blah, I don't know where this comes from. Is it a statement he made in a pleading somewhere? Could she look at it and talk about it? Cross-examining her about a document that --

THE COURT: Objection sustained. Can you ask a foundational question.

MS. LONGORIA: Actually, at this point, Your Honor, Exhibit 26 is something we've discussed, and they are the records of the probate. I'm asking certified copies of public records, to admit those documents so that it's clear the foundation questions that I am working from.

THE COURT: And you object to 26. That -- I reserved ruling on that. This has come in a public record. So I am going to admit them. You can ask the witness about them.

MR. STEED: Understood there. But there's -- for instance, if her ex-husband made a statement in a probate pleading related to a child custody guardianship issue, it's still hearsay. I think the hearsay contained within it has admissibility issues. So I think it has to be taken case by case before it gets --

THE COURT: Right. I know how the hearsay rules work. I didn't -- I don't think she was asking about the truth of the matter. I wasn't even -- I -- I sustained the objection because I didn't understand the question. I didn't think it was clear.

MS. LONGORIA: Thank you.

MS. LONGORIA: So I have separated the statement of the husband. So my first ask, Your Honor, is to admit Exhibit 26, which was in the original Exhibits. And it is the York County probate records under the 902 and 902(4).

THE COURT: I just had said those would be admitted.

MS. LONGORIA: Oh. Okay. Now my second request, so that this line of questioning is founded, I'm going to mark this Document 72.

THE CLERK: 72 has already been used.

MS. LONGORIA: Okay. Thank you. 73.

MR. STEED: Is this new or is this --

MS. LONGORIA: No. This is new.

THE COURT: Thank you.

MS. LONGORIA: I'm not showing it to the witness. I will speak to it in a minute.

Your Honor, I have a certified copy of a public record that is also within the same file. It wasn't in the Exhibit 26. It is not impounded. Or it's a public record, just like all of the other records. It was -- the certified copy was made at the York County Registry. So I would move for its admission as a certified copy of a public record. I would also move for its admission under --

THE COURT: What's the relevance of this document?

MS. LONGORIA: Okay. I can tell you the rest of --

THE COURT: First I'd like to get to the relevance because if I don't think it's relevant, I don't need you to go through all that.

MS. LONGORIA: It's relevant for the chronology. It's relevant with regard to statements that were made by Melanie. And I'm trying to, in my examination, explore various areas that are in the document. And I'd like to show it to her. But until it's admitted into evidence, I can't ask her to review it. She may well testify to various things are inaccurate. But it's not hearsay because as an exception to the hearsay rule, the declarant is deceased. And I have the obituary of

Jeffrey Jewell, who has passed away. So it falls into an exception for the hearsay rule. So I would move to admit it for that reason.

MR. STEED: It's not a sworn statement. But anyway --

THE COURT: I'm not going -- I'm not going to admit this right now. You can ask her -- you can ask her whatever questions you want, and you can get her answer. And then maybe, depending on her answer, you can use if for other reasons. But at this point, I'm not going to admit it. We're just getting so far afield. So you can ask her the questions you want to ask her.

MS. LONGORIA: All right.

BY MS. LONGORIA:

Q. Did there come a time prior to 2016 when your daughter was approximately six that you asked for money from Jeffrey Jewell's family to send her back?

A. Never.

Q. So it's --

A. I'm sorry, did you say was there a time that I asked his family to send me money to send her back?

Q. Correct.

A. Absolutely not.

MS. LONGORIA: Okay. So she's -- that would be why I would want to admit it, Your Honor.

THE COURT: Okay. I'm not admitting it.

MS. LONGORIA: Okay. I'll move on.

BY MS. LONGORIA:

Q. So after you were in Maine, you first worked at the Orono Medical Center?

A. Yes, when I first moved to Maine.

Q. When -- and then you worked for Neurological Associates in Biddeford?

A. No. It's York Neurology. It was through an employment service that I got on as a temp through York -- for York Neurology filing.

Q. And then you eventually began to work at Wal-Mart?

A. Yes.

Q. And you met Henry Howe while working at Wal-Mart. And that's approximately January of 2025?

A. No.

Q. When was that?

A. Sure as heck wasn't 2025.

Q. I'm sorry. Again, I've misspoken 2'05. Thank you for correcting me.

A. I met Mr. Howe in probably February of 2005.

Q. February of what?

A. 2005.

Q. And you were married May 20th of 2005?

A. Yes, ma'am.

Q. And you purchased this property April 20th of 2007?

A. Yes, ma'am.

Q. And the documents that you've seen while we've been proceeding in the court case, the note in particular, is Exhibit 1. And you know, I will move over here. So before you -- and up on the big screen -- let me get rid of the little squiggles.

Okay. All right. Calling your attention to Exhibit 2. Is this your signature?

A. Yes, ma'am.

Q. And whose signature appears beside you?

A. Henry Howe IV.

Q. And did Henry Howe IV affix his own signature to that document?

A. Yes, ma'am.

Q. And the next document I would direct your attention to is the mortgage. It's Exhibit 3. And do you recall signing the mortgage?

A. May I see my signature? Yes, ma'am.

Q. And, again, Henry Howe IV's signature appears next to yours?

A. Yes, ma'am.

Q. And he signed that?

A. Yes, ma'am.

Q. And next I would call your attention to the loan modification agreement. Actually, before the loan modification

agreement that appears as Exhibit 4, you began to fall behind on your mortgage payments in 2009; is that correct? Or was it before that?

A. I'm not sure.

Q. Did there come a point in 2009 where you signed a trial modification with the bank to catch up on your mortgage?

A. I don't remember.

Q. I'm going to direct your attention to Exhibit 40, 1394. Okay. So I'm going to move through this Exhibit and find the earlier pages. One second.

THE COURT: Did you say Exhibit 40?

MS. LONGORIA: Exhibit --

MR. STEED: 49.

THE COURT: It's 49.

MS. LONGORIA: Oh, 49. Yes, 49.

BY MS. LONGORIA:

Q. And it spans pages 1349 through 1505.

Let me move on with some questions while I'm locating that particular document.

The purchase was financed by Challenge Financial Investors Corp; do you recall that?

A. Yes.

Q. And it was a Fannie Mae loan?

A. I don't remember.

Q. And your original loan was for 208,000?

A. Yes, ma'am.
Q. And the original interest rate was 7.25 percent?
A. Okay.
Q. Do you recall that?
A. I don't remember.
Q. Okay. Throughout the course of the -- from, say, 2010 to present, how much mail do you get that has to do not necessarily from the bank, but just in general from folks having to do with the property or the foreclosure request to help, et cetera. Is there very much mail?
A. I get a lot of junk mail about my house.
Q. Pardon?
A. I get a lot of junk mail about my house.
Q. Okay. Do you open it all?
A. Of course I do.
Q. Okay. And your first monthly payments were 1,418.93 for personal -- for P and I. Do you recall that?
A. When was that?
Q. Pardon? No. I'm looking for -- I'm going to find the initial 2009 modification. I'm just trying to go back to it. Unfortunately, they're in reverse order. Prior to the 2010 modification that is Exhibit 4, do you recall having -- making an application with the bank for a loan modification?
A. It's been so long, no, I do not remember.
Q. Okay. So I'll show you what is -- begins on page 1479.

This is entitled a, making home affordable application. And there's a notice to the borrowers. And it appears that it has been filled out and submitted to CitiMortgage. Is this your handwriting?

A. Yes, ma'am.

Q. Okay. And you signed it on 9/7 of 2009?

A. Yes, ma'am.

Q. But that's not Henry's signature, is it?

A. No, ma'am.

Q. That's your signature?

A. Yes, ma'am.

Q. And in this document you say, I pay the bills so my husband only knows what I tell him. My husband was working two jobs, and for health reasons he had to go town to one. My son was sick, and I had to miss a lot of work myself to get fired in May of 2008. So you're making these representations to the bank to ask them to modify your loan?

A. Yes.

Q. Okay. And you talk about car payments and whatnot here. So in 2000 -- actually, today, what kind -- how much credit card debt do you have as of 2025?

MR. STEED: I'm going to object, Your Honor, on relevance.

THE COURT: What's the relevance, Attorney Longoria?

MS. LONGORIA: Yes, Your Honor. The conversations

with the mom span this entire period talk about stress. There's various things in life that cause stress. Just asking a basic question as to how much credit card debt she has now. I'll go back in the years and get estimates of those numbers as we move through chronologically.

THE COURT: Okay. I will let you ask it, but there are a lot of things in life that cause stress for all of us. So if we're going to go through everything, we're never going to finish.

MS. LONGORIA: Thank you.

BY MS. LONGORIA:

Q. 2025 credit card debt?

A. A couple hundred dollars because I don't really have credit.

Q. Okay. And after you filled out the application in 2010, you were given the loan modification in -- that appears as Exhibit 4. This loan modification with Citibank.

And in this document, you acknowledge not only the debt, but the fact that it's -- you're entering into an agreement to make this loan current with the folks at Citi and MERS; do you recall?

A. Okay.

Q. And then after this, did you make a payment under this modification?

A. I don't remember.

Q. Okay. But in some -- some point later in 2010, you began writing to the bank about not being able to afford that modification, and you were asking for another modification. Do you recall that?
A. I do not.
Q. Okay. So Exhibit 35, do you recall signing this modification in 2011?
A. Yes, that's my signature.
Q. That is your -- and is that Henry's signature?
A. That is Henry's signature.
Q. Okay. And did you make a payment under that loan modification?
A. I don't remember.
Q. Did you ever engage again with the bank to get a third loan modification?
A. I honestly don't remember.
Q. Okay. So I guess first I should ask you, you don't remember engaging with the bank to encourage them to give you a loan modification, or you don't remember whether or not you got the loan modification in 2014?
A. I'm telling you that I don't remember. Obviously I've signed the paperwork. I've had four brain surgeries. I don't -- I don't remember.
Q. What years were the brain surgeries?
A. 2013.

Q. All in 2013?

A. Yes, ma'am, all four of them.

Q. Okay. So the Bates stamp pages that began with 1361, this appears to be -- one second. I apologize.

So I'm going to go through some of the communication that has been identified in connection with the loan modifications and refer to the specific Bates stamp pages.

Page 1395 that appears on your screen, your -- what appears to be your signature is next to a date 7/30 of 2011. Is that your signature?

A. Yes, ma'am.

Q. Is that Henry's actual signature?

A. Yes, ma'am.

Q. And this document appearing on 1397, is that your signature?

A. Yes, ma'am.

Q. But that's not Henry's signature, is it?

A. No. I signed that.

Q. And on the tax form, which is page 1402, that is your signature that appears?

A. Yes, ma'am.

Q. Is that Henry's signature or your signature?

A. I don't remember.

Q. And on page 1412, is that your signature or Henry's?

A. My signature under Henry Howe.

Q. So your signature appears on this document. Is the signature above it affixed by Henry Howe, or was it affixed by you?

A. I don't remember. I can't tell.

Q. And you make representations to the bank with regard to both your income and Henry's income in obtaining the loan modifications?

A. Can you repeat your question?

Q. As reflected on page 1415, you make representations to the bank as to your monthly income both for yourself and for Henry Howe?

A. Okay.

Q. I'm asking you, are those representations accurate?

A. I don't know. I don't -- I would imagine. I'm not sure.

Q. And Henry was employed throughout this time, correct?

A. Yes, ma'am.

Q. And on page 1416, your signature appears dated 8/13 of 2013. And there is a signature above the borrower line for Henry Howe. Did you affix his signature to that document as well?

A. Yes.

Q. And in the document, it speaks as if it's written by Henry. My wife, Melanie Howe, became sick in 2010, and it continues. The document speaks for itself. But this is not Henry; this is your speaking, correct?

A. Yes, ma'am.
Q. Why?
A. Because his handwriting is illegible.
Q. Right. But you're a borrower on this loan. Why did you speak of yourself?
A. Well, we were married, and we are as one. So he does not -- he wouldn't have been able to write that. He -- he has -- yes, he knew I had brain surgeries, but he wouldn't have been able to tell you what kind of, like, staph infection I had that I almost died. I mean, he wouldn't have been able to literally write it.
Q. Okay. And your signature appears on 1428 with regard to providing information to the bank to support your request for a modified loan?
A. Yes.
Q. And 1429, this was a letter you typed to CitiMortgage requesting the loan modification?
A. I don't remember writing it, but that's my signature.
Q. And there's an authorization to release information for the York County Community Action Corporation. In your effort to pursue a loan modification that was eventually granted in 2014, did you get the help of the York County Community Action Corporation?
A. Yes, ma'am. Yes, ma'am.
Q. Okay. And you signed this for both you and the signature

for Henry?

A. I'm not sure about Henry's signature, but that is mine.

Q. And with the help of the folks in the York County Community Action program, you were able to get that 2014 mortgage?

A. Yes, ma'am.

Q. And 2014 was a particularly difficult year, I believe you previously testified. Can you tell us a little bit about that?

A. 2014?

Q. Correct.

A. I mean, it was the year after I had my brain surgeries. I had gall bladder surgery. I had hernia surgery repair. I had an EPPP done, which is an uvulopalatopharyngoplasty. I mean, what, in particular, are you looking to know about?

Q. I would -- so with -- following the medical issues, you were diagnosed to receive pain medication?

A. Yes, ma'am.

Q. And you described in your deposition, in detail, some of that pain medication. Are the statements that you made in your deposition with regard to the pain medication, were they true when made?

A. Excuse me?

Q. Were they true when made?

A. Are they what?

Q. True when made. Are the statements in your deposition --

A. About the medication that I was prescribed, are they true?
Q. Yes.
A. Yes.
Q. Okay. And as a result of the fentanyl patch, you developed an addiction to the pain medication?
A. No, ma'am.
Q. You did not?
A. I was not addicted to the fentanyl patch or the morphine. In fact, it was my children standing next to me watching me change the patch that made me decide I'm not taking this anymore.
Q. Okay. And when did you decide to stop the fentanyl and the morphine?
A. Well, I was through the pain clinic. You couldn't have your -- you could not technically have your cake and eat it too. So you couldn't be on the fentanyl patch and morphine and have a medical cannibis card.
Q. Okay.
A. So when Maine enacted the medical marijuana, I don't know if that was -- I don't remember the year, but it's when Canuvo was in Biddeford and it was on the same -- it was on the opposite side of Southern Maine Medical Center. It was -- I was never addicted.
Q. Okay. And when you began using medical marijuana, what form does -- do you use the medical marijuana?

A. I use the flower.
Q. Okay. And before the last deposition, you testified that you had ingested medical marijuana; do you recall that testimony?
A. Medical -- edibles do not do anything to me. So I do not use them.
Q. But you testified that you smoked a joint prior to your prior deposition?
A. Smoking a joint is not the same as eating it.
Q. Okay. You're correct. So prior to your testimony today, have you ingested marijuana either through smoking it, the flower, or in ingesting edibles?
A. No. I don't -- that -- any of ingesting it, edibles. I only smoke, inhale burning flower.
Q. Okay. Did you smoke this morning?
A. I did at 4 o'clock.
Q. This morning?
A. Yes, ma'am.
Q. And how much did you smoke this morning?
A. Two puffs.
Q. And in May of 2023, you were growing your own marijuana. Can you talk a little bit about that?
A. I had received some free plants from my dispensary. I put them in my back yard, but they did not grow.
Q. And your testimony with regard to the growing of marijuana

at your prior deposition was accurate?
A. I'm sorry, what?
Q. That was accurate?
A. Yes, ma'am.
Q. And it was all for your personal consumption?
A. Yes, ma'am.
Q. So let's turn to the time of the 2014 modification. So the 2014 modification is dated August 12th of 2014, so the end of summer of 2014.
Do you recall making any payments on that modification?
A. I don't remember.
Q. You don't recall?
A. I do not remember.
Q. Okay. Do you recall having any conversations with the bank with regard to those payments?
A. No, ma'am.
Q. Do you recall corresponding with them in any way about the payments?
A. No, ma'am.
Q. And in 2017, there was a loan modification offer that was sent to you. It appears in the Exhibits at Exhibit 16, page 152. Do you recall receiving this letter?
A. I don't remember.
Q. You don't recall receiving it?
A. No, ma'am, I do not remember receiving this letter.

Q. Okay. And the Exhibit 15, page 149, do you recall receiving this letter dated March 1st of 2017?
A. No, ma'am, I do not remember receiving that.
Q. And page 159, which is Exhibit 19, do you recall receiving this letter?
A. No.
Q. Okay. Do you recall receiving Exhibit 35, August 5th?
A. I probably did not receive that because my counsel would have received it.
Q. But did you review that letter with your counsel? Have you seen this letter?
A. No.
Q. Okay. And 57. Document 57, dated April 14th of 2023, do you recall receiving this document?
A. Where is it?
Q. It's up on the screen. Oh, no, it's not in front of you. I'm sorry. May I please switch? Thank you for pointing that out. Dated April 14th of 2023.
A. I don't remember receiving it.
Q. Okay. And you were in court earlier when I went through a few documents from your closing. I would like to talk about those. But if you don't recall the closing, I will move on.
Do you recall signing the HUD at the closing -- closing statement, Exhibit 62? Do you recall this document?
A. I don't recall the document, but I recall the day of

closing very vividly.
Q. Okay. And this payment letter to you and Henry bears your signature and his?
A. Yes, ma'am.
Q. So I want to go through a couple of chapters as far as what was happening in the home. With regard to your husband, Henry and yourself, was there an incident where you were ramming your cars into each other when the school bus came? Do you recall that?
A. Well, there was more than just that incident; but, yes.
Q. Okay. And there was another incident where you were stabbing him with scissors?
A. Sorry, it wasn't scissors. I had thrown a knife. And it did not hit him, did not come anywhere near him. And, yes, that happened.
Q. Okay. And there was an incident when the children were in the car that you stopped the car quickly so that he would smash his head into the windshield; do you recall that?
A. No, I do not.
Q. Can you talk about your arrests?
A. Which one?
Q. Start with the first one.
A. Well, I don't remember the exact year, but Henry and I had gotten into an argument. He was calling me a bunch of names in front of our children, and he wouldn't shut his mouth. So I

had -- I believe I had -- I threw -- I believe that's when I threw the knife. And I got arrested, and I was out of the home for a little while.

And then he got arrested for, I don't know, doing something to me. I can't remember exactly what. He had come back over to my house. He was -- my children were getting off the school bus. He was being very vulgar and vile, calling me names again in front of my daughter. I don't believe my younger son had gotten off the school bus yet. And he just would not shut up. So I took a -- I was mad, and so I took a crutch, and I broke the side-view mirror off his 1980 something Chevy truck. And that spawned a jeopardy petition in Biddeford District Court where -- for all three of my children. And that's when I had a divorce -- we had to get divorced.

We had the state of Maine involved in our life. Because we were in foreclosure, they would not dismiss anything until my attorney -- Roger Champagne was my counsel for my divorce in Biddeford District Court with the jeopardy petition with the state of Maine. The Biddeford District Court would not dismiss the jeopardy petition or my divorce until they were aware that my house was not going to be taken from me and my children and I weren't going to be homeless.

Q. And what -- which of your sons were on Adderall prior to 2019?

MR. STEED: I'm going to object.

THE COURT: What is the relevance of her son being on Adderall?

MS. LONGORIA: She was allegedly selling the pills with the children present.

THE COURT: Okay. I'll overrule the question. You can ask.

BY MS. LONGORIA:

Q. Did there come a time when you were with your daughter and you were selling --

A. Absolutely not.

Q. Okay. When you were arrested -- so for a time you went to live with Howard before you were divorce, right, in Biddeford?

A. Who?

Q. Howard, the dentist. The older fella.

A. What about him?

Q. You went to live with him?

A. I never went to live with him.

Q. You didn't spend a summer with him?

A. I didn't spend a summer with him. I have always lived at 3334 Deerwander Road.

Q. Pardon?

A. I have lived at 334 Deerwander Road since 2007.

Q. Okay. Did you stay overnight with Howard on more than one occasion?

A. Maybe a few times.

Q. And were you arrested in Biddeford with a stolen gun on the floor?
A. No. I was arrested, but I did not have a stolen gun.
Q. Okay. There's nothing about a firearm that has --
A. There's nothing about a firearm.
Q. Okay. What was that arrest about?
A. They said I was drunk driving, and I wasn't. That was all dismissed. I did the whole alcoholic -- I had counsel for that. Sarah Churchill was my counsel for the DUI arrest in Biddeford, and it was dismissed.
Q. Does -- does Henry struggle with alcohol as well? Or does -- not as well. Does Henry struggle with alcohol?
A. Who? Which Henry?
Q. Sorry. Your ex-husband.
A. I don't know.
Q. Okay. When your children have had various jobs, how are they required to turn over portions of that to you? In what form does that --
A. I'm not sure what you're talking about.
Q. So, for example, with Coli when --
A. Her name is Coli.
Q. Coli. Sorry. I apologize. With Coli, when she would watch dogs or any of her other jobs, did you ask for some of that money?
A. No, I do not.

Q. You did not. And Henry -- and does Hayden work?
A. He just started to work.
Q. And does --

THE COURT: Pardon me for one minute. Ms. Howe, how old are your children?

THE WITNESS: My daughter is 22. My son, Henry, is 19. And my youngest is 16.

THE COURT: Thank you.

BY MS. LONGORIA:

Q. And was there a time when the father came to see his daughter that you gave an incorrect address so that he could not succeed in that?
A. I don't even know what you're talking about.
Q. Okay. So at the time that the petition was brought in September of 2019, is it true that you had several dogs in the home?
A. Yes.
Q. And that the home smelled like feces?
A. My home did not smell like feces.
Q. Did not smell like feces?
A. No, ma'am.
Q. And it wasn't dirty?
A. Normal everyday wear and tear.
Q. And your children always had clothes to wear to school?
A. They always have clean clothes.

Q. And they always had school supplies?
A. Yes, ma'am.
Q. And before the children were taken out of school for the remote homeschool program, did you attend functions at the school? Awards dinners, things like that?
A. Okay. You need to be a little more specific.
MR. STEED: I object to --
THE COURT: Is there an objection?
MR. STEED: Yeah, Your Honor. Relevance. Like, were you an involved parent in 2014, what does that have to do with anything?
THE COURT: What's the relevance?
MS. LONGORIA: I didn't specify 2014. I'm in 2019, and I was asking her basically about what's happening in life during that time.
THE COURT: Okay. I'll overrule it. I'll allow the questions. But you are getting short on time, Attorney Longoria.
MS. LONGORIA: Yes, Your Honor.
BY MS. LONGORIA:
Q. So let's talk specifically about 2018. What school -- do you remember any -- going to any of the school events at this point?
A. I went to every single school event that my daughter or my sons had.

Q. And have you spoken with your son about his testimony, either prior to his deposition or prior to today?
A. No, I have not.
Q. And did you speak with your mother about her testimony?
A. No, I have not.
Q. And you never spoke with DHHS about -- or your children about what they should say to DHHS?
A. When?
Q. When they came to interview you about --
A. When?

MS. LONGORIA: Okay. I don't have anything further. Thank you.

MR. STEED: Your Honor, could I have a brief break for comfort?

THE COURT: I'm sorry, I just can't hear you.

MR. STEED: Oh, I'm sorry. Could I have a five-minute break?

THE COURT: Sure. We can take a five-minute recess.

(Break taken. Time noted: 12:59 p.m.)

(Proceeding resumed. Time noted: 1:05 p.m.)

THE COURT: Good afternoon, everyone. We're back in session.

Attorney Longoria, I think you were done, but you're still standing.

MS. LONGORIA: I am because we agreed I get to ask one

more question that I forgot.

THE COURT: Okay.

MS. LONGORIA: It's very basic.

BY MS. LONGORIA:

Q. Your house is on septic, ma'am?

A. It has its own private septic.

Q. Right. And when is the last time you had it maintained?

A. I don't remember.

MS. LONGORIA: That's all.

THE COURT: Thank you. You can begin.

CROSS-EXAMINATION

BY MR. STEED:

Q. Just one quick question. So there were a couple of times where you said you signed for Henry?

A. Yes, ma'am. Yes. Sorry. Yes, John.

Q. Just say yes. Why did you -- why did you do that?

A. Because Henry let me.

Q. Okay. So he knew you were doing it?

A. Absolutely.

Q. Yeah. You talked for a while about -- you said you had four brain surgeries?

A. Yes.

Q. What were those for?

A. I have intracranial hypertension, or Pseudotumor Cerebri, and my body doesn't --

THE COURT: I'm sorry?

BY MR. STEED:

Q. I was going to -- there's -- we -- like, so this is really your chance to tell your story a bit. So we can take our time.

You said you had four brain surgeries in 2013. What were those for?

A. The first one was to implant a ventricular shunt, a little bubble-type apparatus in the top of my head. And there was a silicone tubing that would go down around behind my ear, down into my neck, and drain into my stomach. And the first --

Q. Can I actually stop you for a minute? I'm going to go back.

So you had four brain surgeries. Was there one problem that they were all meant to address?

A. Intracranial hypertension. My body doesn't regulate my spinal fluid.

Q. Okay. So intracranial -- that sounds like too much tension in the spinal fluid?

A. Too much spinal fluid buildup. So it's kind of like high blood pressure.

Q. Okay. But with --

A. Without --

Q. Around your brain?

A. Yes, sir.

Q. Does that lead to any -- like, what does that lead to for

you as far as -- (cross-talk)

A. (Cross-talk) -- headaches?

THE COURT: It's hard. I know it's hard to do it because it's not how it works in normal conversation. But you have to wait for him to finish and then kind of pause, and you can start.

BY MR. STEED:

Q. And also it's important to give good, slow, complete answers everyone can let it sink in. So this is important.

A. Okay.

Q. So what kind of symptoms does the intracranial hypertension lead to?

A. Headaches. Visual loss. Dizziness. Imbalance.

Q. Okay. And was that true before you had your surgeries?

A. Pardon?

Q. Was that the case before you had your surgeries?

A. Yes.

Q. And was it the case after your surgeries too?

A. Yes.

Q. And I think -- and then are there -- is there any rhyme or reason to when you get headaches?

A. Stress. Events that happen. Just being under a lot of pressure.

Q. Okay. And so I'm going to start -- we're thinking about first, like, so from about a year before COVID until the end of

COVID is, I think, the time period we're talking about. So some of that is in 2019. Do you have any -- do you remember when COVID started, right?
A. Yes.
Q. And then I think when we talked earlier you said there was a time when you didn't have a car, right?
A. Right. I didn't have a car for about two years.
Q. When was that?
A. Right around 2000 -- about August of 2019 until the end of 2021.
Q. Okay. And so during the time period when you didn't have a car, would you get headaches?
A. Yes.
Q. And you said -- I think you said, incapacitating headaches, right?
A. Yes.
Q. What do you mean by that?
A. My head would hurt so bad, and my right eye would be pulsating and throbbing. I wouldn't be able to see straight, and I would have to be -- I would be in bed and in my bedroom, dark, no TV, everything quiet.
Q. And how -- so for how long would you end up, sort of, in bed?
A. Usually all day and most of the next day.
Q. Okay. And were there -- you said stress made it worse.

How -- can you, sort of, walk me through, like, a headache coming on for you. Like, how do you -- do you know it's coming?
A. Yes. Usually my right eye starts twitching. And then it feels like my eyeball is bulging out of my eye socket. And then it just, like, starts pulsating. And then I just get this massive, like, throbbing sensation on the right side of my head.
Q. Okay. And you said you've got three kids, right?
A. Yes, sir.
Q. Well, on a scale of 1 to 10, how bad does it get when it's sort of the --
A. A ten.
Q. What did you say?
A. I'm sorry, a ten.
Q. You said you had three children?
A. Yes, sir.
Q. Did you have, like, medication when you had your kids?
A. I believe I had an epidural with my daughter. May have had an epidural with my second child. But with my third child, I didn't have anything because I had polyhydramnios, which I had -- I looked like I -- I was huge. I had so much amniotic fluid build-up. It was like a precipice.
Q. Sure. My question is just so that third child --
A. Third child he was, like, the trigger start, like, for --

Q. Sure. My question is, that third childbirth where you had the other stuff --
A. It was my hardest childbirth.
Q. And so what was -- like, on a scale of 1 to 10, what was the pain of that?
A. Probably about an 8.
Q. Okay. So are there -- do events, in your experience, ever trigger headaches?
A. Yes.
Q. And then do you -- do you most of the time not have any headache, or is it --
A. Usually have a dull -- like, my headache is -- if my eye is not pulsating or feeling like it's going to bulge out of my head, there's just like a steady -- like a wooshing. I don't know how to describe it. Like a -- like a steady rumble in my head.
Q. Even now?
A. Yes. I have a really bad headache right now.
Q. What was that? Sorry.
A. I have a really bad headache right now.
Q. Okay. And will stressful events -- so you talked about this when it gets up to a 10 and you're laying in bed. And I sort of think of that as an acute episode. Does that sort of terminology make sense to you as well?
A. Yes.

Q. So does -- do outside events ever, in your experience, seem like they trigger acute episodes?
A. I don't really do a lot of outside events. I don't, I guess, understand the --
Q. Sure. Do things ever happen where it goes from the normal state of your headache to now you're sort of rolled -- it gets worse and then now you're having a bad headache and you need to lay down?
A. Sometimes, but not -- I try not to let it --
Q. Okay.
A. -- keep me down, I guess.
Q. Yeah.
A. I mean, I have to be a mother to my boys.
Q. Okay. So in a -- I'm going to take you back to I think there was a time in 2019 when you talked about -- or early in COVID we talked about where you saw some people on your -- on your property?
A. Yes.
Q. Can you -- can you -- can you take me back to that day? What happened?
A. I was not feeling well. In bed. I had a really bad headache. Everything was quiet. I believe my middle child, Henry, was upstairs. I -- he was doing something, and he hollered at me and said that there was somebody walking around in our yard. And I got up, and I ran outside. And when I got

outside, the guy was all the way back, like, walking the -- the property line of our -- of our garage, on the far part of our garage. And I encountered him, and he -- I asked him who he was.

Q. I got to stop you for a minute. So was he on your property?

A. Yes, sir.

Q. Was he in the front yard or back yard?

A. Pretty much the back yard.

Q. Okay. So you saw him in your back yard?

A. Yes.

Q. Did you talk to him?

A. I did. I ran out there, and I was yelling at him.

Q. Okay. Did he say anything to you?

A. Yeah. He screamed at me that I needed to pay my bills.

Q. Did he say anything about why he was there?

A. Yeah. Because the mortgage company sent him because I don't pay my bills.

Q. So he told you the mortgage company sent him because he didn't -- you didn't pay your bills?

A. Yes.

Q. And how long was he there?

A. I'm not exactly sure from the exact time that he started walking on the property to the time my son saw him and I ran out and encountered him. But he -- as soon as I encountered

him --
Q. Slow down. I think it's going to be probably hard to follow you for -- just -- just speak slower.
A. He -- by the time he -- I encountered him and approached him, he ran and got in his car.
Q. Okay.
A. Which his car was parked in -- there's a treeline in the front of the house, and he was parked where you couldn't see him.
Q. And were you -- how did you feel after that?
A. Invaded and, like, people were going to start coming and, like, spy on us.
Q. Okay. Had you ever seen people doing similar things in the past?
A. Yes. But never coming really on the property. Just standing in the road and either taking pictures -- we've had people come and knock on our door and say, hey, there were people taking pictures at your house.
Q. Okay. And so I want to get back to the time frame with this event where the man was in your yard. Was that during COVID?
A. I believe it was. I believe it was right at the beginning of COVID.
Q. And why do you believe that?
A. Because my -- my son was home, and he never missed school.

Q. Okay. So your son was home. And was there a time when your son had left to go to stay with your mother for a little while at the beginning of COVID?
A. Yes. That was during the summer of COVID.
Q. Okay. And was this -- was this incident before or after that?
A. It was before that.
Q. Okay. And so you said you felt invaded. Did you -- did you feel any other feelings?
A. I felt the people were trying to take our -- take my house. That I was going to, you know, be homeless.
Q. Okay. How did that -- did that change your day at all? You'd been laying down?
A. I was --
Q. Go ahead.
A. -- really upset.
And I -- I can't recall exactly what I did, but I probably -- I was probably incapacitated after that.
Q. Okay.
A. Because it was stressful. Because it stressed my son out, and then trying to get him to, like, calm down was a lot.
Q. And have there been any other times when the -- does it stress you out when you see the people taking pictures of your house?
A. Yes.

Q. What happens there?
A. I usually just yell and scream at them to leave or tell them they really don't have a right to be there.
Q. And so I'm talking about, sort of, the specific time frame of, sort of, when you didn't have your car. So was there more than one time where you saw people taking pictures of your house?
A. There was another instance. I believe it was when I didn't have a car. There was a man standing right in the precipice of the driveway taking pictures. The dog was going berserk. And he just got in his car and left.
THE COURT: I'm sorry, what was that in the end? What did you say? I couldn't hear what you said. He just got --
THE WITNESS: He just got in his car and left.
THE COURT: Okay. Thank you.
BY MR. STEED:
Q. Were there any other times when people spoke with you?
A. I don't think so.
Q. Okay. There was a -- was there a -- did you ever have Jonathan Selkowitz as your lawyer?
A. I did, yes.
Q. And when was that?
A. When I was going through my divorce in 2017, I believe, or '18.
Q. Mm-hmm.

A. And we had been served foreclosure papers. And I had gone to Pine Tree Legal to see if they could help me, and Jonathan Selkowitz took my case on because they were -- the mortgage company was trying to figure out, I guess, who -- who held the loan or who held the title because there were so many buyouts from the 2008 housing market crash. So they didn't know what company held the title, and so Jonathan represented me in that case.

Q. Okay. And that -- did you ever get -- do you know what happened in that lawsuit?

A. Jonathan Selkowitz had called me and said that the case was dismissed with prejudice because the -- Challenge Financial or ML -- or MTQ -- I'm not sure of the acronym, but there was nobody -- that corporation or business had already gone out of business. There was nobody that could, like, just say, oh, I'm from Challenge Financial to make an action to come and just take my house because it wasn't in business anymore. So he basically said that they would have to resurrect this company from the dead, more or less, to be able to take my house. And I was -- like -- like, a burden had just been -- like, I was grateful that -- you know.

Q. And then after you felt that -- you know, you heard that they -- that you won that lawsuit, did -- did -- the time when the people came to your yard, was that after that?

A. I believe it was, but....

Q. Okay.
A. I'm not 100 percent sure.
Q. And then -- and then other times when you saw the people coming to take pictures, were they on your property when they took the pictures or away from your property?
A. On the -- on the shoulder of the property. The shoulder of the road that abuts the property, our property. They would walk -- sorry -- along like the treeline in front. And there's, like, this open area where they would kind of, like, just go in and stand and take pictures.
Q. Mm-hmm.
A. You can't really see it unless you are standing in the front bay window looking and seeing it.
Q. And after when -- sorry. I'm just thinking. Take a minute.
The people -- do people come and take pictures of your house still?
A. Yes.
Q. When you -- when you're at the house, do you ever look for them?
A. Oh, yes. I always feel like I'm being watched.
Q. And then sort of in this period where you didn't have a car, was that the case as well?
A. Yes.
Q. What was your understanding, in that period when you

didn't have the car, of why people were -- came to your -- why the man came to your yard that one time?

A. I'm -- I'm not really sure. Every time somebody would come, I would call Mr. Selkowitz and tell him or e-mail him and I would just, I guess, wonder.

Q. Wonder what?

A. Why they were there. Because I didn't think they had a right to -- to do anything further.

Q. Did you ever find any connection -- no. Never mind.

MR. STEED: I don't think I have any other questions, Your Honor.

THE COURT: Thank you. Any redirect?

MS. LONGORIA: No, Your Honor.

THE COURT: All right. Thank you. All right. You can step down. Thank you.

Any further witnesses, Attorney Longoria?

MS. LONGORIA: Your Honor, I will request permission to call a rebuttal witness, but he still has his case to put on. Or are you done? You have Henry.

MR. STEED: I have Henry.

MS. LONGORIA: Okay. So I'm through with my direct case. Yes, Your Honor.

THE COURT: Okay. Thank you. All right. Attorney Steed, your witness.

MR. STEED: My witness. And then after this we're

done, and all of the evidence is in both cases, and there's no need to cross-pollinate?

THE COURT: I don't know what you mean. It's -- Attorney Longoria just said she did have another witness that she is going to put up in rebuttal.

MS. LONGORIA: Depending on how Henry's testimony comes in, I may well ask to leave the record open to call an additional rebuttal witness. Yes, Your Honor.

THE COURT: Okay. She means today.

MR. STEED: Today?

MS. LONGORIA: Oh.

THE COURT: Right? You mean today?

MS. LONGORIA: No, Your Honor. I don't think today. I think I will ask to leave the record open, and then it would have to be on a different day. Her testimony came in differently than I had expected, and there are, I think, relevant issues. And that's why I would ask to leave the testimony open.

THE COURT: All right. Well, we'll address that when the time comes.

MR. STEED: Yes. I would also like the record left opened indefinitely.

THE COURT: Do you have a witness?

MR. STEED: I do. Henry Howe. Can I go get him or --

MS. LONGORIA: Oh, and we spoke about this, but he'll

agree to have Melanie not in the courtroom when Henry testifies.

MR. STEED: I don't know if we're going to do that or not.

MS. LONGORIA: All right. Then I'll make that request.

THE COURT: Okay. What's the request?

MS. LONGORIA: My request is not have Melanie Howe in the room when Henry Howe is testifying. Counsel and I spoke about this before, and I thought we were in agreement, but I think that the closeness of the relationship in the family is stressful not only on Mrs. Howe, but on Henry and his ability to testify clearly and honestly before the court. I think his testimony is going to be very brief, but I would just like to have it done outside of the presence of his mother, who he still lives with.

THE COURT: What's your basis? What's the case law for me kicking out Ms. Howe because of the witness?

MS. LONGORIA: I understand she's a party. The -- the underlying basis for it was I took a brief deposition in which he was --

THE COURT: What's your legal basis?

MS. LONGORIA: Oh, my legal basis is, much like sequestering a witness so that we make sure there's no influence on the witness prior to their testimony. Even though

this isn't a party, because of the close family relationship I still would ask that because of the influence that -- that she be asked to not be in the same room at the same time.

THE COURT: How old is Henry?

MS. HOWE: About 19.

MR. STEED: He's 19, Your Honor.

THE COURT: No. I'm going to -- he can testify. And, Ms. Howe, you -- if you -- do you want to stay in the room while he testifies?

MS. HOWE: If there's any reason for me to leave....

THE COURT: I'm not -- I'm not going to ask you to leave during his testimony. But if you want to, let your attorney know, and he can make a request. I'm saying during the thing, and I'll consider that then; but I'm not going to ask you to leave.

Before you go and get Mr. Howe, I want to take a quick recess. So it will be just a quick recess. Thank you.

(Break taken. Time noted: 1:28 p.m.)

(Proceeding resumed. Time noted: 1:34 p.m.)

THE COURT: Okay. You can call your witness, Attorney Steed.

MR. STEED: Henry Howe.

THE COURT: So it's Mr. Howe; is that right?

MR. STEED: Before I forget, I just want to move for admission of Exhibit 48. That was the --

THE COURT: Exhibit 48. You are moving for the admission of 48. And you don't object; is that right?

MS. LONGORIA: Sure.

THE COURT: All right. Admitted thank you.

THE CLERK: All right. Please raise your right hand. Do you solemnly swear that the testimony you shall give in the cause now in hearing shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, ma'am.

THE CLERK: All right. Please be seated. Pull yourself as close to the microphone as you can. And I ask that you state your name and spell your first and last name for the record.

THE WITNESS: Right. My name is Henry Winslow Howe. And my name is H-E-N-R-Y, H-O-W-E.

DIRECT EXAMINATION

BY Attorney Steed:

Q. Henry, what's your relationship to Melanie Howe?

A. I'm her son.

Q. Do you live with her?

A. Yes, sir.

Q. From -- have you lived with her from 2019 until now?

A. Yes, sir.

Q. Was there a period during COVID you went and stated with your grandmother?

A. Yes. Was like March -- it was only for, like, two months. But it was from March until two months later after March, I think.

Q. Okay. And except for that, have you always lived with her?

A. Yep, always with my mom.

Q. Your mom -- does your mom get headaches?

A. Yep.

Q. Can you tell me what happens when your mom gets headaches?

A. When she gets her headaches, she's kind of -- like, you can't talk to her. She's very irritable. It's kind of like a -- almost like a separation, if you would call it, I guess. It's just not, kind of, like, an easy thing to, kind of, like, interact with her, I guess.

Q. And when you say when your mom gets her headaches, are there times when they're really bad and --

A. Oh, yeah. Definitely. There could be times where her, like, initial headaches could be, like, just her laying in bed for a day. Or it could turn into, like, it getting worse and she could just be in bed all day. And it could span, like, from, like, one day into almost three or four days.

Q. Okay. And what are your -- what are your interactions with her when she's in bed with her headaches?

A. I kind of like to think of myself as almost like a -- kind of like a caretaker. Just because I'm, you know, trying to

make sure that she's okay. So I would say my interactions are minimal.

Q. And would she get headaches like that where she's in bed -- well, let me back up.

Do you remember a time when your mom didn't have a car?

A. Yeah. And that would be, like, throughout COVID.

Q. Okay. Was it before COVID at all?

A. I'm not entirely sure. I don't remember exactly when she lost her car. But I know -- I know it's -- it was during COVID.

Q. Okay.

A. COVID at least was happening.

Q. And during that, sort of, COVID time period, would your mom get those headaches where she would be incapacitated?

A. Oh, yes, sir.

Q. And do you remember an event where there was a man in your yard and your mom got upset?

A. Oh, yes, sir. Well, I remember multiple events like that; but, yeah.

Q. Well, sort of, walk me -- is there one that sticks out in your mind in particular?

A. I can't exactly remember how old I was. But there was just one time where this guy had come and parked to -- like, in front of our driveway and -- well, like, on the dirt side of, like, the road and was, like, walking alongside of our house

and taking pictures. And I had just happened to, like, be in the living room getting -- making food and stuff. And I saw him in our back yard, and I -- it scared me. So I went and got my mom. And she was in bed, not feeling well already. And I was, like, ma, come upstairs, there's someone in the back yard taking pictures. And she raced upstairs and basically was like, what are you doing here and started screaming at the guy.

Q. Did you hear the guy say anything?

A. No, I didn't. Not exactly. All I heard is that he said he was from the mortgage company. And I was like, I'm not really going to involve myself with this.

Q. Okay. And then -- and then after that, did -- how was your mom after that?

A. Mad. Her -- was really just complaining that her head was hurting. Just not really, like -- what's the word. I apologize. She wasn't really sociable. She wanted to, kind of, be left to her lonesome because she just didn't feel good. It was kind of like -- sorry. Yeah. She just wouldn't feel good. She wouldn't really be hospitable, like a person that you could just go up to and talk to. You, kind of, had to leave her to her lonesome.

Q. And did you ever notice the, like, events, things that happened that would trigger a headache for your mom?

A. Yes. I mean, I was -- I was there all the time. I was the one that would mainly take care of her when she would have

her -- like, in my opinion, I would call them, like, headache incidents where she would just, kind of, be bedridden and I would be the caretaker.

So there would be, like, instances where I would, you know, have to call my dad or whatever to make dinner because my mom would be in bed just not feeling good and not really able to make it through making dinner for us. So I'd call my dad and be like, yo, come over and make dinner.

Q. I guess my question was --

A. Oh.

Q. -- did you ever notice there were outside events that triggered your mom to have the bad headache episodes?

A. No, not really, because we didn't really do anything. We're not really people that would go out and do things. We like to, kind of, just stay at home, if I'm going to be honest.

Q. Not -- not outside.

A. Oh.

Q. Sure. Oh, I didn't mean outdoor events. I mean, would things happen and then that to you seemed like it led to your mom having one of these headache episodes?

A. Yes. I would say it was -- yes.

Q. Okay. What -- what kind of -- what kind of things would happen?

A. To induce these, like, moments of stress?

Q. Yeah.

A. Really would be, like, if she wasn't kind of, like, thinking about the stuff that was going on with the house, because that's what I would call it. I didn't really know what was going on when I was younger. Just thinking about stuff that was going on with the house and stuff with my sister would just, kind of, give her a headache and, kind of, stress her out. I mean, the only really thing that was going on during COVID that would be an extra thing that was giving my mom stress would have been, like, my sister. But other than that and other outside stress other than, like, what's going on here I....

Q. Okay. Did you ever notice any times when -- well, after this incident where you saw the guy in the yard, did that -- did that have -- did you notice your mom having any, like, headache events after that?

A. Yeah. I would say it definitely put her more on edge because she was more on the lookout if people were going to show up randomly. Because we -- as I said earlier, we had had multiple events where we've had people come on the property. So I'd definitely say it really put my mom on, like, a high tense situation thing on, like, trying to keep a lookout for people randomly stumbling upon our property and stuff.

Q. So did you notice your mother being on the lookout for people coming --

A. Yes.

Q. -- onto the property during COVID?

A. Yes, sir.

Q. You said there were other events where -- you said this one where she was in the back yard --- the guy was in the back yard, she -- she yelled at him. Did you see -- were there any other times where there were these people coming taking pictures and your mom yelled at them?

A. There was this instance where she didn't necessarily yell at him, but she -- I -- we were -- we were in the living room, and this vehicle had pulled into, like, this little clearing spot. Not in our driveway, but, like, where you could see our house and a little bit into, like, our back yard. It's like this little opening clearing spot right near where we buried our animals. And they were just sitting there taking pictures. And as soon as my mom walked out the front door, they backed out and drove off. So, I mean, we really haven't had a bunch of experiences of yelling at them because as soon as they see us, they leave. Or notice that we notice them, and then they're gone.

There's been a time where they parked on the side of the road and they were taking pictures, and as soon as, like I said, my mom would go out, they would -- they would leave. There's been, like, a couple times where she's yelled at them, but not a lot. Because they usually didn't like to see us, and then they'd leave.

Q. Okay. I guess during COVID, did you have any sense that -- what was your sense of what was going on with the -- with the stuff with the house? I guess the foreclosure or whatever.
A. From my knowledge back in 2020 of what was going on with the house was, I, kind of, just thought that we were in, kind of, like, a -- just, like, a battle if we were going to keep it or not. I didn't know too much other than if we were going to keep our house or not. I didn't know, like, specifics or even why we were in this. I just knew that it was us trying to keep our house.
Q. And I think -- so some other stuff that's come up during this is that when you were younger --
THE COURT: Pardon me, Attorney Steed. I have to take a brief recess.
(Break taken. Time noted: 1:46 p.m.)
(Proceeding resumed. Time noted: 1:53 p.m.)
BY MR. STEED:
Q. You work now, right?
A. Yes, sir.
Q. How long have you been working?
A. I started originally working in 2022. And I'm still working, yes, sir. So I've been working for four years.
Q. Okay. Do you -- do you pay rent or anything to your mom?
A. No, sir.
Q. Do you have to pay anything into the household expenses?

A. Nope.

Q. Okay. You ever see your mom take money from your sister that she had earned working?

A. Nope.

Q. Did you ever see your parents physically fighting in front of you at any time when you were a kid?

A. I mean, well, yeah. Not going to lie. I was the one that would get in the middle of it.

Q. Okay. When -- and when were your parents living together?

A. When -- the year they got divorced.

Q. Okay. When was that? Do you remember?

A. 2016, 2017.

Q. Okay. So 2016, 2017 it's fair to say there was a lot of stressful stuff going on in your house?

A. Oh, yeah.

Q. And was that also when your sister left?

A. Jeez. I don't even remember the exact date my sister left. I was in eighth grade. So it was, like, 2019, I think.

Q. Have any -- either of your parents -- do they hit you?

A. I've never been struck by my parents.

Q. Okay. How about -- about your sister? You ever see your parents hit your sister?

A. No.

Q. Your younger brother?

A. No.

Q. But there have -- have been some real -- some fights in front of you, huh?
A. Oh, yeah.
Q. And was -- was there a while when DHS was around in your life?
A. Yeah. Yeah.
Q. When was that?
A. I can't remember the exact date when they got, like, fully involved with us and when they stopped. So I'm not entirely sure. I know that they've basically been involved since I was in, I think, elementary school.
Q. Okay. So you have to -- like, there's DHS social workers around some time?
A. Oh, yeah. Coming over, doing visits. Just talking to us. We've gone through so many case workers.
Q. Your mom ever coach you and tell you what to say to the DHS caseworkers?
A. Not necessarily. I mean, there wasn't really anything, like, wrong going on for her to coach us into saying anything different. So, no, not really.
Q. You say, not really. What do you mean? Is that --
A. I would say no. She never told us to say anything different or to say something that wasn't the truth.
Q. Okay. Did she ever tell you not to say something that was -- you know, was the truth?

A. She always tells us to tell them the truth, and nothing but the truth.

Q. Okay. You ever see your mom open the mail and know it was about the mortgage?

A. Not really, no. I would say no. I didn't really pay too close attention to the mail, if I'm going to be honest. Anything I was paying close attention to the mail was like the Game Stop subscriptions that would come in.

Q. Okay. So there was -- there was awhile -- do you remember your mom having, like, a medication patch?

A. Yeah. Her, like, pain patch things. Yeah.

Q. Yeah. Did that worry you at all when it was going on?

A. When I was younger, it would kind of make me think that the only time she was happy was when she would change the patch. So the patch was, like -- like a happy medication for her. It's kind of what it like -- in my -- that was my process -- thought process growing up was, like, oh, this is just her happy patch.

Q. Okay. Do you remember a time when she stopped using that -- the patches?

A. I don't remember exactly when. But, basically, I remember me and my sister basically complaining to her that, you know, the only time she's happy is when she -- when she changes the patch. And I don't remember exactly when we said that. But, essentially, when we said that, it kind of made her -- not made

her, but made her contemplate to stop.

MR. STEED: Okay. I think that's all I got.

THE COURT: Thank you.

Cross-examination.

MS. LONGORIA: Absolutely.

CROSS-EXAMINATION

BY MS. LONGORIA:

Q. Good afternoon, Henry.

A. Good afternoon.

Q. So before coming today, you and I had time to visit over the Zoom?

A. Mm-hmm.

Q. And we sort of went through the various chapters in your life in that conversation. So I'm going to refer to that a little bit, just so I can move things along and get us out -- out of here.

So when we were talking before 2000 -- so in 2016, you were going into the fourth grade?

A. I don't -- I don't know. I don't remember. Like, yeah, I'm not too sure. I don't remember exactly, like, the dates of me going into specific grades.

Q. All right. So when we spoke, you talked about from 2017, that fall, to November of 2020 would be the beginning of the fifth grade year to the second half of eighth grade; do you remember that?

A. Could you say it again? Sorry.

Q. You bet. So from the beginning of fifth grade in 2017 through November of 2020, that would be the beginning of fifth grade to the first half of eighth grade at Bonny Eagle; do you remember that?

A. I believe so. Yes, ma'am.

Q. Okay. And that period -- your brother is three years behind you?

A. Yeah. My brother is three years younger than me, and three years behind in school than me.

Q. So when your sister moved out, as you testified, you were in the eighth grade. Your brother was in the fifth grade?

A. Yeah.

Q. So before your sister moved out, she would help get your brother ready and to school and onto the school bus?

A. No. Because my -- me and my sister would be going to school for, like, 6 in the morning, and my brother would be going school for, like, 8 o'clock. So my mom would be having to take care of him in the morning because me and my sister would be getting up around, like, 5:40 to get ready for 6:40 for the bus.

Q. Great. So specifically with regard to that, if there were days that your mom was staying with Howard, would your sister have to step in or you have to step in and get your brother --

A. No.

Q. -- to the bus?
A. No.
Q. That never happened?
A. Never.
Q. So -- and if your mom was having a headache day, your sister never stayed home from school to get your brother on the bus?
A. No.
Q. Okay. And that chapter when your mom was in court with Ms. Drake, that chapter of your life was pretty chaotic; would that be fair to say?
A. Oh, yeah.
Q. And it was chaotic for -- okay. Actually, let me be more specific.
The day with the knife throwing between your -- when your mom threw the knife at your dad, were you there that day?
A. Well, yeah. I'm the one that called the police and told the dispatcher what happened.
Q. Okay. Thank you. And the day where they were ramming their cars and the school bus was coming, were you there that day?
A. I don't recall an event like that.
Q. Okay. Did you ever call the police any other time?
A. No.
Q. Okay. And February 27th of 2019, you would have been 13;

is that right?
A. Of what year? Sorry.
Q. 2019.
A. I think so. I think. Yes, I believe so.
Q. Okay. And if -- do you recall anything about an encounter with police that afternoon where your mom was arrested?
A. Could you give a little more detail on why she was arrested? Because that's not really, in my opinion, enough go on.
Q. Oh, sure. More specifically, the date -- so February of 2019, do you remember there being a time when she was arrested in the winter of 2019?
A. Not -- not entirely. Just because, I'm not going to lie, they would fight a lot. So all of their fighting and the police getting called is kind of just all mushed together just because I don't like to think about that and stuff.
Q. Absolutely. So after your dad moves out and your mom moves on and has other relationships, in that next period of time, that's the arrest I'm talking about. Not when your dad was around.
A. Oh. I -- I think so. Yeah. Because I think she got -- is this, like, the DUI or something like that? Or I don't exactly remember. But, yeah, she got arrested in, like, something of 2019 for I think it was, like, illegal lane. Like, going in the next lane or something. I think she cut

off, like, a police officer or something while going into, like, the -- the next lane. I think that's the -- I think so. Yes.

Q. Okay.

A. Yes. Because I remember her getting arrested one -- yeah. 2019, I remember her getting arrested. I just don't remember the specific month.

Q. No problem. So you testified earlier that your mom lost her car. Can you describe that?

A. Lost her car?

Q. Right.

A. Well, yeah. So throughout COVID she didn't have a car. I'm sorry. She didn't have a vehicle throughout COVID. We relied on other people. And I can't -- I think she -- yeah, she totaled -- I think totaled her other car, I think. I don't remember exactly what happened to her other car. But essentially we lost that, and then we would, kind of, have to rely on other people for us to -- for them to take us places. Or when my mom wasn't home, me and my brother would call our dad and be like, yo, come pick up us.

Q. And your dad is your best friend?

A. Oh, yeah, I would say.

Q. And the period from -- actually, let me back up.

So when COVID happened, you finished that academic year online with Bonny Eagle?

A. Yeah. So 2021, or whenever I went into my freshman year, my freshman year I was still at Bonny Eagle going in person and online. And then as soon as my sophomore year started, I went online doing Edmentum.

Q. And that's at the XL Sports World in Saco?

A. Yes, ma'am.

Q. And you'd be there -- you'd head to school around 8, and you'd get out around 1:30 or 2?

A. Yes, ma'am.

Q. When your mom smokes marijuana, does she do it inside the house or outside of the house?

A. In the house. But she does it at her, like, desk or table.

Q. And do you smoke marijuana, or do you use marijuana at all?

A. Not, like, smoking. Only, like, the THC rub stuff you put on, like, your arm if you feel like you hurt it or something. Because at my last job at Nouria, I broke my radial -- my left radial.

MS. LONGORIA: I have nothing further. Thank you, Your Honor.

THE COURT: Thank you. Any redirect?

MR. STEED: Nothing else, Your Honor.

THE COURT: Okay. Mr. Howe, thank you so much. You can step down.

Any additional witnesses, Mr. Steed?

MR. STEED: Nothing further, Your Honor.

THE COURT: Any further evidence? In other words, do you rest?

MR. STEED: Oh, actually, I -- no. Could I call the representative for Fay for one more question?

THE COURT: Mr. Paterno?

MR. STEED: Mr. Paterno.

THE COURT: You want to call him for your case in chief? Yeah, this is your case in chief on the cross-claim, so you can.

Mr. Paterno, I said you were done, but I misspoke.

MR. PATERNO: I knew I couldn't be done.

THE CLERK: He does not need to be sworn again?

THE COURT: No. Reminder you're still under oath.

MR. PATERNO: Thank you.

DIRECT EXAMINATION

BY MR. STEED:

Q. Just one question. On the -- on foreclosure, is Fay and the Trust, are they asking for -- if the house isn't enough to satisfy the obligation, is it looking for payment from Mr. and Mrs. Howe?

MS. LONGORIA: Objection. So there's a combined case. And are you referring to the foreclosure case, the combined case, or the multicounts on the note? Because the foreclosure

is just a foreclosure count.

MR. STEED: Well, I'm just asking for the foreclosure count if it -- the note was never accelerated. So I'm just --

THE COURT: I think the question was on the foreclosure -- is Fay's interest -- asking if the house is enough to satisfy the obligation or looking for a payment from Mr. and Mrs. Howe. So I'm going to overrule the objection. You can answer the question.

A. At this moment I, personally, don't know the answer to that. I don't know if that's -- we're looking for in rem judgment or not.

MR. STEED: Okay. I don't have anything else.

THE COURT: Okay. Thank you. Recross?

MS. LONGORIA: I have -- no.

THE COURT: Okay. Thank you. You can go back down again. I won't make promises this time.

THE WITNESS: That's it?

THE COURT: Any further evidence to present, Mr. Steed?

MR. STEED: No, Your Honor. I just ask to incorporate all the evidence from everything else in the case in chief. I assume that's happening, anyway. But if it's not and I need to move it forward, I'd like to do that now.

THE COURT: All the evidence is in for the whole case. So do you rest for your side?

MR. STEED: Yes, Your Honor.

THE COURT: Okay. Attorney Longoria you, had mentioned a potential request to keep the case open for rebuttal.

MS. LONGORIA: Yes, Your Honor.

THE COURT: So you're going to have to make a big showing here.

MS. LONGORIA: I'm requesting the opportunity to call Rebecca Drake. I was in contact with her for the first time last night. She has significant information that is different from the evidence that came in today.

THE COURT: Who is she?

MS. LONGORIA: She is the individual who adopted Coli and is the guardian. So in 2019, she's the one who brought the petition, beginning in September of 2019, ending in 2020. My offer of proof on that was during my conversation, she had a number of specific observations during that two-year period, which is the same two-year period that we've been speaking about. So I believe that her testimony is relevant as rebuttal. She's indicated a willingness to testify and --

THE COURT: Relevant to which piece? To general credibility? To what? Tell me specifically.

MS. LONGORIA: So she -- he still has the nonmonetary damages. So she would be testifying as to the testimony that has come in with regard to nonmonetary damages with regard to

the voracity of the testimony, the accuracy of the testimony, the completelesness [sic] of the testimony.

THE COURT: And why isn't she here now?

MS. LONGORIA: I did not know whether or not Mrs. Howe would testify inconsistently with her prior testimony with regard to the various issues that were happening in the home at that time. Her testimony today, I believe that since her case is based upon emotional damages that I should have the brief opportunity to call a witness that I have recently become aware of that has testimony that -- that is inconsistent with that.

THE COURT: I'm not going to allow it. You could have subpoenaed her to come today and not needed her. That's the way it works with rebuttal witnesses.

MS. LONGORIA: Understood.

THE COURT: Particularly because, again, to continue this case, it's not as if it would be tomorrow. It wouldn't be until January. So I'm not going to allow it.

MS. LONGORIA: I understand, Your Honor.

THE COURT: Anything further, though? Any other evidence, Attorney Longoria?

MS. LONGORIA: No, Your Honor.

THE COURT: Okay. So Michelle is going to -- we're going to take a break. Is there anything I need to admit, or is everything clear?

Why don't we do this, is there anything further from

the parties -- before I close -- officially close, I'll take a recess so we can make sure we can go over everything and have it.

But before I do that, is there anything else from the parties? And then we'll talk about scheduling and things like that when I come back.

MS. LONGORIA: I have nothing else.

THE COURT: Okay. So we'll take recess. I'll let Michelle and you all go through the evidence to make sure everything is in the way it should be or not and needs to be addressed. And then when I come back, we'll talk about deadlines for posttrial briefing and the like. All right. Thank you all.

(Break taken. Time noted: 2:13 p.m.)

(Proceeding resumed. Time noted: 2:29 p.m.)

THE COURT: Okay. We are back on the record. I hear there is another Exhibit?

MS. LONGORIA: Your Honor, just one. So Exhibit 26 that is in, the original of Exhibit 26, the docket sheet that is -- that came with it is certified from the clerk's office is a little different than the online printout. So I marked this 26A and agreed to admit it. Everything else we have agreed on. The original documents are all in the notebooks. Everything we didn't agree on has been pulled out, and we agree on the Exhibit list.

THE COURT: Okay. So 26A will be admitted. Thank you.

Thank you. Okay. Anything else before we close the evidence and talk about scheduling?

MR. STEED: No, Your Honor.

MS. LONGORIA: Oh yes, Your Honor. May I excuse Mike?

THE COURT: Yes, you can be excused. Thank you, Mr. Paterno.

MR. PATERNO: Thank you very much for your time.

MR. STEED: He'll be back.

THE COURT: That's true. Okay. Well, thanks. You all can have a seat while we talk about scheduling.

So, first, thanks to you both. I appreciate your efforts putting the case in. I know it's hard when it's such a longstanding case with a lot of documents and when everybody has a history. So I appreciate your efforts getting the case in.

So I do want proposed findings of fact. I am glad to have accompanied by that -- which I think would be probably most helpful to have those at the same time -- is your argument related to your proposed findings of fact. My thoughts are no more than 40 proposed findings of fact respectively. And -- so, you know, in total. So 40 total. You can split that up how you want. Just say, these are the findings of fact. You can say, this is to this -- however you want to do, but just

it's 40.

I'll say 30 days, although I realize I don't know if that's actually a weekend or something like that. Michelle, can you see what 30 days is? And then accompanied by that, you can have posttrial briefing or argument. Why don't we say -- there's been a lot of briefing, which I have thoroughly read many times over. So just you can be assured of that. I'd like to say -- I'd like to say -- well, what I'd like to say is ten pages. But what I'm offering is going to be 15 pages of briefing. Does that cause anybody extra heartburn? You think you can do it? Less is more. I have a lot. Would that be okay, Attorney Steed?

MR. STEED: Yes.

THE COURT: Would that be okay, Attorney Longoria?

MS. LONGORIA: Yes, Your Honor.

MR. STEED: I have one good joke as a legal writer. I said, if I had twice as long I could make it half as long. If it takes long to write it, I could make it half as long.

THE COURT: I appreciate it. I'm going to use that next time. I'll give you credit.

Okay. So -- so what's the date? Sorry. Michelle, do we know? This will be on the docket.

THE CLERK: January 16th, Your Honor.

THE COURT: January 16th. Okay. What day is that?

THE CLERK: It's a Friday.

THE COURT: Okay. Good. And then that's in before the long weekend. So you all can enjoy your long weekend. Okay. Anything else, Attorney Longoria?

MS. LONGORIA: Yes, Your Honor. So we'll both brief at the same time. Will there be a guideline for responsive briefing?

THE COURT: Oh, I was going to not have responsive briefing; but it's your case. You want it?

MS. LONGORIA: Maybe five pages.

THE COURT: Five pages. You -- I like that. Sure. We've come this far. So -- and I'll even give you seven pages. So seven pages responsive briefings. And I guess I'll ask -- I'll ask you all, do you want those -- I mean, I hate to have those due the next week. But I know this case has been going on for a while, and I do -- I do want to come to a resolution here. So January 30th, that's two weeks, does that work for both of you?

MS. LONGORIA: That's fine, Your Honor.

THE COURT: And we'll put these on the docket too. Don't worry about that. Okay. Anything else?

MS. LONGORIA: No, Your Honor. Thank you.

THE COURT: Thanks. Anything else, Attorney Steed? You're looking pensive.

MR. STEED: Oh. So I think you were saying don't bother rearguing the stuff that's already been briefed?

THE COURT: No, you can reargue it. I just -- if you're certainly going to, it would be helpful for me for you to summarize it and reflect on your proposed findings of fact. But you don't need -- I just want you to be reminded that I have and will read everything you've already submitted again. So -- so you don't need to cut and paste from those briefs or things like that, which I wouldn't think you would. But just bears repeating. It bears repeating to not be repetitive. How about that for a -- all right.

Well, thank you both. Happy holidays. Happy New Year. And I'll be hearing from you if not seeing you in January. Take care.

(Proceeding concluded. Time noted: 2:34 p.m.)

* * * * *

**C E R T I F I C A T I O N**

I, Michelle R. Feliccitti, Registered Professional Reporter and Official Court Reporter for the United States District Court, District of Maine, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: January 19, 2026

/s/ Michelle R. Feliccitti

Official Court Reporter