UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE FOR MFRA TRUST 2015-1, | ) | |
| Plaintiff, | ) | |
| v. | ) | 2:21-cv-00278-SDN |
| HENRY W. HOWE IV and MELANIE B. HOWE, | ) | |
| Defendants, | ) | |
| ASSET ACCEPTANCE, LLC, and CREDIT ACCEPTANCE CORPORATION, | ) | |
| Parties-in-Interest. | ) | |
| MELANIE B. HOWE, | ) | |
| Counter-Plaintiff, | ) | |
| v. | ) | |
| WILMINGTON TRUST, NATIONAL ASSOCIATION NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE FOR MFRA TRUST 2015-1 and FAY SERVICING, LLC, | ) | |
| Counter-Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court conducted a bench trial on December 16 and 17, 2025. This matter stems from a 2007 mortgage loan that has been in default since 2014. After hearing testimony

and reviewing the exhibits, briefs, and post-trial submissions, the Court makes the following findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a).

## PROCEDURAL BACKGROUND[1]

On September 30, 2021, Wilmington Trust National Association Not in Its Individual Capacity but Solely as Trustee for MFRA Trust 2015-1 ("MFRA") filed a complaint ("Note Action") against the Defendants Melanie B. Howe and Henry W. Howe IV for: Breach of Note (Count I); Breach of Contract, Money Had and Received (Count II); Quantum Meruit (Count III); and Unjust Enrichment (Count IV). *See Note Action Compl.* (ECF No. 1). While Mr. Howe defaulted in the Note Action (ECF Nos. 18 & 19), Ms. Howe filed an answer, asserted affirmative defenses, and brought several counterclaims against MFRA and Fay Servicing, LLC ("Fay"). *See Note Action Answer* (ECF No. 8). Ms. Howe alleged both MFRA and Fay violated the Fair Debt Collection Practices Act ("FDCPA") and Fay violated Maine's "mortgage servicer duty of good faith" statute. *Id.* at 25–29. On September 5, 2023, Ms. Howe moved for partial summary judgment. *Mot. for Partial Summ. J.* (ECF No. 64). On December 18, 2024, the Court granted the motion as to Ms. Howe's FDCPA counterclaim against Fay. *Summ. J. Order* (ECF No. 88). MFRA filed a separate foreclosure action ("Foreclosure Action") against the Howes on October 21, 2024. *See Foreclosure Action Compl.* (Docket No. 2:24-cv-00354-NT, ECF No. 1).[2] In June 2025, Ms. Howe filed a consent motion to consolidate

[1] Given the five years of litigation and over 150 docket entries in this case, the Court limits this Order's procedural background to that which is relevant to final disposition.

[2] Unless otherwise noted, as is done here, all ECF references within this Order reflect filings at docket number 2:21-cv-00278-SDN.

the Note and Foreclosure Actions (ECF No. 96), which the Court granted in July 2025. (ECF No. 102).

## FINDINGS OF FACT

### I. The Parties and the Property

1. The mortgage loan concerns the property located at 334 Deerwander Road, Hollis Center, Maine 04042 (the "Property"). *Trial Ex. 3, Mortg.*

2. Plaintiff/counter-defendant MFRA is a National Association organized under United States law with its principal place of business in Wilmington, Delaware. *Note Action Compl.* ¶ 4.

3. Counter-defendant Fay operates as a loan servicing organization. *Bench Trial Tr. 1* at 21:8–13 (ECF No. 149).

4. Defendant/counter-plaintiff Melanie B. Howe resides in Maine. *Bench Trial Tr. 2* at 279 (ECF No. 150).

5. Defendant Henry W. Howe IV resides in Maine. *Note Action Compl.* at 2. On February 3, 2022, Mr. Howe conveyed his interest in the Property to Ms. Howe by quitclaim assignment. *Trial Ex. 25, Howe Quitclaim Assignment*. Following the transfer, MFRA withdrew its foreclosure claim against him. *Mot. to Dismiss Def. Henry W. Howe IV* (Docket No. 2:24-cv-00354-NT, ECF No. 13); *Order Granting Mot. to Dismiss Def. Henry W. Howe IV* (Docket No. 2:24-cv-00354-NT, ECF No. 16). However, Mr. Howe remained a party to the Note Action, and the Court entered a default against him on January 27, 2022. *Order Granting Entry of Default* (ECF No. 22).

6. The Foreclosure Action named two parties-in-interest, Asset Acceptance, LLC ("Asset Acceptance") and Credit Acceptance Corporation ("Credit Acceptance"). *Foreclosure Action Compl.* at 3. Asset Acceptance is a Delaware limited liability company

whose sole member is Encore Capital Group, Inc., based in San Diego, California. *Id.* Credit Acceptance is a Michigan corporation with a principal place of business in Southfield, Michigan. Neither party has appeared in this action. *Id.*

## II. 2007 Loan Origination to 2014 Default

7. On April 20, 2007, the Howes borrowed $208,000 from Challenge Financial Investors, Corp. ("Challenge") to purchase the Property (the "Loan"). *Trial Ex. 2, Note*. A promissory note (the "Note") evidences the loan. *Id.* Challenge endorsed the Note to CitiMortgage, Inc. ("CitiMortgage"), which subsequently endorsed it in blank. *Id.* To secure the Note, the Howes executed a mortgage on the Property (the "Mortgage"), which was recorded in the York County Registry of Deeds in Book 15139, Page 540. *Mortg*. The Mortgage named Mortgage Electronic Registration Systems, Inc. ("MERS") as the nominee for Challenge. *Id.*

8. On June 28, 2007, Challenge sold the Loan to the Federal National Mortgage Association ("FNMA"). *Trial Ex. 17, Decl. of Fannie Mae*.

9. Prior to 2009, the Howes fell behind on their monthly mortgage payments. *Bench Trial Tr. 1* at 37:14–16.

10. In 2010, Ms. Howe began experiencing medical issues that eventually led to her receiving Social Security disability benefits. *Trial Ex. 32, Howe Deposition* at 23:11–18.

11. On July 20, 2010, the Howes executed a loan modification agreement with CitiMortgage and MERS ("2010 Loan Modification"). *Trial Ex. 4, 2010 Loan Modification Agreement*. This agreement capitalized their arrears and established a step-rate interest schedule starting at 2.0%. *Id.*

12. On September 24, 2010, the Florida Secretary of State, Division of Corporations, administratively dissolved Challenge, listing it as an inactive corporation. *Trial Ex. 23, Fla. Action Compl.*

13. In November 2010, Nationstar Mortgage LLC ("Nationstar"), became the loan servicer and sent a welcome letter to the Howes. *Trial Ex. 5, Nationstar Welcome Letter*.

14. On July 21, 2011, the Howes executed a second loan modification agreement with Nationstar ("2011 Loan Modification"). *Trial Ex. 6, 2011 Loan Modification Agreement*. This agreement reduced the monthly payment and interest rate, capitalized additional arrears, and extended the loan's maturity date. *Id.*

15. On or about July 30, 2011, the Howes executed a compliance agreement with Nationstar, obligating them to cooperate with the lender to correct any clerical or typographical errors in the closing documents. *Trial Ex. 7, Compliance Agreement*.

16. On March 1, 2013, MERS, as nominee for Challenge, assigned its interest in the Mortgage to Nationstar and recorded in the York County Registry of Deeds in Book 16559, Page 45. *Trial Ex. 8, Corporate Assignment of Mortgage*.

17. In August 2014, the Howes executed a third loan modification agreement with Nationstar and MERS ("2014 Loan Modification"). *Trial Ex. 9, 2014 Loan Modification Agreement*. The 2014 Loan Modification capitalized arrears and split the balance into a $214,129.99 interest-bearing principal and a $23,199.73 deferred non-interest-bearing principal. It set the interest rate at 4.625%, extended the maturity to August 2054, and required monthly principal and interest payments of $979.92 beginning September 1, 2014. *Id.*

18. By signing the 2014 Loan Modification, the Howes agreed that failing to pay the full by the first of each month would constitute a default. *Id.* The agreement authorized the "Note Holder" to accelerate the debt—requiring immediate payment of the entire principal and interest—after providing written notice. *Id.*

19. MFRA's current calculation of the total amount due in this litigation uses the 2014 Loan Modification as its baseline. *Bench Trial Tr. 1* at 180:3–6.

20. The Howes made only one payment under the 2014 Loan Modification. *Id.* at 179:17–23.

21. The Howes defaulted on the Loan in October 2014. At that time, Nationstar was the Loan's servicer. *Id.* at 33:23–24.

22. On October 30, 2014, and again on August 13, 2015, Nationstar sent the Howes a "Notice of Default and Right to Cure." These letters specified the amount required to cure the default and warned that failure to pay could lead to acceleration and foreclosure.

23. On November 17, 2014, Fay entered into a Flow Servicing Agreement with MFRResidential Assets I, LLC, and other trusts. *Trial Ex. 10, Flow Servicing Agreement*. Under this agreement, Fay serves as the servicer for loans held by these entities. MFRA Trust 2015-1 joined this agreement on August 25, 2015. *Id.*

24. In March 2015, the Howes submitted a $1,000 payment. *Trial Ex. 38, J. Figures/Payment History*. Because this amount did not cover the total arrears, Nationstar placed the funds in a "suspense account"—a holding account used for partial payments that are insufficient to credit a full monthly installment. *Bench Trial Tr. 1* at 180:15. On June 10, 2015, Nationstar returned the $1,000 to the Howes. *J.*

*Figures/Payment History*. The Howes have made no payments since. *Bench Trial Tr. 1* at 179:25.

25. On December 22, 2016, FNMA sold the Mortgage to MTGLQ Investors, LP ("MTGLQ"). *Trial Ex. 14, Notice of Assignment*.

26. On January 17, 2017, Nationstar assigned its interest in the MTGLQ. *Trial Ex. 12, First Corporate Assignment of Mortgage*. Two days later, Nationstar inadvertently recorded a second assignment to MTGLQ. *Trial Ex. 13, Second Assignment of Mortgage*. Around this time, notice of the assignment was mailed to the Howes. *Notice of Assignment*.

27. Around March 2017, Selene Finance LP ("Selene") took over as the Loan's servicer and notified the Howes of the change by letter. *Trial Ex. 15, Selene Servicing Letter*.

**III. Prior Action in State Court**

28. In June 2017, MTGLQ filed an action in Maine Superior Court against Challenge, naming the Howes and others as parties-in-interest. *Trial Ex. 41, Prior State Action*.

29. The complaint in the Prior State Action, titled "Complaint for Declaratory Judgment," and asked the court to find that MTGLQ owned both the Note and Mortgage as of January 17, 2017. *Id.*

30. On September 12, 2017, MTGLQ assigned the Mortgage to MFRA. *Trial Ex. 20, Third Assignment of Mortgage*.

31. In December 2017, MGTLQ substituted MFRA as named plaintiff. *Prior State Action*.

32. The Maine Superior Court dismissed the Prior State Action with prejudice in February 2020. *Id.* MFRA moved to amend the judgment to specify that dismissal only precluded future actions "as to the claims advanced in" that suit. The court denied the motion as untimely but added that even "[i]f timely, the motion to amend judgment would be denied." *Id.*

**IV. Fay as Loan Servicer**

33. Fay Servicing LLC ("Fay"), a loan servicing company, began servicing the Mortgage on September 5, 2017. *Trial Ex. 18, Selene Finance Letter*. In this capacity, it collects payments, imposes fees, and performs other related servicing functions. *Id.* The Loan was in default when Fay began servicing it for MFRA.

34. During the transfer of servicing from Selene, Fay received the Mortgage's payment history and collateral file. *Trial Ex. 33, Michael Paterno Aug. 6, 2025 Deposition*. Through its standard "on-boarding" process, Fay incorporated those transferred records into its own business records for the Mortgage. *Id.*

35. From October 2019 through December 2021, Fay sent monthly mortgage statements to Ms. Howe warning her that she "may risk foreclosure" if she did not pay. *Trial Ex. 59* at p. 1143–44.

36. The mailings also contained the following notices: "[Fay] is a debt collector, and information you provide to us will be used for that purpose," and "You are late on your monthly payments. *Id.* Failure to bring the account current may result in additional fees or expenses, and in certain instances, you may risk foreclosure - the loss of your home." *Id.*

37. In addition, Fay mailed several letters to the Howes stating Fay had "a right to invoke foreclosure based on the terms of [their] mortgage contract." *Trial Ex. 48, Fay*

*Servicing Commc'ns* at p. 1391. These letters encouraged them to seek alternatives to foreclosure (e.g., refinancing, modifying terms, selling the property, or a deed-in-lieu of foreclosure) to avoid losing their home due to non-payment. *Id.*

**V. The Note, Foreclosure, and Florida Receivership Actions**

38. On September 30, 2021, MFRA filed its Note Action against the Howes in this Court. *Note Action Compl.*

39. In 2022, the Howes divorced. *Joint Statement of Fact* (ECF No. 138). In February of that year, Mr. Howe conveyed his rights and interests in the Property to Ms. Howe by quitclaim deed, which is recorded in the York County Registry of Deeds in Book 18944, Page 365. *Howe Quitclaim Assignment*.

40. On August 26, 2022, MFRA brought an action in state court in Florida, seeking declaratory relief and the appointment of a receiver for Challenge ("Florida Receivership Action"). *Fla. Action Compl.* Unlike the Prior State Action, this complaint did not name Ms. Howe; it named only MFRA and Challenge. *Id.*

41. In the Florida Receivership Action, MFRA represented that it could not foreclose under Maine law without obtaining a valid assignment of the Mortgage. *Id.*

42. Challenge did not answer and MFRA moved for and received an entry of default against Challenge. *Trial Ex. 28, Receivership Order*.

43. Following MFRA's January 18, 2023, Motion to Appoint Receiver for Challenge, the Florida court issued an order on February 3, 2023, appointing Paul Wersant, Esq. as the receiver for Challenge ("Receivership Order"). *Id.* As relevant to the pending foreclosure, the Receivership Order empowers and authorizes the receiver "to execute any documents on behalf of [MFRA], including but not limited to any Assignments of Mortgages." *Id.*

44. Receiver Wersant executed the quitclaim assignment of the Mortgage from Challenge to MFRA on February 21, 2023. *Trial Ex. 29, Quitclaim Assignment*.

45. On April 12, 2023, Doonan, Graves & Longoria, LLC—acting on behalf of Fay and MFRA regarding the Loan—sent a Notice of Mortgagor's Right to Cure to the Howes on Fay's behalf.

46. On August 5, 2024, Doonan, Graves & Longoria, LLC, sent a second Notice of Mortgagor's Right to Cure. *Trial Ex. 35, Notice of Right to Cure*. This notice demanded $165,537.78 to reinstate the loan and itemized principal, interest, escrow, mortgage insurance, property inspection fees, and late charges. *Id.*

47. Asserting that it was the legal owner of the Mortgage with standing to sue, MFRA filed its Foreclosure Action with this Court on October 21, 2024. *Foreclosure Action Compl.*

48. At the time of the filing, the Howes were not on active duty with the United States Military. *Id.* ¶ 54.

49. The parties completed mediation via the Maine Foreclosure Diversion Program. *Joint Statement of Fact*.

## CONCLUSIONS OF LAW

### I. Statute of Limitations

The Court first resolves Ms. Howe's statute of limitations defense, asserted in both the Foreclosure and Note Actions. Ms. Howe contends the six-year statute of limitations period bars all MFRA's claims in both Actions, citing 14 M.R.S. § 752, Maine's general civil limitations statute, and 32 M.R.S. § 11013, the limitations provision for collection actions under the Maine Fair Debt Collection Practices Act ("MFDCPA"). MFRA asserts Ms. Howe waived this affirmative defense by failing to plead it, and Ms. Howe counters

that MFRA impliedly consented to litigating the defense under Federal Rule of Civil Procedure 15(b)(2) because it did not object to her raising the statute of limitations in her pre-trial brief and because MFRA engaged with the issue at trial.

Under Federal Rule of Civil Procedure 8(c), a party waives an affirmative defense that it does not properly plead. Fed. R. Civ. P. 8(c); *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 58 (1st Cir. 2012) ("The law is clear that if an affirmative defense is not pleaded pursuant to [Rule 8(c)'s] requirements, it is waived."); *Schindler v. Nilsen*, 2001 ME 58, ¶ 17 n.7, 770 A.2d 638 ("A statute of limitations defense is an affirmative defense which is not preserved unless asserted in a timely manner."). This rule is not absolute: when the parties try an unpleaded affirmative defense by implied consent, the court must treat the defense as if the defendant had raised it in a responsive pleading. *Conjugal P'ship v. Conjugal P'ship*, 22 F.3d 391, 400 (1st Cir. 1994); *see* Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."). A party can provide implied consent to an unpleaded affirmative defense in two ways: (1) by treating it as if it were pleaded, either by engaging the issue on the merits or by silently acquiescing; or (2) by allowing the introduction of evidence that is relevant only to that affirmative defense. *García v. State Ins. Fund Corp.*, 169 F.4th 13, 22 (1st Cir. 2026); *see Conjugal P'ship*, 22 F.3d at 400.

The pleadings show that Ms. Howe invoked a generic statute of limitations defense in her answer to the Note Action complaint but only as to quantum meruit (Count III) and unjust enrichment (Count IV). *See Note Action Answer* at 7. She did not plead any statute of limitations defense in the Foreclosure Action. *See Foreclosure Action Answer* at 6–7 (Docket No. 2:24-cv-00354-NT, ECF No. 14). In her Note Action counterclaims,

Ms. Howe alleged quantum meruit and unjust enrichment were time-barred because MFRA brought them outside the six-year limitations period, but she referred to "Maine law" and did not identify whether she relied on § 752 or the MFDCPA for this assertion. *See Note Action Answer* at 22. MFRA, in responding to those counterclaims, accepted that a six-year limitations period applies to both quantum meruit and unjust enrichment claims but disputed that either was time-barred. *Counterclaims Resp.* ¶¶ 45, 46 (ECF No. 30). In her pre-trial brief, Ms. Howe cited a six-year limitations period under both § 752 and the MFDCPA as to unjust enrichment but only briefly referenced the remaining counts in connection to the MFDCPA. *See Howe Pre-Trial Brief* at 4 (ECF No. 135) (discussing unjust enrichment and noting the MFDCPA "sets the statute of limitations on a 'collection action' to six years after the date of the consumers last activity on the debt" and asserting all MFRA's Note Action claims qualify as "collection actions" under the MFDCPA).

Even if the passing references, considered alone, did not sufficiently establish that MFRA "understood . . . the evidence was aimed at an unpleaded" MFDCPA limitations defense, *In re Fustolo*, 896 F.3d 76, 84 (1st Cir. 2018) (quotation modified), MFRA's post-trial brief directly addressed that defense. MFRA characterized as "unavailing" Ms. Howe's argument that the Note and Mortgage were unenforceable if the Court applied the six-year statute of limitations for consumer debt lacking an explicit limitations period and not executed under seal. *MFRA Proposed Findings of Fact* at 33 (ECF No. 154). MFRA's response shows it understood—and chose to contest on the merits—the timeliness theory Ms. Howe advanced. That response suffices to establish implied consent under Rule 15(b)(2). The Court therefore treats the six-year MFDCPA limitations defense preserved as to breach of note (Count I), money had and received (Count II), quantum meruit

(Counts III), and unjust enrichment (Count IV). The Court also treats the six-year statute of limitations defense under § 752 preserved as to quantum meruit (Count III) and unjust enrichment (Count IV). Ms. Howe preserved no limitations defense, under either statute, in the Foreclosure Action.

The Court next considers whether MFRA's trial conduct broadened the scope of its implied consent. Specifically, the Court considers whether its conduct permitted Ms. Howe to assert the MFDCPA limitations defense as to foreclosure and sale, or the § 752 defense as to breach of note, money had and received, or foreclosure and sale. Ms. Howe asserts MFRA impliedly consented to litigate the MFDCPA's six-year limitations period more broadly because: (1) she identified the six-year limitations issue in her opening statement without objection; (2) MFRA agreed that its status as a "debt collector" presented "an issue of law" for the Court to decide; and (3) Ms. Howe elicited extensive, unobjected-to testimony on whether MFRA qualifies as a debt collector under the MFDCPA. *Howe Proposed Findings of Fact, Brief* at 5 n.5 (ECF No. 156).

The trial record she cites, however, does not support that contention. The testimony on which Ms. Howe relies concerns whether MFRA qualifies as a "debt collector" under the MFDCPA, not on the statute's limitations period.[3] Ms. Howe's counsel mentioned the limitations period only once and only in connection with the debt-collector definition: "some of the defenses depend on what [the Defendants] did, at least as far as whether each is a debt collector under the [MFDCPA]. They could both be a debt collector, and that could have implications through the statute of limitations, at least

---

[3] Specifically, MFRA's counsel stated: "We understand that Fay is a debt collector. That's not an issue. But the law, I would argue, is clear that [MFRA] is not a debt collector. And that's an issue of law for Your Honor to decide, not an issue of fact that has relevant testimony to it." *Bench Trial Tr. 1* at 16:9–13.

under our theory." *Bench Trial Tr. 1* at 9:4–9. This isolated, undeveloped remark did not expand MFRA's consent to litigate an MFDCPA defense in the Foreclosure Action. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Nor did MFRA's agreement that its debt-collector status presented "an issue of law" coupled with the testimony concerning the statutory definition of "debt collector" broaden its consent. *See Bench Trial Tr. 1* at 16:9–13. MFRA never invoked the MFDCPA's limitations period at trial. Moreover, MFRA's status as a debt collector bore directly on Ms. Howe's separate federal FDCPA claims; the related testimony was therefore not uniquely relevant to an MFDCPA limitations defense. Because MFRA "did not introduce any evidence that was relevant *only* to a claim under" the MFDCPA—let alone evidence relevant solely to the limitations defense concerning foreclosure and sale—MFRA's trial conduct did not establish implied consent to litigate that defense in the Foreclosure Action. *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1173 (1st Cir. 1995) (emphasis in original); *see García*, 169 F.4th at 22. For the same reason, MFRA's conduct at trial did not expand its consent to litigate the § 752 defense beyond the quantum meruit and unjust enrichment claims. In short, MFRA impliedly consented only to the limitations defenses Ms. Howe preserved in the Note Action; that consent did not extend to the Foreclosure Action.

Having concluded that MFRA impliedly consented to litigate the timeliness defenses preserved in the Note Action, the Court turns to MFRA's alternative argument that 14 M.R.S. § 751 supplies the governing twenty-year limitations period, rather than the six-year periods under the MFDCPA or § 752. MFRA argues that because the legislature enacted the MFDCPA's six-year limitations period in 2015, the provision

cannot bar claims arising from a loan and mortgage executed in 2007, when § 751 imposed a twenty-year limitations period. MFRA further maintains the MFDCPA's six-year limitations provision operates only prospectively and does not reach back to existing loans. Ms. Howe counters by arguing that the MFDCPA, as a specific consumer-protection statute, takes precedence over the more general limitations statute in § 751 and MFRA acquired no vested right to a twenty-year limitations period merely because the Howes executed the Loan and Mortgage in 2007. For the reasons set forth below, the Court agrees with MFRA: the MFDCPA's six-year limitations period does not apply retroactively to the Howe Loan and Mortgage.

In Maine, civil actions are subject to a six-year limitations period, "except as otherwise specially provided." 14 M.R.S. § 752. One exception is found in § 751, which creates a twenty-year statute of limitations for "personal actions on contracts or liabilities under seal, promissory notes signed in the presence of an attesting witness, or on the bills, notes or other evidences of debt issued by a bank." *Id.* § 751. Another exception, the MFDCPA, prohibits a debt collector from commencing "a collection action more than [six] years after the date of the consumer's last activity on the debt." 32 M.R.S. § 11013(8). A law in effect at the time of a contract's execution generally is incorporated into that contract. *Portland Sav. Bank v. Landry*, 372 A.2d 573, 575 (Me. 1977). Both § 751 and § 752 were in effect when the Howes executed the Loan and Mortgage in 2007, while the MFDCPA's limitations period was not enacted until 2015. Still, a legislatively enacted statute can apply retroactively if: (1) the legislature expressly states its intent for retroactive application of the statute; and (2) retroactive application does not violate the Maine Constitution. *Black v. Bureau of Parks & Lands*, 2022 ME 58, ¶ 34, 288 A.3d 346.

Neither condition is met here. The text of the MFDCPA does not suggest retroactive application; nothing in the statute expresses a clear legislative intent that the six-year limitations period apply to preexisting debts or contracts. As such, the presumption under Maine law that statutes operate prospectively absent a clear legislative statement to the contrary controls. *See Miller v. Fallon*, 134 Me. 145, 148, 183 A. 416 (1936). That is not, however, the only relevant presumption. Maine's highest court also presumes that "procedural or remedial enactments . . . apply retroactively and that statutes affecting substantive rights . . . apply only prospectively." *Sinclair v. Sinclair*, 654 A.2d 438, 439 (Me. 1995). Because of the "elusive distinction between substance and procedure," the Law Court employs a legislative-purpose inquiry to determine whether a newly enacted statute of limitations period should apply retroactively or prospectively. *Id.* at 439–440.

In *Sinclair v. Sinclair*, the Law Court applied a legislative-purpose analysis to permit retroactive application of a limited procedural requirement in the mortgage-foreclosure context. *Id.* The statute at issue, 14 M.R.S.A. § 6111, required mortgagees to provide a right-to-cure notice before foreclosure. *Id.* at 438. The Court held that because the notice requirement "introduced [only] a minimum delay in the process of protecting the mortgagees' interest," it did not substantially impair the mortgagees' rights and was reasonable in light of the "significant and legitimate public purpose" it served—preventing "the unnecessary loss of a mortgagor's home." *Id.* at 440. In reaching that result, the Court reiterated that any retroactive application must remain consistent with constitutional principles and must not impair existing rights or contracts. *Id.*

Applying that framework here, two considerations favor prospective-only application of the MFDCPA's six-year limitations period. First, nothing in the record suggests that applying the MFDCPA prospectively would frustrate any identifiable

legislative purpose. This case materially differs from *Sinclair*: there, prospective-only application would have left existing mortgagors without the right-to-cure notice the legislature created specifically "to prevent the unnecessary loss of a mortgagor's home," *id.*, thereby undermining the very purpose for which the legislature enacted § 6111. Here, by contrast, the record contains no indication that the legislature adopted the MFDCPA's six-year limitations period to address an urgent problem of stale debt collection on pre-2015 loans, or that prospective application would leave any class of borrowers unprotected from a harm the statute specifically targeted. Absent such evidence, the Court has no basis to conclude that prospective application frustrates the MFDCPA's purpose in the way that prospective-only application would have frustrated § 6111's purpose in *Sinclair*.

Second, retroactive application of the MFDCPA would not merely impose the kind of minimal procedural delay tolerated in *Sinclair*; it would substantively shorten the governing limitations period from twenty years to six. That distinction matters. Section 6111 imposed only a brief, fixed delay before foreclosure could proceed, leaving the mortgagee's underlying enforcement rights intact. Retroactively applying the MFDCPA here would extinguish fourteen years of MFRA's enforcement window outright, impairing a substantive right rather than imposing an incidental procedural burden.

Ms. Howe contends this reduction would not impair MFRA's rights because MFRA has no vested interest in a longer limitations period, relying on *Dupuis v. Roman Catholic Bishop of Portland*. 2025 ME 6, 331 A.3d 294. But *Dupuis* does not endorse retroactively shortening an unexpired limitations period; it holds that "[o]nce a statute of limitations has expired for a claim, a right to be free of that claim has vested, and the claim cannot be revived." *Id.* ¶ 56, 331 A.3d 294. *Dupuis* thus addressed the opposite scenario, and the

Law Court has long distinguished between statutes that enlarge a limitations period and those that shorten it. *See Dobson v. Quinn Freight Lines, Inc.*, 415 A.2d 814, 817 (Me. 1980). Accordingly, *Dupuis* offers little guidance on whether the Legislature may retroactively shorten an unexpired limitations period. Rather, *Miller v. Fallon* provides the closer analogue. 134 Me. 145, 183 A. 416 (1936). In *Miller*, the Court held a statute that shortened the limitations period for medical malpractice claims from six years to two applied only prospectively because the statute contained no "legislative intent to the contrary." *Id.* at 151, 183 A. at 417. The MFDCPA likewise contains no indication that the Legislature intended to apply the limitations period retroactively. And, as in *Miller*, the Legislature here provided no "grace period" to afford a reasonable time to bring existing claims before the new, shorter limitations period would bar them. *See Me. Med. Ctr. v. Cote*, 577 A.2d 1173, 1178 (Me. 1990) (distinguishing *Miller* from a statute that included a two-year grace period). In these circumstances, Maine's presumptions against retroactivity and its distinction between procedural and substantive changes point in the same direction: the MFDCPA's six-year limitations period applies only prospectively and does not retroactively shorten the twenty-year period that governed the Howe Loan and Mortgage.

Because the MFDCPA applies only prospectively here, its six-year limitations period does not govern MFRA's claims in the Note Action. The only limitations defense that remains available to Ms. Howe is 14 M.R.S. § 752, which the Court already determined applies only to quantum meruit and unjust enrichment.

Having concluded that Ms. Howe may raise a statute of limitations defense as to quantum meruit and unjust enrichment, the Court considers whether those claims are time-barred. The parties agree that the cause of action accrued with the 2014 default,

which occurred more than six years before MFRA filed the Note Action on September 30, 2021. Consequently, both claims are time-barred. *See* 14 M.R.S. § 752 ("All civil actions shall be commenced within [six] years after the cause of action accrues . . ."). The Court therefore enters judgment in Ms. Howe's favor on Counts III and IV.

## II. MFRA's Foreclosure Action

Foreclosure in Maine is a "creature of statute" and a party seeking a foreclosure must strictly comply with statutory requirements.[4] *Bank of Am., N.A. v. Greenleaf*, 2014 ME 89, ¶¶ 8–9, 18, 96 A.3d 700; *see* 14 M.R.S. §§ 6101–6327. Maine law requires a plaintiff to prove eight statutory elements to foreclose on real property:

> (1) "the existence of the mortgage, including the book and page number of the mortgage, and an adequate description of the mortgaged premises, including the street address, if any";
>
> (2) "properly presented proof of ownership of the mortgage note and [evidence of the mortgage note and] the mortgage, including all assignments and endorsements of the note and the mortgage";
>
> (3) "a breach of condition in the mortgage";
>
> (4) "the amount due on the mortgage note, including any reasonable attorney fees and court costs";
>
> (5) "the order of priority and any amounts that may be due to other parties in interest, including any public utility easements";
>
> (6) "evidence of properly served notice of default and mortgagor's right to cure in compliance with statutory requirements [of 14 M.R.S. § 1611]";
>
> (7) "after January 1, 2010, proof of completed mediation (or waiver or default of mediation), when required, pursuant to the statewide foreclosure mediation program rules"; and
>
> (8) "if the homeowner has not appeared in the proceeding, a statement, with a supporting affidavit, of whether or not the defendant is in military service in accordance with the Servicemembers Civil Relief Act."

---

[4] When sitting in diversity, federal courts apply the substantive law of the forum state. *See Doe v. Missionary Oblates of Mary Immaculate E. Province*, 761 F. Supp. 3d 218, 222 (D. Me. 2025).

*Greenleaf*, 2014 ME 89, ¶ 18, 96 A.3d 700 (citing *Chase Home Fin. LLC v. Higgins,* 2009 ME 136, ¶ 11, 985 A.2d 508).

Ms. Howe disputes three of these elements. She contends: (1) MFRA lacks standing because it failed to establish itself as the holder of the Note and Mortgage; (2) MFRA has not properly established the amount due because MFRA bases its judgment figure on the 2014 Modification Agreement, which she alleges is void; and (3) the notice of default fails to comply with 14 M.R.S. § 1611.

**A. Standing**

Because standing is the threshold inquiry, the Court begins there. *See Franklin Prop. Tr. v. Foresite, Inc.*, 438 A.2d 218, 220 (Me. 1981); *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To have standing to foreclose under Maine law, a plaintiff must have the requisite legal interest in both the promissory note and the mortgage. *Greenleaf*, 2014 ME 89, ¶ 9, 96 A.3d 700; *see* 14 M.R.S. § 6321. The Maine Uniform Commercial Code ("UCC") governs the enforceability of a note. *Greenleaf*, 2014 ME 89, ¶ 10, 96 A.3d 700. Because a note is a negotiable instrument, a plaintiff that "merely holds or possesses—but does not necessarily own—the note satisfies the note portion of the standing analysis." *Id.* ¶ 12, 96 A.3d 700. A mortgage, by contrast, is not a negotiable instrument, and the mortgage portion of the standing analysis requires the plaintiff to establish ownership of the mortgage under 14 M.R.S. § 6321. *Id.* Accordingly, to establish standing, the plaintiff must prove its requisite interest in both the note and the mortgage. If the plaintiff fails to establish the requisite interest in either, it lacks standing to foreclose. *See id.* ¶ 17, 96 A.3d 700.

The parties do not dispute that MFRA, which possesses the Note endorsed in blank, is the Note's present holder and has the authority to enforce it. *See id.* ¶ 10, 96 A.3d 700 (under Maine law, a party may enforce a note if "if it is the 'holder' of the note, that is, if it is in possession of the original note that is indorsed in blank"); 11 M.R.S. § 1-1201(21)(a) (defining "holder" to include the "person in possession of a negotiable instrument that is payable . . . to bearer"). Because MFRA possesses the power to enforce the Note, its standing to foreclose hinges on whether it can demonstrate ownership of the Mortgage under § 6321. *See Greenleaf*, 2014 ME 89, ¶ 12, 96 A.3d 700.

In 2007, the Howes executed the Note in favor of Challenge and secured it with a Mortgage listing MERS as Challenge's nominee. The Mortgage was subsequently assigned three times—from MERS (as Challenge's nominee) to Nationstar, from Nationstar to MTGLQ, and from MTGLQ to MFRA. Because the initial assignment from MERS to Nationstar did not transfer substantive legal rights in the mortgage, to prove ownership, MFRA must produce a valid chain of assignments leading back to the original mortgagee (Challenge). *See id.* ¶¶ 16–17, 96 A.3d 700; *Taitt v. Select Portfolio Servicing, Inc.*, No. 25-cv-00008, 2025 WL 2030197, at *5 (D. Me. July 21, 2025) (party demonstrates ownership of a mortgage by showing it is either the mortgagee or legally possesses the mortgage through a valid chain of assignments from the original mortgagee).

MFRA contends it lawfully owns the Mortgage in one of two ways. First, it argues Challenge's quitclaim assignment, which a Florida receiver executed in MFRA's favor in 2023, validly transferred Challenge's interest in the Mortgage to MFRA. Alternatively, it argues the loan modification agreements ratified MFRA's interest because, in those agreements, the Howes purportedly acknowledged MFRA (or its predecessor) as the lender with the authority to enforce the loan.

This case presents a question that the Law Court has not yet squarely resolved: whether, and how, a foreclosing plaintiff may cure standing defects arising from a defective MERS assignment when the original lender is defunct and unwilling to assign its original rights to the party seeking foreclosure. *See U.S. Bank N.A. v. Gordon*, 2020 ME 33, ¶ 28 n.4, 227 A.3d 577 (Horton, J. concurring) (questioning how, after the Law Court rejected the equitable trust doctrine's application to mortgages, "the owner of the mortgage note can obtain legal title to the mortgage if the holder of legal title either refuses or is unable to transfer title"). Absent controlling authority from Maine's highest court, this Court must make an "informed prophecy" as to how the Law Court would decide the issue. *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018) (quoting *Sanders v. Phoenix Ins. Co.*, 843 F.3d 37, 42 (1st Cir. 2016)). In doing so, it may consider analogous decisions, dicta, scholarly commentary, and other reliable indicators of how the Law Court would resolve the question. *Id.*

*Quitclaim Assignment*

To establish ownership of the Mortgage, MFRA first relies on the quitclaim assignment that Challenge's court-appointed receiver executed in MFRA's favor in 2023 following the Florida Receivership Action. MFRA contends this quitclaim assignment cured the *Greenleaf* defect by conveying and assigning "all of [Challenge's] rights, title and interest (whatever they may be, if any) in the Mortgage" to MFRA. Ms. Howe disputes that MFRA can rely on this assignment to establish standing.

The quitclaim assignment sits at the intersection of Maine property law and Florida corporate and property law. Corporations exist by virtue of state law, and "state courts retain the traditional equitable authority to appoint receivers for insolvent corporations." *In re Whittaker Clark & Daniels Inc*, 176 F.4th 241, 256 (3d Cir. 2026). At

the same time, the law of the situs—the law of the state in which the property sits—governs real property rights, including the method for foreclosing on a home. *Harbor Funding Corp. v. Kavanagh*, 666 A.2d 498, 500 (Me. 1995). As discussed above, Maine law controls the process for foreclosing on the Property. With these principles in mind, the Court considers the Florida Receivership Action and its significance for this Maine foreclosure.

MFRA argues the Court must recognize the Florida receivership under the Full Faith and Credit Clause. *MFRA Fla. Receivership Br. Resp.* at 2 (ECF No. 127); *see* U.S. Const. art. IV, § 1 ("Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state."). On that premise, MFRA contends the Court must give effect to the Florida court's appointment of a receiver and to the receiver's subsequent quitclaim assignment transferring Challenge's legal interest in the Mortgage to MFRA. MFRA further relies on Florida law, which provides that a dissolved corporation continues to exist for the limited purpose of winding up and liquidating its business and affairs, including disposing of property. Fla. Stat. § 607.1405. And, as the Law Court confirmed in *Carrington Mortg. Servs., LLC v. Brisley*, Florida's § 607.1405(1) permits a dissolved corporation to wind up its affairs by executing a quitclaim assignment of a mortgage encumbering real property in Maine. No. ARO-23-79, 2023 WL 11988399, at *1 (Me. Oct. 17, 2023).

Even so, Ms. Howe disputes MFRA's reliance on the Florida Receivership Action to cure the defective assignment. In her view, MFRA improperly invoked the "mortgage-follows-the-note" theory—which Maine law explicitly rejects—to establish the receiver's authority to transfer Challenge's legal interest in the Mortgage to MFRA. The Law Court's recent decision in *Wilmington v. Cortellino* is instructive. *See Wilmington Sav. Fund*

*Soc'y, FSB as Tr. for Brougham Fund I Tr. v. Cortellino*, 2026 ME 49, 358 A.3d 1124. *Cortellino* involved a dissolved corporation; an out-of-state receivership established after a motion that similarly invoked a "mortgage-follows-the-note" theory; and a subsequent quitclaim assignment executed pursuant to that receivership. *Id.* ¶¶ 2–5, 358 A.3d 1124. The Law Court affirmed the plaintiff's mortgage ownership because the receiver acted within the scope of the authority conferred by the receivership order. The resulting assignment was therefore enforceable and preserved an unbroken chain of title from the original lender to the mortgagee. *See id.* ¶ 7, 358 A.3d 1124. And while *Cortellino* concerned a corporation dissolved following bankruptcy, the Law Court centered the discussion, not on the circumstances of the dissolution, but on whether the dissolved corporation retained legal rights in the mortgage sufficient to effectively convey them to the plaintiff.

Still, Ms. Howe attempts to distinguish *Cortellino*. She argues that, unlike the Delaware statute at issue there, the Florida statutes underlying the Florida Receivership Action required the joinder of third parties, including the mortgagor. *Howe Cortellino Supp'l Brief* at 2–4 (ECF No. 165). In particular, she maintains that MFRA's failure to join her in an action that pleaded a claim under Florida's Declaratory Judgment Act rendered the Florida Receivership Action defective and deprived the receiver of authority to convey Challenge's interest in the Mortgage.

MFRA asserted two counts in the Florida Receivership Action: one seeking appointment of a receiver under Fla. Stat. § 607.1432, and the other for declaratory relief under Florida's Declaratory Judgment Act, Fla. Stat. § 86.091. *See Trial Ex. 23, Florida*

*Complaint*. Attorney Adam Diaz[5] testified that MFRA ultimately did not pursue the declaratory relief count because it was "essentially an alternative" to the receivership count. *Bench Trial Tr. 1* at 145:22–146:4. The Florida court did not enter declaratory relief. Instead, it appointed a receiver for Challenge and authorized the receiver to execute a quitclaim assignment conveying Challenge's interest in the Mortgage to MFRA.

Section 86.091 provides, in relevant part, that when declaratory relief is sought, persons claiming an interest that would be affected by the declaration "*may* be made parties." Fla. Stat. § 86.091 (emphasis added). Florida Courts have treated that language as permissive rather than mandatory. *See, e.g.*, *Century-Nat'l Ins. Co. v. Frantz*, 369 So. 3d 739, 744 (Fla. Dist. Ct. App. 2023) ("In describing proper parties, [§ 86.091] uses the word 'may,' which is permissive."). The statute separately provides that "[n]o declaration shall prejudice the rights of persons not parties to the proceedings." Fla. Stat. § 86.091. These provisions work together: the statute does not require every person whose interests might be affected to join the action, and it protects those who are not parties from a declaration affecting their rights. *See Century-Nat'l Ins. Co.*, 369 So. 3d at 744 ("By contrast, [§ 86.091] uses the mandatory term 'shall' in prohibiting prejudice to nonparties. Thus the plain language of the first sentence broadly permits but does not require all persons having or claiming an interest in the declaration to be parties. And the second sentence expressly contemplates the existence of persons who are not parties to the declaratory proceedings yet whose rights are implicated therein." (quotation modified)); *Indep. Fire Ins. v. Paulekas*, 633 So. 2d 1111, 1113 (Fla. 3d DCA 1994). Thus,

[5] Attorney Diaz is a partner at a law firm in Florida whom MFRA retained to assist with obtaining the Mortgage from Challenge. *Bench Trial Tr. 1* at 111:7–15. He prepared and filed the complaint in the Florida Receivership Action.

MFRA's decision to plead declaratory relief in the alternative did not itself require Ms. Howe's joinder or strip the Florida court of authority to grant the separate receivership. More fundamentally, the Florida court never adjudicated the declaratory relief count or entered a declaration affecting Ms. Howe's rights.

Ms. Howe separately argues that MFRA should not have proceeded ex parte because the receivership statue requires a hearing after notice to "all parties to the proceeding and any interested persons designated by the court." Fla. Stat. § 607.1432(1). The Florida court nonetheless permitted MFRA to proceed ex parte. Ms. Howe contends she was an interested person entitled to notice and the lack of notice rendered the receivership defective. Even assuming Ms. Howe was entitled to notice, however, the record does not show that the Florida Receivership Action adjudicated her rights, determined the validity or priority of any interest she may have held, or entered an order purporting to bind her. The Florida court instead found that "the appointment of a receiver is proper and necessary for [MFRA] to enforce its lien in Maine." *Trial Ex. 28, Order Granting Receivership*. The court then authorized the receiver to act for Challenge, and the receiver exercised that authority by executing the quitclaim assignment. In other words, the receivership order addressed Challenge's capacity to convey its own remaining interest in the Mortgage; it did not purport to resolve Ms. Howe's rights in the Mortgage or the Property. On this record, the asserted notice defect does not show that the receiver acted outside the authority the Florida court conferred.

The Florida Receivership Action therefore differs materially from the Prior State Action in Maine state court. In the Prior State Action, MFRA asked the Maine court to "confirm transfer of the Mortgage and its ownership rights" to MFRA through a *nunc pro tunc* order that would "effective[ly] reaffirm . . . the assignment to MERS." The Florida

court made no comparable determination in the Florida Receivership Action; it appointed a receiver for Challenge, and the receiver conveyed to MFRA whatever interest Challenge retained in the Mortgage.

The Court therefore need not decide whether Ms. Howe would have been entitled to notice had the Florida court proceeded on the declaratory relief count. It did not do so. Nor did MFRA's decision to plead declaratory relief in the alternative transform the receivership proceeding into an adjudication of Ms. Howe's underlying rights. The relevant inquiry is what the Florida court actually ordered; it appointed a receiver for Challenge; it did not issue a declaration concerning Ms. Howe's rights. Ms. Howe has therefore not shown that her non-joinder deprived the receiver of authority to execute the quitclaim assignment.

The Court next considers whether the receiver's assignment validly conveyed Challenge's interest in the Mortgage to MFRA. No separate bad-faith issue remains for decision: Ms. Howe's objections challenge the validity and effect of the Florida receivership and the receiver's authority, and the Court has concluded that the receiver acted within the authority granted by the Florida court. The remaining question is whether that authorized quitclaim assignment cured the defect in the prior MERS assignment by transferring Challenge's residual legal interest in the Mortgage.

Maine state and federal decisions recognize that a later quitclaim assignment from the entity holding the mortgage's legal interest can cure a prior defective MERS assignment, provided the record establishes a continuous chain of title to the mortgage. *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Lowell*, 2017 ME 32, ¶ 2 n.2, 156 A.3d 727 (recognizing mortgage ownership where a MERS assignment was followed by a subsequent quitclaim assignment from the mortgage holder and observing that, in light

of the quitclaim assignment, the plaintiff's standing to pursue foreclosure was not at issue); *Fed. Nat'l Mortg. Ass'n v. Quinn*, No. 19-cv-00097, 2019 WL 6684489, at *2 (D. Me. Dec. 6, 2019) (concluding that, although MERS as nominee for the original lender invalidly assigned the mortgage, a subsequent quitclaim assignment by the original lender conveying its mortgage rights resolved the defect and conferred enforceable ownership); *U.S. Bank Tr. Nat'l Ass'n v. Gauthier*, No. 23-cv-00380, 2024 WL 1953624, at *2 (D. Me. May 3, 2024), *report and recommendation adopted sub nom. U.S. Bank Tr. Nat'l Ass'n as Tr. of Bravo Residential Funding Tr. 2021-C v. Gauthier*, 2024 WL 4825780 (D. Me. Nov. 19, 2024) (concluding that the original lender's quitclaim assignment of "any and all rights it may have under the Mortgage" cured the prior *Greenleaf* defect and conveyed a " now-full bundle of rights").

Here, the record permits the Court to trace the chain of title to the Mortgage from Challenge through MERS to MFRA. Although Challenge's assignment to MERS was defective, the 2023 quitclaim assignment transferred to MFRA whatever legal interest Challenge retained in the Mortgage, thereby supplying MFRA with the "now-full bundle of rights." *Gauthier*, 2024 WL 1953624, at *2.

Accordingly, the Court finds that the 2023 quitclaim assignment validly conveyed ownership of the Mortgage to MFRA.[6] Because MFRA has demonstrated the requisite legal interest in both the Note and Mortgage, it has standing to foreclose on the Property.

[6] Because the Court concludes the quitclaim assignment establishes MFRA's Mortgage ownership sufficient to confer foreclosure standing, it need not address MFRA's alternative argument that the 2010, 2011, and 2014 Loan Modifications independently establish that interest.

### B. Notice of Default and Mortgagor's Right to Cure

Having determined that MFRA has standing to foreclose, the Court next examines whether MFRA's notice of default and mortgagor's right to cure strictly complied with the requirements of 14 M.R.S. § 6111.[7] As relevant, the written notice must include an "itemization of all past due amounts causing the loan to be in default and the total amount due to cure the default." 14 M.R.S. § 6111(1-A)(B). Ms. Howe argues MFRA did not establish "the amount due on the mortgage note" as statutorily required. She contends Nationstar and MERS lacked authority to modify the Note at the time the Howes executed the 2014 Modification Agreement, which increased the principal balance of the Loan. Because the judgment figure rests on the principal balance from that allegedly invalid modification, Ms. Howe asserts that MFRA has not proven the exact amount due on the Note.

The Howes entered into three loan modification agreements: the first in 2010, the second in 2011, and the third in 2014. In determining the amount due under § 6111, the Court interprets the unambiguous provisions of these three agreements according to their plain meaning. *Camden Nat'l Bank v. Steamship Navigation Co.*, 2010 ME 29, ¶ 16, 991 A.2d 800. In 2010, the Howes entered a loan modification between themselves as "Borrower" and CitiMortgage as "Lender." *See 2010 Loan Modification Agreement*. The Mortgage defines "Lender" to "include any Person who takes ownership of the Note and [Mortgage]." *See Mortg*. When CitiMortgage executed the 2010 Loan Modification with

[7] The notice provision of 14 M.R.S. § 6111 applies "to mortgages upon residential property . . . when the mortgagor is occupying all or a portion of the property as the mortgagor's primary residence and the mortgage secures a loan for personal, family or household use." 14 M.R.S. § 6111(1). In those cases, "the mortgagee may not accelerate maturity of the unpaid balance of the obligation or otherwise enforce the mortgage because of a default . . . until at least 35 days after the date that written notice . . . is given by the mortgagee to the mortgagor." *Id.*

the Howes, it was neither the Note holder nor the Mortgage owner. In 2010, FNMA held the Note, *Decl. of Fannie Mae*, and the Mortgage was still with Challenge because MERS "cannot assign either a note or mortgage," thus the "the assignment of the mortgage to [CitiMortgage] was invalid," *Quinn*, 2019 WL 6684489, at *3; *see Greenleaf*, 2014 ME 89, ¶¶ 16-17, 96 A.3d 700. CitiMortgage therefore lacked authority to enter the 2010 Loan Modification with the Howes.

The same defect infects the 2011 and 2014 loan modifications. Both the 2011 and 2014 Loan Modifications are between Nationstar as "Lender" and the Howes as "Borrower." *Compare 2010 Loan Modification Agreement, with 2011 Loan Modification Agreement, and 2014 Loan Modification Agreement*. During this time, FNMA still held the Note and Nationstar lacked sufficient legal interest in or authority under the Mortgage to modify it. *See Greenleaf*, 2014 ME 89, ¶¶ 16-17, 96 A.3d 700.

The remaining question is whether ordinary contract law principles can salvage these otherwise invalid agreements. *See Kondaur Cap. Corp. v. Hankins*, 2011 ME 82, ¶ 20, 25 A.3d 960 (determining a loan modification was invalid and querying "how that invalidity affects the amounts due on the mortgage or, perhaps, whether that invalidity was cured by express or implied ratification of the parties, operation of estoppel, or some other legal theory"). MFRA asserts the Howes waived any "authority issues" because they voluntarily signed the 2010, 2011, and 2014 Loan Modifications, received a contractual benefit, and ratified the latter agreement by making at least one payment.

Consideration of *Wells Fargo, N.A. v. Burek* illustrates why this argument fails. 2013 ME 87, 81 A.3d 330. In *Burek*, the Law Court held that a loan modification agreement between the Bureks—the mortgagors—and Wells Fargo—the disputed note and mortgage owner—reflected a "mutual understanding" that Wells Fargo had the right

to enforce the note. *Id.* ¶ 21, 81 A.3d 330. Crucially, before that loan modification agreement, the original lender executed a separate assignment of the Burek's mortgage to MERS that expressly transferred "the right to enforce the note secured by the mortgage" to MERS—language the Law Court distinguished from provisions that limit MERS solely to the role of nominee. *Id.* ¶ 21 n.7, 81 A.3d 330. That broader grant of authority, coupled with the loan modification agreement, established Wells Fargo's right to enforce the note. *Id.* ¶ 21, 81 A.3d 330.

By contrast here, the language in the Mortgage, the purported 2013 assignment from MERS to Nationstar, and the 2014 modification all confirm MERS acted solely as nominee for the lender and any successors or assigns. *See Mortg. Elec. Registration Sys., Inc. v. Saunders*, 2010 ME 79, ¶¶ 9–11, 15, 2 A.3d 289 (interpreting language identical to that in this case as conferring mere "nominee" status to MERS). Nationstar therefore obtained only what MERS possessed—the right to record the Mortgage as nominee, *see Greenleaf*, 2014 ME 89, ¶ 17, 96 A.3d 700—and there is no competent evidence that either Nationstar or CitiMortgage had authority to enter into a binding loan modification agreement with the Howes on behalf of the actual mortgage owner. Nor does the record show how the Howes' signatures or payments could cure that lack of authority. A borrower cannot ratify a defective property conveyance on behalf of an absent lender; accordingly, ordinary contract principles cannot transform these invalid modification agreements into a valid mortgage assignment.

Because MFRA calculated the total amount needed to cure based on the seemingly invalid 2014 Loan Modification—which increased the principal loan amount by a deferred balance of $23,199.73—the total amount due is overstated. *See J.P. Morgan Mortg. Acquisition Corp. v. Moulton*, 2024 ME 13, ¶ 11, 314 A.3d 134 (concluding a notice which

"itself overstated the amount required to cure the default" bars proving "strict compliance" with § 6111, which is "an essential element of foreclosure"). Because the notice to cure is therefore defective under § 6111, MFRA has not strictly complied with the statutory requirements and cannot foreclose. *See, e.g.*, *U.S. Bank Tr., N.A. for LSF9 Master Participation Tr. v. Jones*, 330 F. Supp. 3d 530, 538 (D. Me. 2018), *aff'd sub nom. U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr. v. Jones*, 925 F.3d 534 (1st Cir. 2019) (dismissing foreclosure action because notice overstated amount due by $2,638.32 and noting the Law Court "instructs that § 6111's requirement that notices include 'the precise amount' a borrower must pay 'is strictly enforced'" (quoting *Lowell*, 2017 ME 32, ¶ 13, 156 A.3d 727)); *Cortellino,* 2026 ME 49, ¶ 7, 358 A.3d 1124 (remanding case to trial court to dismiss complaint because "[w]hen a right-to-cure notice overstates the amount required to cure the default, the notice does not strictly comply with section 6111 and is therefore deficient"). Accordingly, Ms. Howe is entitled to judgment on MFRA's foreclosure claim.[8]

### III. MFRA's Remaining Counts

In addition to the Foreclosure Action, MFRA brings four counts related to the Note: Breach of Note (Count I); Breach of Contract, Money Had and Received (Count II); Quantum Meruit (Count III); and Unjust Enrichment (Count IV). *Note Action Compl.* at 4–9. Even if a plaintiff is not entitled to foreclose on a property, it may be entitled to judgment on its underlying note claims. *See US Bank Tr. Nat'l Ass'n as trustee for*

[8] In November 2024, MFRA served Asset Acceptance and Credit Acceptance, parties-in-interest to the Foreclosure Action. In February 2025, MFRA filed a motion for entry of default against both, and the clerk entered default that same day. Because MFRA does not have standing to foreclose, the Court cannot enter default judgment against Asset Acceptance and Credit Acceptance. Accordingly, the motion for default judgment as to the parties-in-interest is **MOOT**. (ECF No. 106).

*VRMTG Asset Tr. v. Thomas*, No. 19-cv-00361, 2022 WL 4546177, at *6 (D. Me. Sept. 29, 2022); *see also Knope v. Green Tree Servicing, LLC*, 2017 ME 95, ¶ 22, 161 A.3d 696 ("Actions under the mortgage may be treated as separate and distinct from actions under the note because notes are unsecured and separate from mortgages, presenting differing issues that may, sometimes, be adjudicated in separate proceedings."). Because the Court already dispensed with Counts III and IV as time-barred, it only addresses Counts I and II.

### A. Breach of Note (Count I)

MFRA requests all amounts due under the Note, interest, and costs and expenses for Ms. Howe's breach of the Note (Count I). MFRA argues it has standing to enforce the Note as its lawful holder and that Ms. Howe breached its contractual terms by failing to make her required payments.[9] Ms. Howe contends this count is barred by claim preclusion, but the Court previously rejected this affirmative defense in its earlier Order denying summary judgment. *Summ. J. Order* at 13–19.

A promissory note is a contract to which ordinary principles of contract law apply. *Briggs v. Briggs*, 1998 ME 120, ¶ 6, 711 A.2d 1286. A breach of contract claim requires the existence of a valid contract, breach of the contract's terms, and damages resulting from that breach. *See Tobin v. Barter*, 2014 ME 51, ¶¶ 9, 10, 89 A.3d 1088. Here, the Note is a valid contract, Ms. Howe breached its terms by failing to make her required monthly payments, and MFRA demonstrated that it suffered financial harm from that breach. MFRA has therefore established the requisite elements of its breach of note claim against Ms. Howe. Having determined a contractual obligation existed, the question is whether

[9] The Court already dispensed with any argument that the statute of limitations bars this count.

MFRA has established, with competent evidence, the amount presently recoverable under the Note.

Under the terms of the Note, MFRA is entitled to recover principal, interest, and "all of its costs and expense in enforcing th[e] Note." *Note* ¶ 6(E). Because MFRA has demonstrated legal rights in both the Note and Mortgage, it may enforce the obligations contained in each instrument under a breach of contract theory. *Cf. Carrington Mortg. Servs., LLC v. Gionest*, No. 16-cv-00534, 2020 WL 1303554, at *5 (D. Me. Mar. 19, 2020) ("Because Carrington has not shown that it owns the mortgage, it cannot recover payments made pursuant to the Mortgage based on breach of contract."); *Knope*, 2017 ME 95, ¶ 14, 161 A.3d 696 ("Because of the 'failed' mortgage, the only contract between the parties is the promissory note, and most of the expenses at issue here were not paid or recoverable pursuant to that note.").

In addition to the amounts due under the Note, MFRA may recover sums advanced to protect its security interest pursuant to the terms of the Mortgage. *See Mortg.* (describing the "Borrower's Obligations" under the Mortgage to "Pay Charges, Assessments and Claims" . . . "Maintain Hazard Insurance of Property Insurance . . . [and] "to Maintain and Protect the Property"). MFRA specifically seeks reimbursement for the principal balance, interest, late fees, escrow advances, and pro rata mortgage insurance premium ("MIP")/private mortgage insurance ("PMI").[10] At trial, MFRA's witness[11] testified that the escrow advance amount consists of payments for taxes, insurance, and

[10] MFRA is not requesting as part of the judgment the recoverable corporate advance balance, which covers attorney's fees, title fees, and property inspection costs. *MFRA Proposed Findings of Fact* at 20; *Bench Trial Tr. 1* at 107:21–108:6.

[11] At trial, Michael Paterno testified on behalf of both MFRA and Fay. ECF No. 146.

mortgage insurance; and the pro rata amount is the cost for mortgage insurance. *Bench Trial Tr. 2* at 211–15. Because these expenditures were incurred pursuant to the Mortgage to protect the Property and preserve MFRA's security interest, they are recoverable under the Mortgage's terms. Because the Court has determined the three loan modification agreements are unenforceable, MFRA cannot recover any amounts attributable to those agreements; it may recover only the amounts the record establishes are due under the original, unmodified instruments.

To assist in determining that amount, the Court ordered the parties to submit supplemental post-trial briefing detailing the loan and amounts due absent the three invalid modifications. *See MFRA Calculations Supp'l Brief* (ECF No. 167); *Howe Calculations Supp'l Brief* (ECF No. 168*); MFRA Calculations Rebuttal* (ECF No. 169); *Howe Calculations Rebuttal* (ECF No. 170). The parties disagree on whether the evidence permits the Court to discern the amount due under the original Note and Mortgage. MFRA contends the record supports its demanded amount, *see generally MFRA Calculations Supp'l Brief*, while Ms. Howe argues the absence of a complete payment history from 2007 through 2010 renders the reconstruction impossible, *see generally Howe Calculations Supp'l Brief*. The Court therefore considers whether the record establishes by a preponderance of the evidence the amount due under the Note's original terms. Although the amount of damages need not be determined with mathematical precision, MFRA must provide evidence from which the Court can determine the amount with reasonable certainty. *See Brown v. Compass Harbor Vill. Condo. Ass'n*, 2020 ME 44, ¶ 20, 229 A.3d 158 ("[R]easonableness, not mathematical certainty, is the criteri[on] for determining whether damages were awarded properly." (quoting *Down E. Energy Corp. v. RMR, Inc.*, 1997 ME 148, ¶ 7)). "A monetary award based on a judgmental

approximation is proper, provided the evidence establishes facts from which the amount of damages may be determined to a probability." *Merrill Tr. Co. v. State*, 417 A.2d 435, 441 (Me. 1980).

The Court finds that the record, considered as a whole, establishes by a preponderance of the evidence that the unpaid principal balance immediately before the 2010 Loan Modification was $203,256.84. Although Ms. Howe argues MFRA did not introduce a complete loan history documenting each payment and charge from the Note's origination in 2007 through the 2010 Loan Modification, that gap in the record does not defeat MFRA's showing. That figure appears in the 2010 Loan Modification, *see 2010 Loan Modification Agreement*, and MFRA's witness testified that Ms. Howe's payments reduced the original $208,000.00 principal to $203,256.84, *Bench Trial Tr. 1* at 38:13–18. The Court need not disregard this evidence simply because the transaction history is incomplete. Moreover, the record contains no evidence suggesting a different principal balance related to the original Note. The Court therefore finds it more likely than not that $203,256.84 represented the unpaid principal under the original Note immediately before the 2010 Loan Modification.[12]

Having found that the original unpaid principal was $203,256.84, the Court accepts MFRA's reconstruction of the account from that starting point. *See MFRA Calculations Supp'l Brief* at 3–5. Its calculation applies the terms of the original Note, including its 7.25% annual interest rate. *Id.* at 4. It credits all of Ms. Howe's payments

[12] The Court recognizes the loan servicing history reflects a principal balance of $223,541.08 for November 2010. *See Trial Ex. 38, Judgment Figures/Payment History* at 604. This figure does not alter the Court's finding. The $223,541.08 balance appears to reflect capitalized arrears—unpaid interest, fees, or other charges added to principal—that are properly excluded from the $203,256.84 the Court finds proven as the unpaid principal due under the Note's original, unmodified terms.

from December 2010 onward, totaling $27,243.46, and applies them entirely to the principal balance. *Id.* This approach is conservative: crediting payments directly against principal lowers the balance on which interest accrues. These figures are supported by the record and thus established with reasonable certainty and probability. *See Brown*, 2020 ME ¶ 20, 229 A.3d 158; *Merrill Tr. Co.*, 417 A.2d at 441. The Court therefore accepts MFRA's reconstruction as establishing the principal amount and interest due under the Original Note and Mortgage, without giving effect to amounts generated by the three invalid loan modifications.

The Court enters judgment for MFRA on Count I in the amount of $319,798.42. This award consists of $176,013.38 in principal, $143,196.16 in accrued interest, and $588.88 in late fees. In its supplemental calculations, MFRA identified various components of its claimed damages and listed a total of $420,279.00. But the individual components listed in MFRA's calculations sum to only $391,157.00, a difference of $29,122.00. *See MFRA Calculations Supp'l Brief* at 5. The discrepancy appears to result from inadvertent double counting of the $29,122.00 tax amount in calculating the total. The Court nonetheless finds MFRA has established the damages amount of $319,798.42 with reasonable certainty.

MFRA's supplemental calculations also include $15,056.26 for "Total Attorney Fees and Costs." *Id.* Elsewhere, however, MFRA identified the same amount as "Corporate Advances including Attorney costs and fees" and expressly stated the amount was "not requested as part of the Proposed Judgment." *See MFRA Proposed Findings of Fact* at 20. At trial, MFRA likewise confirmed that amount included attorney's fees, title fees, and other property-related costs, but that it did not seek some of these costs in the proposed judgment. *Bench Trial Tr. 1* at 107:21–108:6. Because MFRA inconsistently

characterizes the $15,056.26 and failed to establish its recoverability with reasonable certainty, the Court excludes it from the judgment.

MFRA's post-trial proposed findings of fact and conclusions of law request $55,725.92 in escrow advances for taxes, insurance, and mortgage insurance. *See MFRA Proposed Findings of Fact* at 20. In its subsequent supplemental calculation, however, MFRA identified $13,285.48 in insurance, $29,122.00 in taxes, and $13,894.84 in PMI, totaling $56,302.32 in escrow advances. *See MFRA Calculations Supp'l Brief* at 4–5. This unexplained discrepancy between the requested escrow amount and the amount reflected in MFRA's supplemental calculations is not readily reconcilable, particularly when considered alongside the other mathematical errors and discrepancies described above. The Court cannot determine the amount of escrow advances with reasonable certainty and therefore does not include the requested escrow amount in the award.

Although damages need not be established with mathematical precision, MFRA must present evidence from which the Court can determine the amount with reasonable certainty. *See Brown*, 2020 ME 44, ¶ 20, 229 A.3d 158. The Court is not required to reconstruct or reconcile an internally inconsistent accounting on the parties' behalf. *See Poultry Processing, Inc. v. Old Orchard Ocean Pier Co.*, 780 F. Supp. 846, 865 (D. Me. 1991) (denying request for attorney fees where court found mathematical discrepancies).

**B. Money Had and Received (Count II)**

MFRA also asserts a claim for breach of contract, money had and received (Count II). Ms. Howe argues MFRA cannot recover under a theory of money had and received because MFRA seeks to affirm the parties' contractual agreement by collecting on the Note and Mortgage, and the existence of a contract precludes such a claim. MFRA

maintains it has advanced taxes, insurance, and other corporate funds to preserve the Property and is entitled to recover this money from which Ms. Howe unfairly benefited.

An action in assumpsit for money had and received may be brought where "one person has in [her] possession money which in equity and good conscience belongs to another." *Greenlaw v. Rodick*, 158 Me. 440, 447, 185 A.2d 895 (1962); *see Ketch v. Smith*, 131 Me. 275, 161 A. 300, 300 (1932). For such claims, because the law implies both the contract and the obligation to reimburse the payor, an express contract or privity between the parties is not needed. *See Greenlaw*, 158 Me. at 447, 185 A.2d 895; *Dresser v. Kronberg*, 108 Me. 423, 81 A. 487, 488 (1911) (an action for money had and received does not require a valid contract because when one person holds "another's money which he has not a right conscientiously to retain," the law "creates both the privity and the contract," as well the implied promise to repay).

Money had and received, however, cannot recover amounts arising under an enforceable contract that the plaintiff continues to affirm. *Harmony Homes Corp. v. Cragg*, 390 A.2d 1033, 1035 (Me. 1978) ("Ordinarily, a party may not affirm, or make use of, a contract to recover damages for breach thereof consistently with treating the contract as having been disaffirmed and proceeding on a 'money had and received' (restitution) rationale of recovery."); *see also Berry Huff McDonald Milligan, Inc. v. McCallum*, No. BCD-cv-12-01, 2013 WL 1845778, at *2 (Me. B.C.D. Mar. 26, 2013) (labeling money had and received "a restitutionary cause of action that disaffirms the existence of a contract in the first instance").

As the Court explained in its analysis of Count I, the original Note and Mortgage are valid and enforceable, while the three loan modification agreements are invalid and thus do not alter the parties' contractual rights and obligations. Because the original Note

and Mortgage remain valid and enforceable, any amounts owed under those instruments are recoverable, if at all, through the parties' existing contractual rights and remedies, and MFRA cannot separately recover those amounts through equitable restitution. *See Harmony Homes Corp.*, 390 A.2d at 1035–37.

As to the sums not authorized under the original Note and Mortgage—amounts instead attributable to the invalid load modification agreements and thus unrecoverable under Count I—the Court must determine whether MFRA may recover them under a theory of money had and received. To succeed, MFRA must establish Ms. Howe received money from MFRA that equity and good conscience require her to repay. *See Greenlaw*, 158 Me. at 447, 185 A.2d 895; *Ketch*, 131 Me. 275, 161 A. at 300.

MFRA has not shown how the increased principal balance, interest, and late fees created by the three invalid loan modifications represent money or value conferred on Ms. Howe. These figures merely recalculate Ms. Howe's alleged contractual obligations under the invalid modified loan terms: the principal increase revises her alleged indebtedness, the interest derives from that revised balance, and the late fees penalize nonpayment. *See 2014 Loan Modification Agreement* ¶¶ 1, 2. A claim for money had and received requires Ms. Howe to possess money that, in equity and good conscience, belongs to MFRA; it does not permit recovery for amounts that merely represent a contractual measure of liability under an unenforceable agreement. *See Ketch*, 131 Me. 275, 161 A. at 300; *Harmony Homes Corp.*, 390 A.2d at 1035–37.

The remaining amounts MFRA identifies—escrow advances, pro rata MIP/PMI amount, and corporate advances[13]—represent MFRA's actual expenditures and require

---

[13] MFRA does not request judgment on the corporate advance amount, so the Court does not address it. *MFRA Proposed Findings of Fact* at 19–20.

further consideration. *Bench Trial Tr. 2* at 211–14. MFRA spent the pro rata amount and a portion of the escrow advances on mortgage insurance, which the Mortgage defines as "insurance protecting [MFRA] against the nonpayment of, or default on, the Loan." *See Mortg*. The Mortgage further provides: "A Mortgage Insurance policy pays [MFRA] . . . for certain losses it may incur if [Ms. Howe] does not repay the Loan as agreed. [Ms. Howe] is not a party to the Mortgage Insurance policy." *Id.* ¶ 10 ("Mortgage Insurance"). Because MFRA incurred the mortgage insurance costs to protect MFRA's interest in the Property, rather than to satisfy an obligation of Ms. Howe, MFRA has not shown Ms. Howe received, actually or constructively, money which, in equity and good conscience, belongs to MFRA. *See Ketch*, 131 Me. 275, 161 A. at 300; *Harmony Homes Corp.*, 390 A.2d at 1035–37. As such, MFRA may not recover the mortgage insurance costs under either the escrow advances or the pro rata amount.

The remainder of the escrow advances consists of payments MFRA made for real estate taxes and property insurance. *Bench Trial Tr. 1* at 11:23–24; *Trial Ex. 39* (including hazard insurance and city tax disbursement in the escrow advance calculations). Unlike the mortgage insurance, these payments to a third party conferred an economic benefit on Ms. Howe by preserving the Property and satisfying obligations associated with ownership. *Cf. Gionest*, 2020 WL 1303554, at *6 (permitting recovery on equitable restitution theory of unjust enrichment, in part because the lender "conferred a benefit" on the mortgagor "by paying the city taxes and hazard insurance on her property" and "it would be inequitable" for the mortgagor to "retain the value of those benefits without paying for them, as that would amount to a windfall for her"); *Knope*, 2017 ME 95, ¶ 23, 161 A.3d 696 (upholding district court award for property taxes, insurance, and property preservation fees under unjust enrichment theory because it was "inequitable for the

[mortgagor] to retain the value of those benefits"). The question under Count II, however, is not merely whether Ms. Howe received a benefit that could support some form of equitable restitution, but whether MFRA established entitlement to recover on a theory of money had and received.

Historically, Maine courts have framed the action around the defendant's receipt or retention of money belonging to the plaintiff. *See, e.g.*, *Titcomb v. Powers*, 108 Me. 347, 80 A. 851, 852 (1911) ("Under the count for money had and received it is incumbent upon the plaintiff to prove, not only *the receipt of the money by the defendant*, but also that it was received by him to plaintiff's use, that is, the plaintiff's title to it." (emphasis added)); *Jellison v. Jordan*, 68 Me. 373, 374 (1878) ("It is well settled that an action for money had and received lies *to recover back money paid* by a party to an agreement invalid by the statute of frauds, which the other party refuses to perform." (emphasis added)). Even so, Maine courts have also recognized that, although money had and received is an action at law, it remains "equitable in spirit and purpose" and "comprehensive in its reach and scope." *Webb v. Brannen*, 128 Me. 287, 147 A. 208, 210 (1929). For example, in *Hathaway v. Burr*, the Law Court recognized that payment "in any manner" may be treated as the equivalent of money where the defendant took and sold the plaintiff's property. 21 Me. 567, 569–72 (1842). Because the *Hathway* defendant received payment for the value of the plaintiff's stolen property through that transaction, the Law Court treated the payment as the equivalent of money belonging to the plaintiff for the purposes of money had and received. *Id.* at 570. The circumstances here are different. Ms. Howe did not take or sell MFRA's property, receive payment from a third party, or otherwise obtain MFRA's funds through a transaction comparable to that in *Hathway*.

Maine law treats the payment of real estate taxes and property insurance as obligations associated with owning mortgaged property. *See* 36 M.R.S. § 554 ("In cases of mortgaged real estate, the mortgagor, for the purposes of taxation, shall be deemed the owner, until the mortgagee takes possession."); 33 M.R.S. § 769 (instructing mortgagor to pay taxes and assessments on the mortgaged premises and maintain the required insurance); 9-B M.R.S. § 429(1)(A) (defining residential mortgage escrow account as "any account established by agreement between a mortgagor and mortgagee under which the mortgagor pays to the mortgagee sums to be used to pay taxes or insurance premiums"). MFRA paid the real estate taxes and property insurance directly to the taxing authority and insurer, thereby extinguishing obligations for which Ms. Howe was otherwise responsible. *See Bench Trial Tr. 1* at 21:16–21, 36:6–15. Although those payments may have conferred an economic benefit on Ms. Howe, *see Carrington Mortg. Servs.*, 2020 WL 1303554, at *6; *Knope*, 2017 ME 95, ¶ 23, 161 A.3d 696, MFRA has not identified a basis for treating its direct payment to third parties as money had and received by Ms. Howe. As such, it has not met its burden of demonstrating how those circumstances fit within a claim for money had and received.

Accordingly, although MFRA made payments for real estate taxes and property insurance that benefited Ms. Howe, it has not established that those payments give rise to a claim for money had and received. Nor has MFRA met its burden as to any other amount sought under the invalid loan modifications. The Court enters judgment in Ms. Howe's favor on Count II.

## IV. Ms. Howe's Counterclaims[14]

### A. Judicial Notice

Before turning to the substance of Ms. Howe's counterclaims, the Court first considers her motion for judicial notice pursuant to Federal Rule of Evidence 201. *Motion for Judicial Notice* (ECF No. 142). On the first day of trial, Ms. Howe requested—in a motion spanning over 300 pages—that the Court take judicial notice of various court proceedings and land records purportedly bearing on whether MFRA qualifies as a "debt collector." *Id.* She contends these materials concern her affirmative defenses under the MFDCPA and not her counterclaims. MFRA opposes the motion, describing it as an attempt to introduce "essentially 22 additional exhibits" whose relevance would require the Court to make unsupported inferential leaps. *Motion for Judicial Notice Resp.* at 3 (ECF No. 153).

Rule 201(b) authorizes judicial notice only of facts "not subject to reasonable dispute" because they either are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court may take judicial notice "at any stage of the proceeding." *Id.* 201(d). Although federal courts may take judicial notice of relevant proceedings from other courts, *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990), they apply Rule 201(b) narrowly. As the First Circuit has cautioned,

---

[14] The day before trial, Ms. Howe filed a motion in limine asking the Court to exclude the testimony of Mr. Paterno and Mr. Diaz to the extent they sought "to offer testimony, directly, or indirectly, about the laws governing the issues before the Court." *See Mot. in Limine* (ECF No. 137). Because the bench trial has concluded, Ms. Howe's request to exclude testimony concerning the laws governing the issues before the Court is **DENIED AS MOOT**. To the extent the witnesses offered such testimony, the Court either addressed its admissibility and weight during the trial or did so, as necessary, in resolving the merits of the case.

"accepting disputed evidence not tested in the crucible of trial is a sharp departure from standard practice." *Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995).

Courts also recognize that Rule 201 sets an exacting standard: "if judicial notice should be taken, the Court will wonder why the lawyers could not agree on something that is indisputable." *Hinton v. Outboard Marine Corp.*, No. 9-cv-00554, 2012 WL 174934, at *2 (D. Me. Jan. 20, 2012). Here, Ms. Howe could have submitted many of her proffered documents prior to trial under other evidentiary provisions that would have permitted MFRA to test and challenge their contents and relevance. Accordingly, the Court **DENIES** Ms. Howe's motion for judicial notice.

### B. Fair Debt Collection Practices Act ("FDCPA") Counterclaim

Ms. Howe alleges MFRA violated two provisions of the FDCPA. First, she claims MFRA violated 15 U.S.C. § 1692e by using "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt" when it assertedly threatened foreclosure without a lawful right to do so and misrepresented the legal status and amount of the debt. Second, she claims MFRA violated 15 U.S.C. § 1692f by using "unfair or unconscionable means to collect or attempt to collect any debt"—when it allegedly sought to recover amounts not owed and relied on inaccurate loan data without adequate procedures to ensure accuracy. Ms. Howe contends MFRA is a "debt collector" within the meaning of the statute and agency principles render MFRA vicariously liable under the FDCPA for Fay's debt collection activities. MFRA disputes it is a debt collector subject to the FDCPA and contends Fay did not engage in prohibited practices, asserting that all communications were proper because MFRA had standing to foreclose through the quitclaim assignment or the three loan modifications.

Congress enacted the FDCPA to "eliminate abusive, deceptive, and other unfair debt collection practices." *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 22 (1st Cir. 2002) (citing 15 U.S.C. § 1692). A private cause of action arises under the FDCPA when there are "legal actions against a debtor, . . . for the benefit of the creditor, . . . [and] conduct[] by persons within the [statute's] scope." *Hamilton v. Fed. Home Loan Mortg. Corp.*, No. 13-cv-00414, 2014 WL 4594733, at *18 (D. Me. Sept. 15, 2014). To prevail on her FDCPA claim, Ms. Howe must prove by a preponderance of the evidence that she: (1) "was the object of collection activity arising from consumer debt"; and that MFRA (2) "is a debt collector within the meaning of the statute"; and (3) "engaged in a prohibited act or omission under the FDCPA." *Poulin v. The Thomas Agency*, 760 F. Supp. 2d 151, 158 (D. Me. 2011) (quotation modified). The Court evaluates the debt collection conduct from the perspective of an "unsophisticated consumer." *Pollard v. L. Off. of Mandy L. Spaulding*, 766 F.3d 98, 103 (1st Cir. 2014). Moreover, district courts in this circuit treat defendants as "vicariously liable under the FDCPA for the debt collection efforts of an apparent or authorized agent, provided that the principal party meets the definition of a 'debt collector' under the [FDCPA]." *Winne v. Nat'l Collegiate Student Loan Tr. 2005-1*, 228 F. Supp. 3d 141, 152 (D. Me. 2017).

As a preliminary matter, neither party disputes that Ms. Howe is a "consumer" under the FDCPA. The Court previously determined that Fay is a "debt collector" within the meaning of the FDCPA and liable to Ms. Howe under § 1692e for its debt collection activities.[15] It also determined that Ms. Howe's FDCPA claim was timely as to debt

---

[15] The Court adopts its previous ruling that Fay's conduct violated § 1692e, as detailed in its December 2024 Order granting Ms. Howe's motion for partial summary judgment. *See Summ. J. Order* at 19–30, 32. Specifically, the Court determined Fay violated the FDCPA by: (1) sending a September 2021 letter that

collection conduct that took place on or after December 10, 2020. *See Summ. J. Order* at 23–30; 15 U.S.C. § 1692k(d) (an action to enforce liability pursuant to the FDCPA must be brought "within one year from the date on which the violation occurs"). The Court did not, however, reach the question of Fay's liability under § 1692f. Thus, the remaining issues are: (1) whether Fay violated § 1692f; (2) whether MFRA is a debt collector within the meaning of the FDCPA; and, if so, (3) whether MFRA is vicariously liable under agency principles for Fay's FDCPA violations. The Court addresses each issue in turn.

First, Ms. Howe alleges Fay violated § 1692f by demanding amounts not owed and by directing property inspections on MFRA's behalf despite lacking standing to foreclose. Section 1692f prohibits "unfair or unconscionable means" of debt collection and provides examples of potentially prohibited conduct. 15 U.S.C. § 1692f. Relevant here, the statute prohibits collecting "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* § 1692f(1). Ms. Howe claims Fay charged her unauthorized escrow payments in its monthly mortgage statements from October 2019 through December 2020, *Howe Proposed Findings of Fact, Brief* at 12–13, but the Court already held that only conduct occurring after December 10, 2020, is timely.

Ms. Howe also alleges Fay's use of third parties to inspect the Property was an improper means of collecting debt under § 1692f. *Id.* Property preservation activities, such as inspections, are not inherently undertaken "in connection with the collection of any debt" or an attempt to collect a debt under the FDCPA. 15 U.S.C. § 1692c; *see, e.g.*,

falsely stated it had "a right to invoke foreclosure"; and (2) including language in the Delinquency Notice portion of various monthly mortgage statements to Ms. Howe falsely stating it "made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process" and warning her that she may risk losing her home "to a foreclosure sale." *Id.* at 29. At the time Fay sent these communications to Ms. Howe, MFRA did not have legal rights to the Mortgage and could not foreclose on the Property.

*Fermaint v. Planet Home Lending, LLC*, No. 18 C 07325, 2023 WL 5227381, at *22 (N.D. Ill. Aug. 15, 2023) (noting "property preservation services generally do not trigger the FDCPA"). In alleging liability under § 1692f, Ms. Howe relies, in part, on a summer 2020 incident in which an inspector on the Property instructed Ms. Howe to "pay [her] bills." *Bench Trial Tr. 2* at 123. Unlike a routine inspection or property preservation visit, that statement—which the Court credits—provides a direct connection between the inspection and the attempt to collect the underlying debt. But any § 1692f claim predicated on that incident is untimely because it occurred before December 10, 2020. And while Ms. Howe suggests that inspectors continued to visit the Property after that date, the record does not establish the nature of those later inspections with sufficient detail to support finding that they constituted debt collection activity rather than ordinary property preservation visits. *See, e.g.*, *Gordon v. Bank of N.Y. Mellon Corp.*, 964 F. Supp. 2d 937, 949 (N.D. Ind. 2013) (explaining that property-related conduct is not inherently debt collection absent a connection to an attempt to collect a debt). Accordingly, while Fay violated § 1692e through its debt collection communications that threatened foreclosure when it lacked a right to foreclose, Ms. Howe has not proved that Fay violated § 1692f.

Turning next to whether MFRA is a debt collector under the FDCPA. The statute defines a debt collector as any person who: (1) "uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts"; or (2) "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). This statutory definition excludes those trying to collect a debt that "was not in default at the time it was obtained by such person." *Id.* § 1692a(6)(F). It may, however, include "loan servicers who take on loans only after they are in default." *Beaulieu v. Bank. of Am., N.A.*, No. 14-cv-

00023, 2014 WL 4843809, at *12 (D. Me. Sept. 29, 2014). The FDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, [or] property . . . which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5).

The FDCPA does not define the word "collector" or "collection." Even so, "[c]reditors collecting on their own accounts are generally excluded from the statute's reach." *Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 41 (1st Cir. 2010) (citing 15 U.S.C. § 1692a(6)(F)(ii)); *see Bank of Am., N.A. v. Camire*, 2017 ME 20, ¶ 13, 155 A.3d 416. The Supreme Court has explained that under the statute's "regularly collects" definition of debt collector, a debt buyer may "collect debts for its own account without triggering the statutory definition." *Henson v. Santander Consumer USA, Inc.*, 582 U.S. 79, 83 (2017). But the Court did not address whether a debt purchaser under the "principal purpose" definition is likewise excluded from qualifying as a debt collector. *Id.* at 82; *see* 15 U.S.C. § 1692a(6).

MFRA admits that it attempted to collect on the Note, which it acquired in 2017 after the Howes had already defaulted. But MFRA maintains it attempted to collect its own debt and is therefore not a debt collector under the FDCPA. The requirement that a debt be owed or due to another only modifies the "regularly collects" definition, however, not the "principal purpose" definition *See Henson*, 582 U.S. at 83; *see also Barbato v. Greystone All., LLC*, 916 F.3d 260, 266 (3d Cir. 2019) (noting the same). Although the First Circuit has not directly addressed whether a debt purchaser who collects on their own debt qualifies as a "debt collector" under the FDCPA's "principal purpose" definition, other courts of appeals have held that an entity whose principal purpose is collecting

debts, even if their own debt, may qualify as a debt collector under the statute. *See, e.g.*, *Barbato*, 916 F.3d at 267 (stating "[a]s long as a business's *raison d'être* is obtaining payment on the debts that it acquires, it is a debt collector" under the FDCPA); *McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1094 (9th Cir. 2020) (in using the noun "collection," Congress "did not specify who must do the collecting or to whom the debt must be owed" (quotation modified)).

Ms. Howe argues MFRA is a debt collector because its principal purpose is the collection of debts. *Howe Proposed Findings of Fact, Brief* at 11. Under the FDCPA, Ms. Howe bears the burden to establish MFRA's status as a debt collector. *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 60 (2d Cir. 2004). The relevant inquiry is whether debt collection is incidental to the business's objectives, or its dominant objective. *See McAdory*, 952 F.3d at 1093. The trial testimony establishes that MFRA's business model consists of purchasing debt and that it derives its revenue from mortgage servicers' collection of payments and from the sale of real-estate-owned properties. *Bench Trial Tr. 2* at 221–23. MFRA further testified that it holds no assets apart from mortgage investments and relies on third-party servicers to collect mortgage debts on its behalf. When asked whether its "money comes from mortgage servicers collecting mortgage payments," MFRA responded "correct," and when asked whether those servicers remit the collected funds to MFRA, it again responded "correct." *Bench Trial Tr. 2* at 220–23. This evidence demonstrates that mortgage debt collection constitutes MFRA's dominant or principal objective. Accordingly, MFRA qualifies as a debt collector under the FDCPA's principal-purpose definition. *See, e.g.*, *Barbato*, 916 F.3d at 268 (noting that "the record reflects that [the alleged debt collector's] only business is the purchasing of debts for the purpose of collecting on those debts, and, as

[the alleged debt collector] candidly acknowledged at oral argument, without the collection of those debts, [it] would cease to exist."); *see also Reygadas v. DNF Assocs., LLC*, 982 F.3d 1119, 1125 (8th Cir. 2020) ("The foreseeable and logical consequence of hiring lawyers and debt collection agencies to collect debts [defendant] has purchased is *itself* evidence of purpose." (emphasis in original)).

Moreover, MFRA's use of third parties, like Fay, to collect these debts does not exclude it from the principal purpose definition of a debt collector. *See Barbato*, 916 F.3d at 270 ("[A]n entity that is itself a 'debt collector'—and hence subject to the FDCPA—should bear the burden of monitoring the activities of those it enlists to collect debts on its behalf." (quoting *Police v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 405 (3d Cir. 2000)); *McAdory*, 952 F.3d at 1095 (stating the "fact that the FDCPA includes limits on direct collection activities does not require the conclusion that Congress intended to regulate only those entities that directly interact with consumers" and noting "the text of the principal purpose prong contains no such limitation"); *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325 (7th Cir. 2016) ("A debt collector should not be able to avoid liability for unlawful debt collection practices simply by contracting with another company to do what the law does not allow it to do itself.").

Having determined that MFRA is a debt collector, the Court considers whether it can be held vicariously liable under traditional agency principles for Fay's violation of § 1692e. *See Clark v. Cap. Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1173 (9th Cir. 2006) (stating "general principles of agency . . . form the basis of vicarious liability under the FDCPA"). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or

otherwise consents so to act." Restatement (Third) of Agency § 1.01 (A.L.I. 2006); *see State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44, ¶ 16, 995 A.2d 651. An agency relationship exists where the principal: (1) has the "right to direct or control" the agent's actions; (2) manifests consent to the agent acting on its behalf; and (3) receives consent from the agent to so act. *Meyer v. Holley*, 537 U.S. 280, 286 (2003). Vicarious liability attaches where the agent acts with actual authority or the principal ratifies the agent's conduct. *See* Restatement (Third) of Agency § 7.03.

Here, under the servicing agreement between Fay and MFRA,[16] Fay was responsible for "servicing[ing] and administer[ing] each of the Assets on behalf of, and in the best interest of, the Owners." *Flow Servicing Agreement* at 55. The servicing agreement also granted Fay with "full power and authority, acting alone, or to the extent contemplated by and in accordance with the [servicing agreement's performance standards] . . . to do all things in connection with such servicing and administration which [Fay] my deem necessary or desirable." *Id.* At trial, Fay testified that it acts as a comprehensive "soup-to-nuts" loan servicer for MFRA, including accepting borrower payments and pursuing foreclosure. *Bench Trial Tr. 1* at 21:16–21. The Court finds the language of the servicing agreement, coupled with MFRA's testimony that Fay collected mortgage debts on its behalf, establishes an agency relationship and actual authority for Fay to engage in the challenged collection activities. Therefore, because agency principles permit "a principal entity which meets the definition of a 'debt collector' [to] be held vicariously liable for the acts of its authorized or apparent agent under the FDCPA,"

[16] The flow servicing agreement is between Fay, MFResidential I, LLC, and "any Person and Trusts joined hereto from time to time." MFRA Trust 2015-1 signed onto this agreement in 2015. In 2017, Fay became the servicer of the Howe Loan.

*Oberther v. Midland Credit Mgmt., Inc.*, 45 F. Supp. 3d 125, 130 (D. Mass. 2014) (quotation modified), MFRA is vicariously liable for Fay's violations of § 1692e.

Finally, MFRA argues even if an FDCPA violation occurred, the bona fide error defense applies because any violation resulted from a good faith mistake. Ms. Howe contends MFRA cannot invoke this affirmative defense because: (1) it does not apply to mistakes of law; (2) MFRA and Fay knew they lacked foreclosure rights; (3) and Fay failed to show it had procedures designed to prevent such violations, which is required to claim a bona fide error. The Court agrees. Under the bona fide error defense to the FDCPA, a debt collector is not liable if it shows by a preponderance of the evidence that the violation was: (1) unintentional; and (2) the result of a bona fide error; (3) "notwithstanding the maintenance of procedures reasonably adopted to avoid any such error." 15 U.S.C. § 1692k(c); *see Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 573, 605 (2010) (holding the bona fide error defense under the FDCPA is not available for mistakes of law). Here, MFRA had actual knowledge that it did not have the right to foreclose following the state court dismissing the Prior State Action in 2020. Further, even though the 2023 quitclaim assignment established MFRA's legal rights in the Mortgage,[17] from December 10, 2020 (the date from which Ms. Howe's claims under the FDCPA are considered timely) to February 3, 2023 (the date of the Mortgage quitclaim assignment), MFRA had actual knowledge that it did not own the Mortgage

---

[17] To the extent MFRA argues it believed it had standing to foreclose based on the three loan modification agreements, it is judicially estopped from relying on this position. In the Florida Receivership Action, MFRA stated "only an assignment directly from the originating lender (Challenger) will permit the assignee to foreclose the Mortgage" and "without a Quitclaim Assignment of Mortgage from the now defunct Challenge . . . [MFRA] cannot foreclose pursuant to the terms of the Howe Mortgage." *Motion to Appoint Receiver* ¶¶ 16, 19. For MFRA to now argue it can establish standing to foreclose through the loan modification agreement: (1) is "clearly inconsistent" with the position it took in the Florida Receivership Action; (2) creates "the perception that either" the Florida court or this court "was misled"; and (3) unfairly advantages MFRA. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotations modified).

and, therefore, lacked standing to foreclose on the Property during that time. That knowledge forecloses the bona fide error defense. Therefore, the bona fide error defense is not applicable and MFRA is vicariously liable for Fay's actions that violated the FDCPA. Accordingly, the Court enters judgment in favor of Ms. Howe on her counterclaim against MFRA for violating § 1692e of the FDCPA.

### C. Mortgage Servicer Duty of Good Faith Counterclaim Against Fay

Ms. Howe also alleges Fay violated its duty of good faith under Maine's mortgage servicer statute: 14 M.R.S. § 6113. She contends Fay breached that duty by falsely representing in its communications with her that it held certain rights under the Mortgage and by continuing to exercise said purported Mortgage-related rights—including sending inspectors to the Property—when it knew that MFRA lacked an enforceable interest in the Mortgage. The statute defines a mortgage servicer as "a person responsible for servicing an obligation, including a person that holds or owns an obligation . . . if the person also services the obligation." 14 M.R.S. § 6113(1)(B-1). The parties do not dispute that Fay qualifies as a mortgage servicer within the meaning of the statute.

Section 6113 requires a mortgage servicer to "act in good faith toward an obligor in the servicing of an obligation secured by a mortgage and in any foreclosure action relating to such an obligation." *Id.* § 6113(2). The statute defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." *Id.* § 6113(1)(A).

Because Maine courts have provided limited guidance concerning the conduct that violates § 6113, the Court looks to analogous sources. The Maine UCC likewise imposes an obligation of good faith in the performance and enforcement of contracts and defines good faith in materially identical terms. *See* 11 M.R.S. § 1-304 (Maine UCC obligation of good faith); *id.* § 1–1201(20) (defining "good faith" as "honesty in fact and the observance

of reasonable commercial standards of fair dealing"). The Law Court has interpreted this definition to include both a subjective component—honesty in fact—and an objective component—commercial reasonableness. *See Chartier v. Farm Fam. Life Ins. Co.*, 2015 ME 29, ¶ 7, 113 A.3d 234 (finding good faith under this two-part inquiry when a bank permitted a wife to cash out the husband's annuity policy, deposit the funds with a forged check, and shortly thereafter withdraw more than one-third of the total amount before filing for divorce the same day because Maine law permitted the bank to authorize such transactions between joint owners of a shared bank account). Guided by this framework, the Court evaluates Ms. Howe's claim by determining whether Fay: (1) acted honestly; and (2) observed reasonable commercial standards of fair dealing in servicing the Loan. *See Me. Fam. Fed. Credit Union v. Sun Life Assur. Co. of Can.*, 1999 ME 43, ¶¶ 18, 24, 727 A.2d 335.

With respect to the subjective component, the relevant inquiry is whether Fay knew that MFRA lacked an enforceable interest in the Mortgage. *See id.* ¶ 22, 727 A.2d 335 (inquiring into actual knowledge in evaluating good-faith obligations under the Maine UCC and determining defendant acted with honesty in fact where it had no notice of problem at issue or knowledge of fraud involved). The record establishes that, following the February 2020 dismissal of the Prior State Action, MFRA had actual knowledge that it lacked enforceable mortgage rights because the state court rejected its equitable-trust theory based solely on possession of the Note. The record further establishes that Fay possessed this same knowledge by at least March 2020. Fay's representative testified that Fay authorized counsel to file a motion to amend the judgment in the Prior State Action on March 11, 2020. *See Trial Ex. 33, Michael Paterno Aug. 6, 2025 Deposition* at 19:25–20:11. Although the representative expressed less certainty as to Fay's awareness of the

motion's denial in April 2021, that uncertainty does not alter the dispositive point: by March 2020, Fay knew that MFRA did not own the Mortgage and therefore could not foreclose. Despite that knowledge, Fay continued to service and enforce the Loan as though MFRA possessed rights in the Mortgage. *Id.* 20:12–21:22. Fay sent Ms. Howe communication asserting a right to foreclose and caused or permitted a property inspector to enter the Property in connection with its servicing or enforcement activities, despite knowing that MFRA lacked an enforceable mortgage interest. Accordingly, these actions demonstrate Fay's lack of honesty in servicing the loan.

As to the objective component, Ms. Howe bears the burden to show that Fay failed to observe reasonable commercial standards of fair dealing. She has not carried that burden. The record does not contain sufficient evidence of prevailing industry standards or of how Fay's policies and procedures deviated from those standards in a manner that would render its conduct commercially unreasonable. *See, e.g.*, *Me. Fam. Fed. Credit Union*, 1999 ME 43, ¶ 30, 727 A.2d 335 (considering internal policies, regulatory compliance, and industry practice); *Chartier*, 2015 ME 29, ¶ 7, 113 A.3d 234 (evaluating commercial reasonableness against contractual provisions and governing law). Absent such evidence, the Court cannot conclude that Fay's servicing practices fell below the objective standard required by § 6113.[18]

Nevertheless, the statute requires both honesty in fact *and* adherence to reasonable commercial standards. 14 M.R.S. § 6113(1)(A). Because Fay failed to satisfy

---

[18] Ms. Howe introduced into evidence a 2024 consent order between the Consumer Financial Protection Bureau ("CFPB") and Fay, *Trial Ex.* 46, which the CFPB terminated in 2025, *Trial Ex.* 61. The parties did not sufficiently develop, during trial or in their post-trial briefing, how the requirements or findings described in the CFPB's 2024 consent order bear on the reasonable commercial standards of fair dealing applicable to Fay's servicing conduct at issue in this case. The Court therefore does not rely on that order in determining whether Fay satisfied the objective component of § 6113.

the subjective component requiring acting in honesty, it breached its duty of good faith. *See Me. Fam. Fed. Credit Union*, 1999 ME 43, ¶ 17, 727 A.2d 335 ("Because the tests are presented in the conjunctive, a holder must now satisfy both a subjective and an objective test of 'good faith.'"). Accordingly, the Court enters judgment in favor of Ms. Howe on her counterclaim for Fay's violation of the duty of good faith pursuant to 14 M.R.S. § 6113.

## DAMAGES

Having determined liability, the Court turns to assessing damages under the FDCPA and 14 M.R.S. § 6113.

### I. FDCPA

Under 15 U.S.C. § 1692k, a debt collector who violates the FDCPA is liable to the debtor for three categories of relief: (1) actual damages; (2) "additional damages as the court may allow" not to exceed $1,000; and (3) reasonable attorney's fees. 15 U.S.C. § 1692k(a). To determine the damages MFRA and Fay owe, the Court first addresses how liability is allocated between the two Defendants and then determines the amount of actual and additional damages. *See Sweetland v. Stevens & James, Inc.*, 563 F. Supp. 2d 300, 303, 304 (D. Me. 2008).

#### A. Multiple Defendants

The Court first addresses how the damages award applies to the two Defendants. As discussed above, Fay is directly liable for the underlying FDCPA violations, while MFRA is vicariously liable under agency principles. The Defendants, therefore, share liability for the same underlying conduct, rather than being independently liable for distinct FDCPA violations. Because no First Circuit precedent directly addresses whether the FDCPA requires courts to enforce the actual and additional damages provisions per suit or against each defendant, the Court looks to persuasive authority from other circuits.

As to additional damages, other courts have held that when a "plaintiff "suffered an indivisible harm caused by defendants who did not violate the FDCPA independently of each other," additional damages are "not multiplied by the number of defendants" but are instead capped at $1,000 per suit, regardless of the number of violations. *Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 900 F.3d 377, 386 (7th Cir. 2018). The Court finds that approach persuasive because, while awarding additional damages up to $1,000 per defendant would further the FDCPA's goal of incentivizing debt collectors to follow the law, limiting that award to defendants who acted independently of one another prevents double recovery. *See Wilson v. NACM-Or. Serv. Co.*, No. 12-cv-01515, 2013 WL 6780627, at *12 (D. Or. Dec. 19, 2013). This case does not involve multiple defendants independently liable for distinct FDCPA violations; rather, MFRA is vicariously liable based on Fay's conduct. *Cf. Overcash v. United Abstract Grp., Inc.*, 549 F. Supp. 2d 193, 196 (N.D.N.Y. 2008) (allowing per-defendant recovery where multiple defendants separately attempted to collect a single debt). Accordingly, Fay and MFRA are jointly and severally liable for Ms. Howe's additional damages award.

The same principle applies to Ms. Howe's actual damages, which compensate for the harm Fay's FDCPA violations caused her. *See Portalatin*, 900 F.3d at 385 ("[T]he actual-damages provision mirrors the additional-damages (also known as 'statutory damages') provision. There is no doubt actual damages for the same single, indivisible injury are not multiplied by the number of defendants."). Section 1692k permits the recovery of "any actual damage[s] sustained." 15 U.S.C. § 1692k(a)(1). The statute therefore does not authorize assessing actual damages separately against each defendant for the same injury. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 346 (7th Cir. 2018) ("Under the single recovery rule, defendants are jointly and severally liable for the full

amount of compensatory damages that result from an indivisible harm; a plaintiff can recover only once for those damages."). Because Ms. Howe suffered indivisible harm arising from conduct for which Fay was directly liable and MFRA was vicariously liable, the Defendants are jointly and severally liable for Ms. Howe's actual damages award.

Accordingly, because Ms. Howe's injury arose from Fay's course of conduct, for which MFRA is vicariously liable, Fay and MFRA are jointly and severally liable for the total award amount.

**B. Actual Damages**

The Court now turns to determining actual damages. This category encompasses emotional distress and exists to compensate the plaintiff fairly, "not to punish or deter the defendant." *Sweetland*, 563 F. Supp at 304. Actual damages, however, are not awarded on a strict liability basis: rather, a plaintiff must establish a causal connection between the defendant's conduct and her claimed harm. *See* 15 U.S.C. § 1692k(a)(1) (permitting award of actual damage the plaintiff sustains "*as a result of*" the debt collector's failure "to comply with any provision" of the FDCPA (emphasis added)).

Ms. Howe seeks damages for emotional distress she experienced from December 2020 through December 2021, a period during which Fay sent her a series of violative monthly mortgage notices and letters. Those communications warned: "You are late on your monthly payments. Failure to bring the account current may result in additional fees or expenses, and in certain instances, you may risk foreclosure - the loss of your home." The letters also declared Fay's "right to invoke foreclosure based on the terms of [the Howes'] mortgage contract." Mrs. Howe also testified that unannounced visits to the property left her feeling "like she is being watched." The incident that first provoked this fear, however, predates December 2020, and Mrs. Howe's trial testimony did not

establish that the more recent visits were connected to debt collection activity; the Court therefore does not attribute that particular harm to Fay's conduct.

The remaining evidence supports an award for actual damages. Ms. Ada Wood, Ms. Howe's mother, remains in regular contact with her daughter and testified that Ms. Howe has been "stressed" and "tearful sometimes" about the foreclosure and related debt collection activity. Ms. Howe and her son likewise testified that the stress of the foreclosure brings migraines. Crediting this testimony, the Court awards Ms. Howe $2,000.00 in actual damages. *See, e.g.*, *Sweetland*, 563 F. Supp. 2d at 301, 303–04 (awarding $2,500 for violations of 15 U.S.C. §§ 1692d and 1692e when debt collection conduct caused plaintiff to be "upset, anxious, and distressed" and the conduct consisted of two aggressive and rude phone calls, during one of which the debt collector threatened to send a private investigator to plaintiff's home and "made it clear that he was going to extract money from her one way or the other"); *Salazar v. Green Square Co., LLC*, No. 21-cv-00542, 2022 WL 1492577, at *8 (D.N.M. Mar. 16, 2022), *report and recommendation adopted*, 2022 WL 1115271 (D.N.M. Apr. 14, 2022) (awarding $2,000 for violations of § 1692d as a result of "aggravation and [emotional] distress," including "hours of lost sleep, worry, anxiety, fear, and relapsed mental health"); *Bullock v. Abbott & Ross Credit Servs., L.L.C.*, No. A-09-cv-413, 2009 WL 4598330, at *4 (W.D. Tex. Dec. 3, 2009), *report and recommendation adopted*, 2009 WL 10713334 (W.D. Tex. Dec. 22, 2009) (citing cases awarding $1,000 to $3,000).

**C. Additional Damages**

Having awarded actual damages, the Court turns to whether—and how much—additional damages should be awarded, up to the $1,000 statutory ceiling. *See Sweetland*, 563 F. Supp. 2d at 303. In setting that amount, the Court weighs "the frequency and

persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." 15 U.S.C. § 1692k(b)(1). Because the FDCPA imposes strict liability for this category of damages, a plaintiff who proves a violation may recover additional damages regardless of whether she can also prove actual damages. *Sweetland*, 563 F. Supp. 2d at 304; *see Shapiro v. Haenn*, 222 F. Supp. 2d 29, 43 n.8 (D. Me. 2002).

The record here reflects sustained, deliberate noncompliance rather than an isolated mistake. As discussed above, Defendants violated § 1692e by mailing Ms. Howe a letter that threatened foreclosure despite knowing they lacked standing to foreclose, and by sending approximately ten monthly mortgage statements that included a "Delinquency Notice" falsely asserting a right to foreclose. Fay repeated this same false representation to Ms. Howe over an extended period, all while knowing that MFRA had no lawful right to foreclose on the Property. That frequency and persistence, combined with the deliberate and knowingly false nature of the threat—one directed at the loss of Ms. Howe's home—together justify a substantial additional damages award. Because MFRA's liability is derivative of Fay's conduct rather than independent misconduct of its own, the Court treats the FDCPA violation as giving rise to a single statutory recovery rather than separate awards against each Defendant. Weighing the frequency, persistence, nature, and intentionality of Fay's violations together, the Court concludes that the statutory maximum of $1,000 best serves the FDCPA's remedial and deterrent purposes, and the Defendants are jointly and severally liable for that amount. *See, e.g.*, *Clomon v. Jackson*, 988 F.2d 1314, 1316 (2d Cir. 1993) (upholding $1,000 additional damages award where the defendant "authorized the sending of debt collection letters bearing his name and a facsimile of his signature without first reviewing the collection letters or the files of the

persons to whom the letters were sent"); *Campos v. Tolteca Enters., Inc.*, No. 14-cv-874, 2015 WL 13802511, at *1 (W.D. Tex. Dec. 4, 2015) (concluding $1,000 "is a relatively modest penalty and that a lower figure would do little to effectuate the FDCPA's statutory purpose").

In sum, the Court awards Ms. Howe $2,000 in actual damages and $1,000 in additional damages, for a total award of $3,000 under the FDCPA. MFRA and Fay are jointly and severally liable for that amount.

## II. Mortgage Servicer Duty of Good Faith

The Court next determines Ms. Howe's actual and statutory damages under 14 M.R.S. § 6113(4). When a mortgage servicer violates its duty of good faith, the statute permits a homeowner to recover "for all actual damages sustained" because of that violation. 14 M.R.S. § 6113(4)(A). In addition to actual damages, courts may award statutory damages "not exceeding $15,000 for a pattern or practice" of the mortgage servicer's violations. *Id.* § 6113(4)(B). The statute also requires courts to award the homeowner costs and reasonable attorney fees when a violation occurs. *Id.* § 6113(4)(C).

The contours of § 6113's damages provision remain largely undefined. No authority addresses how courts should determine actual damages or how courts should exercise their discretion to award statutory damages up to the $15,000 maximum. The Court therefore turns to ordinary rules of statutory construction for interpretive guidance, beginning with the plain language of § 6113. *See Penobscot Nation v. Frey*, 3 F.4th 484, 490–491 (1st Cir. 2021).

### A. Actual Damages

The Court first considers the actual damages Ms. Howe sustained as a result of Fay's § 6113 violations. The statute provides: "A homeowner or obligor injured by a

violation of the duty of good faith may bring an action against the mortgage servicer for all actual damages sustained by the homeowner or obligor." 14 M.R.S. § 6113(4)(A). The text of § 6113(4)(A) does not limit actual damages to any particular category of loss. Rather, it permits recovery for "all actual damages." *Id.* The Court therefore considers whether Ms. Howe's emotional distress, which she identifies as the consequence of Fay's violative servicing conduct, constitutes actual damages under § 6113. The Court concludes that it does.

As the Supreme Court has recognized, the meaning of "actual damages" depends on the statutory context in which the phrase appears. *See F.A.A. v. Cooper*, 566 U.S. 284, 292–94 (2012). Here, the legislature's use of the unqualified phrase "all actual damages" favors a broad construction.

In *Kowalski v. Seterus, Inc.*, the District of Maine distinguished the Maine Unfair Trade Practices Act, which requires a "loss of money or property" and therefore excludes emotional distress, from the Maine Consumer Credit Code ("MCCC"), which imposes no such limitation and simply authorizes recovery of "actual damages." No. 16-cv-00160, 2017 WL 79949, at *18 (D. Me. Jan. 9, 2017) (citing 5 M.R.S. § 213; 9-A M.R.S. § 9-405). Because the MCCC's undifferentiated reference to "actual damages" carries no pecuniary-loss requirement, the court held it permits recovery for emotional distress—consistent with how courts construe "actual damages" under analogous consumer-protection statutes—and denied the servicer's motion to dismiss the plaintiff's MCCC claim on that basis. *Id.* (quotation modified).

Section 6113(4)(A) shares this same unqualified structure: it authorizes recovery for "all actual damages sustained" without requiring a showing of pecuniary loss. 14 M.R.S. § 6113(4)(A). As in *Kowalski*, that language forecloses reading in a limitation

the Legislature did not write. *See Cornn v. United Parcel Serv., Inc.*, No. C03-2001, 2006 WL 449138, at *3 (N.D. Cal. Feb. 22, 2006) (construing similarly broad "all actual damages" language). Nothing in § 6113(4)(A) excludes emotional distress damages, and the Court declines to read such an unstated exception into the statute.

The Court must nevertheless distinguish damages Fay's § 6113 violations caused from damages for which Ms. Howe already recovered under her successful FDCPA claim. The rule against double recovery prohibits Ms. Howe from obtaining two awards for an indivisible injury arising from the same conduct. *See Miranda*, 900 F.3d at 346. Thus, the Court awards no damages under § 6113 for the emotional distress that Ms. Howe experienced from December 2020 through December 2021 for which she already recovered under the FDCPA. Instead, the Court considers whether Fay's conduct before December 2020 caused an additional injury for which the FDCPA award does not compensate her.

The record establishes such an injury. As discussed above, Fay's conduct supporting the § 6113 claim began no later than March 2020, when Fay knew that MFRA lacked an enforceable interest in the Mortgage and therefore could not lawfully foreclose on the Property. Nevertheless, during the period from March 2020 through December 2020, Fay continued servicing and collection activities as though MFRA possessed enforceable mortgage rights. Those activities included communications threatening foreclosure and the property inspection that occurred during the first summer of the COVID-19 pandemic. Ms. Howe identifies both the communications and property inspection as sources of additional emotional distress for which she seeks damages under § 6113. *Howe Proposed Findings of Fact, Brief* at 13–14, 15.

Although the Court did not find the summer 2020 inspection constituted a timely FDCPA violation, it is relevant to and timely under the separate § 6113 claim because it occurred during the period in which Fay continued to exercise purported mortgage-related rights despite knowing MFRA lacked an enforceable interest in the Mortgage. Ms. Howe encountered the property inspector in her backyard, where he yelled at her to pay her bills. She testified that this incident made her feel "invaded," caused her to fear that "people were going to start coming and [spying on her]," and was sufficiently stressful that she was "probably incapacitated after." *Bench Trial Tr. 2* at 315–16. The Court finds this testimony credible.

Fay's mortgage statements during this period further support an actual damages award. From April 2020 through November 2020, Ms. Howe received eight monthly statements warning she was delinquent and failure to bring her account current could result in additional fess, expenses, or "foreclosure - the loss of [her] home." These communications reinforced the false assertion that MFRA possessed enforceable mortgage rights, despite Fay's knowledge to the contrary. The Court credits Ms. Howe's testimony that these violative statements contributed to her emotional distress.

Taken together, the property inspection, eight mortgage statements, and Ms. Howe's testimony establish that she sustained actual damages resulting from Fay's § 6113 violations distinct from the damages already awarded under the FDCPA. The Court therefore awards Ms. Howe $1,500 in actual damages under § 6113(4)(A) for the additional injury Fay's March 2020 through December 2020 conduct caused her.

**B. Statutory Damages**

Ms. Howe also seeks statutory damages under § 6113(4)(B), which authorizes the Court to award damages "not exceeding $15,000 for a pattern or practice of the mortgage

servicer's violating the duty of good faith." 14 M.R.S. § 6113(4)(B). The statute instructs the Court to consider: (1) the frequency and persistence of violations; (2) the nature of the violations; (3) the extent to which the violations were intentional; and (4) the extent to which the violations were prohibited by state or federal laws, rules or regulations, or any consent judgments to which the mortgagor is a party. *Id.*

*1. Pattern or Practice*

The Court first considers whether Fay's conduct establishes a "patten or practice" under § 6113. Because the statute does not define that phrase and neither party proposes an interpretation, the Court must supply one. A pattern or practice ordinarily means more than single or sporadic act; it denotes a standard way of operating. *See Pattern*, Black's Law Dictionary (12th ed. 2024) (defining pattern as a "mode of behavior or series of acts that are recognizably consistent"); *Practice,* Black's Law Dictionary (12th ed. 2024) (defining practice as an "established custom or prescribed usage"). That definition nonetheless leaves open several unanswered questions, so the Court looks to analogous statutes for guidance.

Other Maine statutes employ the phrase "pattern or practice" in different contexts, *see*, *e.g.*, 38 M.R.S. § 349-N (barring Maine Department of Environmental Protection from recommending criminal charges against a regulated entity absent a "pattern or practice" demonstrating a management philosophy that conceals environmental violations or conscious involvement by corporate officials in such violations). But § 6113's use of the phrase as a prerequisite for statutory damages is best compared to federal consumer protection law, particularly the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2605 *et seq.*, which likewise conditions statutory damages on a "pattern or practice" of noncompliance. RESPA aims "to encourage communication to

provide borrowers with accurate information about, and transparency regarding, their loans," *McGahey v. Fed. Nat'l Mortg. Ass'n*, 266 F. Supp. 3d 421, 442 (D. Me. 2017), and permits statutory damages up to $2,000 in the case of "a pattern or practice of noncompliance," 12 U.S.C. § 2605(f)(1).

Courts applying RESPA have not adopted a uniform test, but two commonalities emerge from that body of law. One or two single RESPA violations are generally insufficient to find a pattern or practice of noncompliance, but more than two violations can support a pattern or practice claim under the statute. *Compare Long v. Residential Credit Sols., Inc.*, No. 15-cv-80590, 2015 WL 4983507, at *2 (S.D. Fla. Aug. 21, 2015) (one violation insufficient), *and McLean v. GMAC Mortg. Corp.*, 595 F. Supp. 2d 1360, 1365 (S.D. Fla. 2009) (two violations insufficient), *with Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 868–69 (N.D. Ill. 2002) (five violations sufficient). Multiple violations against the same individual may suffice. *See, e.g.*, *Smith v. Specialized Loan Servicing, LLC*, No. 16-cv-2519, 2017 WL 1711283, at *8 (S.D. Cal. May 3, 2017) (seventeen unlawful letters to single borrower over period of twenty two months sufficient for pattern or practice under RESPA); *Ploog*, 209 F. Supp. 2d at 867 (five violations of RESPA against single borrower sufficient for pattern or practice); *see also Aduayi v. PHH Mortg. Servs.*, No. 23-cv-10857, 2024 WL 1018441, at *5 (D. Mass. Mar. 8, 2024) ("If alleging statutory damages related to a pattern or practice of noncompliance, repeated failures to respond to a single Plaintiff may qualify as a pattern or practice."). Under this reasoning, which the Court finds persuasive, multiple violative acts against a single borrower can sustain statutory damages under § 6113.

Here, Fay's communications with Mrs. Howe were not an isolated, erroneous occurrence. Rather, the record establishes that Fay repeated the same underlying false

representation—that MFRA possessed a right to foreclose—across multiple communications, even after Fay knew that MFRA lacked an enforceable interest in the Mortgage. The repeated conduct establishes a pattern or practice of violations within the meaning of § 6113.

*2. Statutory Factors*

The Court next considers the relevant statutory factors. The first enumerated factor—the frequency and persistence of violations—weighs in favor of a statutory award. Fay's conduct was not confined to a single communication or isolated error. The record establishes multiple communications asserting a right to foreclose, as well as continued servicing and enforcement activity premised on that purported right. Ms. Howe's mortgage statements alone reflect violative communications sent on a monthly basis. Fay's violations were therefore both frequent and persistent.

The second factor—the nature of the violations—also weighs in favor of a statutory award. Fay repeatedly communicated a foreclosure right to Ms. Howe that MFRA did not possess. These were not incidental or inconsequential representations; they concerned the right to enforce the Mortgage against Ms. Howe's Property, including the right to foreclose—a grave misrepresentation. The nature of these violations is particularly serious given the absence of any policies or procedures on Fay's part designed to identify or prevent such errors or to ensure that correspondence concerning foreclosure was tailored to the requirements of Maine law. *Bench Trial Tr. 2* at 206. The record instead reflects that Fay repeatedly communicated a purported foreclosure right without safeguards sufficient to account for the legal circumstances governing MFRA's interest in the Mortgage.

The third factor—the extent to which the violations were intentional—also weighs in favor of an award. In determining liability, the Court found that Fay possessed actual knowledge, by at least March 2020, that MFRA lacked an enforceable interest in the Mortgage. Despite that knowledge, Fay continued to service and enforce the Loan as though MFRA possessed rights in the Mortgage, including by communicating a right to foreclose and causing or permitting a property inspector to enter the Property in connection with its servicing or enforcement activities. Fay's § 6113 violation rests on Fay's failure to act with honesty in fact and not merely on an inadvertent or mistaken representation. The absence of policies or procedures to identify such errors, or to ensure that foreclosure-related correspondence accounted for the particular requirements of Maine law, further underscores the significance of the repeated conduct.

The fourth factor—the extent to which the violations were "prohibited by state or federal laws, rules or regulations, and the extent to which such actions constitute violations by the mortgage servicer of any consent judgments to which it is a party"—is notable because it does not limit the Court's consideration of statutory damages to violations of § 6113 itself. Instead, the Maine legislature specifically contemplated other legal and regulatory obligations as relevant to a court's statutory damages determination. Here, the Court found that Fay's servicing activities violated federal law, namely, the FDCPA. The Court therefore considers that violation as an additional circumstance bearing on statutory damages.[19]

[19] The Court does not, however, rely on the 2024 consent order in determining damages under § 6113. As with the liability analysis, the parties did not sufficiently develop at trial or in their post-trial briefing how the requirements or findings described in that 2024 order bear on the statutory damages amount, including any basis for using the order to establish quantity, or otherwise determine the damages attributable to Fay's violations.

Weighing these factors together where the evidence establishes a persistent pattern of intentional, false foreclosure representations repeated across multiple communications.

The Court concludes that $10,000 in statutory damages is warranted.

## CONCLUSION

In light of the foregoing findings of fact and conclusions of law, the Court enters judgment in MFRA's favor on Count I in the Note Action to the extent set forth herein and awards $319,798.42. The Court enters judgment in Ms. Howe's favor on Counts II, III, and IV in the Note Action.

In the Foreclosure Action, the Court enters judgment on Count I in favor of Ms. Howe. As a result, MFRA's motion for default judgment against defaulted parties-in-interest Asset Acceptance and Credit Acceptance (ECF No. 106) requesting the Court determine the order of priority and other related matters is **MOOT**.

As to Ms. Howe's counterclaims, the Court grants judgment in her favor on Counts I and II. The Court **AWARDS** her $14,500 in damages. Finally, the Court **DENIES** Ms. Howe's motion for judicial notice with prejudice (ECF No. 142) and **DENIES AS MOOT** her motion in limine. (ECF No. 137).

**SO ORDERED.**

Dated this 15th day of September, 2026.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**